## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 16-31928** |
| | § | |
| **ENERGY XXI LTD, *et al.*,** | § | **(Chapter 11)** |
| | § | |
| | § | **Jointly Administered** |
| **Debtors.**[1] | § | **Related to Docket Nos. 328 & 398** |
| | § | |

### NOTICE OF FILING OF CLEAN AND BLACKLINE
### VERSIONS OF THE AMENDED DISCLOSURE STATEMENT FOR THE
### DEBTORS' PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE** that on May 20, 2016, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") filed the *Disclosure Statement for the Debtors' Proposed Joint Chapter 11 Plan of Reorganization* [Docket No. 328] (the "***Disclosure Statement***").

**PLEASE TAKE FURTHER NOTICE** that contemporaneously herewith, the Debtors are filing the *Amended Disclosure Statement for the Debtors' Proposed Joint Chapter 11 Plan of Reorganization* (the "***Amended Disclosure Statement***"), attached hereto as **Exhibit A**.  Also attached hereto as **Exhibit B** is a blackline of the Amended Disclosure Statement, showing changes made from the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights and remedies with respect to the Amended Disclosure Statement including, but not limited to, the right to amend, modify and/or supplement the Amended Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that if you would like to obtain a copy of the Amended Disclosure Statement, or related documents, please contact the Debtors' solicitation agent, Epiq Bankruptcy Solutions, LLC (the "***Solicitation Agent***"), (a) by calling (646) 282-2500 or (866) 734-9393 (toll free), or (b) by sending an email to tabulation@epiqsystems.com with "EXXI" in the subject line and requesting a copy be provided to you.  You may also obtain copies of such documents free of charge by visiting the Solicitation Agent's website at http://dm.epiq11.com/Energy XXI.

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Anglo-Suisse Offshore Pipeline Partners, LLC (9562), Delaware EPL of Texas, LLC (9562), Energy Partners Ltd., LLC (9562), Energy XXI GOM, LLC (0027), Energy XXI Gulf Coast, Inc. (8595), Energy XXI Holdings, Inc. (1638), Energy XXI, Inc. (2108), Energy XXI Leasehold, LLC (8121), Energy XXI Ltd (9286), Energy XXI Natural Gas Holdings, Inc. (7517), Energy XXI Offshore Services, Inc. (4711), Energy XXI Onshore, LLC (0308), Energy XXI Pipeline, LLC (5863), Energy XXI Pipeline II, LLC (8238), Energy XXI Services, LLC (3999), Energy XXI Texas Onshore, LLC (0294), Energy XXI USA, Inc. (8552), EPL of Louisiana, L.L.C. (9562), EPL Oil & Gas, Inc. (9562), EPL Pioneer Houston, Inc. (9749), EPL Pipeline, L.L.C. (1048), M21K, LLC (3978), MS Onshore, LLC (8573), Natural Gas Acquisition Company I, LLC (0956), Nighthawk, L.L.C. (9562), and Soileau Catering, LLC (2767).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  1021 Main Street, Suite 2626, Houston, Texas 77002.

US 4374040

Dated: June 14, 2016
Houston, Texas

**VINSON & ELKINS LLP**

By:   */s/ Reese A. O'Connor*
Harry A. Perrin (TX 15796800)
Bradley R. Foxman (TX 24065243)
Reese A. O'Connor (TX 24092910)
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Tel:  713.758.2222
Fax:  713.758.2346
hperrin@velaw.com; bfoxman@velaw.com;
roconnor@velaw.com

- and -

Paul E. Heath (TX 09355050)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
Tel:  214.220.7700
Fax: 214.999.7787
pheath@velaw.com

- and -

David S. Meyer (admitted *pro hac vice*)
Jessica C. Peet (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel:  212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com; jpeet@velaw.com;
lkanzer@velaw.com

**ATTORNEYS FOR THE DEBTORS**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on June 14, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>  /s/ Reese A. O'Connor       </u>
One of Counsel

US 4374040

## EXHIBIT A

**Amended Disclosure Statement**

**(Clean)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 16-31928** |
| | § | |
| **ENERGY XXI LTD,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| | § | **Jointly Administered** |
| **Debtors.**[1] | § | |

**AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS'
PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

Harry A. Perrin (TX 15796800)
Bradley R. Foxman (TX 24065243)
Reese A. O'Connor (TX 24092910)
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760

David S. Meyer (admitted *pro hac vice*)
Jessica C. Peet (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040

Paul E. Heath (TX 09355050)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201

**VINSON & ELKINS LLP
ATTORNEYS FOR THE DEBTORS**

**Dated:  June 14, 2016**

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Anglo-Suisse Offshore Pipeline Partners, LLC (9562), Delaware EPL of Texas, LLC (9562), Energy Partners Ltd., LLC (9562), Energy XXI GOM, LLC (0027), Energy XXI Gulf Coast, Inc. (8595), Energy XXI Holdings, Inc. (1638), Energy XXI, Inc. (2108), Energy XXI Leasehold, LLC (8121), Energy XXI Ltd (9286), Energy XXI Natural Gas Holdings, Inc. (7517), Energy XXI Offshore Services, Inc. (4711), Energy XXI Onshore, LLC (0308), Energy XXI Pipeline, LLC (5863), Energy XXI Pipeline II, LLC (8238), Energy XXI Services, LLC (3999), Energy XXI Texas Onshore, LLC (0294), Energy XXI USA, Inc. (8552), EPL of Louisiana, L.L.C. (9562), EPL Oil & Gas, Inc. (9562), EPL Pioneer Houston, Inc. (9749), EPL Pipeline, L.L.C. (1048), M21K, LLC (3978), MS Onshore, LLC (8573), Natural Gas Acquisition Company I, LLC (0956), Nighthawk, L.L.C. (9562), and Soileau Catering, LLC (2767).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  1021 Main Street, Suite 2626, Houston, Texas 77002.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF ENERGY XXI AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN SECOND LIEN NOTEHOLDERS, AND ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH

STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND THESE STATEMENTS, INCLUDING THOSE RELATING TO THE INTENT, BELIEFS, PLANS OR EXPECTATIONS OF THE COMPANY ARE BASED UPON CURRENT EXPECTATIONS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS (THE "BANKRUPTCY COURT").

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................................ 1

II. OVERVIEW OF THE DEBTORS' OPERATIONS ............................................................... 5

    A.      The Debtors' Business .......................................................................................... 5

    B.      The Debtors' History ............................................................................................ 6

    C.      The Debtors' Corporate Structure ....................................................................... 7

    D.      The Debtors' Operations ...................................................................................... 7

    E.      Regulation of the Debtors' Business ................................................................... 8

    F.      Directors and Officers.......................................................................................... 9

    G.      The Debtors' Capital Structure .......................................................................... 10

III. KEY EVENTS LEADING TO CHAPTER 11 CASES ....................................................... 14

    A.      Commodities Downturn and Industry Distress .................................................. 14

    B.      Deleveraging Initiatives ..................................................................................... 15

    C.      Restructuring Negotiations ................................................................................. 16

    D.      The Restructuring Support Agreement ............................................................... 16

IV. DEVELOPMENTS AND ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES........... 18

    A.      First Day Pleadings............................................................................................. 18

    B.      Other Administrative Motions and Retention Applications ............................... 20

    C.      Appointment of Official Committee .................................................................. 21

    D.      Ad Hoc Group of EPL Noteholders .................................................................. 21

    E.      Cash Collateral.................................................................................................... 21

    F.      RSA Assumption Motion.................................................................................... 22

    G.      Motion to Appoint Equity Committee ............................................................... 22

    H.      Claims Bar Date.................................................................................................. 23

    I.      Schedules of Assets and Liabilities and Statements of Financial Affairs......................... 23

    J.      Assumption and Rejection of Executory Contracts and Unexpired Leases...................... 23

    K.      Litigation Matters .............................................................................................. 23

V. SUMMARY OF THE PLAN ..................................................................................................... 24

    A.      Administrative Claims, Professional Fee Claims, and Priority Claims ............................ 24

    B.      Classification of Claims and Interests................................................................ 26

    C.      Treatment of Claims and Interests ..................................................................... 27

    D.      Means for Implementation of the Plan................................................................ 34

    E.      Treatment of Executory Contracts and Unexpired Leases................................. 42

    F.      Provisions Governing Distributions.................................................................... 45

G.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ..................... 50

H.     Settlement, Release, Injunction, and Related Provisions ................................................ 52

I.     Conditions Precedent to Confirmation and Consummation of the Plan ......................... 62

J.     Modification, Revocation, or Withdrawal of the Plan ..................................................... 64

K.     Retention of Jurisdiction .................................................................................................. 65

L.     Miscellaneous Provisions ................................................................................................ 67

VI. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES
LAWS ...................................................................................................................................... 70

A.     Legends ............................................................................................................................ 71

VII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ...................................................................................................................................... 71

A.     Introduction ...................................................................................................................... 71

B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ................... 73

C.     Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of
Claims .............................................................................................................................. 74

D.     Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of
Claims .............................................................................................................................. 78

E.     Information Reporting and Back-Up Withholding ........................................................... 82

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ............................................................ 83

A.     Certain Bankruptcy Law Considerations ......................................................................... 83

B.     Additional Factors Affecting the Value of the Reorganized Debtors ............................... 86

C.     Risks Relating to the Debtors' Business and Financial Condition ................................... 86

D.     Factors Relating to Securities to Be Issued Under the Plan .............................................. 88

E.     Additional Factors ........................................................................................................... 89

IX. VOTING PROCEDURES AND REQUIREMENTS .................................................................. 90

A.     Parties Entitled to Vote .................................................................................................... 90

B.     Voting Procedures ............................................................................................................ 91

C.     Voting Deadline ................................................................................................................ 91

D.     Waivers of Defects, Irregularities, etc. ............................................................................ 92

X. CONFIRMATION OF THE PLAN ............................................................................................. 93

A.     Confirmation Hearing ...................................................................................................... 93

B.     Objections To Confirmation ............................................................................................. 93

C.     Requirements for Confirmation of the Plan ..................................................................... 95

D.     Best Interests Test/Liquidation Analysis ......................................................................... 96

E.     Feasibility ......................................................................................................................... 97

F.     Acceptance by Impaired Classes ..................................................................................... 97

G.      Additional Requirements for Nonconsensual Confirmation ............................................... 98

H.      Valuation of the Debtors ..................................................................................................... 98

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................... 99

A.      Alternative Plan of Reorganization ..................................................................................... 99

B.      Sale Under Section 363 of the Bankruptcy Code ............................................................. 99

C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ................................ 99

XII. CONCLUSION AND RECOMMENDATION ................................................................................... 99

## EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Corporate Structure Chart

EXHIBIT D    Disclosure Statement Order

EXHIBIT E    Liquidation Analysis

EXHIBIT F    Financial Projections

EXHIBIT G    Valuation Analysis

## I.  INTRODUCTION

Energy XXI Ltd ("***Energy XXI***") and its 25 debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***") submit this disclosure statement (the "***Disclosure Statement***") pursuant to section 1125 of title 11 of the Bankruptcy Code in connection with the solicitation of votes on the *Debtors' Proposed Joint Chapter 11 Plan of Reorganization*, dated May 20, 2016 (the "***Plan***," attached hereto as **Exhibit A**).[2]  The Plan constitutes a separate chapter 11 plan for Energy XXI and each of the other Debtors.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.

The Debtors are commencing this solicitation after extensive discussions over the past several months among the Debtors and certain of their key creditor constituencies.   As a result of these negotiations, certain creditors holding approximately 63% of the Debtors' Second Lien Notes Claims entered into a restructuring support agreement (the "***Restructuring Support Agreement***") with the Debtors, a copy of which is attached hereto as **Exhibit B**.  Under the terms of the Restructuring Support Agreement, the Second Lien Noteholders who are, or later become, signatories to the Restructuring Support Agreement have agreed to a deleveraging transaction that would restructure the existing debt obligations of the Debtors in chapter 11 through the Plan (the "***Restructuring***").  The Restructuring is also supported by the Bureau of Ocean Energy Management ("***BOEM***") insofar as the Debtors represent that the Restructuring will permit the Debtors (and the Reorganized Debtors) to meet their obligations as offshore lessees and operators, including those obligations relating to financial assurance and decommissioning.

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes:  (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* Section V—Summary of the Plan below.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|-------|--------------------------|-----------|------------------------|---------------|--------------------|
| 1 | Other Priority Claims | Payment in full in Cash or such other treatment as may be agreed to by the holder, the Debtors, and the Majority Restructuring Support Parties | Unimpaired | Presumed to Accept | 100% |

---

[2]       Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

1

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|---|---|---|---|---|---|
| 2 | Other Secured Claims | Payment in full in Cash, Reinstatement, return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or such other treatment as may be agreed to by the holder, the Debtors, and the Majority Restructuring Support Parties | Unimpaired | Presumed to Accept | 100% |
| 3 | Secured Tax Claims | Payment in full in Cash, Reinstatement, return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or such other treatment as may be agreed to by the holder, the Debtors, and the Majority Restructuring Support Parties | Unimpaired | Presumed to Accept | 100% |
| 4 | EXXI Holdings Promissory Note Claims | Reinstated | Unimpaired | Presumed to Accept | 100% |
| 5 | First Lien Claims | Letters of credit other than the Exxon LCs shall be Reinstated, the Exxon LCs shall be Reinstated in accordance with that certain letter agreement dated April 27, 2016, and holders shall receive their *pro rata* share of (x) the Restricted Cash and (y) the Reorganized Debtors' obligations under the Exit Facility | Impaired | Entitled to Vote | 100% |
| 6 | Second Lien Notes Claims | *Pro rata* share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package | Impaired | Entitled to Vote | 24.8 – 36.6%[3] |
| 7 | EGC Unsecured Notes Claims | *Pro rata* share of the EGC Warrant Package Allocation; *provided, however* that if Class 7 votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan | Impaired | Entitled to Vote | 1.2 – 4.6% |
| 8 | EPL Unsecured Notes Claims | *Pro rata* share of the EPL Warrant Package Allocation; *provided, however* that if Class 8 votes to reject the Plan, holders of EPL Unsecured Notes Claims will not receive a distribution under the Plan | Impaired | Entitled to Vote | 0.2 – 0.9% |

---

[3]    The Second Lien Notes Claims include any Claim against the Debtors on account of the Second Lien Notes, including the Second Lien Notes Deficiency Claim and Second Lien Notes Guaranty Claim.  The projected recovery to holders of Second Lien Notes is approximately 1.2-4.6% on account of the Second Lien Notes Deficiency Claim and 0.2-0.8% on account of the Second Lien Notes Guaranty Claim.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|-------|--------------------------|-----------|------------------------|---------------|---------------------|
| 9 | EXXI Convertible Notes Claims | *Pro rata* share of the EXXI Warrant Package Allocation; *provided, however* that if Class 9 votes to reject the Plan, holders of EXXI Convertible Notes Claims will not receive a distribution under the Plan | Impaired | Entitled to Vote | 0.2 – 0.8% |
| 10 | Trade Claims | At the holder's election, either (A) such holder's Trade Claim Settlement Distribution (which election shall constitute the Trade Claim Settlement Release), which will be paid on the later of (i) the Effective Date and (ii) the date such Trade Claim becomes allowed or (B) Cash in the amount of its Secured Allowed Trade Claim (only to the extent the Bankruptcy Court or such other court of competent jurisdiction enters a Final Order finding that such Allowed Trade Claim is Secured), which will be paid in two parts, first on or about the date such Trade Claim is determined to be Secured pursuant to a Final Order, and then on the last Business Day of the following calendar quarter. | Impaired | Entitled to Vote | 75 – 100% |
| 11 | General Unsecured Claims | *Pro rata* share of the General Unsecured Claims Distribution | Impaired | Entitled to Vote | 0.2 – 4.6% |
| 12 | Section 510(b) Claims | No distribution | Impaired | Not Entitled to Vote | 0% |
| 13 | Intercompany Claims | Reinstated, or at the Reorganized Debtors' option cancelled | Unimpaired / Impaired | Not Entitled to Vote | N/A |
| 14 | Intercompany Interests | Reinstated, or at the Reorganized Debtors' option cancelled | Unimpaired / Impaired | Not Entitled to Vote | N/A |
| 15 | EXXI Interests | Extinguished | Impaired | Deemed to Reject | 0% |

All holders of Claims are encouraged to read Section V—Summary of the Plan below in its entirety, but certain important features of the treatment of Claims and Interests are highlighted here:

- Holders of Class 7 EGC Unsecured Notes Claims shall receive their *pro rata* share of the EGC Warrant Package Allocation if the class of Class of EGC Unsecured Notes Claims votes to accept the Plan. **If the class of EGC Unsecured Notes Claims votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan.**

- Holders of Class 8 EPL Unsecured Notes Claims shall receive their *pro rata* share of the EPL Warrant Package Allocation if the class of Class of EPL Unsecured Notes Claims

**the Plan, holders of EPL Unsecured Notes Claims will not receive a distribution under the Plan.**

- Holders of Class 9 EXXI Convertible Notes Claims shall receive their *pro rata* share of the EXXI Warrant Package Allocation if the class of Class of EXXI Convertible Notes Claims votes to accept the Plan. **If the class of EXXI Convertible Notes Claims votes to reject the Plan, holders of EXXI Convertible Notes Claims will not receive a distribution under the Plan.**

- A holder of a Class 10 Trade Claim may elect to receive such holder's Trade Claim Settlement Distribution, which will be paid on the later of (i) the Effective Date and (ii) the date such Trade Claim becomes allowed. If the holder of a Trade Claim elects to receive such holder's Trade Claim Settlement Distribution, (a) such election shall constitute the Trade Claim Settlement Release and (b) such holder shall be deemed to assign its Trade Claims to the Reorganized Debtors.

- If a holder of a Class 10 Trade Claim elects not to receive the Trade Claim Settlement Distribution, the holder will receive Cash in the amount of its Secured Allowed Trade Claim only to the extent the Bankruptcy Court or such other court of competent jurisdiction enters a Final Order finding that such Allowed Trade Claim is Secured.  The Cash will be paid in two parts, first on or about the date such Trade Claim is determined to be Secured pursuant to a Final Order, and then on the last Business Day of the following calendar quarter.

    **WHERE TO FIND ADDITIONAL INFORMATION**:  Energy XXI currently files annual, quarterly and current reports, proxy statements, and other information with the Securities and Exchange Commission (the "*SEC*").  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  The information included in the following filings incorporated by reference is deemed to be part of this Disclosure Statement, except for any information superseded or modified by information contained expressly in this Disclosure Statement.  You should not assume that the information in this Disclosure Statement is current as of any date other than the date on the first page of the Disclosure Statement.  Any information Energy XXI files under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1933, as amended, that updates information in the filings incorporated by reference will update and supersede that information:

- Annual Report on Form 10-K for the fiscal year ended June 30, 2015, filed on September 29, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015, filed on November 9, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2015, filed on February 16, 2016;

- Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2016, filed on May 10, 2016; and

- Current Reports on Form 8-K filed October 15, 2015, March 1, 2016, March 4, 2016, March 7, 2016, March 15, 2016, April 14, 2016, April 20, 2016, and May 18, 2016.

**DECIDING HOW TO VOTE ON THE PLAN**:  All holders of Claims are encouraged to read this Disclosure Statement, its exhibits, and the Plan carefully and in their entirety before, if applicable, deciding to vote either to accept or to reject the Plan.  This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan and developments concerning the Chapter 11 Cases.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE **VOTING DEADLINE OF [__:__] A.M./P.M., PREVAILING CENTRAL TIME, ON [____], 2016**, UNLESS EXTENDED BY THE DEBTORS.  IF YOU HOLD YOUR CLAIMS THROUGH A NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE FOR RETURNING YOUR VOTING INSTRUCTIONS.  UNLESS OTHERWISE INSTRUCTED, PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE OR YOUR VOTE WILL NOT BE COUNTED.

**EACH BALLOT ADVISES THAT CREDITORS WHO (A) VOTE TO ACCEPT THE PLAN OR (B) DO NOT VOTE OR VOTE TO REJECT THE PLAN AND DO NOT ELECT TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS SET FORTH IN ARTICLE VIII OF THE PLAN AND UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CAUSES OF ACTION.  CREDITORS WHO DO NOT GRANT THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN WILL NOT RECEIVE THE BENEFIT OF THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN.**

ARTICLE IX OF THIS DISCLOSURE STATEMENT PROVIDES ADDITIONAL DETAILS AND IMPORTATION INFORMATION REGARDING VOTING PROCEDURES AND REQUIREMENTS.  PLEASE READ ARTICLE IX OF THIS DISCLOSURE STATEMENT CAREFULLY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

---

**THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.  THE DEBTORS AND THE AD HOC COMMITTEE OF SECOND LIEN NOTEHOLDERS BELIEVE THAT THE PLAN MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND REPRESENTS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  FURTHER, THE PLAN HAS THE SUPPORT OF BOEM, A SIGNIFICANT PARTY IN INTEREST IN THESE CHAPTER 11 CASES.**

---

## II. OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    The Debtors' Business

Energy XXI is a publicly-traded, independent oil and natural gas exploration and production company founded by John D. Schiller, Jr. and two other investors.  Energy XXI and the other debtors , all of which are indirect wholly-owned domestic subsidiaries of Energy XXI, (collectively, the "**Company**") historically have engaged in the acquisition, exploration, development, and operation of oil and natural gas properties primarily offshore on the Gulf of Mexico Shelf (the "**GoM Shelf**"), as well as onshore in Louisiana.  Headquartered in Houston, Texas, the Debtors currently employ approximately 250 full-time employees, and utilize the services of an additional 1,000 specialized and trained field workers and

engineers through third-party service providers.  Based on production volume, the Debtors are one of the largest publicly-traded, independent operators on the GoM shelf.

As of March 31, 2016, the Company reported total assets of approximately $1.20 billion on its unaudited consolidated balance sheet, of which approximately $317 million were current assets.  The remaining $885 million in reported assets related primarily to oil and gas properties, other property and equipment, restricted cash, and other assets.   The Company reported consolidated net losses of approximately $1.72 billion for the nine months ended March 31, 2016.

### B.      The Debtors' History

Energy XXI was founded in July 2005 as an exempted company under the laws of Bermuda to serve as a vehicle for the acquisition of oil and gas reserves and related assets.  Since Energy XXI's formation, it has completed acquisitions and divestitures for aggregate cash consideration of more than $5 billion.  Energy XXI's most recent acquisitions are highlighted below.

### 1.      *EPL Acquisition*

Energy XXI's most recent significant acquisition was of EPL Oil & Gas, Inc., a Delaware corporation ("*EPL*").  The EPL acquisition was completed on June 3, 2014, just before the precipitous decline in oil and gas prices, for approximately $2.3 billion, including the assumption of EPL debt.[4]  The EPL acquisition involved a merger whereby EPL became a wholly-owned subsidiary of Energy XXI Gulf Coast, Inc., a Delaware corporation and indirect wholly-owned subsidiary of Energy XXI ("*EGC*").  The assets acquired in the EPL acquisition are located on the GoM Shelf.

In connection with the EPL acquisition, each EPL stockholder had the right to elect to receive, for each share of EPL common stock held by that stockholder:  (a) cash, (b) Energy XXI common stock, or (c) a combination of cash and Energy XXI common stock.  Approximately 65% of the aggregate merger consideration was paid in cash and approximately 35% was paid in Energy XXI common stock.

Additionally, in connection with the acquisition of EPL, the Company's First Lien Credit Agreement was amended on September 5, 2014 (the "*Ninth Amendment*").  The Ninth Amendment increased the borrowing base under the First Lien Credit Agreement from $1.2 billion to $1.5 billion and established a separate sub-facility for EPL with a borrowing base of $475 million.[5]  At the time of the EPL acquisition, EPL had $510 million in aggregate principal amount of 8.25% senior unsecured notes due February 15, 2018, which were left in place at EPL post-merger, and as a result, became a part of the Company's capital structure.  As further described herein, this structure has resulted in debt obligations at both EPL and EGC[6] on account of EPL's assets.

---

[4]      In connection with the closing of the EPL transaction, EPL acquired an asset package consisting of certain shallow-water central GoM Shelf oil and natural gas interests in the South Pass 49 field from Energy XXI GOM for cash consideration of approximately $230 million.

[5]      The First Lien Credit Agreement was further amended, to among other things reduce the overall borrowing base and the EPL sub-facility, but the concept of an EPL sub-facility remains in place.

[6]      Energy XXI is also the obligor on certain senior unsecured convertible notes, which remain outstanding.

2. *M21K Acquisition*

Energy XXI GOM, LLC, a Delaware limited liability company and indirect wholly-owned subsidiary of Energy XXI ("***Energy XXI GOM***") completed the acquisition of M21K, LLC ("***M21K***") in August 2015, pursuant to a stock purchase agreement whereby Energy XXI GOM acquired all of the remaining equity interests of M21K for consideration consisting of the assumption of all obligations and liabilities of M21K, including approximately $25.2 million associated with M21K's first lien credit facility, which was required to be paid at closing. Prior to this transaction, Energy XXI had owned a 20% interest in M21K though its investment in Energy XXI M21K, LLC.

**C.    The Debtors' Corporate Structure**

All of the Debtors are direct or indirect subsidiaries of Energy XXI. The Company's full corporate organization structure is detailed on **<u>Exhibit C</u>**, attached hereto. The following simplified organization chart depicts the Company's main business silos:



**D.    The Debtors' Operations**

The Company is primarily an oil-focused company, with more than 740,000 acres of leasehold interests. To that end, the Company owns and operates nine of the largest GoM Shelf oil fields ranked by total production: the West Delta 73 Field, the West Delta 30 Field, the South Timbalier 54 Field, the Grand Isle 16/18 Fields, the Main Pass 61/78 Fields, the Ship Shoal 208 Field, the South Pass 49 Field, the South Pass 78 Field, and the South Timbalier 21/54 fields.

Because the Company operates approximately 97% of its proved reserves, it is able to exercise significant control over the optimization of production, the timing and amount of capital expenditures, as well as the costs of its projects. Further, the Company's geographic concentration in the GoM Shelf enables the Company to realize cost synergies and more efficiently service its operations.

The Company markets substantially all of the oil and natural gas production from the properties it operates. The majority of this production is sold to a variety of purchasers under short-term contracts (less than 12 months) at market-based prices. As of the Petition Date, the Company's largest customers—Shell Trading Company, Chevron USA, and Trafigura Trading, LLC—accounted for approximately 75% of the Company's total oil and natural gas revenues.

Because the Company's revenues from production are driven largely by market-based prices, the Company historically has entered into hedging transactions to protect against fluctuations in commodity prices. These transactions have included pricing collars (a combination put and call option that locks in a fixed price range), puts and put spreads, and swap transactions. For the calendar year 2016, the Company had entered into oil price collars covering 14,000 barrels per day, as well as monthly three-way natural gas collars. These hedging transactions were terminated and monetized in March 2016 in connection with a waiver and amendment to the First Lien Credit Agreement. As of the Petition Date, the Company did not have any open hedge transactions.

The Company's operations are concentrated at three entities, Energy XXI GOM, LLC, a subsidiary of EGC, M21K, and EPL. Debtor Energy XXI Services, LLC ("**EXXI Services**") provides certain shared services to these entities and others, including management, legal, accounting, corporate secretarial, human resources, employee benefit administration, office space and other furniture and equipment management, and other support services. The costs of the services provided by EXXI Services are charged to certain of the other Debtors who utilize the services pursuant to an intercompany services and cost allocation agreement, dated June 3, 2014. For example, in the three months ended December 31, 2015 approximately $9 million was allocated to EPL, of which approximately $7.5 million was included in general and administrative expense.

### E.     Regulation of the Debtors' Business

#### 1.     *Outer Continental Shelf Regulations*

The Company's operations on the GoM Shelf include a substantial number of oil and gas leases issued by the U.S. Department of the Interior. Operation of these leases is subject to regulation by BOEM and the Bureau of Safety and Environmental Enforcement ("**BSEE**"), and requires compliance with BOEM and BSEE regulations and orders issued pursuant to various federal laws, including the Outer Continental Shelf Lands Act. For offshore operations, lessees must obtain BOEM approval for exploration, development and production plans prior to the commencement of such operations. In addition to permits required from other agencies such as the U.S. Environmental Protection Agency, lessees must obtain a permit from BSEE prior to commencing drilling and comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, plugging and abandonment of wells on the Outer Continental Shelf (the "**OCS**"), and removal of infrastructure facilities.

To cover the various obligations of lessees on the OCS, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production, BOEM generally requires that lessees post substantial bonds or provide other acceptable assurances that such obligations will be met, unless BOEM exempts the lessee from such financial assurance requirements. In order to demonstrate its financial capability and provide assurances to BOEM, the Company is required to, among other things, provide surety bonds. As of the Petition Date, the Debtors had approximately $388 million in outstanding surety bonds, of which approximately $226 million are lease and/or area bonds issued to BOEM and the remainder to third parties. Additionally, Energy XXI GOM has delivered $225 million in issued, undrawn letters of credit in favor of Exxon Mobil Corporation ("**Exxon**"), the purpose of which is to guarantee any actual plugging and abandonment expenditures with respect to certain properties that Energy XXI GOM purchased from Exxon.[7] Because the Company would be unable to operate its federal

---

[7]     Under a purchase and sale agreement dated December 1, 2010, Energy XXI GOM was required to deliver to Exxon three $75 million letters of credit to guarantee Energy XXI GOM's plugging and abandonment obligations with respect to the purchased properties. These letters of credit will be re-determined at three

leases without satisfying its financial assurance obligations to BOEM, the Company's surety bond program is vitally important to its operations.

### 2. *BOEM Long Range Plan*

In April 2015, the Company received letters from BOEM stating that certain of its subsidiaries no longer qualified for the waiver of certain supplemental bonding requirements for potential offshore decommissioning and plugging and abandonment liabilities, and instead would be required to develop a tailored, long-term financial assurance plan to satisfy BOEM's new Notice to Lessees, or NTL, regarding financial assurances. The letters notified Energy XXI that certain of its subsidiaries would be required to provide approximately $1.0 billion in supplemental financial assurance and/or bonding for their offshore oil and gas leases, rights-of-way, and rights-of-use and easements. In June 2015, the Company reached an interim agreement with BOEM, whereby it provided $150.0 million of supplemental bonds issued to BOEM.

In October 2015, the Company received information from BOEM indicating that the Company could receive additional demands of supplemental financial assurance for amounts in addition to the $1.0 billion initially sought by the BOEM in April 2015, primarily relating to certain properties that were no longer exempt from supplemental bonding as a result of co-lessees losing their exemptions. After receiving this additional information from BOEM in October 2015, the Company had a series of discussions and exchanges of information with BOEM on the long-term financial assurance plan. In November 2015, Energy XXI submitted an initial proposal for a long-term plan to BOEM, and received a counter proposal at the end of the month. While the Company continued to work with BOEM on a long-term plan, the Company provided an additional $21 million of supplemental bonds to BOEM in December 2015.

The Company's discussions with BOEM culminated in the Company's submission of an updated version of the long-term financial assurance plan to BOEM for approval on February 2, 2016. BOEM accepted the revised plan on February 25, 2016. The long-term plan does not require any immediate additional bonding, but prior to July 1, 2016 the Company must develop a plan with respect to providing financial assurance for certain properties with co-lessees, as well as comply with certain other insurance and financial security obligations.

As noted in the Restructuring Support Agreement, it is anticipated that the Debtors will continue to (a) fund and perform plugging and abandonment work as contemplated in their Iron Idle Plan and (b) perform their obligations under that certain Long Range Plan agreed to between the Company and BOEM and dated February 25, 2016 during the pendency of the chapter 11 cases and in connection with consummation of the Restructuring.

### F. Directors and Officers

Energy XXI's current board of directors is composed of James LaChance, Chairman, William Colvin, Cornelius Dupré, II, Hill A. Feinberg, Kevin Flannery, Scott A. Griffiths, and John D. Schiller, Jr.

EGC's current board of directors is composed of Bruce W. Busmire, John D. Schiller, Jr. and George C. Morris. Mr. Morris was appointed on March 29, 2016 as an additional member of the EGC board of directors, and as the sole member of an independent Special Committee of the EGC Board, was tasked with reviewing and evaluating, in connection with any potential restructuring transaction, the

---

year intervals such that the next redetermination will commence thirty days prior to the date that is three years from the Effective Date.

treatment of the EGC Unsecured Notes and the Second Lien Notes, the treatment of the EGC Intercompany Note, and any matters on which an actual conflict exists between EGC and its subsidiaries (other than EPL and its subsidiaries), on the one hand, and Energy XXI or its direct and indirect subsidiaries (with the exception of EGC and its direct subsidiaries, other than EPL and its subsidiaries), on the other hand.

EPL's current board of directors is composed of Bruce W. Busmire, John D. Schiller, Jr. and James R. Latimer, III. Mr. Latimer was appointed on March 8, 2016 as an additional member of the EPL board of directors, and as the sole member of an independent Special Committee of the EPL Board, is tasked with reviewing and evaluating, in connection with any potential restructuring transaction, the treatment of the EPL Unsecured Notes, the treatment of the EGC Intercompany Note, and any matters on which an actual conflict exists between EPL and any of the other Debtors.

Energy XXI's current senior management team is composed of John D. Schiller, Jr., President and Chief Executive Officer; Bruce W. Busmire, Chief Financial Officer; Antonio de Pinho, Chief Operating Officer; Hugh Menown, Executive Vice President and Chief Accounting Officer; Keith Acker, Senior Vice President—Production; Tom O'Donnell, Senior Vice President—Exploitation & Exploration; Kamil Lodhi, Senior Vice President—Corporate Planning and Business Development; Bo Boyd, Senior Vice President—Legal & Corporate Secretary; Rick Fox, Senior Vice President—Controller; Kerry McDonough, Senior Vice President—Human Resources and Administration; Glen Priestley, Vice President—Treasury.

The composition of the board of directors and identity of the officers of each Reorganized Debtor, as well as the nature of any compensation to be paid to any director or officer who is an "insider" under the Bankruptcy Code, will be disclosed prior to the entry of the order confirming the Plan in accordance with 11 U.S.C. § 1129(a)(5).

### G.     The Debtors' Capital Structure

#### 1.     *Equity Ownership*

##### (a)     **Preferred Stock**

As of March 31, 2016, Energy XXI had issued and outstanding approximately 692,450 shares of 5.625% Perpetual Convertible Preferred Stock and approximately 3,000 shares of 7.25% Perpetual Convertible Preferred Stock (collectively, the "***Preferred Stock***"). Dividends on all Preferred Stock are payable quarterly and may be payable in cash, shares of common stock, or a combination thereof. In the event of a liquidation, winding-up or dissolution of the Company, holders of the Preferred Stock are entitled to receive a liquidation preference of $250 and $100 per share, respectively, plus any accumulated or accrued dividends to be paid out of the assets of the Company available for distribution before any payment is made to the Company's common stockholders. At the close of the quarter ended March 31, 2016, the Company suspended the quarterly dividends on its Preferred Stock.

##### (b)     **Common Stock**

As of the Petition Date, the Company has 97,507,056 outstanding shares of common stock, par value $0.005 per share. Since August 2007, the ordinary shares of Energy XXI have been traded on the NASDAQ Global Select Market (the "***NASDAQ***") under the symbol "EXXI." On April 14, 2016, Energy XXI received a letter from The NASDAQ Listing Qualifications Staff stating that the Staff had determined that the Company's securities would be delisted from NASDAQ. The decision was reached by the Staff under NASDAQ Listing Rules 5101, 5110(b) and IM-5101-1 as a result of the Company's

announcement that it filed the Petitions (as defined below), the associated public interest concerns raised by the Petitions, concerns regarding the residual equity interest of the existing listed securities holders and concerns about the Company's ability to sustain compliance with all requirements for continued listing on NASDAQ.  The trading of the Company's common stock was suspended at the opening of business on April 25, 2016, and a Form 25-NSE was filed with the SEC on May 19, 2016, which removed Energy XXI's securities from listing and registration on NASDAQ.  The Company's common stock resumed trading on the OTC Markets Group Inc.'s OTC Pink (the "***OTC Pink***") under the symbol "EXXIQ" on April 25, 2016.

### 2.   *Prepetition Secured Indebtedness*

#### (a)   **Revolving Credit Facility**

EGC and EPL are borrowers under that certain Second Amended and Restated First Lien Credit Agreement dated as of May 5, 2011 (as amended, the "***First Lien Credit Agreement***"), between EGC, EPL, the lenders party thereto (the "***First Lien Lenders***"), and Wells Fargo Bank, N.A., as administrative agent (the "***First Lien Agent***").

The reserve-based revolving credit facility (the "***Revolving Credit Facility***") under the First Lien Credit Agreement, as amended, has a maximum facility amount and borrowing base of approximately $327.1 million.  Approximately $99.4 million of the total borrowing base is allocated to the sub-facility established for EPL under the First Lien Credit Agreement.  The remaining approximately $227.7 million borrowing base at EGC is undrawn, but committed for issued and outstanding undrawn letters of credit, including $225 million in issued, undrawn letters of credit in favor of Exxon.  Accordingly, as of the Petition Date, there was no availability to draw on the Revolving Credit Facility.  The Revolving Credit Facility bears interest on the funded amount at a base rate of 6.25%.

EGC's obligations under the Revolving Credit Facility are guaranteed by each of EGC's subsidiaries, other than EPL and its subsidiaries, and Energy XXI USA, Inc. on a limited recourse basis.  EPL's obligations under the Revolving Credit Facility are guaranteed by EGC and each of its subsidiaries (other than EPL itself), and Energy XXI USA, Inc. on a limited recourse basis.  The Revolving Credit Facility generally is secured by a first priority lien and security interests on substantially all assets and capital stock of EGC and its subsidiaries (except that EPL and its subsidiaries do not provide security for EGC's obligations, only EPL's obligations), including a security interest in EGC's cash on hand and real property mortgages on at least 90% of the value of each of the proved reserves and proved developed producing reserves of EGC and its subsidiaries.

#### (b)   **Second Lien Notes**

On March 12, 2015, EGC issued $1.45 billion aggregate principal amount of senior secured second lien notes due March 15, 2020 (the "***Second Lien Notes***").  The Second Lien Notes were issued under the indenture dated March 12, 2015 (the "***Second Lien Indenture***"), among EGC, as issuer, the guarantors, and U.S. Bank National Association, as trustee.  Interest under the Second Lien Notes is payable semi-annually in March and September, subject to a 30-day grace period.

The Second Lien Notes are guaranteed by Energy XXI, Energy XXI USA, Inc. on a limited recourse basis, MS Onshore, LLC, and Energy XXI GOM and its subsidiaries.  EPL and its subsidiaries are not guarantors of the Second Lien Notes.  The Second Lien Notes are secured by second-priority liens on substantially all assets of EGC and its subsidiaries (other than EPL and its subsidiaries) and all of Energy XXI USA, Inc.'s equity interest in EGC, in each case to the extent such assets secure the Revolving Credit Facility.

(c)      **EGC Intercompany Note**

In connection with the offering of the Second Lien Notes, on March 12, 2015, EGC provided a $325 million secured second lien loan under a promissory note between EPL, as the maker, and EGC, as the payee (the "***EGC Intercompany Note***").  The EGC Intercompany Note bears interest at an annual rate of 10%, has a maturity date of October 9, 2018, and is secured by a second priority lien on certain assets of EPL that secure EPL's obligations under the First Lien Credit Agreement.

(d)      **Unencumbered Assets**

The First Lien Lenders and Second Lien Noteholders do not have security interests in all of the Company's assets.  In particular, certain assets are either not part of the collateral package for either the First Lien Lenders or Second Lien Noteholders, are part of the collateral package, but such interest has not been perfected, or are assets pledged to other entities as collateral.  These unencumbered assets include (a) the Intercompany Note, which is not part of the First Lien Lenders' or Second Lien Noteholders' collateral package; (b) approximately $22.3 million in cash deposited in accounts that are not part of the collateral package; (c) certain real property interests not subject to mortgages or otherwise not perfected; (d) commercial tort claims (if any), security interests in which have not been perfected; and (e) other personal property that is not part of the First Lien Lenders' or Second Lien Noteholders' collateral package.

3.      ***Prepetition Unsecured Indebtedness***

(a)      **9.25% Senior Notes**

EGC is party to that certain Senior Notes Indenture, dated as of December 17, 2010, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 9.25% Senior Notes due December 15, 2017 in the aggregate principal amount of $750 million (the "***9.25% Senior Notes***").

Interest under the 9.25% Senior Notes is payable semi-annually in June and December, subject to a 30-day grace period.  The 9.25% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries.  As of the Petition Date, a total of approximately $249.45 million in face amount of the 9.25% Senior Notes was outstanding

(b)      **7.75% Senior Notes**

EGC is party to that certain Senior Notes Indenture, dated as of February 25, 2011, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 7.75% Senior Notes due February 25, 2011 in the aggregate principal amount of $250 million (the "***7.75% Senior Notes***").

Interest under the 7.75% Senior Notes is payable semi-annually in June and December, subject to a 30-day grace period.  The 7.75% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries.  As of the Petition Date, a total of approximately $101.08 million in face amount of the 7.75% Senior Notes was outstanding.

### (c)     7.50% Senior Notes

EGC is party to that certain Senior Notes Indenture, dated as of September 26, 2013, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 7.50% Senior Notes due December 15, 2021 in the aggregate principal amount of $500 million (the "*7.50% Senior Notes*").

Interest under the 7.50% Senior Notes is payable semi-annually in June and December, subject to a 30-day grace period.  The 7.50% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries.  As of the Petition Date, a total of approximately $238.07 million in face amount of the 7.50% Senior Notes was outstanding.

### (d)     6.875% Senior Notes

EGC is party to that certain Senior Notes Indenture, dated as of May 27, 2014, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 6.875% Senior Notes due March 15, 2024 in the aggregate principal amount of $650 million (the "*6.875% Senior Notes*").

Interest under the 6.875% Senior Notes is payable semi-annually in March and September, subject to a 30-day grace period.  The 6.875% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries.  As of the Petition Date, a total of approximately $143.99 million in face amount of the 6.875% Senior Notes was outstanding.

### (e)     8.25% Senior Notes

On June 3, 2014, at the time of the EPL acquisition, the Company added EPL's pre-existing $510 million in aggregate principal amount of 8.25% senior unsecured notes due February 15, 2018 (the "*EPL Unsecured Notes*") under the Indenture dated as of February 14, 2011, by and among EPL, each of the guarantors named therein, and Delaware Trust Company, as successor trustee (the "*EPL Indenture*") to its capital structure.

Interest under the EPL Unsecured Notes is payable semi-annually in February and August, subject to a 30-day grace period.  The EPL Unsecured Notes are fully and unconditionally guaranteed on an unsecured senior basis by EPL's existing and future subsidiaries.  As of Petition Date, a total of approximately $213.68 million in face amount of the EPL Unsecured Notes was outstanding.

### (f)     3.0% Senior Convertible Notes

Energy XXI is party to that certain Senior Notes Indenture, dated as of May 27, 2014, among Energy XXI and Wilmington Savings Fund Society, FSB, as successor trustee, pursuant to which the Company issued 3.0% Senior Notes due December 15, 2018 in the aggregate principal amount of $400 million (the "*Convertible Notes*").  The Convertible Notes are convertible into cash, shares of common stock, or a combination of cash and shares of common stock, at the election of Energy XXI.

Prior to the Petition Date, certain holders of the Convertible Notes exercised their conversion rights and Energy XXI elected to convert their Convertible Notes into shares of common stock.  As of the Petition Date, a total of approximately $363.02 million in face amount of the Convertible Notes was outstanding.

(g)     **Trustee Succession**

On March 30, 2016, Wilmington Trust, National Association, the successor trustee, replaced Wells Fargo Bank, National Association, the resigning trustee, as the trustee, registrar, paying agent, notes custodian, and conversion agent with respect to:  (i) the Second Lien Notes, (ii) the 9.25% Senior Notes, (iii) the 7.75% Senior Notes, (iv) the 7.50% Senior Notes, and (v) the Convertible Notes.

On May 3, 2016, Wilmington Savings Fund Society, FSB, the successor trustee, replaced Wilmington Trust, National Association as the trustee, and as of June 1, 2016, as registrar, paying agent, notes custodian and conversion agent on the Convertible Notes.

On May 17, 2016, Delaware Trust Company, the successor trustee, replaced U.S. Bank National Association as the trustee, registrar, paying agent and notes custodian on the EPL Unsecured Notes.

(h)     **Performance Bonds**

As of the Petition Date, the Debtors have approximately $388 million in outstanding surety bonds, of which approximately $226 million are lease and/or area bonds issued to BOEM, and the remainder to third parties.  In connection with these bonds, certain of the Company's sureties have required collateral to be posted pursuant to the terms of certain indemnity agreements between the sureties and the Company.  As of the Petition Date, the Company had posted collateral totaling approximately $41.75 million.  The Company has not posted any additional collateral since the Petition Date.

## III.  KEY EVENTS LEADING TO CHAPTER 11 CASES

### A.     Commodities Downturn and Industry Distress

The Company's revenue streams, earnings, and cash flows have been significantly impacted by the sustained decrease in commodity prices since the second-half of calendar year 2014.  The scale of the oil price decline cannot be overstated.  Indeed, since July 2014, NYMEX-WTI oil prices have dropped nearly 65%—from approximately $105 a barrel as of July 1, 2014 to $36.79 a barrel as of April 1, 2016.[8] Over the same period, Henry Hub spot prices for natural gas fell from approximately $4.45 per MMBtu to below $1.96 per MMBtu.[9]

These market conditions have affected oil and gas companies at every level, but exploration and production ("**E&P**") companies have been hit particularly hard.  In the United States, 35 E&P companies, with cumulative debt of nearly $18 billion, filed for bankruptcy protection between July 2014 and December 2015.[10]  And, since the start of the year through May 1, 2016, more than 25 additional independent E&P companies have filed for chapter 11, including, among others, Antero Energy Partners, LLC, Emerald Oil, Inc., Linn Energy LLC, Midstates Petroleum Company, Inc., New Source Energy Partners, LP, Osage Exploration and Development, Inc., Pacific Exploration & Production Corp., Penn Virginia Corp., Ultra Petroleum Corp., and Venoco, Inc.

---

[8]      Source:  Bloomberg.

[9]      *Id.*

[10]     *See* DELOITTE CENTER FOR ENERGY SOLUTIONS, THE CRUDE DOWNTURN FOR EXPLORATION & PRODUCTION COMPANIES 4 (2016), *available at* http://www.deloitte.com/ru/en/pages/energy-and-resources/articles/2016/the-crude-downturn-exploration-production.html#.

With the continued market instability, numerous E&P companies have been forced to stop drilling new wells—the core of an E&P company's business—and cut capital expenditures, as it is not economically feasible to undertake capital intensive projects at current prices.[11]  Others have been forced to sell off assets at severe discounts, or even stop operations altogether.  As outlined below, the Company took proactive steps to stave off such an outcome.  Notwithstanding these proactive initiatives, however, the Company along with the independent directors at EGC and EPL determined that commencing chapter 11 cases to implement the restructuring contemplated by the Restructuring Support Agreement will maximize value for its stakeholders.

### B.    Deleveraging Initiatives

Prior to the Petition Date, the Company initiated a series of operational and financial actions in reaction to the substantial and rapid decline of commodity prices, and with the goal of improving its liquidity position.  Early initiatives included:

- issuing the Second Lien Notes to reduce certain funded debt obligations and add incremental liquidity to the Company's balance sheet;

- revising the original budget for the fiscal year ended June 30, 2015 of $850-$950 million (established in July 2014) several times between November 2014 and the fourth fiscal quarter to $640-$660 million.[12]

- reducing the fiscal year 2016 capital budget to a planned amount of $155-$160 million, as compared to actual capital expenditures in fiscal year 2015 (excluding acquisition activity) of approximately $649 million;[13]

- reducing field level operating costs, and bringing lease operating costs per barrel down by 34% from first quarter of fiscal year 2015 to second quarter of fiscal year 2016;

- suspending dividends on common stock and preferred stock;

- exploring various exchange offer opportunities;

- executing non-disclosure agreements and participating in discussions with numerous financial investors regarding potential out-of-court third-party financing or refinancing transactions;

- negotiating with the First Lien Lenders for temporary relief from certain financial covenants under the First Lien Credit Agreement;

- completing asset sales; and

- repurchasing notes at significant discounts to principal amounts in open market transactions.

---

[11]    *See, e.g.*, Tess Stynes, *Anadarko Slashes Capital Spending Budget for 2016*, WALL STREET J., Mar. 1, 2016, http://www.wsj.com/articles/anadarko-slashes-capital-spending-budget-for-2016-1456846896.

[12]    Energy XXI's fiscal year runs from July 1 to June 30 of each year.  The Company is currently in the fourth quarter of fiscal year 2016.

[13]    The Debtors have subsequently increased the fiscal year 2016 capital budget.

### C.      Restructuring Negotiations

Given the uncertainty regarding future commodity prices, continued price declines, and the Company's unsustainable capital structure, Energy XXI's board of directors (the "**Board**") determined to hire PJT Partners LP ("**PJT**") and Vinson & Elkins LLP ("**V&E**") in February 2016 to explore additional strategic alternatives.   At this time, the Company and its advisors also began discussions with the First Lien Lenders and certain Second Lien Noteholders.   As the Debtors continued to evaluate all options and alternatives, the Debtors also hired Opportune LLP in February 2016 as restructuring advisor.

With the help of its advisors, the Company employed several additional strategies to ensure that its businesses were best positioned to compete in the offshore E&P industry going forward.   To achieve an orderly restructuring and maximize the value of its businesses, the Company and its advisors took a series of steps in a coordinated manner leading up to the filing of these chapter 11 cases.   These steps included:   (i) entering the grace period with respect to an approximately $8 million interest payment that was due on February 16, 2016 on the EPL Unsecured Notes; (ii) obtaining a waiver with respect to delivery of a compliance certificate under the First Lien Credit Agreement through March 14, 2016, avoiding an immediate event of default under the First Lien Credit Agreement; (iii) progressing restructuring negotiations with the advisors to the Second Lien Noteholders and the ad hoc committee of Second Lien Noteholders (the "**Ad Hoc Committee**"); (iv) appointing independent directors at EGC and EPL to ensure that the interests of their respective stakeholders were appropriately considered to guarantee a value-maximizing result; (v) making the approximately $8 million interest payment on the EPL Unsecured Notes prior to the expiration of the grace period to provide further time for negotiations with the ad hoc committee of Second Lien Noteholders and the steering committee for the RBL Lenders; (vi) obtaining an extension of the waiver with respect to delivery of a compliance certificate under the First Lien Credit Agreement through April 14, 2016, again avoiding an immediate event of default under the First Lien Credit Agreement; and (vii) entering the grace period with respect to March 15, 2016 interest payments due on the Second Lien Notes and the 6.875% Senior Notes, which totaled more than $85 million and would have significantly impacted the Company's liquidity and ability to proceed in chapter 11 without additional financing.   The Company also kept BOEM and other key stakeholders apprised of its actions throughout this period to ensure their cooperation with an orderly bankruptcy case.

### D.      The Restructuring Support Agreement

After extensive, arms'-length negotiations, the Company and the Ad Hoc Committee were able to agree on the terms of a comprehensive restructuring transaction.   The key terms of this transaction are embodied in the Restructuring Support Agreement attached hereto as **Exhibit B**, which was signed on April 11, 2016 by the Debtors and a group of Second Lien Noteholders holding approximately 63% of the face value of the Second Lien Notes.

The Debtors entered into the Restructuring Support Agreement only after a robust review process by the members of each of the Debtors' boards of directors.   Based upon regular updates to the Boards regarding the status of negotiations between the parties in the period leading up to the commencement of these chapter 11 cases, and upon rigorous review and negotiation of the Restructuring Support Agreement and the Term Sheet by the Boards, including the independent directors at EGC and EPL and their respective legal counsel, the Debtors determined that the terms of the Restructuring Support Agreement represent the best transaction available and will maximize value to all stakeholders.

The Restructuring Support Agreement contemplates that certain restructuring transactions will be implemented in accordance with terms consistent with the term sheet (the "***Term Sheet***") attached to the Restructuring Support Agreement.   The key elements of the Term Sheet include:

- **Reorganized EGC[14] becomes the New Parent and issues New Equity**. After the Effective Date, EGC becomes the "New Parent" and is referred to in the Term Sheet as "New Parent" or "Reorganized EGC." On the Effective Date, new common stock in EGC will be issued and distributed (the "**New Equity**"), and the New Parent will hold substantially all of the assets of Energy XXI and its subsidiaries.

- **Second Lien Noteholders receive the New Equity**. The Second Lien Noteholders will receive 100% of the New Equity, subject to dilution in connection with the Warrant Package and Management Incentive Plan described below.

- **Unsecured noteholders share in a Warrant Package**. The Warrant Package will consist of warrants equal to an aggregate of up to 10% of the New Equity,[15] with a maturity of 10 years and an agreed-upon strike price. The Warrant Package is divisible among the classes of EGC Unsecured Notes Claims, EPL Unsecured Notes Claims, and EXXI Convertible Notes Claims, as defined in the Term Sheet. If, however, any such class votes to reject the Plan, it will not receive a distribution thereunder.

- **CEO Schiller is retained**. John D. Schiller, Jr. has agreed to remain on the New Parent Board and to serve as the chief executive officer (the "**CEO**") of the New Parent.

- **Energy XXI files a winding-up proceeding in Bermuda**. Energy XXI will file a winding-up petition and commence an official liquidation proceeding in Bermuda under Bermudian law.

- **Restructuring takes place on an agreed schedule.** The restructuring transactions will be conducted under a timeline set forth in the Restructuring Support Agreement, which requires the Debtors to file the Plan by May 16, 2016 and the Effective Date to occur no later than September 2, 2016.

- **Releases**. The Plan will include mutual releases and exculpation provisions in favor of (a) the Debtors and their related persons, professionals, and entities, and (b) the Restructuring Support Parties and their related persons, professionals, and entities.

The Restructuring Support Agreement includes the following key milestones:[16]

- no later than May 16, 2016, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; and (iii) a motion (the "**Disclosure Statement and Solicitation Motion**") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**");[17]

---

[14]   The Debtors and the Majority Restructuring Support Parties have reserved the right to cause the New Parent to be an entity other than EGC pursuant to the Restructuring Support Agreement, and it is possible that Reorganized EGC will not be the New Parent.

[15]   This 10% is subject to dilution from the Management Incentive Plan described in the Term Sheet.

[16]   The Restructuring Support Agreement contains additional milestones that have already been satisfied.

[17]   This milestone was extended to May 20, 2016.

- no later than May 25, 2016, the Bankruptcy Court shall have entered the Final Cash Collateral Order;

- no later than July 1, 2016, the Bankruptcy Court shall have entered an order authorizing the assumption of the Restructuring Support Agreement;

- no later than July 1, 2016, (i) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion; and (ii) no later than five (5) business days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Debtors shall have commenced solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan;

- no later than August 8, 2016, the Bankruptcy Court shall have commenced the Confirmation Hearing;

- no later than August 19, 2016, the Bankruptcy Court shall have entered the Confirmation Order; and

- no later than September 2, 2016, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "***Effective Date***"), it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Plan and the Term Sheet) shall be conditions precedent to the occurrence of the Effective Date.

It is important to note that the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement. Specifically, Section 8(c) of the Restructuring Support Agreement provides that each Debtor may terminate its obligations thereunder if its board of directors (or board of managers, as applicable) determines that proceeding with the contemplated restructuring transactions "would be inconsistent with the exercise of its fiduciary duties."

## IV.  DEVELOPMENTS AND ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

Under the Restructuring Support Agreement, the Debtors agreed to commence the Chapter 11 Cases no later than April 14, 2016 (the "***Petition Date***"). The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 by September 2, 2016. ***No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.***

### A.  First Day Pleadings

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "***Petitions***"), the Debtors filed several motions (the "***First Day Pleadings***") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, insurers, and taxing authorities, among others, following the commencement of the Chapter 11 Cases. On April 15, 2016, the Bankruptcy Court entered orders approving the following First Day Pleadings on a final basis:

- *Order Directing Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 23];

- *Order Granting Complex Chapter 11 Bankruptcy Case Treatment* [Docket No. 52];

- *Order (A) Granting Authority to File a Consolidated List of Creditors; (B) Granting Authority to File a Consolidated List of 50 Largest Unsecured Creditors' (C) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (D) Setting Bar Dates* [Docket No. 53];

- *Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 54];

- *Final Order (A) Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (III) Pay Independent Contractor Obligations, and (B) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations* [Docket No. 55];

- *Final Order Authorizing the Payment of Prepetition Taxes and Fees* [Docket No. 57]; and

- *Final Order Providing Adequate Assurance of Utility Payments* [Docket No. 59].

On the same day, the Bankruptcy Court entered orders approving other First Day Pleadings on an interim basis.  On April 25, 2016, the Bankruptcy Court entered the *Final Order Authorizing the Debtors to Pay or Honor Prepetition Obligations to Critical Vendors* [Docket No. 136].

On May 19, 2016 and May 23, 2016, the Bankruptcy Court entered orders approving certain First Day Pleadings on a final basis, these included:

- *Final Order Authorizing the Debtors to Pay Prepetition Amounts Arising Under Insurance Policies* [Docket No. 346];

- *Final Order Authorizing the Debtors to Pay Prepetition Royalty and Working Interest Obligations, Delay Rentals, Joint Interest Billings, Transportation Costs, and Gas Buybacks* [Docket No. 320];

- *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates* [Docket No. 324]; and

- *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 And 507, Bankruptcy Rules 2002, 4001 and 9014 and Bankruptcy Local Rule 4001-1 (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* [Docket No. 319].

A final hearing on the Debtors' *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (C) Continue Intercompany Arrangements and (II) Granting Related Relief* [Docket No. 10] is currently scheduled for June 23, 2016.

The First Day Pleadings, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://dm.epiq11.com/EnergyXXI.

**B.      Other Administrative Motions and Retention Applications**

The Debtors intend to file several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases.  The Debtors have also filed the following applications (the "*Retention Applications*") to retain various professionals to assist them in the Chapter 11 Cases, including:

- *Application for Entry of an Order Authorizing the Retention and Employment of Vinson & Elkins LLP as the Debtors' Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 236];

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of BDO USA, LLP as Auditor for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 237];

- *Application for Entry of an Order Authorizing the Retention and Employment of Conyers Dill & Pearman Limited as Special Bermuda Counsel for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 238];

- *Application for Entry of an Order Authorizing the Retention and Employment of Gray Reed & McGraw, P.C. as Special Corporate Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 239];

- *Application for Entry of an Order Authorizing the Retention and Employment of KPMG LLP as Accounting Advisor* Nunc Pro Tunc *to the Petition Dat*e [Docket No. 240];

- *Application for Entry of an Order Authorizing the Retention and Employment of Locke Lord LLP as Special Counsel for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 241];

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Opportune LLP as Financial Advisor and Tax Advisor for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 242]; and

- *Application for Entry of an Order Authorizing the Retention and Employment of PJT Partners LP as Investment Banker for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 243] (the "***PJT Application***"); and

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Special Corporate and Compensation Counsel for the Debtors and Debtors in Possession Effective* Nunc Pro Tunc *to the Petition Date* [Docket No. 268].

The Retention Applications, other than the PJT Application, have been approved by the Court. *See* Docket Nos. 343-345 and 404-412.  A hearing on the PJT Application is scheduled for June 23, 2016.

### C. Appointment of Official Committee

On April 26, 2016, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 142], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "**Committee**") in the Chapter 11 Cases. On June 3, 2016, the U.S. Trustee filed the *Notice of Reconstituted Committee of Unsecured Creditors* [Docket No. 395], notifying parties in interest that Committee had been reconstituted to include additional members.

The Committee is currently composed of the following members: (a) Wilmington Trust, National Association, as Indenture Trustee; (b) Axip Energy Services, LP; (c) Fab-Con, Incorporated; (d) Wellbore Fishing & Rental Tools, LLC; (e) B&J Martin, Inc; (f) Wilmington Savings Fund Society, FSB, as Successor Indenture Trustee; and (g) Delaware Trust Company, as Successor Indenture Trustee. The Committee has retained Latham & Watkins LLP and Heller, Draper, Patrick, Horn & Dabney, L.L.C. as its proposed legal counsel and FTI Consulting, Inc. as its proposed financial advisor, subject to Court approval.

The Debtors and its advisors have engaged in multiple telephonic meetings with the Committee and its advisors since the Committee was appointed in order to discuss, among other things, treatment of unsecured creditors under a chapter 11 plan and the Committee's investigation. The Debtors and the Committee have scheduled at least one in-person meeting to discuss the Plan and these chapter 11 cases and anticipate further meetings will take place in the future.

### D. Ad Hoc Group of EPL Noteholders

As noted above in section III.C, the Debtors did not make an interest payment due on the EPL Unsecured Notes on February 15, 2016 and entered a 30-day grace period. At no point during the grace-period or when the interest payment was missed did any holder of EPL Unsecured Notes contact the Debtors. The Debtors eventually cured the defaulted interest payment prior to the expiration of the grace period, and again no holder of EPL Unsecured Notes contacted the Debtors. On May 3, 2016, however, Wilmer Cutler Pickering Hale and Dorr LLP ("**WilmerHale**") filed a statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure disclosing its representation of an ad hoc group of holders of EPL Unsecured Notes (the "**EPL Noteholder Group**"). The EPL Noteholder Group filed an objection [Docket No. 178] to the Debtors' *Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors' Use of Cash Collateral, (B) Granting Adequate Protection to the Prepetition Secured Parties, (C) Modifying the Automatic Stay, and (D) Granting Related Relief.*

The Debtors and its advisors have attempted to be as cooperative as possible to accommodate the EPL Noteholder Group to date. The Debtors anticipate further discussions and meetings will take place with the EPL Noteholder Group in the future to discuss the Plan and the treatment of the EPL Unsecured Notes thereunder.

### E. Cash Collateral

On April 15, 2016, the Bankruptcy Court entered an *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 And 507, Bankruptcy Rules 2002, 4001 and 9014 and Bankruptcy Local Rule 4001-1 (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* [Docket No. 66] (the "**Interim Cash Collateral Order**"). The Interim Cash Collateral Order authorized the Debtors to use cash collateral for disbursements set forth in the Budget (as defined in the Interim Cash Collateral Order).

Prior to the hearing on the Final Cash Collateral Order (as defined below), the Debtors received a number of filed objections to entry of the Final Cash Collateral Order, as well as informal comments from the Committee and the trustee for the EGC Unsecured Notes. The majority of these objections were resolved prior to the hearing on May 19, 2016.

On May 19, 2016, over the objection of certain parties, including the EPL Noteholder Group, the Bankruptcy Court entered a *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 And 507, Bankruptcy Rules 2002, 4001 and 9014 and Bankruptcy Local Rule 4001-1 (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* [Docket No. 319] (the "**Final Cash Collateral Order**"). The Final Cash Collateral Order, among other things, authorizes the Debtors to use cash collateral for disbursements set forth in the Budget (as defined in the Final Cash Collateral Order).

### F.    RSA Assumption Motion

As described more fully herein, before commencing the Chapter 11 Cases, the Debtors and certain holders of Second Lien Notes Claims worked diligently to negotiate the terms of a global restructuring. The result of these efforts was the Restructuring Support Agreement executed prior to the filing of the Petitions on April 11, 2016, the material terms of which are incorporated in the Plan. The Restructuring Support Agreement binds the support of the Restructuring Support Parties for the Restructuring so long as the Debtors satisfy the milestone deadlines and other conditions contained in the Restructuring Support Agreement. The Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement. Specifically, Section 8(c) of the Restructuring Support Agreement provides that each Debtor may terminate its obligations thereunder if its board of directors (or board of managers, as applicable) determines that proceeding with the contemplated restructuring transactions "would be inconsistent with the exercise of its fiduciary duties."

On April 14, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume the Restructuring Support Agreement* [Docket No. 43] (the "**RSA Assumption Motion**"). Pursuant to the RSA Assumption Motion, the Debtors request entry of an order authorizing the Debtors to assume the prepetition Restructuring Support Agreement among the Debtors and the Restructuring Support Parties. A hearing on the RSA Assumption Motion was originally scheduled to be heard on June 23, 2016, but has been postponed to a date to be determined.

### G.    Motion to Appoint Equity Committee

On June 2, 2016, an ad hoc group of equity holders (the "**Ad Hoc Equityholder Group**") filed a motion seeking to appoint an official committee of equity holders pursuant to section 1102(a)(2) of the Bankruptcy Code [Docket No. 389] (the "**Equity Committee Motion**"). The Ad Hoc Equityholder Group, who represents less than 1% of Energy XXI's total equity, contacted the U.S. Trustee prior to filing the Equity Committee Motion regarding appointment of an equity committee, but the U.S. Trustee has declined to appoint an equity committee unless it becomes clear that equity will receive a distribution. *See* ¶ 9, Equity Committee Motion.

The Equity Committee Motion is opposed by the Debtors, the Committee, the Ad Hoc Committee, and the First Lien Agent, all of whom filed objections to the Motion. *See* Docket Nos. 470, 472, 484, 491. An emergency hearing on the Motion is set for June 15, 2016.

### H.       Claims Bar Date

On April 15, 2016, the Bankruptcy Court entered the *Order (A) Granting Authority to File a Consolidated List of Creditors; (B) Granting Authority to File a Consolidated List of 50 Largest Unsecured Creditors' (C) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (D) Setting Bar Dates* [Docket No. 53] (the "**Bar Date Order**").  The Bar Date Order sets August 8, 2016 at 5:00 p.m. (Central Time) as the general bar date and deadline by which unsecured creditors must file proofs of claim.  The Bar Date order sets October 11, 2016 at 5:00 p.m. (Central Time) as the government bar date and deadline by which governmental entities holding claims against the Debtors must file proofs of claim.

The Debtors intend to file a motion to establish procedures for filing proofs of claim, which is intended to streamline the claims process and eliminate the need for certain creditors to file proofs of claim.

### I.       Schedules of Assets and Liabilities and Statements of Financial Affairs

On April 15, 2016, the Bankruptcy Court entered the *Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 54] (the "**SOFA Extension Order**").  The SOFA Extension Order extended the deadline for the Debtors to file Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (collectively, the "**Schedules and Statements**") to May 28, 2016, without prejudice to the Debtors' right to seek an additional extension upon cause shown therefor.

The Debtors filed their Schedules and Statements on May 28, 2016, providing creditors and other parties in interest ample time to review the Schedules and Statements prior to the hearing to approve this Disclosure Statement.

### J.       Assumption and Rejection of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into hundreds of Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.

The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of their Executory Contracts and Unexpired Leases to be carried out as of the Effective Date, but may also elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.

### K.       Litigation Matters

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced

before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

As discussed in more detail below in section V.H, the Debtors' CEO borrowed funds in 2007, 2009, and 2014, from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services, and in 2014 from Norman Louie, a former member of the board of directors of Energy XXI, who, at the time of the loan, was a managing director at Mount Kellett Capital Management LP. At the time of the loan, Mount Kellett was majority owner of Energy XXI M21K, LLC, a non-debtor in the Chapter 11 Cases, as described above in section II.B.2, and owned 6.3% of Energy XXI's common stock. As a result of the loans, the disinterested members of the Energy XXI board of directors conducted an independent investigation, as detailed below in section V.H. The investigation did not reveal any illegal activity or any impact on the Debtors' financial reporting or financial statements. Further details regarding the loans and the internal investigation can be found in the Current Report on Form 8-K filed on October 15, 2015 (the "**October 15, 2015 8-K**") and the Annual Report on Form 10-K filed on September 29, 2015 (the "**2015 10-K**"), both of which are incorporated herein by reference.

In February 2015, the SEC began a non-public investigation of a third party. Upon learning of the Norman Louie loan during that investigation, the SEC requested information from Energy XXI and Mr. Schiller about the Norman Louie loan and Mr. Schiller's pledge of his Energy XXI stock. The SEC later requested information from Energy XXI and Mr. Schiller about the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services. The Debtors and their directors, officers, managers and employees have cooperated fully with the SEC, and will continue to do so, in connection with the SEC's investigation of the Norman Louie loan, the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services, the pledge of Energy XXI stock, and Energy XXI's obligations under the applicable securities laws. To date, the SEC has not brought any formal claims against Mr. Schiller or Energy XXI, nor has any Debtor received a notice from the SEC identifying any potential actions to be brought, but it is possible that they may do so in the future. The Debtors believe that any such claims against Energy XXI would be classified as General Unsecured Claims under the Plan and would be subject to discharge, settlement, and release in connection with the Chapter 11 Cases.

## V. SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

### A.    Administrative Claims, Professional Fee Claims, and Priority Claims

#### 1.    *Treatment of Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s), with the consent of the Majority Restructuring Support Parties, agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and

(c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, (i) requests for payment of Administrative Claims arising in the time period between the Petition Date and the Administrative Claims Bar Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Administrative Claims Order no later than the Administrative Claims Bar Date, and (ii) requests for payment of Administrative Claims arising between the Administrative Claims Bar Date and the Effective Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Final Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such dates shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date or such other date fixed by the Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.

### 2. *Professional Compensation*

#### (a) **Final Fee Applications**

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be Filed and served on the Reorganized Debtors no later than 45 days after the Effective Date. All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Court, will be promptly paid from the Professional Fee Escrow Account up to its full Allowed amount. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Court.

#### (b) **Professional Fee Escrow Account**

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount, which shall be funded by New Parent. The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals. The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors without any further action or order of the Court.

(c)        **Professional Fee Reserve Amount**

Professionals shall reasonably estimate their unpaid Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five business days before the Effective Date, *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)        **Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

3.        *Treatment of Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

4.        *Statutory Fees*

All fees payable pursuant to 28 U.S.C. §1930(a) shall be paid by the Debtors or Reorganized Debtors, as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or a final decree is issued, whichever occurs first.  The Reorganized Debtors shall continue to file quarterly-post confirmation operating reports in accordance with the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession.

B.        **Classification of Claims and Interests**

1.        *Summary of Classification of Claims and Interests*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are:  (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| 3 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 4 | EXXI Holdings Promissory Note Claims | Unimpaired | Presumed to Accept |
| 5 | First Lien Claims | Impaired | Entitled to Vote |
| 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 7 | EGC Unsecured Notes Claims | Impaired | Entitled to Vote |
| 8 | EPL Unsecured Notes Claims | Impaired | Entitled to Vote |
| 9 | EXXI Convertible Notes Claims | Impaired | Entitled to Vote |
| 10 | Trade Claims | Impaired | Entitled to Vote |
| 11 | General Unsecured Claims | Impaired | Entitled to Vote |
| 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote |
| 13 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 14 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote |
| 15 | EXXI Interests | Impaired | Deemed to Reject |

**C.**  **Treatment of Claims and Interests**

**1.**  *Class 1:  Other Priority Claims*

(a)  *Classification*: Class 1 consists of Other Priority Claims.

(b)  *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each holder thereof shall receive (A) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim or (B) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

(c)  *Voting*: Class 1 is Unimpaired under the Plan. Each holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Other Priority Claims will not be entitled to vote to accept or reject the Plan.

**2.**  *Class 2:  Other Secured Claims*

(a)  *Classification*: Class 2 consists of Other Secured Claims.

(b)  *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each such holder shall receive, at the Debtors' election (with

the consent of the Majority Restructuring Support Parties), either (a) Cash equal to the full Allowed amount of its Claim, (b) Reinstatement of such holder's Allowed Other Secured Claim, (c) the return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or (d) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

(c)     *Voting*: Class 2 is Unimpaired under the Plan. Each holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Other Secured Claims will not be entitled to vote to accept or reject the Plan.

**3.     *Class 3:  Secured Tax Claims***

(a)     *Classification*: Class 3 consists of Secured Tax Claims.

(b)     *Treatment*: Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Secured Tax Claim, each such holder shall receive, at the Debtors' election (with the consent of the Majority Restructuring Support Parties), either (a) Cash equal to the full Allowed amount of its Claim, (b) Reinstatement of such holder's Allowed Secured Tax Claim, (c) the return or abandonment of the collateral securing such Allowed Secured Tax Claim to such holder, or (d) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

(c)     *Voting*: Class 3 is Unimpaired under the Plan. Each holder of a Secured Claim Tax will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Tax Claims will not be entitled to vote to accept or reject the Plan.

**4.     *Class 4:  EXXI Holdings Promissory Note Claims***

(a)     *Classification*: Class 4 consists of EXXI Holdings Promissory Note Claims.

(b)     *Treatment*: On the Effective Date, the EXXI Holdings Promissory Note Claims shall be Reinstated.

(c)     *Voting*: Class 4 is Unimpaired under the Plan. Each holder of an EXXI Holdings Promissory Note Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of the EXXI Holdings Promissory Note Claims will not be entitled to vote to accept or reject the Plan.

**5.     *Class 5:  First Lien Claims***

(a)     *Classification*: Class 5 consists of the First Lien Claims.

28

(b)    *Allowance*: The First Lien Claims shall be Allowed in the aggregate amount of the First Lien Prepetition Indebtedness.

(c)    *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, (i) all letters of credit issued under the First Lien Credit Agreement other than the Exxon LCs shall be Reinstated in accordance with their terms; (ii) the Exxon LCs shall be Reinstated in accordance with that certain letter agreement dated April 27, 2016 and (iii) except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed First Lien Claim each such holder shall receive its *Pro Rata* share of (x) the Restricted Cash and (y) the Reorganized Debtors' obligations under the Exit Facility.

(d)    *Voting*: Class 5 is Impaired under the Plan. Holders of First Lien Claims will be entitled to vote to accept or reject the Plan.

**6.**    ***Class 6:  Second Lien Notes Claims***

(a)    *Classification*: Class 6 consists of all Second Lien Notes Claims.

(b)    *Allowance*: The Second Lien Notes Claims shall be Allowed in the aggregate amount of the Second Lien Prepetition Indebtedness.

(c)    *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Second Lien Notes Claim, each such holder shall receive its *Pro Rata* share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package.

(d)    *Voting*: Class 6 is Impaired under the Plan. Holders of Allowed Second Lien Notes Claims will be entitled to vote to accept or reject the Plan.

**7.**    ***Class 7:  EGC Unsecured Notes Claims***

(a)    *Classification*: Class 7 consists of all EGC Unsecured Notes Claims.

(b)    *Treatment*: If Class 7 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EGC Unsecured Notes Claim, each holder of an Allowed EGC Unsecured Notes Claim shall receive its Pro Rata share of the EGC Warrant Package Allocation; *provided*, *however* that if Class 7 votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan.

(c) *Voting*: Class 7 is Impaired under the Plan. Holders of Allowed EGC Unsecured Notes Claims will be entitled to vote to accept or reject the Plan.

**8.     Class 8:  EPL Unsecured Notes Claims**

(a) *Classification*: Class 8 consists of all EPL Unsecured Notes Claims.

(b) *Treatment*: If Class 8 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EPL Unsecured Notes Claim, each holder of an Allowed EPL Unsecured Notes Claim shall receive its Pro Rata share of the EPL Warrant Package Allocation; *provided*, *however* that if Class 8 votes to reject the Plan, holders of EPL Unsecured Notes Claims will not receive a distribution under the Plan.

(c) *Voting*: Class 8 is Impaired under the Plan. Each holder of Allowed EPL Unsecured Notes Claim will be entitled to vote to accept or reject the Plan.

**9.     Class 9:  EXXI Convertible Notes Claims**

(a) *Classification*: Class 9 consists of all EXXI Convertible Notes Claims.

(b) *Treatment*: If Class 9 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EXXI Convertible Claim, each holder of an Allowed EXXI Convertible Notes Claims shall receive its Pro Rata share of the EXXI Warrant Package Allocation; *provided*, *however* that if Class 9 votes to reject the Plan, holders of EXXI Convertible Notes Claims will not receive a distribution under the Plan.

(c) *Voting*: Class 9 is Impaired under the Plan. Each holder of Allowed EXXI Convertible Notes Claim will be entitled to vote to accept or reject the Plan.

**10.     Class 10:  Trade Claims**

(a) *Classification*: Class 10 consists of all Trade Claims.

(b) *Treatment*: Except to the extent that a holder of an Allowed Trade Claim agrees to less favorable treatment (with the consent of the Majority Restructuring Support Parties), in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Trade Claim and of and in exchange for each Allowed Trade Claim, each such holder shall, at its election, either (i) receive such holder's Trade Claim Settlement Distribution or (ii) to the extent the Bankruptcy Court or another court of competent jurisdiction enters a Final Order finding that such Allowed Trade Claim is Secured, Cash in the amount of such Secured Allowed Trade Claim.

1)     If the holder of a Trade Claim elects to receive such holder's Trade Claim Settlement Distribution, (a) such election shall constitute the Trade

Claim Settlement Release, (b) such holder shall be deemed to assign its Trade Claims and any liens or security interests securing such Trade Claims to the Reorganized Debtors, and (c) the Trade Claim Settlement Distribution on account of such Trade Claim shall be made on or about the later of (i) the Effective Date and (ii) the date such Trade Claim becomes Allowed.

2)      If the holder of a Trade Claim elects not to receive the Trade Claim Settlement Distribution, the first payment on account of its Trade Claim shall be made on or about the date such Trade Claim is determined to be Secured pursuant to a Final Order, on which date such Trade Claim shall become Allowed. Thereafter, the holder of such Secured Allowed Trade Claim shall receive a second and final payment for the remainder of such Secured Allowed Trade Claim on the last Business Day of the following calendar quarter. If the holder of a Trade Claim elects not to receive the Trade Claim Settlement Distribution and any portion of its Claim is determined to be Unsecured pursuant to a Final Order, such Unsecured Claim will be treated as a General Unsecured Claim.

**(c)**      *Voting*: Class 10 is Impaired under the Plan. Each holder of an Allowed Trade Claim will be entitled to vote to accept or reject the Plan.

**11.**      ***Class 11:  General Unsecured Claims***

**(a)**      *Classification*: Class 11 consists of all Allowed General Unsecured Claims.

**(b)**      *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a Class 11 Allowed General Unsecured Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Class 11 Claim, each such holder shall receive its Pro Rata share of the General Unsecured Claims Distribution.

**(c)**      *Voting*: Class 11 is Impaired under the Plan. Each holder of a General Unsecured Claim in Class 11 will be entitled to vote to accept or reject the Plan.

**12.**      ***Class 12:  Section 510(b) Claims***

**(a)**      *Classification*: Class 12 consists of all Section 510(b) Claims.

**(b)**      *Treatment*: Class 12 Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims.

**(c)**      *Voting*: Class 12 is Impaired under the Plan.  Each holder of a Section 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan.

13. ***Class 13: Intercompany Claims***

    **(a)**    *Classification*: Class 13 consists of all Intercompany Claims.

    **(b)**    *Treatment*: Intercompany Claims shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, shall be cancelled. No distribution shall be made on account of any Intercompany Claims other than in the ordinary course of business of the Reorganized Debtors, as applicable.

    **(c)**    *Voting*: Intercompany Claims are either Unimpaired, in which case the holders of such Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the holders of such Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

14. ***Class 14: Intercompany Interests***

    **(a)**    *Classification*: Class 14 consists of all Intercompany Interests.

    **(b)**    *Treatment*: Intercompany Interests shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, shall be cancelled. No distribution shall be made on account of any Intercompany Interests. No distributions on account of Intercompany Interests are being made to the holders of such Intercompany Interests. Instead, to the extent Intercompany Interests are Reinstated under the Plan, such Reinstatement is solely for the purposes of administrative convenience, for the ultimate benefit of the holders of the New Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt: (1) to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall continue to be owned by the Reorganized Debtor that corresponds to the Debtor that owned such Intercompany Interests prior to the Effective Date; and (2) except as set forth in the Description of the Transaction Steps, no Interests in a Debtor or Non-Debtor Subsidiary, or Affiliate of a Debtor or Non-Debtor Subsidiary, held by a Non-Debtor Subsidiary or a Non-Debtor Affiliate of a Debtor will be affected by the Plan.

    **(c)**    *Voting*: Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

15. ***Class 15:  EXXI Interests***

    **(a)**    *Classification*: Class 15 consists of all EXXI Interests.

    **(b)**    *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, all EXXI Interests will be extinguished in accordance with the Description of the Transaction Steps and the holders of EXXI Interests shall not receive or retain any distribution, property, or other value on account of their EXXI Interests.

    **(c)**    *Voting*: Class 15 is Impaired under the Plan. Each holder of an EXXI Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an EXXI Interests will not be entitled to vote to accept or reject the Plan.

16. ***Special Provision Governing Unimpaired Claims***

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

17. ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

18. ***Elimination of Vacant Classes***

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

19. ***Voting Classes; Presumed Acceptance by Non-Voting Classes***

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

20. ***Subordinated Claims***

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

33

#### D.      Means for Implementation of the Plan

##### 1.      *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors, with the consent of the Majority Restructuring Support Parties, shall take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate, the Restructuring Support Agreement and the Plan (the "***Restructuring Transactions***"), including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) all transactions necessary to provide for the purchase of some or substantially all of the assets or Interests of any of the Debtors, which transactions shall be structured in the most tax efficient manner, including in whole or in part as a taxable transaction for United States federal income tax purposes, as determined by the Debtors and the Majority Restructuring Support Parties; (5) the execution and delivery of the Exit Facility Documents; (6) the consummation of the New Money Contribution; and (7) all other actions that the Debtors, the Reorganized Debtors, or the Majority Restructuring Support Parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

##### 2.      *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan as follows:

###### (a)      Issuance and Distribution of New Equity

The New Equity, including options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized on the Effective Date without the need for any further corporate action and without any further action by the holders of Claims or Interests.

All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, any claimant's acceptance of the New Equity, including any issuance and distribution following the Effective Date on account of the Warrant Package, shall be deemed to constitute its agreement to the terms of the New Shareholders' Agreement.

###### (b)      Exit Facility

On the Effective Date, the Reorganized Debtors will enter into the Exit Facility in accordance with the terms of the Exit Facility Term Sheet. The Reorganized Debtors may use the proceeds of the Exit Facility for any purpose permitted by the Exit Facility Documents, including the funding of distributions under the Plan and satisfaction of ongoing working capital needs.

The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3. *Distributions to Holders of Trade Claims and General Unsecured Claims*

Distributions to holders of Allowed Trade Claims and Allowed General Unsecured Claims shall be funded from Cash on hand available on the applicable distribution date.

### 4. *Corporate Existence*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Organizational Documents. For the avoidance of doubt, EXXI shall have no assets or operations, and the Provisional Liquidator shall seek entry of an order by the Bermuda Court liquidating EXXI as soon as practicable following the Effective Date in accordance with the Description of the Transaction Steps.

5.     *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the Exit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the Reorganized Debtors may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Reorganized Debtors. The Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by this Plan, shall be given prior to the presentation of such Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

6.     *Cancellation of Existing Securities*

Except as otherwise provided in the Plan: (1) the obligations of the Debtors under the First Lien Credit Agreement, the Second Lien Indenture, the EGC Unsecured Notes Indentures, the EPL Unsecured Notes Indenture, the EXXI Convertible Notes Indenture, the EGC Intercompany Note, all EXXI Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; *provided that* the extinguishment of EXXI Interests shall occur pursuant to Bermuda law in connection with the Bermuda Proceeding and as set forth in the Description of the Transaction Steps; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; *provided that* notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of

36

enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; *provided*, *further*, that nothing in this section shall effectuate a cancellation of any New Equity, Intercompany Interests, or Intercompany Claims.

On and after the Effective Date, all duties and responsibilities of the First Lien Administrative Agent under the First Lien Credit Agreement, the Second Lien Indenture Trustee under the Second Lien Indenture, the EGC Unsecured Notes Indenture Trustee under the respective EGC Unsecured Notes Indentures, the EPL Unsecured Notes Indenture Trustee under the EPL Unsecured Notes Indenture, and the EXXI Convertible Notes Indenture Trustee under the EXXI Convertible Notes Indenture shall be discharged unless otherwise specifically set forth in or provided for under the Plan or the Plan Supplement.

If the record holder of the Second Lien Notes, EGC Unsecured Notes, EPL 8.25% Senior Notes, or the EXXI 3.0% Senior Convertible Notes is DTC or its nominee or another securities depository or custodian thereof, and such Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial owner of such Notes shall be deemed to have surrendered its Notes upon surrender of such global security by DTC or such other securities depository or custodian thereof.

## 7.    *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable: (1) entry into the Exit Facility; (2) execution and delivery of the Exit Facility Documents; (3) consummation of the New Money Contribution; (4) the issuance of the New Equity; (5) appointment of the directors and officers for New Parent and the other Reorganized Debtors; (6) the right of the New EXXI Board to adopt the Management Incentive Plan on terms and conditions determined by the New EXXI Board in accordance with Article IV.N of the Plan; (7) implementation of the Restructuring Transactions; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of New Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, New Parent, or the other Reorganized Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, New Parent or the other Reorganized Debtors, as applicable. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, New Parent, or the other Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of New Parent and the other Reorganized Debtors, including the Exit Facility Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court. The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

## 8.    *New Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, New Parent and the other Reorganized Debtors will, on or as soon as practicable after the Effective Date, file their respective New

Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities. After the Effective Date, New Parent and the other Reorganized Debtors, as applicable, may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation and their respective New Organizational Documents.

On the Effective Date, the New Organizational Documents, substantially in the forms to be filed with the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions, such terms and provisions being satisfactory to the Majority Restructuring Support Parties. If the New Shareholders' Agreement is put in place, any Person that receives shares of New Equity pursuant to the Plan shall be deemed to have duly executed and delivered to New Parent a counterpart to the New Shareholders' Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

## 9.     *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. As set forth in the Restructuring Support Agreement, the initial New Parent Board shall consist of: (a) John D. Schiller Jr. as the Chief Executive Officer of New Parent; and (b) six additional Persons selected by the Majority Restructuring Support Parties. Successors will be elected in accordance with the New Organizational Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that will serve as an officer of New Parent or any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of New Parent and each of the other Reorganized Debtors.

## 10.     *Consultation with Provisional Liquidator*

The Debtors shall consult and liaise with the Provisional Liquidator with respect to all matters related to the Plan, including, but not limited to, the Confirmation Order, the Plan Supplement, the Definitive Transaction Documents, and any amendments thereto, in accordance with and to the extent contemplated by the Provisional Liquidator Appointment Order.

## 11.     *Effectuating Documents; Further Transactions*

On and after the Effective Date, New Parent and each of the other Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further

evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Equity, in the name of and on behalf of New Parent or the other Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

12. ***Exemption from Certain Taxes and Fees***

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a Security (including, without limitation, of the New Equity) or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

13. ***Preservation of Causes of Action***

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, without limitation, pursuant to Article VIII of the Plan, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.L of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the the applicable Reorganized Debtor.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

14.     *Director and Officer Liability Insurance*

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each such D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

15.     *Management Incentive Plan*

The Management Incentive Plan will be a comprehensive equity based award plan with the New Parent Board to formulate the types of equity based awards (including stock option and restricted stock units) on terms and conditions determined by the New Parent Board.  The Confirmation Order shall authorize the New Parent Board to adopt and enter into the Management Incentive Plan, on the terms set forth in Article IV.N of the Plan.  The equity based awards under the Management Incentive Plan shall dilute all of the New Equity, on terms set forth in the Restructuring Support Agreement and the Plan Supplement.

Awards under the Management Incentive Plan will be awarded to the Reorganized Debtors' officers, directors, employees, and consultants at the discretion of the New Board; *provided*, *however*, that 3% of the Management Equity Pool will be allocated by the New Board to such officers, directors, employees, and consultants no later than 60 days after the Effective Date on terms and conditions determined by the New Board, including the type of equity based awards.  Subject to the foregoing, the New Board will determine the additional terms of the Management Incentive Plan after the Effective Date, including the allocation, granting, and vesting of applicable awards under the Management Incentive Plan.

16.     *Employee and Retiree Benefits*

Except as otherwise provided in the Plan or the Plan Supplement, and subject to the consent of the Majority Restructuring Support Parties (which shall be determined prior to the Confirmation Date) all written employment, severance, retirement, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors and the Non-Debtor Subsidiaries, including any key employee incentive plans and/or key employee retention plans that may be approved by the Court in the Chapter 11 Cases and any items approved as part of the Confirmation Order (including, for the avoidance of doubt, all obligations arising from the Chapter 11 Compensation Order), retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors, on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided that* the foregoing shall not apply to any equity-based compensation, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the

40

foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 17.    *Payment of Fees and Expenses of the First Lien Administrative Agent*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the First Lien Administrative Agent and its advisors, including counsel, without application to or approval of the Court.

### 18.    *Payment of Fees and Expenses of Second Lien Indenture Trustee*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Second Lien Indenture Trustee and its advisors, including counsel, without application to or approval of the Court. For the avoidance of doubt, nothing herein affects the Second Lien Indenture Trustee's right to exercise any charging lien arising under and in accordance with the Second Lien Indenture to obtain payments of its fees and expenses and the fees and expenses of its professionals.

### 19.    *Payment of Fees and Expenses of the Restructuring Support Parties*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Restructuring Support Parties and their advisors, including counsel, without application to or approval of the Court and in accordance with the terms of the Restructuring Support Agreement.

### 20.    *Preservation of the Charging Lien of the EGC Unsecured Notes Indenture Trustees, EPL Unsecured Notes Indenture Trustee, and EXXI Convertible Notes Indenture Trustee*

Each of the ECG Unsecured Notes Indenture Trustees, the EPL Unsecured Notes Indenture Trustee, and the EXXI Convertible Notes Indenture Trustee shall be entitled to assert its charging lien arising under and in accordance with the applicable indenture to obtain payment of its respective fees and expenses and the fees and expenses of its professionals.

### 21.    *Preservation of Royalty and Working Interests*

Notwithstanding any other provision in the Plan, but subject in all respect to all payments authorized and made pursuant to the Royalty Order, on and after the Effective Date all Royalty and Working Interests shall be fully preserved and remain in full force and effect in accordance with the terms of the relevant granting instruments or other governing documents applicable to such Royalty and Working Interests, which granting instruments and governing documents shall remain in full force and effect, and no Royalty and Working Interests or any liabilities and obligations arising therefrom, including payment obligations, whether arising before or after the Petition Date, shall be compromised or discharged by the Plan.

### E.      Treatment of Executory Contracts and Unexpired Leases

#### 1.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors or their designated assignee in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order, including those that are subject to a notice issued pursuant to the Rejection Procedures Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.  For the avoidance of doubt, Debtors will assume all of their OCS mineral leases from the BOEM (and will not seek to abandon any OCS leases).

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Majority Restructuring Support Parties, alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three (3) days' notice to the applicable non-Debtor counterparties.

#### 2.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be promptly served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Court pursuant to the Court's order approving the Disclosure Statement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within the earliest to occur of (1) thirty days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection or (2) thirty days after notice of any rejection that occurs after the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or any Proof of Claim to the contrary**. Claims arising

from the rejection of the Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.11 of the Plan.

### 3. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or assumption and assignment or related Cure Claim must be Filed, served and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. In the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such time as the Cure Notices referred to above have been distributed, a separate Cure Notice of proposed assumption or assumption and assignment and the proposed amount of the Cure Claim with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a hearing will be set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or assumption and assignment or the proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment and the Cure Claim. Payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, to such counterparty of the amount set forth on the applicable Cure Notice shall, as a matter of law, satisfy any and all monetary defaults under the applicable Executory Contract or Unexpired Lease. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or assumption and assignment, such dispute shall be resolved by a Final Order of the Court.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or the Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, subject to the consent of the Majority Restructuring Support Parties, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date. After such Executory Contract or Unexpired Lease is added to the Schedule of Rejected Executory Contracts and Unexpired Leases, the applicable counterparty shall be served with a notice of rejection of its Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

### 4. *Indemnification Obligations*

As of the Effective Date, the Indemnification Obligations shall be deemed to be Executory Contracts and rejected by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code.

### 5.     *Insurance Policies*

Without limiting Article IV.M of the Plan, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

### 6.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases, with the consent of the Majority Restructuring Support Parties, shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.     *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8.     *Nonoccurence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code

### 9.     *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

F.       **Provisions Governing Distributions**

     1.       *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim (or such holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

     2.       *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

     (a)       **Delivery of Distributions**

     1)       Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims and Interests. The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

     2)       Delivery of Distributions in General

Distributions to holders of Allowed Claims shall be made to the holders of record as of the Distribution Record Date by the Debtors or the Reorganized Debtors, as applicable, as follows: (1) to the signatory set forth on the last Proof of Claim Filed by such holder or other representative identified therein (or at the last known addresses of such holder if the Debtors have been notified in writing of a change of address); (2) at the address set forth in any written notice of address changes delivered to the Reorganized Debtors after the Effective Date; (3) at the address reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) to any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

     3)       Delivery of Distributions to First Lien Lenders

Any and all distributions to holders of First Lien Claims as of the Distribution Record Date shall be governed by the First Lien Credit Agreement. The First Lien Administrative Agent shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within three (3) business days following the Distribution Record Date,

the Debtors or Reorganized Debtors with a list of all holders of First Lien Claims as of the Distribution Record Date, including the address at which each such holder is authorized to receive its distribution under the Plan and the amount of First Lien Claims held by each such holder.

4)      Delivery of Distributions to Second Lien Noteholders

Any and all distributions to the holders of the Second Lien Notes Claims as of the Distribution Record Date shall be governed by the Second Lien Indenture. The Second Lien Indenture Trustee shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within three (3) business days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of Second Lien Notes Claims as of the Distribution Record Date, including the amount of the Second Lien Notes Claims held by each such holder. Distributions to the holders of the Second Lien Notes Claims shall be deemed to have been made when reflected in the Reorganized Debtors' stock register according to the information provided by the Second Lien Indenture Trustee.

5)      Delivery of Distributions to EGC Unsecured Notes Indenture Trustee

All distributions to the holders of the EGC Unsecured Notes Claims as of the Distribution Record Date shall be deemed completed when made to the EGC Unsecured Notes Indenture Trustee, which shall be deemed to be the holder of all EGC Unsecured Notes Claims for purposes of distributions to be made hereunder. The Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EGC Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI.D.1.d, the EGC Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EGC Unsecured Notes Claims. For the avoidance of doubt, distributions to holders of the EGC Unsecured Notes Claims pursuant to Article VI.D.1.d of the Plan shall be made by the Indenture Trustee.

6)      Delivery of Distributions to EPL Unsecured Notes Indenture Trustee

All distributions to the holders of the EPL Unsecured Notes Claims as of the Distribution Record Date shall be deemed completed when made to the Indenture Trustee, which shall be deemed to be the holder of all EPL Unsecured Notes Claims for purposes of distributions to be made hereunder. The EPL Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EPL Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI.D.1.d of the Plan, the EPL Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EPL Unsecured Notes Claims. For the avoidance of doubt, distributions to the holders of EPL Unsecured Notes Claims pursuant to Article VI.D.1.d of the Plan shall be made by the EPL Unsecured Notes Indenture Trustee.

7)      Delivery of Distributions to EXXI Convertible Notes Indenture Trustee

All distributions to the holders of the EXXI Convertible Notes Claims as of the Distribution Record Date shall be deemed completed when made to the EXXI Convertible Notes Indenture Trustee, which shall be deemed to be the holder of all EXXI Convertible Notes Claims for purposes of distributions to be made hereunder. The EXXI Convertible Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EXXI Convertible Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI.D.1.d of the Plan, the EXXI Convertible Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EXXI Convertible Notes Claims. For the avoidance of doubt,

distributions to the holders of EXXI Convertible Notes Claims pursuant to Article VI.D.1.d of the Plan shall be made by the Indenture Trustee.

<div align="center">

**(b)**      **Minimum Distributions**

</div>

No fractional shares of New Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of shares of New Equity shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Equity to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $50.00 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder shall be forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

<div align="center">

**(c)**      **Undeliverable Distributions and Unclaimed Property**

</div>

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtors or the Reorganized Debtors, as applicable, shall have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of Article VI.D.3 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) without need for a further order by the Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

<div align="center">

**3.**      ***Registration or Private Placement Exemption***

</div>

Except as otherwise set forth immediately below, all shares of New Equity issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of New Equity issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Equity issued pursuant to section 1145 of the Bankruptcy Code (a) is not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Equity from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. **New Equity issued to holders of Second Lien Notes Claims in exchange for such Claims, and the New Equity underlying the Warrant Package shall be issued in reliance on section 1145 of the Bankruptcy Code. The New Equity underlying the Management Incentive Plan will be issued pursuant to a registration**

<div align="center">

47

</div>

**statement or another available exemption from registration under the Securities Act and other applicable law.**

On the Effective Date, the Registration Rights Beneficiaries and New Parent shall enter into a registration rights agreement in form and substance acceptable to (i) the Majority Restructuring Support Parties, (ii) the Registration Rights Beneficiaries, and (iii) New Parent. The registration rights agreement shall provide the Registration Rights Beneficiaries with certain demand registration rights (including with respect to underwritten offerings) and with piggyback registration rights. The registration rights agreement shall also provide that on or before the date that is 60 days after the Effective Date, New Parent shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the New Equity held by the Registration Rights Beneficiaries. The registration rights agreement shall contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Equity to be held through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan and Confirmation Order with respect to the treatment of such applicable portion of the New Equity, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity is exempt from registration.

### 4.     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors or the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### 5.     *Allocations*

Each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan (cash or value) to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion.

### 6.     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any

Claims or Interests and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

**7.**       *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor of any such Claim it may have against the holder of such Allowed Claim

**8.**       *Claims Paid or Payable by Third Parties*

**(a)**       **Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to Debtors or the Reorganized Debtors, as applicable, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

**(b)**       **Claims Payable by Insurers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

**(c)**       **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein

constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### G.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### 1.     *Allowance of Claims*

On or after the Effective Date, each of the Reorganized Debtors shall have any and all rights and defenses its predecessor Debtor had with respect to any Claim immediately prior to the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

#### 2.     *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, by order of the Court, shall together have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

#### 3.     *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

#### 4.     *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

5.       *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be filed by any party, shall be Filed on or before the Claims Objection Deadline.

6.       *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

Except as provided herein (including with respect to any counterparties to rejected Executory Contracts or Unexpired Leases who are required to file Proofs of Claim after the rejection of their contracts or leases), any and all Proofs of Claim or requests for payment of Administrative Claims, as applicable, Filed after the applicable Claims Bar Date, Administrative Claims Bar Date, Final Administrative Claims Bar Date, Governmental Bar Date, and applicable deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

7.       *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

8.       *No Distributions Pending Allowance*

No payment or distribution provided under the Plan shall be made on account of a Disputed Claim or portion thereof, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII of the Plan, unless and until such Disputed Claim becomes an Allowed Claim.

9.       *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals shall be paid to the holder of such Allowed Claim on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in herein.

10.   *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus applicable interest. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as such Debtor's Chapter 11 Case is closed, dismissed, or converted.

## H.   Settlement, Release, Injunction, and Related Provisions

### 1.   *Compromise and Settlement of Claims, Interests, and Controversies*

#### (a)   **Compromise and Settlement**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims against, and Interests in, all Debtors, including all controversies relating to the contractual, legal, and subordination rights that a holder of an Allowed Claim against a Debtor may have with respect to such Allowed Claim or any distribution to be made on account of such Allowed Claim, including:

     1.   the treatment of the EGC Intercompany Note and the distributions associated therewith;

     2.   any dispute regarding the appropriate allocation of general and administrative costs across the Debtors' Estates;

     3.   any challenges to transfers made by the Debtors to any related entities;

     4.   the value and allocation of the Warrant Package; and

     5.   the releases, exculpations, and injunctions provided herein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

#### (b)   **EGC Intercompany Note**

The Debtors and their respective Boards have proposed to allocate out-of-the-money warrants equal to an aggregate of 0.5% of the New Equity issued pursuant to the Warrant Package to the EPL

Noteholders in exchange for cancellation of the EGC Intercompany Note. Although it is the Debtors' position that EGC's creditors have a superior claim to EPL's assets as between EGC's creditors and holders of the EPL Unsecured Notes (the "***EPL Unsecured Noteholders***"), the Company has proposed this allocation in an effort structure a fully consensual plan and to resolve any potential litigation concerning the EGC Intercompany Note.[18]

Although the EPL Unsecured Noteholders made no attempts to contact the Debtors prior to the Petition Date when the Debtors missed the February 15 interest payment due on the EPL Unsecured Notes and only organized and began communicating with the Debtors after the Petition Date, the Debtors anticipate that the EPL Unsecured Noteholders will seek to challenge the EGC Intercompany Note. Specifically, the Debtors anticipate that the EPL Unsecured Noteholders will take the position that the EGC Intercompany Note should not be considered debt, and should instead be recharacterized as equity, such that the EPL Unsecured Noteholders would have a superior claim to EPL's assets as between the EPL Unsecured Noteholders and EGC. Courts apply various multi-factor tests to determine whether to recharacterize debt as equity in bankruptcy proceedings. To analyze whether a court is likely to recharacterize the EGC Intercompany Note, the Debtors' counsel reviewed the underlying transaction documents as well as email communications concerning the EGC Intercompany Note between February 1, 2015 and February 2016 from Company representatives and counsel involved in the transaction. The Debtors' counsel also interviewed Company representatives and counsel involved in the transaction concerning the EGC Intercompany Note and the background of the transaction.

The Debtors submit that the EGC Intercompany Note is properly considered a debt instrument and is not subject to recharacterization as equity under the multi-factor recharacterization analysis. Factors favoring a determination of debt include that the EGC Intercompany Note appears on its face to be a debt instrument and contains formal indicia of debt, including a fixed interest rate, quarterly interest payments, and a fixed maturity date that can be accelerated upon an event of default. In addition, the EGC Intercompany Note was the result of extensive negotiations between sophisticated parties and various mechanisms ensure EGC's unconditional right to repayment, including that the Note is secured by substantially all of EPL's and its subsidiaries' assets and has priority over general unsecured creditors. Contemporaneous communications and interviews with Company representatives involved in the transaction further demonstrate that the parties intended to structure the EGC Intercompany Note as a debt instrument.

The Debtors recognize that the EPL Unsecured Noteholders may be able to point to certain factors in the recharacterization analysis to support a determination that the EGC Intercompany Note was an equity contribution, including EGC's control over EPL at the time of the transaction and EPL's failure to pay interest on the EGC Intercompany Note. Although the Debtors submit that such factors are insufficient to recharacterize the EGC Intercompany Note as equity, the Debtors' proposed allocation of the Warrant Package takes into consideration that there is some risk associated with certain factors in the recharacterization analysis as well as the risk inherent in any litigation. The proposed allocation also takes into consideration the inherent value and efficiency associated with avoiding time-consuming litigation in favor of a chapter 11 plan that proposes a settlement of such controversies.

The independent Special Committees of both the EPL board of directors and the EGC board of directors reviewed the terms of this settlement and approved it.

---

[18] As discussed in section II.G of this Disclosure Statement, the EGC Intercompany Note is secured by a second priority lien on certain assets of EPL that secure EPL's obligations under the First Lien Credit Agreement.

(c)        **Debtor Releases**

As described below, the Plan provides for, among other things, releases by the Debtors of the Released Parties, including the Debtors, their current and former officers and directors, and their Affiliates.

At a hearing on June 10, 2016 before Judge Martin Isgur, Judge Isgur requested that the Debtors supplement their disclosures with respect to the Debtors' release of claims against insiders of the Debtors to provide additional information about any such claims and the reasons that the Debtors have proposed the releases.  The Debtors include these additional disclosures to address Judge Isgur's request and provide parties in interest with additional information regarding the Debtor releases contained in the Plan.

As a general matter, the Debtors are not aware of any meritorious claims held by the Debtors against the current or former directors, officers, managers, or employees, or any of the other Released Parties.  The Debtors have, however, attempted to identify and analyze potential claims herein.

First, as disclosed in Energy XXI's 2015 10-K and October 15, 2015 8-K, in 2015 the Board learned that in 2007, 2009, and 2014, Energy XXI's CEO borrowed funds from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services.  The Board also learned that Norman Louie, one of Energy XXI's former directors, made a personal loan to Mr. Schiller in 2014 before Mr. Louie became a director of Energy XXI.  At the time the loan was made, Mr. Louie was a managing director at Mount Kellett Capital Management LP, which at the time, and as of June 30, 2015, owned a majority interest in Energy XXI M21K and 6.3% of Energy XXI's common stock.  The loans made in 2014 are still outstanding.  Since Mr. Schiller did not disclose any of these loans (collectively, the "*Loans*") before they were made, the Board determined that he did not comply with the procedural requirements of Energy XXI's Code of Business Conduct and Ethics.  Upon learning of Mr. Schiller's loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services, the disinterested members of the Board engaged independent legal counsel, Sidley Austin LLP, to conduct an internal investigation, with the assistance of outside forensic accountants, Berkeley Research Group, to review these loans and Energy XXI's vendor procurement processes (the "*Independent Investigation*").

The Independent Investigation did not uncover any illegal activity on the part of any director, officer, manager, or employee of Energy XXI or any impact on Energy XXI's financial reporting or financial statements; however, the Board concluded that this noncompliance was a material weakness in its control environment given the leadership position of this officer, the visibility and importance of his actions to Energy XXI's overall system of controls, and the significance with which Energy XXI viewed this nondisclosure.  To better align the corporate governance policies of Energy XXI with industry best practices, the Board approved a number of actions to strengthen Energy XXI's policies and procedures relating to the Debtor's business conduct; the pledging and hedging of Energy XXI stock by the Debtors' officers and directors; and vendor procurement.  The recommended changes to the corporate governance policies and procedures were the result of an extensive review of best practices and comparable policies among and outside of Energy XXI's peer group and were intended to prevent actions that might result in even the appearance of conflicts of interest among the management and directors.  The Board's belief that periodic reassessment and policy improvements are important to good governance and part of its ongoing responsibilities led it to revise its policies and procedures as follows:

- *Revision of Code of Business Conduct and Ethics.*  Energy XXI's Code of Business Conduct and Ethics was updated to include, among other things, (a) an express prohibition on personal loans from Energy XXI's vendors in the future (other than ordinary course loans from financial institutions), (b) procedures for soliciting or

accepting charitable contributions from entities doing business with Energy XXI, (c) clarifying the precise procedures for reporting potential conflicts of interest and requesting waivers, and (d) independent oversight from a chief compliance officer (a position being currently filled by the Chairman of the Board of Directors and the Lead Independent Director) and, in the case of executive officers and directors, the Audit Committee.

- *Prohibition on Pledging Company Shares*.  Energy XXI's policies with respect to the pledging and hedging of Energy XXI's shares by directors and officers were revised.  These revisions included, among other things, (a) express prohibitions on pledges and margin loans relating to Energy XXI's shares and (b) express prohibitions on hedging transactions and short sales related to Energy XXI's shares.

- *Vendor Procurement Policies*.  A vendor procurement policy was adopted to provide enhanced scrutiny from the chief compliance officer and the Audit Committee of instances in which there is even the appearance of a conflict of interest between Energy XXI and any of its vendors.  Among other things, in such instances competitive bids are required absent an emergency, and the chief compliance officer must review and approve the terms of the proposed arrangement, including the proposed scope of work and compensation to be paid to the vendor.  The Audit Committee is copied on any such approval.

- *Training*.  The Board also directed Energy XXI to implement a comprehensive training program for Energy XXI's officers and employees, to inform them of these new policies and the importance of compliance.

Accordingly, based upon the findings of the Independent Investigation and their own review, the Debtors believe there is no basis for a claim against the directors, officers, managers, or employees of the Debtors in connection with the Loans, and that the Debtors' release of any such hypothetical direct or derivative claims that could be asserted with respect to the Loans is appropriate.

The Debtors have been cooperating with the SEC in connection with a non-public investigation of a third-party.  Upon learning of the Norman Louie loan during that investigation, the SEC requested information from Energy XXI and Mr. Schiller about the Norman Louie loan and Mr. Schiller's pledge of his Energy XXI stock.  The SEC later requested information from Energy XXI and Mr. Schiller about the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services.  The Debtors and their directors, officers, managers, and employees have cooperated fully with the SEC, and will continue to do so, in connection with the SEC's investigation of the Norman Louie loan, the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services, the pledge of Energy XXI stock, and Energy XXI's obligations under the applicable securities laws.  To date, no claim has been brought against the Debtors or any directors, officers, managers, or employees of any Debtor relating to the Loans, nor has any Debtor received a notice from the SEC identifying any potential actions to be brought.  The Debtors believe that, to the extent asserted, any potential claims by the SEC against Energy XXI would be subject to discharge in connection with these Chapter 11 Cases and treated as General Unsecured Claims.  The SEC is not a Releasing Party under the Plan and is not providing a release of any of the Released Parties.

Second, the Debtors' release of claims against all current or former directors, officers, managers, or employees includes a release of any claims or causes of action arising under chapter 5 of the Bankruptcy Code or "avoidance actions."  The Debtors' Schedules and Statements detail payments made

to insiders of the Debtors, including directors and officers, within one year before the Petition Date (the look back period for preference actions under section 547 of the Bankruptcy Code). The Debtors believe that these payments, including bonus payments, were a valid exercise of the Debtors' business judgment, are supported by the advice of independent, third-party advisors and the Compensation Committee of Energy XXI's board of directors, made up entirely of independent directors, and are subject to certain other defenses. Moreover, the Debtors believe that the damage to the Debtors' business and management team in pursuing such claims would outweigh any potential benefit or recovery that could be achieved.

The Debtors are not aware of any other potential claims held by the Debtors against the current or former directors, officers, managers, or employees, or any of the other Released Parties. However, to the extent such claims may exist, the Debtors believe that the Debtor releases pursuant to section 1123(b) are in the best interest of their estates, as required by courts in the Fifth Circuit. *See, e.g.*, *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp*., 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006). Courts in the Fifth Circuit generally determine whether a release is "in the best interest of the estate" by reference to the following factors: (i) the probability of success of litigation; (ii) the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment; (iii) the interest of creditors with proper deference to their reasonable views; and (iv) the extent to which the settlement is truly the product of arm's-length negotiations. *See Mirant*, 348 B.R. at 739-40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop.* (*In re Cajun Elec. Power Coop.*), 119 F.3d 349, 355-56 (5th Cir. 1997)). The Debtors believe these factors weigh in favor of the releases.

First, as outlined above and as previously disclosed as part of their public filings with the SEC, the Board has taken extensive steps to analyze potential claims the Debtors could bring against the Released Parties, including John D. Schiller, Jr. The Independent Investigation, combined with the independent third-party advice the Compensation Committee utilized to make its compensation decisions for 2015 and 2016, support the Debtors' conclusion that there are no valuable claims being released pursuant to the Plan, and therefore a low probability of success of receiving a meaningful recovery from litigation on account of any such claims.

Second, any hypothetical recovery on causes of action pursued by the Debtors, or on their behalf, against directors and officers would be a substantial distraction to the Debtors' business operations and would be costly both in terms of actual dollars spent and in terms of time spent on litigation. Moreover, such causes of action would likely garner a negative reaction from BOEM, which places significant importance on the Debtors' management team, particularly the Debtors' founder and CEO, John D. Schiller, Jr., and views the Debtors—including their senior management team—as a model operator in the Gulf of Mexico. An adverse reaction from BOEM, as a result of litigation pursuing claims that lack merit against the Debtors' current or former officers and directors, could negatively impair value for all of the Debtors' stakeholders and tighten the Debtors' valuable and necessary liquidity for operations.

Third, the creditors who would be the primary beneficiaries of any successful litigation claim against the Released Parties would be the Second Lien Noteholders – creditors who hold an unsecured deficiency claim in excess of $1.3 billion on Second Lien Notes that were issued in March 2015. The Second Lien Noteholders could, hypothetically, assert adequate protection claims against the proceeds of any and all Avoidance Actions successfully prosecuted against the Released Parties to the extent of any diminution in value during the Chapter 11 cases. Nonetheless, the Second Lien Noteholders support the releases embodied in the Plan. The Debtors' unsecured noteholders do not currently support the releases included in the Plan, nor do they support the Warrant Package proposed to be allocated on account of their claims or the EGC Intercompany Note Settlement. This reality will not change based on the Debtor releases, which facilitate maximizing value for all stakeholders, including the unsecured noteholders. The unsecured noteholders, and other voting creditors, are also not required to consent to the releases in the

56

Plan and can opt out of the third-party releases to preserve any hypothetical claims they believe they can assert.

Fourth, the Debtors' releases, third-party releases, and exculpation provisions were an important element of the negotiations between the Debtors and the Ad Hoc Committee, and are supported by the Debtors and certain key stakeholders, including the Ad Hoc Committee and the steering committee of the First Lien Lenders.  Therefore, the Debtors believe the significant cost and distraction of pursuing claims against the Debtors' directors and officers would outweigh any resulting recovery to the Debtors, and their stakeholders, from actions brought against the Debtors' directors and officers.  The Ad Hoc Committee, on account of the Second Lien Noteholders proposed to be the owners of the Reorganized Debtors after the Effective Date, also believes post-confirmation date litigation against existing officers and directors will be detrimental to the value of the Reorganized Debtors and their operations and a significant distraction after emergence.

Based on the foregoing, the Debtors believe that the Debtor releases in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by courts in the Fifth Circuit.

### 2.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### 3.    *Term of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

### 4.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien,**

pledge, or other security interest under the Exit Facility Documents), the New Money Contribution (to the extent applicable), or in any other contract, instrument, agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors. In addition, at the Debtors' or Reorganized Debtors' sole expense, the First Lien Administrative Agent and the Second Lien Indenture Trustee shall execute and deliver all documents reasonably requested by the Reorganized Debtors, or the administrative agent(s) for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

## 5. *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, and the Reorganized Debtors from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the First Lien Credit Agreement, the Second Lien Indenture, the Intercreditor Agreement, the Interim Cash Collateral Order and the Final Cash Collateral Order (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, the Definitive Documentation, the Bermuda Proceeding, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth herein do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions, and (ii) nothing in this provision shall, nor shall it be deemed to, release any Released

Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article VIII.E of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or cause of action released pursuant to such releases.

      6.      *Releases by Holders of Claims and Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, its Estate, Reorganized Debtor, and Released Party from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the First Lien Credit Agreement, the Second Lien Indenture, the Intercreditor Agreement, the Interim Cash Collateral Order and the Final Cash Collateral Order (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, the Definitive Documentation, the Bermuda Proceeding, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions, and (ii) nothing in this provision shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article

VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring Transactions; and (7) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such releases.

### 7.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation of votes with respect to this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Bermuda Proceeding, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 8.    *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting,

or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

### 9.    *Protection Against Discriminatory Treatment*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

### 10.    *Recoupment*

In no event shall any holder of an Allowed Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

11.     *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

12.     *Reimbursement or Contribution*

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## I.     Conditions Precedent to Confirmation and Consummation of the Plan

### 1.     *Conditions Precedent to the Confirmation Date*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      An order approving the Disclosure Statement shall have been entered by the Court in form and substance acceptable to the Debtors, the Majority Restructuring Support Parties, and the First Lien Administrative Agent and shall have become a Final Order;

2.      An order approving the Debtors' assumption of the Restructuring Support Agreement shall have been entered by the Court in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties;

3.      The Confirmation Order shall have been approved by the Court in form and substance acceptable to the Debtors and Majority Restructuring Support Parties;

4.      The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, each in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties, shall have been Filed subject to the terms hereof; and

5.      To the extent the Debtors' projected cash or liquidity on hand at emergence (excluding, for the avoidance of doubt, the Restricted Cash, the reduction in letters of credit, and any liquidity available under the Exit Facility) is less than Minimum Emergence Liquidity (as defined in the Exit Facility Term Sheet), the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have consented to the material terms of the New Money Contribution, which terms shall be disclosed in the Plan Supplement; *provided, however*, that nothing herein shall constitute a commitment by the First Lien Lenders or the Second Lien Noteholders to fund or otherwise provide such New Money Contribution.

### 2.     *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      Entry of the Confirmation Order in form and substance satisfactory to the Debtors and the Majority Restructuring Support Parties, and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

2.      The Bermuda Court shall have entered an order recognizing the Plan under Bermuda law;

3.      All of the Restructuring Support Parties' reasonable and documented professional fees and out-of-pocket expenses incurred in connection with the Restructuring Transactions, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall have been paid by the Debtors in accordance with the Restructuring Support Agreement;

4.      All fees ordered to be paid pursuant to the Final Cash Collateral Order, including the First Lien Administrative Agent's reasonable and documented professional fees shall have been paid or will be paid prior to or contemporaneously with the Effective Date in accordance with the terms of the Final Cash Collateral Order.

5.      The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties and made in accordance with the Article X.A of the Plan;

6.      The Exit Facility Documents in form and substance acceptable to the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

7.      All documentation effectuating the New Money Contribution, to the extent deemed necessary prior to Confirmation, in form and substance acceptable to the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Money Contribution shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Money Contribution shall be deemed to occur concurrently with the occurrence of the Effective Date;

8.      The Definitive Documentation shall be executed and satisfactory to the Majority Restructuring Support Parties in accordance with Section 3 of the Restructuring Support Agreement;

9.      All conditions precedent to the issuance of the New Equity, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

10.     The New Organizational Documents, in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties, have been duly filed with the applicable authorities in the relevant jurisdictions;

11.     All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions; *provided*, *however* that consummation of the Bermuda Proceeding shall not be a condition to the Effective Date;

12.     All documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements (including, without limitation, the Exit Facility Documents); and

13.     All Allowed Professional Fee Claims approved by the Court shall have been paid in full and the Professional Fee Escrow Account shall have been funded in the Professional Fee Reserve Amount.

### 3.     *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors, the Majority Restructuring Support Parties, and the First Lien Administrative Agent without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan

### 4.     *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### 5.     *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.  If the Effective Date shall not have occurred by September 2, 2016, it shall be a termination event under the Restructuring Support Agreement entitling, but not requiring, the Majority Restructuring Support Parties to terminate the Restructuring Support Agreement (as more fully set forth therein), in which case the Effective Date may not occur.

### J.     Modification, Revocation, or Withdrawal of the Plan

### 1.     *Modification and Amendments*

Subject to the limitations contained herein and the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy

Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the terms of the Restructuring Support Agreement, the Debtors expressly reserve their right (with the consent of the Majority Restructuring Support Parties) to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### 2. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. *Revocation or Withdrawal of the Plan*

The Debtors reserve the right (with the consent of the Majority Restructuring Support Parties) to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the Non-Debtor Subsidiaries; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries; or (iv) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

## K.   Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections relating to any of the foregoing;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3. resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (b) the

Debtors (with the consent of the Majority Restructuring Support Parties) or the Reorganized Debtors, as applicable, amending, modifying, or supplementing, pursuant to Article V hereof, the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the Restructuring Support Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Restructuring Support Agreement;

9.      enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1 of the Plan;

14.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Court;

22.     hear any other matter not inconsistent with the Bankruptcy Code;

23.     enter an order concluding or closing the Chapter 11 Cases; and

24.     enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

### L.      Miscellaneous Provisions

#### 1.      *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

#### 2.      *Additional Documents*

On or before the Effective Date, with the consent of the Majority Restructuring Support Parties, the Debtors may File with the Court such agreements and other documents, in form and substance satisfactory to the Majority Restructuring Support Parties, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, with the consent of the Majority Restructuring Support Parties, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3. ***Dissolution of the Committee***

On the Effective Date, the Committee shall dissolve automatically, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the Committee after the Effective Date.

4. ***Reservation of Rights***

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any holder of any Claim with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any claimant with respect to any Claims or Interests.

5. ***Successors and Assigns***

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

6. ***Service of Documents***

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

**Reorganized Debtors**                             **Energy XXI Ltd**
1021 Main Street, Suite 2626
Houston, Texas 77002
Attn:  John D. Schiller, Jr.

**Attorneys to the Debtors**                      **Vinson & Elkins LLP**
First City Tower
1001 Fannin, Suite 2500
Houston, Texas 77002-6760
Attn:  Harry A. Perrin

and

**Vinson & Elkins LLP**
666 Fifth Avenue, 26th Floor
New York, New York  10103-0040
Attn:  David S. Meyer
       Jessica C. Peet
       Lauren R. Kanzer

68

| | |
|---|---|
| **United States Trustee** | **Office of the United States Trustee for the Southern District of Texas** 515 Rusk Street, Suite 3516 Houston, Texas 77002 Attn:  Hector Duran, Esq. |
| **Counsel to the Ad Hoc Committee of Second Lien Noteholders** | **Milbank, Tweed, Hadley & McCloy LLP** 28 Liberty Street New York, NY 10005 Attn:  Dennis E. Dunne Samuel A. Khalil |
| **Proposed Attorneys to the Committee** | **Latham & Watkins LLP** 885 Third Avenue New York, NY 10022-4834 Attn:  Mitchell A. Seider Adam J. Goldberg |

### 7.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Restructuring Support Agreement, and the Exit Facility Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 9.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://dm.epiq11.com/EXL or the Court's website at www.txs.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

### 10.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be

69

applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors and the Majority Restructuring Support Parties. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Majority Restructuring Support Parties' consent; and (3) nonseverable and mutually dependent.

### 11.     *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### 12.     *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

### 13.     *Waiver or Estoppel*

Each holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Notice and Claims Agent prior to the Confirmation Date.

## VI.    TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The issuance and the distribution under the Plan of New Equity will be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  The Plan provides for the distribution of New Equity to the Holders of Second Lien Notes Claims and in connection with the Management Incentive Plan and the distribution of Warrants among the classes of EGC Unsecured Notes Claims, EPL Unsecured Notes Claims, and EXXI Convertible Notes Claims.  The New Equity may be resold without registration under the Securities Act or federal securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a

joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash or property.  Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan for persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

*In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.*

### A.      Legends

To the extent certificated, certificates evidencing the New Equity held by holders of 10% or more of the New Equity will bear a legend substantially in the form below:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS ENERGY XXI RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## VII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to the holders of Allowed Second Lien Notes Claims, EGC Unsecured Notes Claims, EPL Unsecured Notes Claims, and EXXI Convertible Notes Claims.

This discussion is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the Plan to the Debtors or any holder of a Claim or Interest.  The Debtors will not seek a

ruling from the Internal Revenue Service (the "*IRS*") and have not obtained an opinion of counsel regarding any tax consequences of the Plan to the Debtors or any holder of a Claim or Interest.  No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), or the tax consequences arising under the laws of any foreign, state, local or other jurisdiction or any income tax treaty.

This discussion does not apply to holders of Claims that are otherwise subject to special treatment under the Tax Code, such as: financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; certain former U.S. citizens or long-term residents; persons who hold Claims as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons who received their Claims upon exercise of employee unit options or otherwise as compensation; and holders not entitled to vote on the Plan. The following discussion assumes that holders hold their Claims as "capital assets" (as defined in section 1221 of the Tax Code).

For purposes of this discussion, a "U.S. holder" is a beneficial owner of a Second Lien Notes Claim, EGC Unsecured Notes Claim, EPL Unsecured Notes Claim, or EXXI Convertible Notes Claim, that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (i) the administration of which is subject to the primary supervision of a U.S. court and that has one or more United States persons that have the authority to control all substantial decisions of the trust or (ii) that has made a valid election under applicable U.S. Treasury regulations to be treated as a United States person.

A "Non-U.S. holder" is a beneficial owner of a Claim that is an individual, corporation, estate or trust that is not a U.S. holder.

THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

### B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

As of June 30, 2015, the Debtors' consolidated U.S. net operating loss ("**NOL**") carryover was estimated to be approximately $1.02 billion. During the tax year ending on June 30, 2016, the Debtors expect to generate approximately $1.49 billion of cancellation of indebtedness income ("**CODI**") as a result of debt repurchases for less than the adjusted issue price of such debt. The Debtors expect to generate additional NOLs during the tax year ending on June 30, 2016, but the amount is uncertain. These NOLs and certain other tax attributes may be subject to limitations on their use and significantly reduced as a result of CODI generated by debt repurchases during the tax year ending on June 30, 2016 and upon implementation of the Plan.

#### 1.      Cancellation of Debt and Reduction of Tax Attributes

It is anticipated that the Plan will result in cancellation of a significant portion of the Debtors' outstanding indebtedness. Absent an exception, the Debtors would generally recognize CODI upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. However, with respect to CODI generated upon implementation of the Plan, the Debtors anticipate that they will not be required to include any amount of such CODI in gross income, because the discharge of debt will occur pursuant to a proceeding under title 11 of the Bankruptcy Code.

The Debtors expect that they will be required to reduce their tax attributes by the amount of CODI that is excluded from gross income, in accordance with the methodology set forth in the Treasury regulations addressing such reduction for consolidated groups.  Generally, tax attributes are reduced in the following order: (a) NOLs and NOL carryovers; (b) certain tax credit carryovers; (c) net capital losses and capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. However, the Debtors may elect to first reduce the basis of their depreciable assets, in which case the limitation on reduction in tax basis in assets described above in (d) will not apply.

The Debtors expect that their NOLs and other tax attributes will be substantially reduced or eliminated as a result of the Debtors' excluded CODI.  However, the exact amount of excluded CODI, and the resulting tax attribute reduction amount, will depend in part on the fair market value of the New Equity and the New Warrants (as defined below), which cannot be known with certainty as of the date hereof, and the manner in which the Restructuring Transactions are implemented.

#### 2.      Limitation of NOL Carryforwards and Other Tax Attributes

If a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change" under section 382 of the Tax Code (an "**Ownership Change**") the amount of its pre-ownership change NOLs and/or built-in losses (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally is subject to an annual limitation (the "**Annual Limitation**").

The Debtors anticipate that the issuance of the New Equity under the Plan will result in an Ownership Change. However, as a result of the Chapter 11 Cases, the Debtors expect that a modification to the standard Annual Limitation will apply. Consequently, the Debtors' Annual Limitation should equal the product of (a) the fair market value of the stock of the corporation after taking into account the increase in value from any surrender or cancellation of Claims in the Chapter 11 Cases and (b) the applicable "long-term tax-exempt rate" (*e.g.*, 2.27% for May 2016).

Any NOLs generated in any post-Effective Date taxable year (including the portion of the taxable year of the Ownership Change following the Effective Date) should not be subject to this limitation. If an

additional Ownership Change occurs after the Effective Date, the Reorganized Debtors' use of their Pre-Change Losses may be adversely affected.

### 3.    *Alternative Minimum Tax*

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. NOL carryovers can only offset up to 90% of AMT income in computing AMT. In addition, an Ownership Change that occurs with respect to a Debtor having a net unrealized built-in loss in its assets may cause the Debtor's aggregate tax basis in its assets to be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date, the effect of which may increase the amount of AMT owed by the Debtors.

### C.    **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims**

#### 1.    *U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Second Lien Notes Claims*

##### (a)    **U.S. Federal Income Tax Consequences to U.S. Holders of a Tax-Free Exchange**

It has not yet been determined whether New Parent will be Reorganized EGC, Reorganized EXXI Inc. or another entity.  Such determination shall be made by the Debtors and the Majority Restructuring Support Parties prior to the Effective Date.  As a result, the following discussion describes the U.S. federal income tax consequences associated with the likely potential alternatives.

###### 1)    U.S. Federal Income Tax Consequences to U.S. Holders of a Tax-Free Recapitalization

Pursuant to the Plan, each U.S. holder of an Allowed Second Lien Notes Claim shall receive a pro rata share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package.  If Reorganized EGC is the New Parent, whether and to what extent the U.S. holder of a Second Lien Notes Claim recognizes gain or loss as a result of the exchange of its claim for the New Equity depends, in part, on whether the exchange qualifies as tax-free recapitalization under the Tax Code (a "**Recapitalization**").  Whether an exchange of such holder's Second Lien Notes Claim for New Equity in Reorganized EGC qualifies as a tax-free Recapitalization with respect to such holder further depends on whether debt underlying the Second Lien Notes Claim surrendered is treated as a "security" for purposes of the Tax Code.

Whether a debt instrument constitutes a "security" depends on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is one important factor. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. While the term of an instrument is often viewed as an important factor, there are numerous other factors that should also be considered in determining whether a debt instrument is a security. To the extent the Debtors are required to take a position, they intend to treat the Second Lien Notes as a security for federal income tax purposes.  However, because of the inherently factual nature of this determination, each U.S. holder of a Claim is urged to consult its tax advisor regarding whether debt underlying a Second Lien Notes Claim constitutes a security for federal income tax purposes.

To the extent the exchange of a Second Lien Notes Claim for New Equity in Reorganized EGC qualifies as a Recapitalization, a U.S. holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section VII.C.3. of this Disclosure Statement). Such U.S. holder's total combined tax basis in its New Equity received should equal the U.S. holder's tax basis in the Second Lien Notes Claim surrendered therefor increased by gain, if any, recognized by such U.S. holder in the exchange. A U.S. holder's holding period for the New Equity should include its holding period for the Second Lien Notes Claim surrendered (except to the extent any New Equity is allocable to accrued but unpaid interest, in which case its holding period in the New Equity would begin on the day following the Effective Date).

          2)        U.S. Federal Income Tax Consequences to U.S. Holders of a Section 351 Exchange

Pursuant to the Plan, each U.S. holder of an Allowed Second Lien Notes Claim shall receive a pro rata share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package. If Reorganized EXXI Inc. is the New Parent, whether and to what extent the U.S. holder of a Second Lien Notes Claim recognizes gain or loss as a result of the exchange of its claim for the New Equity depends, in part, on whether the exchange qualifies as a tax-free transfer of property to New Parent in exchange for New Equity pursuant to Section 351 of the Tax Code (a "*351 Exchange*"). A transfer of property to a corporation in exchange for stock in such corporation will be treated as a 351 Exchange if, immediately after the transfers, the transferors of property, in the aggregate, are "in control" of the transferee corporation. For this purpose, control means ownership of 80% or more of the total voting power of the voting stock of the transferee corporation and 80% or more of each class of non-voting stock. If Reorganized EXXI Inc. is the New Parent, the Plan provides that holders of Allowed Second Lien Notes Claims will transfer their Claims to New Parent in exchange for 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package. Because the New Equity issued to holders of Allowed Second Lien Notes Claim should constitute "control" of New Parent for purposes of Section 351 of the Tax Code, if Reorganized EXXI Inc. is the New Parent, the exchange of Allowed Second Lien Notes Claims for New Equity is expected to qualify as a 351 Exchange. To the extent the exchange of a Second Lien Notes Claim for New Equity qualifies as a 351 Exchange, a U.S. holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section VII.C.3. of this Disclosure Statement). Such U.S. holder's total combined tax basis in its New Equity received should equal the U.S. holder's tax basis in the Second Lien Notes Claim surrendered therefor increased by gain, if any, recognized by such U.S. holder in the exchange. A U.S. holder's holding period for its interest in the New Equity should include the holding period for the Second Lien Notes Claim surrendered therefor (except to the extent any New Equity is allocable to accrued but unpaid interest, in which case its holding period in the New Equity would begin on the day following the Effective Date).

          **(b)**        **U.S. Federal Income Tax Consequences to U.S. Holders in a Taxable Exchange**

To the extent the exchange is not a Recapitalization or a 351 Exchange, a U.S. holder of a Second Lien Notes Claim will be treated as exchanging such Claim for New Equity in a taxable exchange. Accordingly, each U.S. holder of such Second Lien Notes Claim should recognize gain or loss equal to the difference between the fair market value of New Equity received in exchange for the Claim and such U.S. holder's adjusted basis, if any, in such Claim. Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. holder previously has claimed a bad debt deduction with respect to its Claim.

See Sections VII.C.3. and VII.C.4. of this Disclosure Statement, entitled "Accrued Interest" and "Market Discount."  A U.S. holder's tax basis in any New Equity received should equal the fair market value of such New Equity as of the date such New Equity is distributed to the holder.  A U.S. holder's holding period for the New Equity received should begin on the day following the Effective Date.

> ### 2. *U.S. Federal Income Tax Consequences to U.S. Holders of Allowed EGC Unsecured Notes Claims, Allowed EPL Unsecured Notes Claims and Allowed EXXI Convertible Notes Claims*

The holders of the EGC Unsecured Notes Claims, the EPL Unsecured Notes Claims and the EXXI Convertible Notes Claims (collectively, the "***Unsecured Notes Claims***") will receive a Pro Rata share of the EGC Warrant Package Allocation, the EPL Warrant Package Allocation, or the EXXI Warrant Package Allocation, respectively (the "***New Warrants***").  Except as discussed below, a U.S. holder of Unsecured Notes Claims should be treated as exchanging such Unsecured Notes Claims for the New Warrants in a fully taxable exchange.  U.S. holders of Unsecured Notes Claims will recognize gain or loss equal to the difference between the value of the New Warrants received and the respective holder's adjusted basis, if any, in such Unsecured Notes Claims surrendered in the exchange. The gain or loss recognized generally should be long-term capital gain or loss if the U.S. holder has held its interest in the Debtor for more than one year at the time of the exchange. A U.S. holder's tax basis in the New Warrants received should equal the fair market value of such interests. A U.S. holder's holding period for the New Warrants received on the Effective Date would begin on the day following the Effective Date.

However, if Reorganized EGC is the New Parent, the receipt of New Warrants by holders of the EGC Unsecured Notes Claims may qualify as a Recapitalization. Whether an exchange of such holder's EGC Unsecured Notes Claims for New Warrants in Reorganized EGC qualifies as a tax-free Recapitalization with respect to such holder further depends on whether debt underlying the EGC Unsecured Notes Claims surrendered is treated as a "security" for purposes of the Tax Code. To the extent the Debtors are required to take a position, they intend to treat the EGC Unsecured Notes Claims as a security for federal income tax purposes.  However, because of the inherently factual nature of this determination, each U.S. holder of a Claim is urged to consult its tax advisor regarding whether debt underlying an EGC Unsecured Notes Claim constitutes a security for federal income tax purposes.

To the extent the exchange of EGC Unsecured Notes Claims for New Warrants qualifies as a Recapitalization, a U.S. holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section VII.C.3. of this Disclosure Statement).  Such U.S. holder's total combined tax basis in its New Warrants received should equal the U.S. holder's tax basis in the EGC Unsecured Notes Claims surrendered therefor increased by gain, if any, recognized by such U.S. holder in the exchange.  A U.S. holder's holding period for the New Warrants should include its holding period for the EGC Unsecured Notes Claims surrendered (except to the extent any New Equity is allocable to accrued but unpaid interest, in which case its holding period in the New Equity would begin on the day following the Effective Date).

> ### 3. *Accrued Interest*

To the extent that any amount received by a U.S. holder of a Claim is attributable to accrued but unpaid interest (including accrued original issue discount ("***OID***")) on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. holder as ordinary interest income (to the extent not already taken into income by the U.S. holder). Conversely, a U.S. holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest (including accrued OID) was previously included in the U.S.

holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the plan, each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion. The IRS could take the position that the consideration received by a holder should be allocated in a manner other than as determined by such holder.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 4. *Market Discount*

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount. Any gain recognized by a U.S. holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued).

If Reorganized EGC is the New Parent, to the extent that the Allowed Claims that were acquired with market discount are exchanged in a Recapitalization for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount. If, however, Reorganized EXXI Inc. is the New Parent, to the extent that the Allowed Claims that were acquired with market discount are exchanged in a transaction that qualifies as a 351 Exchange, the U.S. holder may be required to recognize any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) to the extent of any deemed gain. However, the tax law is unclear on this point.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 5. *U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Equity and the New Warrants*

#### (a) Distributions on New Equity

The gross amount of any distribution of cash or property made to a U.S. holder with respect to New Equity generally will be includible in gross income by a U.S. holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed our current and accumulated earnings and profits, the distribution (i) will be treated as a non-taxable return of the U.S. holder's

adjusted basis in the New Equity and (ii) thereafter as capital gain. Dividends received by non-corporate U.S. holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a corporate U.S. holder and certain other requirements are satisfied.

<div align="center">

**(b)      Exercise of New Warrants**

</div>

U.S. holders of New Warrants generally will not realize gain or loss upon the exercise of the New Warrants into New Equity. A U.S. holder's basis in the New Equity received upon the exercise of such U.S. holder's New Warrants will equal the sum of (i) the U.S. holder's tax basis in the New Warrants and (ii) the strike price. A U.S. holder's holding period in the New Equity received on exercise of New the Warrants will begin on the date of exercise of the New Warrants.

<div align="center">

**(c)      Sale, Exchange, or Other Taxable Disposition of New Equity or New Warrants**

</div>

For U.S. federal income tax purposes, a U.S. holder generally will recognize gain or loss on the sale, exchange, or other taxable disposition of any of its New Equity or New Warrants in an amount equal to the difference, if any, between the amount realized for the New Equity or the New Warrants and the U.S. holder's adjusted tax basis in the New Equity or the New Warrants. Subject to the rules discussed above under Section VII.C.4., entitled "Market Discount," any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has a holding period in the New Equity or the New Warrants of more than one year as of the date of disposition. Non-corporate U.S. holders may be eligible for reduced rates of taxation on long-term capital gains.

<div align="center">

**6.      *Medicare Tax***

</div>

Certain U.S. holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on the consummation of the Plan to such U.S. holders and the ownership and disposition of any consideration to be received under the Plan.

<div align="center">

**D.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims**

</div>

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. holders. The rules governing the U.S. federal income tax consequences to Non-U.S. holders are complex. Each Non-U.S. holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. holders and the ownership and disposition of the New Equity and the New Warrants, as applicable.

<div align="center">

**1.      *Gain Recognition***

</div>

Whether a Non-U.S. holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders. Subject to the rules discussed below under Sections VII.D.6. and VII.E., entitled "FATCA" and "Information Reporting and Back-Up Withholding," any gain realized by a Non-U.S. holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met, or (ii) such gain

<div align="center">

78

</div>

is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States).

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain realized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described in Section VII.D.3., entitled "Income or Gain Effectively Connected with a U.S. Trade or Business."

        **2.**     *Accrued Interest*

Subject to the rules discussed below under Sections VII.D.6. and VII.E., entitled "FATCA" and "Information Reporting and Back-Up Withholding," payments attributable to U.S. source accrued but unpaid interest (including OID) to a Non-U.S. holder generally will not be subject to U.S. federal income tax and will be exempt from withholding under the "portfolio interest" exemption if the Non-U.S. holder properly certifies to its foreign status (generally, by providing the withholding agent IRS Form W-8BEN or W-8BEN-E prior to payment), and:

    (i)      the Non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of the Debtor's stock entitled to vote;

    (ii)     the Non-U.S. holder is not a "controlled foreign corporation" that is a "related person" with respect to the Debtor;

    (iii)    the Non-U.S. holder is not a bank whose receipt of interest on the notes is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of the Non-U.S. holder's trade or business; and

    (iv)    such interest is not effectively connected with the Non-U.S. holder's conduct of a U.S. trade or business.

A Non-U.S. holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or lower applicable income tax treaty rate) on payments that are attributable to accrued but unpaid interest (including OID). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If any accrued but unpaid interest is effectively connected income, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described in Section VII.D.3., entitled "Income or Gain Effectively Connected with a U.S. Trade or Business."

        **3.**     *Income or Gain Effectively Connected with a U.S. Trade or Business*

If any interest or gain realized by a Non-U.S. holder on the exchange of its Claims is effectively connected with such holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, the holder maintains a permanent establishment in the United States to which such interest or gain is attributable), then the interest income or gain will be subject to U.S. federal

income tax at regular graduated income tax rates generally in the same manner as if you were a U.S. holder. Effectively connected income will not be subject to U.S. federal withholding tax if you satisfy certain certification requirements by providing to the applicable withholding agent a properly executed IRS Form W-8ECI (or successor form), In addition, if such a Non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

4.    *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of New Equity or the New Warrants*

(a)    **Dividends on New Equity**

Any distributions made with respect to New Equity will constitute dividends for U.S. federal income tax purposes to the extent of New Parent's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent those distributions exceed our current and accumulated earnings and profits, the distributions will be treated as a non-taxable return of capital to the extent of the Non-U.S. holder's tax basis in our common stock and thereafter as capital gain from the sale or exchange of such New Equity. Subject to the rules discussed above under Section VII.D.3., entitled "Income or Gain Effectively Connected with a U.S. Trade or Business," and below under Sections VII.D.5. and VII.D.6., entitled "FIRPTA" and "FATCA," any distribution made to a Non-U.S. holder on the New Equity generally will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the distribution unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced treaty rate, a Non-U.S. holder must provide the applicable withholding agent with an IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) certifying qualification for the reduced rate.

Dividends paid to a Non-U.S. holder that are effectively connected with a trade or business conducted by the Non-U.S. holder in the United States (and, if required by an applicable income tax treaty, are treated as attributable to a permanent establishment maintained by the Non-U.S. holder in the United States) generally will be taxed on a net income basis at the rates and in the manner generally applicable to United States persons (as defined under the Code). Such effectively connected dividends will not be subject to U.S. withholding tax if the non-U.S. holder satisfies certain certification requirements by providing the applicable withholding agent a properly executed IRS Form W-8ECI certifying eligibility for exemption. If the non-U.S. holder is a non-U.S. corporation, it may also be subject to a branch profits tax (at a 30% rate or such lower rate as specified by an applicable income tax treaty).

(b)    **Sale, Redemption, or Repurchase of New Equity or the New Warrants**

Subject to the rules discussed below under Sections VII.D.6. and VII.E., entitled "FATCA" and "Information Reporting and Back-Up Withholding," a Non-U.S. holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of any of its New Equity or New Warrants, including any gain resulting from a non-dividend distribution in excess of the holder's tax basis in their New Equity, unless (i) the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States), or (iii) New Parent is or has been during a specified testing period a USRPHC (as defined below).

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain realized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. holder, and a Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). If the third exception applies, the Non-U.S. holder will be subject to U.S. federal income tax and U.S. federal withholding tax as discussed in Section VII.D.5, entitled "FIRPTA."

### (c)    Exercise of the New Warrants

In general, it is not expected that the exercise of the New Warrants into New Equity will cause a Non-U.S. holder to recognize gain or loss under the Tax Code. However, each Non-U.S. holder is urged to consult its own tax advisor prior to the exercise of the New Warrants into New Equity and prior to a sale or disposition of New Equity acquired by such exercise, including regarding FIRPTA reporting requirements to the IRS relating to such exercise.

### 5.    *FIRPTA*

Under the Foreign Investment in Real Property Tax Act of 1980 ("***FIRPTA***"), gain or loss of a foreign person on a disposition of a United States real property interest ("***USRPI***") is deemed to be effectively connected with a trade or business carried on in the United States and subject to U.S. federal income tax. A USRPI includes any interest (other than solely as a creditor) in a domestic corporation if the domestic corporation is a United States real property holding corporation ("***USRPHC***"). Common stock that is regularly traded on an established securities market is, however, excepted from treatment as a USRPI if any class of stock of the corporation is regularly traded on an established securities market and the holder of such stock does not, at any time during an applicable measuring period, own more than 5% of that class of stock (the "***5% Public Shareholder Exception***").  In addition, if a non-regularly traded interest is convertible into common stock that is regularly traded on an established securities market, such non-regularly traded interest is excepted from treatment as a USRPI if on the date on which a holder acquired such interest it does not have a fair market value greater than 5% of the regularly traded class of stock into which it is convertible (the "***5% Convertible Exception***" and together with the 5% Public Shareholder Exception, the "***5% Exception***").

If the common stock of the corporation were not considered to be regularly traded on an established securities market during the calendar year in which the relevant disposition by a Non-U.S. holder occurs, the Non-U.S. holder (regardless of the percentage of common stock owned or the fair market value of the non-regularly traded interest convertible into common stock) would be subject to U.S. federal income tax on a taxable disposition of the common stock or the non-regularly traded interest convertible into common stock, and a 15% withholding tax would apply to the gross proceeds from such disposition.

The Debtors expect that New Parent will be a USRPHC.  Accordingly, the New Equity and the New Warrants will be treated as USRPIs, unless a Non-U.S. holder qualifies for the 5% Exception. Following the Effective Date, the New Parent may take steps to create a market for the New Equity, but no assurances can be given that New Parent will take such steps or, that if they do, the New Parent's actions will permit certain Non-U.S. holders to rely on the 5% Exception with respect to their New Equity.

**NON-U.S. HOLDERS SHOULD CONSULT THEIR INDEPENDENT TAX ADVISORS TO DETERMINE WHETHER THE NEW EQUITY AND/OR THE NEW WARRANTS ARE SUBJECT TO FIRPTA.**

6. *FATCA*

The Foreign Account Tax Compliance Act ("*FATCA*") imposes a 30% withholding tax on "withholdable payments", in each case if paid to a "foreign financial institution" or a "non-financial entity" (each as defined in the Code) (including in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Code) or provides the applicable withholding agent with a certification identifying the direct and indirect substantial United States owners of the entity (in either case, generally on an IRS Form W-8BEN-E), or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation (such as an IRS Form W-8BEN-E). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes.

For this purpose, "withholdable payments" are generally U.S. source payments of (i) fixed or determinable, annual or periodical income (including interest on debt instruments issued on or after July 1, 2014 and dividends on shares of New Equity) and (ii) gross proceeds from the sale or other disposition of any property of a type which can produce U.S. source interest or dividends (if such sale or other disposition occurs after December 31, 2018). Because the debt underlying the EGC Unsecured Notes Claim or EPL Unsecured Notes Claim was issued prior to July 1, 2014, FATCA will not apply a holder with respect to the exchange of its EGC Unsecured Notes Claim or EPL Unsecured Notes Claim.

Each Non-U.S. holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. holder's U.S. federal income tax consequences under the Plan.

**E.      Information Reporting and Back-Up Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. holder, such U.S. holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. holder, such Non-U.S. holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

In addition, from an information reporting perspective, the Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## VIII.   CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The risk factors below should not be regarded as the only risks associated with the Debtors' businesses or the Plan and its implementation.  Documents filed with the SEC may contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A.      Certain Bankruptcy Law Considerations

#### 1.      *General*

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure the parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' ability to develop and execute their business plan, their financial condition, and their liquidity.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.      *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are

83

substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3. *The Conditions Precedent to the Confirmation Date and/or Effective Date of the Plan May Not Occur*

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

### 4. *The Debtors May Fail to Satisfy Voting Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 5. *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 6. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 7. *The Debtors May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial

reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to nonaccepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.   Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 8.      *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 9.      *Risk of Termination of the Restructuring Support Agreement*

The Restructuring Support Agreement contains certain provisions that give the Majority Restructuring Support Parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied, such as the failure to meet of the proposed milestones or the conversion of one or more of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code.  Should a termination event occur, all obligations of the Restructuring Support Parties under the Restructuring Support Agreement will terminate, except that any party's termination solely with respect to itself will not result in the termination of the Restructuring Support Agreement with respect to any other party.  Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could

significantly and detrimentally impact the Debtors' relationships with vendors, employees, and major customers.

### 10. *Conversion into Cases under Chapter 7 of the Bankruptcy Code*

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.  See the Liquidation Analysis attached hereto as **Exhibit E** for further discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### B. **Additional Factors Affecting the Value of the Reorganized Debtors**

#### 1. *The Total Amount of Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than what the Debtors have estimated, which, in turn, could cause the value of distributions to be reduced substantially.

#### 2. *Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### C. **Risks Relating to the Debtors' Business and Financial Condition**

#### 1. *Risks Associated with the Debtors' Business and Industry*

The risks associated with the Debtors' business and industry are more fully described in the Debtors' SEC filings, including:

- Annual Report on Form 10-K for the fiscal year ended June 30, 2015, filed on September 29, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015, filed on November 9, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2015, filed on February 16, 2016; and

- Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2016, filed on May 10, 2016.

The risks associated with the Debtors' business and industry described in the Debtors' filings with the SEC include, but are not limited to, the following:

- domestic and foreign supplies of oil and natural gas;

- price and quantity of foreign imports of oil and natural gas;

- actions of the Organization of Petroleum Exporting Countries and other state-controlled oil companies relating to oil and natural gas price and production controls;

- level of global oil and natural gas exploration and production activity;

- the effects of government regulation and permitting and other legal requirements;

- costs associated with perfecting title for mineral rights in some of our properties;

- competition in the oil and gas industry;

- uncertainties in estimating our oil and gas reserves and net present values of those reserves;

- uncertainties in exploring for and producing oil and gas, including exploitation, development, drilling and operating risks;

- political conditions in or affecting other oil-producing and natural gas-producing countries, including the current conflicts in the Middle East and conditions in South America and Russia;

- weather conditions;

- technological advances affecting oil and natural gas production and consumption; and

- overall U.S. and global economic conditions.

### 2.    *Liquidity During and After the Chapter 11 Cases*

Although the Debtors lowered their capital budget and reduced the scale of their operations significantly, their business remains capital intensive.  In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors believe that they will have sufficient cash on hand and cash flow from operations to continue to fund the Reorganized Debtors' operations after emergence from chapter 11.

The Debtors current liquidity may not be sufficient to allow the Debtors to satisfy their obligations related to the Chapter 11 Cases, proceed with the confirmation of a chapter 11 plan of reorganization, and/or emerge from bankruptcy.  While the Debtors have an agreement in principal with the First Lien Administrative Agent on the terms of the Exit Facility, the Debtors can provide no assurance that they will be able to secure interim financing or exit financing, if needed, to meet their liquidity needs or, if sufficient funds are available, that any financing offered to the Debtors will be on terms acceptable to the Debtors.

### 3.     *Post-Effective Date Indebtedness*

Following the Effective Date, the Reorganized Debtors will have significantly reduced their outstanding secured indebtedness, but will still have debt outstanding under the First Lien Credit Agreement.  The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D.     **Factors Relating to Securities to Be Issued Under the Plan**

### 1.     *Market for Securities*

On April 14, 2016, Energy XXI received a letter from The NASDAQ Listing Qualifications Staff stating that the Staff had determined that the Company's securities would be delisted from NASDAQ. The decision was reached by the Staff under NASDAQ Listing Rules 5101, 5110(b) and IM-5101-1 as a result of Chapter 11 Cases, the associated public interest concerns raised by the Petitions, concerns regarding the residual equity interest of the existing listed securities holders, and concerns about the Company's ability to sustain compliance with all requirements for continued listing on NASDAQ. Trading of the Company's common stock was suspended at the opening of business on April 25, 2016, and a Form 25-NSE was filed with the SEC on May 19, 2016, which removed Energy XXI's securities from listing and registration on NASDAQ.  EXXI Common Stock is currently trading on the OTC Pink under the symbol "EXXIQ" as of April 25, 2016.

New Parent may seek listing of the New Equity on a national exchange upon consummation of the Plan.  There can be no assurance that any public market for the New Equity will exist in the future or that New Parent will be successful with such listing.  Until listed on a national exchange, the OTC Pink is a significantly more limited market than NASDAQ, and the quotation of the New Equity on the OTC Pink may result in a less liquid market available for existing and potential shareholders to trade shares of New Equity.  This could further depress the trading price of New Equity and could also have a long-term adverse effect on New Parent's ability to raise capital.

### 2.     *Potential Dilution*

The ownership percentage represented by the New Equity distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the Management Incentive Program and the exercise of any Warrants issued under the Plan, as well as the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtors could adversely affect the value of the New Equity issuable upon such conversion. The amount and dilutive effect of any of the foregoing could be material.

### 3.   *Equity Interests Subordinated to the Reorganized Debtors' Indebtedness*

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity would rank below all debt claims against the Reorganized Debtors. As a result, holders of New Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### 4.   *Implied Valuation of New Equity Not Intended to Represent the Trading Value of the New Equity*

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Equity in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Equity is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Equity to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity in the public or private markets.

### E.   **Additional Factors**

### 1.   *The Debtors Could Withdraw Plan*

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2.   *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.   *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. *No Legal or Tax Advice Is Provided by this Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of Claims or Interests should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. *No Admission Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6. *Certain Tax Consequences*

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, *see* Section VII hereof.

## IX. VOTING PROCEDURES AND REQUIREMENTS

### A. **Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

The claims in the following classes (collectively, the "***Voting Classes***") are entitled to vote to accept or reject the Plan:

- Class 5– First Lien Claims

- Class 6 – Second Lien Notes Claims

- Class 7 – EGC Unsecured Notes Claims

- Class 8 – EPL Unsecured Notes Claims

- Class 9 – EXXI Convertible Notes Claims

- Class 10 – Trade Claims

- Class 11 – General Unsecured Claims

The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

### B.      Voting Procedures

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in certain exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> **PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

### C.      Voting Deadline

Ballots will be provided for holders of Voting Claims as of June [•], 2016 (the "***Voting Record Date***") to vote to accept or reject the Plan.  Because all other Classes are unimpaired and deemed to accept or impaired and deemed to reject, only the Voting Classes are entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, the applicable standards for tabulating Ballots, and opting out of the releases set forth in the Plan.

The Debtors have engaged Epiq Bankruptcy Solutions ("***Epiq***") as their claims, noticing, solicitation, and balloting agent (the "***Solicitation Agent***") to assist in, among other things, the transmission of voting materials and in the tabulation of votes with respect to the Plan.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF __:__ A.M./P.M., PREVAILING CENTRAL TIME, ON _____, 2016, UNLESS EXTENDED BY THE DEBTORS.  IF YOU HOLD YOUR CLAIMS THROUGH A NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE FOR RETURNING YOUR VOTING INSTRUCTIONS.   UNLESS OTHERWISE INSTRUCTED, PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE OR YOUR VOTE WILL NOT BE COUNTED.

EACH BALLOT ADVISES THAT CREDITORS WHO (A) VOTE TO ACCEPT THE PLAN OR (B) DO NOT VOTE OR VOTE TO REJECT THE PLAN AND DO NOT ELECT TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS SET FORTH IN ARTICLE VIII OF THE PLAN AND UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CAUSES OF ACTION. CREDITORS WHO DO NOT GRANT THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN WILL NOT RECEIVE THE BENEFIT OF THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN.

Delivery of a Ballot by facsimile, e-mail or any other electronic means will not be accepted. Ballots returnable to the Solicitation Agent must be returned by the Voting Deadline with an original signed copy to:

| Via First Class Mail: | Via Hand Delivery or Overnight Courier: |
|---|---|
| Energy XXI Ltd Ballot Processing c/o Epiq Bankruptcy Solutions, LLC P.O. Box 4422 Beaverton, OR 97076-4422 | Energy XXI Ltd Ballot Processing c/o Epiq Bankruptcy Solutions, LLC 10300 SW Allen Blvd. Beaverton, OR 97005 |

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT NO LATER THAN [_____], 2016 AT [   :   ] A.M./P.M. (PREVAILING CENTRAL TIME).

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

D.      Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Solicitation Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot

by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.

Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors determine, unless otherwise ordered by the Bankruptcy Court.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will the Debtors or any other person incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## X.  CONFIRMATION OF THE PLAN

### A.  Confirmation Hearing

Pursuant to sections 1128 and 1129 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing to consider confirmation of the Plan.  The Confirmation Hearing has been scheduled to be heard on _____, 2016 at __:__ a.m./p.m. (Prevailing Central Time) in Courtroom 400 of the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.  The Confirmation Hearing may be adjourned from time-to-time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

In addition, the Bankruptcy Court has set the deadline to object to the confirmation of the Plan as _____, 2016 at __:__ a.m./p.m. (Prevailing Central Time) (the "*Objection Deadline*").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections and responses to the Plan, if any, must be served and filed as to be received on or before the Objection Deadline in the manner described below.  For the avoidance of doubt, an objection to the Plan filed with the Bankruptcy Court will not be considered a vote to reject the Plan.

### B.  Objections To Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

> 1)      The Debtors and Counsel to the Debtors:
>
> Energy XXI Ltd
> 1021 Main Street, Suite 2626
> Houston, Texas 77022
> Attn:    Bo Boyd
>
> – and –

Vinson & Elkins LLP
First City Tower
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Attn:    Harry A. Perrin and Bradley R. Foxman
Tel:     (713) 758-2222
Email:  hperrin@velaw.com; bfoxman@velaw.com

*– and –*

Vinson & Elkins LLP
666 Fifth Avenue
New York, New York 10103-0040
Attn:    David S. Meyer, Jessica C. Peet, and Lauren R. Kanzer
Tel:     (212) 237-0000
Email:  dmeyer@velaw.com; jpeet@velaw.com; lkanzer@velaw.com

2)      The United States Trustee:

Office of the U.S. Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002
Attn:    Hector Duran

3)      The Ad Hoc Committee of Second Lien Noteholders:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attn:    Samuel Khalil and Matthew Brod
Tel:     (212) 530-5000
Email:  skhalil@milbank.com; mbrod@milbank.com

4)      The First Lien Agent:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:    Ana Alfonso
Tel:     (212) 728-8000
Email:  aalfonso@willkie.com

*– and –*

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2310
Houston, Texas 77002
Attn:    Jennifer Hardy
Tel:     (713) 510-1700
Email:  jhardy2@willkie.com

94

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### C.    Requirements for Confirmation of the Plan

The requirements for Confirmation of the Plan pursuant section 1129(a) of the Bankruptcy Code include, without limitation, whether:

1)    the Plan complies with the applicable provisions of the Bankruptcy Code;

2)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

3)    the Plan has been proposed in good faith and not by any means forbidden by law;

4)    any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

5)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

6)    with respect to each Class of Claims or Interests, each holder of an impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

7)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

8)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

95

9)      at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

10)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

11)     all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### D.  Best Interests Test/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.  This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

Attached hereto as **Exhibit E** and incorporated herein by reference are liquidation analyses (collectively, the "*Liquidation Analysis*") prepared by the Debtors with the assistance of Opportune LLP ("*Opportune*"), the Debtors' financial advisor.  The Liquidation Analysis provides the Debtors analysis with respect to separate liquidations of each of:  Energy XXI and its affiliates, EGG and its subsidiaries (other than EPL and its subsidiaries), and EPL and its subsidiaries.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial reduction in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit E** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can

96

be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### E.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

For purposes of determining whether the Plan meets this requirement, the Debtors, with the assistance of Opportune, have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared a projected consolidated income statement, which includes the consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "**_Financial Projections_**") for the period beginning July 1, 2016 and continuing through June 30, 2019. The Financial Projections are based on an assumed Effective Date of August 31, 2016 and certain assumptions regarding the Debtors' ability to obtain Exit Financing. To the extent that the Effective Date occurs before or after August 31, 2016, recoveries on account of Allowed Claims could be impacted. Creditors and other interested parties should review Article VIII of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **<u>Exhibit F</u>** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe they will be a viable operation following the Chapter 11 Cases Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### F.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[19]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

---

[19]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### G.      Additional Requirements for Nonconsensual Confirmation

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      *No Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.

### 2.      *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.   As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### H.      Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  The valuation analyses are set forth in **Exhibit G** attached hereto (together, the "***Valuation Analysis***") and incorporated herein by reference.

## XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.        Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.        Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Class 5, and in certain instances Class 6, would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property.[20]  In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 4, 5, and 6 would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds could be used to pay holders of Claims in Classes 7 through 15.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan.

### C.        Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit E**.

As noted in Section X.D of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

## XII.  CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.

---

[20]     Pursuant to that certain Intercreditor Agreement dated as of March 12, 2015 between Wells Fargo Bank, N.A., as priority lien agent, and EGC, the Priority Lien Agent (as defined in the Intercreditor Agreement) is given the exclusive right to credit bid; i.e. holders of Claims in Class 4 would not be entitled to credit bid.

Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  June 14, 2016
        Houston, Texas

ENERGY XXI LTD
on behalf of itself and all other Debtors


\s\ _____
John D. Schiller Jr.
President and Chief Executive Officer
1021 Main Street, Suite 2626
Houston, Texas 77002

## EXHIBIT A

**Plan of Reorganization**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 16-31928** |
| | § | |
| **ENERGY XXI LTD**, *et al.*, | § | **(Chapter 11)** |
| | § | |
| | § | **Jointly Administered** |
| **Debtors.**[1] | § | |

### DEBTORS' PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN UNDER BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE COURT.**

Harry A. Perrin (TX 15796800)
Bradley R. Foxman (TX 24065243)
Reese A. O'Connor (TX 24092910)
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760

David S. Meyer (admitted *pro hac vice*)
Jessica C. Peet (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040

Paul E. Heath (TX 09355050)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201

**VINSON & ELKINS LLP**
**ATTORNEYS FOR THE DEBTORS**

**Dated: June 14, 2016**

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Anglo-Suisse Offshore Pipeline Partners, LLC (9562), Delaware EPL of Texas, LLC (9562), Energy Partners Ltd., LLC (9562), Energy XXI GOM, LLC (0027), Energy XXI Gulf Coast, Inc. (8595), Energy XXI Holdings, Inc. (1638), Energy XXI, Inc. (2108), Energy XXI Leasehold, LLC (8121), Energy XXI Ltd (9286), Energy XXI Natural Gas Holdings, Inc. (7517), Energy XXI Offshore Services, Inc. (4711), Energy XXI Onshore, LLC (0308), Energy XXI Pipeline, LLC (5863), Energy XXI Pipeline II, LLC (8238), Energy XXI Services, LLC (3999), Energy XXI Texas Onshore, LLC (0294), Energy XXI USA, Inc. (8552), EPL of Louisiana, L.L.C. (9562), EPL Oil & Gas, Inc. (9562), EPL Pioneer Houston, Inc. (9749), EPL Pipeline, L.L.C. (1048), M21K, LLC (3978), MS Onshore, LLC (8573), Natural Gas Acquisition Company I, LLC (0956), Nighthawk, L.L.C. (9562), and Soileau Catering, LLC (2767).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  1021 Main Street, Suite 2626, Houston, Texas 77002.

# TABLE OF CONTENTS

**ARTICLE I.  DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**...............................................1

 A.  *Defined Terms* ................................................................................1
 B.  *Rules of Interpretation* .................................................................19
 C.  *Computation of Time*....................................................................20
 D.  *Governing Law*..............................................................................20
 E.  *Reference to Monetary Figures* ...................................................20
 F.  *Reference to the Debtors or the Reorganized Debtors* .........................20
 G.  *Controlling Document* ..................................................................20

**ARTICLE II.  ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY CLAIMS**...................................................21

 A.  *Administrative Claims* ..................................................................21
 B.  *Professional Compensation* ..........................................................22
 C.  *Priority Tax Claims*......................................................................23
 D.  *Statutory Fees* ...............................................................................23

**ARTICLE III.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**....................................................................................23

 A.  *Summary of Classification* ...........................................................23
 B.  *Treatment of Claims and Interests* ..............................................24
 C.  *Special Provision Governing Unimpaired Claims* ................................31
 D.  *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* ..........................................................................31
 E.  *Elimination of Vacant Classes* ....................................................31
 F.  *Voting Classes; Presumed Acceptance by Non-Voting Classes* ...........................31
 G.  *Subordinated Claims*....................................................................31

**ARTICLE IV.  MEANS FOR IMPLEMENTATION OF THE PLAN** ......................31

 A.  *Restructuring Transactions*..........................................................31
 B.  *Sources of Consideration for Plan Distributions* ................................32
 C.  *Distributions to Holders of Trade Claims and General Unsecured Claims*..........33
 D.  *Corporate Existence*......................................................................33
 E.  *Vesting of Assets in the Reorganized Debtors* ..................................34
 F.  *Cancellation of Existing Securities* ..............................................34
 G.  *Corporate Action* .........................................................................35
 H.  *New Organizational Documents*...................................................36
 I.  *Directors and Officers of the Reorganized Debtors* .........................36
 J.  *Consultation with Provisional Liquidator* ...................................37
 K.  *Effectuating Documents; Further Transactions*..............................37
 L.  *Exemption from Certain Taxes and Fees* ......................................37
 M.  *Preservation of Causes of Action* ................................................37
 N.  *Director and Officer Liability Insurance* .....................................38
 O.  *Management Incentive Plan* .........................................................38

P.      *Employee and Retiree Benefits* .................................................................39
Q.      *Payment of Fees and Expenses of the First Lien Administrative Agent* ...............39
R.      *Payment of Fees and Expenses of the Second Lien Indenture Trustee* .................40
S.      *Payment of Fees and Expenses of the Restructuring Support Parties* ...................40
T.      *Preservation of the Charging Lien of the ECG Unsecured Notes Indenture Trustees, EPL Unsecured Notes Indenture Trustee, and EXXI Convertible Notes Indenture Trustee* ...................................................................40
U.      *Preservation of Royalty and Working Interests* .................................................40

**ARTICLE V.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..............................................................................**40**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases* ..........40
B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases* ...........41
C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ........42
D.      *Indemnification Obligations* .......................................................................43
E.      *Insurance Policies* ......................................................................................43
F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements* ...................................................................................................43
G.      *Reservation of Rights* ..................................................................................43
H.      *Nonoccurrence of Effective Date* .................................................................43
I.      *Contracts and Leases Entered into After the Petition Date* ..................................44

**ARTICLE VI.  PROVISIONS GOVERNING DISTRIBUTIONS** ..............................**44**

A.      *Timing and Calculation of Amounts to Be Distributed* ......................................44
B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions* ..........44
C.      *Registration or Private Placement Exemption* ...................................................47
D.      *Compliance with Tax Requirements* ..............................................................48
E.      *Allocations* ................................................................................................48
F.      *No Postpetition Interest on Claims* ...............................................................48
G.      *Setoffs and Recoupment* ..............................................................................48
H.      *Claims Paid or Payable by Third Parties* .......................................................49

**ARTICLE VII.  PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** .................................................**50**

A.      *Allowance of Claims* ...................................................................................50
B.      *Claims and Interests Administration Responsibilities* .........................................50
C.      *Estimation of Claims* ...................................................................................50
D.      *Adjustment to Claims Without Objection* ........................................................51
E.      *Time to File Objections to Claims* .................................................................51
F.      *Disallowance of Claims* ...............................................................................51
G.      *Amendments to Claims* ................................................................................51
H.      *No Distributions Pending Allowance* .............................................................51
I.      *Distributions After Allowance* ......................................................................52
J.      *Single Satisfaction of Claims* .......................................................................52

**ARTICLE VIII.   SETTLEMENT, RELEASE, INJUNCTION, AND
RELATED PROVISIONS** ...................................................................................**52**

A.   *Compromise and Settlement of Claims, Interests, and Controversies* .................52
B.   *Discharge of Claims and Termination of Interests* ...............................................53
C.   *Term of Injunctions or Stays* ................................................................................53
D.   *Release of Liens* ....................................................................................................54
E.   *Releases by the Debtors* ........................................................................................54
F.   *Releases by Holders of Claims and Interests* .......................................................55
G.   *Exculpation* ...........................................................................................................56
H.   *Injunction* ..............................................................................................................57
I.   *Protection Against Discriminatory Treatment* ......................................................58
J.   *Recoupment* ...........................................................................................................58
K.   *Subordination Rights* ............................................................................................58
L.   *Reimbursement or Contribution* ...........................................................................58

**ARTICLE IX.   CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN** ........................................................**58**

A.   *Conditions Precedent to the Confirmation Date* ..................................................58
B.   *Conditions Precedent to the Effective Date* ..........................................................59
C.   *Waiver of Conditions* ............................................................................................61
D.   *Substantial Consummation* ...................................................................................61
E.   *Effect of Non-Occurrence of Conditions to the Confirmation Date or the
     Effective Date* ........................................................................................................61

**ARTICLE X.   MODIFICATION, REVOCATION, OR WITHDRAWAL OF
THE PLAN** ..........................................................................................................**61**

A.   *Modification and Amendments* ..............................................................................61
B.   *Effect of Confirmation on Modifications* ..............................................................62
C.   *Revocation or Withdrawal of the Plan* ..................................................................62

**ARTICLE XI.   RETENTION OF JURISDICTION** ...........................................**62**

**ARTICLE XII.   MISCELLANEOUS PROVISIONS** ...........................................**64**

A.   *Immediate Binding Effect* ......................................................................................64
B.   *Additional Documents* ...........................................................................................65
C.   *Dissolution of the Committee* ................................................................................65
D.   *Reservation of Rights* ............................................................................................65
E.   *Successors and Assigns* .........................................................................................65
F.   *Service of Documents* ............................................................................................65
G.   *Term of Injunctions or Stays* ................................................................................66
H.   *Entire Agreement* ..................................................................................................67
I.   *Exhibits* .................................................................................................................67
J.   *Nonseverability of Plan Provisions* ......................................................................67
K.   *Votes Solicited in Good Faith* ...............................................................................67
L.   *Closing of Chapter 11 Cases* ................................................................................68
M.   *Waiver or Estoppel* ...............................................................................................68

## INTRODUCTION

Energy XXI Ltd and its Debtor affiliates, as Debtors and debtors in possession, propose this joint plan of reorganization for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

> **ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.     "***Administrative Claim***" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

2.     "***Administrative Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Claims (other than Professional Fee Claims) as set by the Court pursuant to the Administrative Claims Order or other Final Order.

3.     "***Administrative Claims Order***" means the order entered by the Court setting the Administrative Claims Bar Date.

4.     "***Affiliate***" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.     "***Allowed***" means with respect to any Claim against a Debtor, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim Filed by the Claims Bar Date, Administrative Claims Bar Date, Final Administrative Claims Bar Date, Governmental Bar Date, or deadline for filing Proofs of Claim based on the Debtors' rejection of the Executory Contracts or Unexpired Leases, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not

1

contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Court; *provided that* with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed and the applicable period of time fixed by the Plan to file an objection has passed, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim or request for payment of an Administrative Claim Filed after the Claims Bar Date, Administrative Claims Bar Date, Final Administrative Claims Bar Date, Governmental Bar Date, or deadline for filing Proofs of Claim based on the Debtors' rejection of the Executory Contracts or Unexpired Leases, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allow" and "Allowing" shall have correlative meanings.

6.      "***Avoidance Actions***" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

7.      "***Bankruptcy Code***" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

8.      "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Court other than the Local Rules.

9.      "***Bar Date Order***" means the order entered by the Court setting the Claims Bar Date and the Governmental Bar Date [Docket No. 53].

10.     "***Bermuda Court***" means the Supreme Court of Bermuda.

11.     "***Bermuda Proceeding***" means the official liquidation proceeding for EXXI under the laws of Bermuda commenced pursuant to the winding-up petition before the Bermuda Court.

12.     "***Bermuda Subsidiaries***" means, collectively, the following non-Debtor Bermudan subsidiaries of EXXI: (a) Energy XXI (US Holdings) Limited; (b) Energy XXI International Limited; (c) Energy XXI Malaysia Limited; and (d) Ping Petroleum Limited.

13.     "***BOEM***" means the Bureau of Ocean Energy Management.

2

14. "***BOEM Long Range Plan***" means that certain Long Range Plan agreed to between the Debtors and BOEM and dated February 29, 2016.

15. "***Business Day***" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16. "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

17. "***Causes of Action***" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

18. "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Court.

19. "***Claim***" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "***Claims Bar Date***" means August 8, 2016 at 5:00 p.m. (prevailing Central Time), the date established pursuant to the Bar Date Order by which Proofs of Claim, other than Administrative Claims and Claims held by Governmental Units, must be Filed.

21. "***Claims Objection Deadline***" means the deadline for objecting to a Claim against a Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Court for objecting to such Claims.

22. "***Claims Register***" means the official register of Claims against and Interests in the Debtors maintained by the Notice and Claims Agent.

23. "***Class***" means a category of Claims against or Interests in the Debtors as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

24. "***Committee***" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

3

25.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

26.     "*Confirmation Date*" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.     "*Confirmation Hearing*" means the hearing held by the Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

28.     "*Confirmation Order*" means a Final Order of the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance satisfactory to the Debtors and the Majority Restructuring Support Parties.

29.     "*Consummation*" means the occurrence of the Effective Date.

30.     "*Court*" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

31.     "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

32.     "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Court of any related disputes.

33.     "*D&O Liability Insurance Policies*" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors, including, for the avoidance of doubt, the independent directors of EGC and EPL.

34.     "*Debtors*" means, collectively, the following: Anglo-Suisse Offshore Pipeline Partners, LLC, Delaware EPL of Texas, LLC, Energy Partners Ltd., LLC, Energy XXI GOM, LLC, Energy XXI Gulf Coast, Inc., Energy XXI Holdings, Inc., Energy XXI, Inc., Energy XXI Leasehold, LLC, Energy XXI Ltd, Energy XXI Natural Gas Holdings, Inc., Energy XXI Offshore Services, Inc., Energy XXI Onshore, LLC, Energy XXI Pipeline, LLC, Energy XXI Pipeline II, LLC, Energy XXI Services, LLC, Energy XXI Texas Onshore, LLC, Energy XXI USA, Inc., EPL of Louisiana, L.L.C., EPL Oil & Gas, Inc., EPL Pioneer Houston, Inc., EPL Pipeline, L.L.C., M21K, LLC, MS Onshore, LLC, Natural Gas Acquisition Company I, LLC, Nighthawk, L.L.C., and Soileau Catering, LLC.

4

35.     "*Definitive Documentation*" means the definitive documents and agreements governing the Restructuring Transactions (as defined in the Restructuring Support Agreement) and shall include, without limitation: (a) the Plan (and all exhibits thereto) and the Confirmation Order; (b) the Disclosure Statement; (c) the solicitation materials with respect to the Plan; (d) the Interim Cash Collateral Order and the Final Cash Collateral Order; (e) the Exit Facility and the Exit Facility Documents; and (f) any other documents or agreements executed in connection with Consummation, including any shareholders' agreements, certificates of incorporation, etc. Any document that is included within this definition of "Definitive Documentation," including any amendment, supplement, or modification thereof, shall be in form and substance satisfactory to the Majority Restructuring Support Parties. In addition, for the avoidance of doubt, the Debtors shall consult with the Provisional Liquidator with respect to the Definitive Documentation in accordance with the Provisional Liquidator Appointment Order.

36.     "*Description of Transaction Steps*" means the description of the Restructuring Transactions as set forth in the Plan Supplement.

37.     "*Disallowed*" means, with respect to any Claim, or any portion thereof, that such Claim, or any portion thereof, is not Allowed.

38.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Proposed Joint Chapter 11 Plan of Reorganization*, dated as of May 20, 2016, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in form and substance satisfactory to the Debtors and the Majority Restructuring Support Parties, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law [Docket No. 328].

39.     "*Disputed Claim*" means a Claim that is not yet Allowed.

40.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, other than with respect to publicly held securities, which date shall be the Confirmation Date or such other date as designated in an order of the Court.

41.     "*DTC*" means The Depository Trust Company.

42.     "*Effective Date*" means the date that is a Business Day selected by the Debtors, in consultation with the Majority Restructuring Support Parties, on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.B have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective.

43.     "*EGC*" means Energy XXI Gulf Coast, Inc.

44.     "*EGC 6.875% Senior Notes*" means the 6.875% senior unsecured notes due March 15, 2024 issued pursuant to the EGC 6.875% Senior Notes Indenture.

45.     "*EGC 6.875% Senior Notes Indenture*" means that certain indenture, dated May 27, 2014, among EGC, the guarantors and Wilmington Trust, National Association, as trustee.

46.    "*EGC 7.50% Senior Notes*" means the 7.50% senior unsecured notes due December 15, 2021 issued pursuant to the EGC 7.50% Senior Notes Indenture.

47.    "*EGC 7.50% Senior Notes Indenture*" means that certain indenture, dated September 26, 2013, among EGC, the guarantors and Wilmington Trust, National Association, as trustee.

48.    "*EGC 7.75% Senior Notes*" means the 7.75% senior unsecured notes due June 15, 2019 issued pursuant to the EGC 7.75% Senior Notes Indenture.

49.    "*EGC 7.75% Senior Notes Indenture*" means that certain indenture, dated February 25, 2011, among EGC, the guarantors and Wilmington Trust, National Association, as trustee.

50.    "*EGC 9.25% Senior Notes*" means the 9.25% senior unsecured notes due December 15, 2017 issued pursuant to the EGC 9.25% Senior Notes Indenture.

51.    "*EGC 9.25% Senior Notes Indenture*" means that certain indenture, dated December 17, 2010, among EGC, the guarantors and Wilmington Trust, National Association, as trustee.

52.    "*EGC Intercompany Note*" means that certain promissory note in the principal amount of $325.0 million between EPL, as the maker, and EGC, as the payee, and secured by a second priority lien on certain assets of EPL that secure EPL's obligations under the First Lien Credit Agreement.

53.    "*EGC Unsecured Notes*" means, collectively, the EGC 6.875% Senior Notes, the EGC 7.50% Senior Notes, the EGC 7.75% Senior Notes, and the EGC 9.25% Senior Notes.

54.    "*EGC Unsecured Notes Claims*" means, collectively, Claims arising on account of the EGC Unsecured Notes.

55.    "*EGC Unsecured Notes Indentures*" means, collectively, the EGC 6.875% Senior Notes Indenture, the EGC 7.50% Senior Notes Indenture, the EGC 7.75%  Senior Notes Indenture, and the EGC 9.25%  Senior Notes Indenture.

56.    "*EGC Unsecured Notes Indenture Trustee*" means Wilmington Trust, National Association, as trustee under each of the EGC Unsecured Notes Indentures, respectively.

57.    "*EGC Warrant Package Allocation*" means out-of-the-money warrants equal to an aggregate of 8.75% of the New Equity (subject to dilution from the Management Incentive Plan) issued pursuant to the Warrant Package and subject to the terms thereof, which shall be distributed to holders of EGC Unsecured Notes Claims on a Pro Rata basis and in accordance with the terms of the Plan if Class 7 (EGC Unsecured Notes Claims) votes to accept the Plan.

58.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

6

59.    "*EPL*" means EPL Oil & Gas, Inc.

60.    "*EPL 8.25% Senior Notes*" means the 8.25% senior unsecured notes due February 15, 2018 issued pursuant to the EPL 8.25% Senior Notes Indenture.

61.    "*EPL 8.25% Senior Notes Indenture*" means that certain supplemental indenture dated as of April 18, 2014 among EPL, the guarantors party thereto, and U.S. Bank National Association, as trustee.

62.    "*EPL Unsecured Notes Claims*" means, collectively, Claims arising on account of the EPL 8.25% Senior Notes.

63.    "*EPL Unsecured Notes Indenture Trustee*" means U.S. Bank National Association, as trustee under the EPL 8.25% Senior Notes Indenture.

64.    "*EPL Warrant Package Allocation*" means out-of-the-money warrants equal to an aggregate of 0.5% of the New Equity (subject to dilution from the Management Incentive Plan) issued pursuant to the Warrant Package and subject to the terms thereof, which shall be distributed to holders of EPL Unsecured Notes Claims on a Pro Rata basis and in accordance with the terms of the Plan if Class 8 (EPL Unsecured Notes Claims) votes to accept the Plan.

65.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

66.    "*Exculpated Party*" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Restructuring Support Parties; (d) the First Lien Administrative Agent; (e) the First Lien Secured Parties; (f) the Second Lien Indenture Trustee; (g) the Provisional Liquidator; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, managed accounts and funds, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, subcontractors, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each solely in their capacity as such.

67.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

68.    "*Exit Facility*" means a new credit facility or credit facilities, on the terms and conditions (including amount) set forth in the Exit Facility Term Sheet, and otherwise satisfactory to the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties.

69.    "*Exit Facility Agent*" means the administrative agent and collateral agent under the Exit Facility, or any successor thereto, solely in its capacity as such.

70.     "***Exit Facility Documents***" means the Exit Facility and any other guarantee, security, and relevant documentation with respect to the Exit Facility, each in form and substance acceptable to the First Lien Administrative Agent and the Majority Restructuring Support Parties.

71.     "***Exit Facility Term Sheet***" means that certain term sheet attached hereto as **Exhibit 1** and incorporated herein by reference.

72.     "***EXXI***" means Energy XXI Ltd.

73.     "***EXXI Convertible Notes Claims***" means, collectively, claims arising on account of the *3.0% Senior Convertible Notes*.

74.     "***EXXI 3.0% Senior Convertible Notes***" means the 3.0% senior convertible notes due on December 15, 2018 issued pursuant to the EXXI 3.0% Senior Convertible Notes Indenture.

75.     "***EXXI 3.0% Senior Convertible Notes Indenture***" means that certain indenture dated as of November 22, 2013 among EXXI and Wilmington Trust, National Association, as trustee.

76.     "***EXXI 3.0% Senior Convertible Notes Indenture Trustee***" means Wilmington Savings Fund Society, FSB, as successor trustee, under the EXXI 3.0% Senior Convertible Notes Indenture.

77.     "***EXXI Common Stock***" means EXXI's authorized and issued common stock outstanding as of the Petition Date.

78.     "***EXXI Holdings Promissory Note***" means that certain 4.14% promissory note in principal amount of $5,490,000 dated September 4, 2012 among Energy XXI Holdings, Inc., as promisor, and BB&T Equipment Finance Corporation, as payee.

79.     "***EXXI Holdings Promissory Note Claim***" means any Secured Claim arising on account of the EXXI Holdings Promissory Note.

80.     "***EXXI Inc.***" means Energy XXI, Inc.

81.     "***EXXI Interests***" means, collectively, EXXI Common Stock and EXXI Preferred Stock.

82.     "***EXXI Preferred Stock***" means EXXI's authorized and issued shares of 5.625% Perpetual Convertible Preferred Stock and shares of 7.25% Perpetual Convertible Preferred Stock, in each case, outstanding, as of the Petition Date.

83.     "***EXXI Warrant Package Allocation***" means out-of-the-money warrants equal to an aggregate of 0.75% of the New Equity (subject to dilution from the Management Incentive Plan) issued pursuant to the Warrant Package and subject to the terms thereof, which shall be

distributed to holders of EXXI Convertible Notes Claims on a Pro Rata basis and in accordance with the terms of the Plan if Class 9 (EXXI Convertible Notes Claims) votes to accept the Plan.

84.     "***Exxon***" means Exxon Mobil Corporation.

85.     "***Exxon LCs***" means the approximately $225 million in undrawn letters of credit EGC has delivered in favor of Exxon, the purpose of which is to guarantee any actual plugging and abandonment expenditures with respect to certain properties that EGC purchased from Exxon pursuant to that certain Purchase and Sale Agreement effective December 1, 2010 among Exxon Mobil Corporation, Mobil Oil Exploration & Producing Southeast, Inc., ExxonMobil Pipeline Company, and Mobil Eugene Island Pipeline Company, as sellers, and Energy XXI GOM, LLC, as buyer.

86.     "***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date, compounded annually.

87.     "***File***," "***Filed***," or "***Filing***" means file, filed, or filing in the Chapter 11 Cases with the Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

88.     "***Final Administrative Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims, other than Professional Fee Claims, arising in the time period between the Administrative Claims Bar Date and the Effective Date, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

89.     "***Final Cash Collateral Order***" means the Final Order entered by the Court authorizing the Debtors to, on a final basis, (a) use cash collateral during the pendency of the Chapter 11 Cases, and (c) granting certain related relief [Docket No. 319].

90.     "***Final Order***" means (i) an order or judgment of the Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Cases (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

91.     "*First Lien Administrative Agent*" means Wells Fargo Bank, N.A. as administrative agent under the First Lien Credit Agreement.

92.     "*First Lien Claims*" means, collectively, Claims against the Debtors arising under the First Lien Credit Agreement.

93.     "*First Lien Credit Agreement*" means that certain Second Amended and Restated First Lien Credit Agreement, dated as of May 5, 2011, by and among EGC, each of the guarantors party thereto, the First Lien Administrative Agent, and the lenders and agents from time-to-time party thereto (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date).

94.     "*First Lien Lenders*" refers collectively to the lenders party to the First Lien Credit Agreement.

95.     "*First Lien Prepetition Indebtedness*" means $99,400,000, plus any liability with respect to any letters of credit issued under the First Lien Credit Agreement which are drawn following the Petition Date, plus accrued and unpaid interest, fees and costs and expenses, including, without limitation, attorney's fees, agent's fees, other professional fees and disbursements.

96.     "*First Lien Secured Parties*" means the "Secured Parties" as such term is defined in the First Lien Credit Agreement.

97.     "*General Unsecured Claim*" means any Unsecured Claim against any Debtor (including, for the avoidance of doubt, any Claim arising from the rejection of an Executory Contract or Unexpired Lease) that is not otherwise paid in full or otherwise satisfied during the Chapter 11 Cases pursuant to an order of the Court, other than a Priority Tax Claim, an Other Priority Claim, a Second Lien Notes Deficiency Claim, a Second Lien Notes Guaranty Claim, an EGC Unsecured Notes Claim, an EPL Unsecured Notes Claim, an EXXI Convertible Notes Claim, a Section 510(b) Claim, or an Intercompany Claim.

98.     "*General Unsecured Claim Distribution*" means $410,000.

99.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

100.    "*Governmental Bar Date*" means October 11, 2016 at 5:00 p.m. (prevailing Central Time), the date established pursuant to the Bar Date Order by which Proofs of Claim of Governmental Units must be Filed.

101.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

102.    "*Indemnification Obligations*" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the current and former

directors and the officers of the Debtors; *provided however* that the Indemnification Obligations shall not include any indemnification obligations arising under the D&O Liability Insurance Policies.

103.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

104.    "*Intercompany Claim*" means any Claim, other than a Claim arising under the EGC Intercompany Note, held by one Debtor or a Non-Debtor Subsidiary against another Debtor.

105.    "*Intercompany Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of March 12, 2015 between Wells Fargo Bank, N.A., as priority lien agent, and EGC.

106.    "*Intercompany Interest*" means, other than an Interest in EXXI, an Interest in one Debtor or Non-Debtor Subsidiary held by another Debtor.

107.    "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of March 12, 2015 between Wells Fargo Bank, N.A., as priority lien agent, and U.S. Bank National Association, as second lien collateral trustee.

108.    "*Interests*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including, without limitation, the Preferred Stock and the Common Stock, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

109.    "*Interim Compensation Order*" means the order entered by the Court establishing procedures for compensation of Professionals [Docket No. 409].

110.    "*Interim Cash Collateral Order*" means the interim order entered by the Court authorizing the Debtors, on an interim basis, to (a) use cash collateral during the pendency of the Chapter 11 Cases, and (c) granting certain related relief [Docket No. 66].

111.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

112.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

113.    "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas.

114.    "*Majority Restructuring Support Parties*" means those Restructuring Support Parties who hold, in the aggregate, at least 66.6% in principal amount outstanding of the Second Lien Notes Claims held by the Restructuring Support Parties.

115.    "**Management Equity Pool**" means up to 8% of the total New Equity on a fully diluted basis reserved under the Management Incentive Plan, 3% of which will be allocated by the New Board to officers, directors, employees, and consultants no later than 60 days after the Effective Date on terms and conditions determined by the New Board, including the type of equity based awards.

116.    "**Management Incentive Plan**" means that certain post-Effective Date management and New Parent Board incentive plan, pursuant to which the Management Equity Pool shall be reserved and allocated.

117.    "**New Boards**" means the initial board of directors, members, or managers, as applicable, of each Reorganized Debtor, including the New Parent Board.

118.    "**New Equity**" means the common stock or limited liability company Interests, as applicable, of New Parent to be issued pursuant to the Plan on the Effective Date.

119.    "**New Money Contribution**" means a new money contribution, which may be in the form of Cash, a new credit facility or credit facilities, or other financing and the terms of which shall be disclosed in the Plan Supplement and satisfactory to the Debtors, the First Lien Administrative Agent and the Majority Restructuring Support Parties; *provided*, *however* that the Exit Facility shall be senior in priority to any New Money Contribution in the form of financing.

120.    "**New Organizational Documents**" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, including the New Shareholders' Agreement, which forms shall be included in the Plan Supplement, in each case in form and substance satisfactory to the Debtors and Majority Restructuring Support Parties.

121.    "**New Parent**" means Reorganized EGC, Reorganized EXXI Inc., or such other entity as determined by the Debtors and the Majority Restructuring Support Parties, which entity will, on and after the Effective Date, hold, directly or indirectly, substantially all of the assets of EXXI and its subsidiaries.

122.    "**New Parent Board**" means the initial board of directors of New Parent, as determined pursuant to Article IV.H.

123.    "**New Shareholders' Agreement**" means that shareholders' agreement that will govern certain matters related to the governance of New Parent, the form of which shall be included in the Plan Supplement and which shall be in form and substance satisfactory to the Debtors and the Majority Restructuring Support Parties, as it may be amended or modified from time to time following the Effective Date in accordance with its terms.

124.    "**Non-Debtor Subsidiaries**" means all of EXXI's wholly and not-wholly owned subsidiaries who are not Debtors in these Chapter 11 Cases, including: (a) Energy XXI Insurance Limited; (b) Energy XXI M21K, LLC; (c) Energy XXI GIGS Services, LLC; and (d) the Bermuda Subsidiaries.

125.    "*Notice and Claims Agent*" means Epiq Bankruptcy Solutions, LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases pursuant to the order entered by the Court on April 15, 2016 [Docket No. 92].

126.    "*OCS*" means the Outer Continental Shelf.

127.    "*Ordinary Course Professionals*" means the various Professionals the Debtors employ in the ordinary course of their business and retained by the Debtors pursuant to, and who are subject to, the Ordinary Course Professionals Order.

128.    "*Ordinary Course Professionals Order*" means the order entered by the Court establishing the procedures for retaining and compensating the Ordinary Course Professionals [Docket No. 408].

129.    "*Other Priority Claim*" means any Claim against a Debtor other than an Administrative Claim or a Secured Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases.

130.    "*Other Secured Claim*" means any Secured Claim other than the following: (a) First Lien Claims; (b) Second Lien Notes Claims; (c) Secured Tax Claims; (d) Secured Trade Claims; or (e) Claims arising under the EGC Intercompany Note. For the avoidance of doubt, "*Other Secured Claims*" includes any Claim against a Debtor, other than a Claim arising on account of the Exxon LCs, arising under, derived from, or based upon any letter of credit issued for the account of one or more Debtors, the reimbursement obligation for which is either secured by a Lien or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

131.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

132.    "*Petition Date*" means April 14, 2016, the date on which each Debtor Filed its voluntary petition for relief commencing the Chapter 11 Cases.

133.    "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Restructuring Support Agreement and the terms hereof, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan, in each case in form and substance satisfactory to the Debtors and the Majority Restructuring Support Parties.

134.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), to be Filed by the Debtors no later than 10 Business Days before the Confirmation Hearing, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement (which, for the avoidance of doubt, shall also be in form and substance acceptable to the Debtors, the Majority Restructuring Support Parties, and their

13

advisors), including the following, as applicable: (a) the New Organizational Documents; (b) the terms of the Exit Facility; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Assumed Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) the New Shareholders' Agreement; (g) the Description of Transaction Steps; (h) the Management Incentive Plan; (i) the form of the Warrant Agreement; (j) the terms of the Warrants; (k) employment agreements for senior management to be retained on the Effective Date (to the extent known); (l) the identity of the members of the New Boards and the senior management team to be retained by the Reorganized Debtors as of the Effective Date (to the extent known); and (m) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with the Restructuring Support Agreement and with the consent of the Majority Restructuring Support Parties.

135.   "*Priority Tax Claim*" means any Claim against a Debtor of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

136.   "*Pro Rata*" means, unless indicated otherwise, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

137.   "*Professional*" means an Entity employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

138.   "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Court. To the extent the Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Allowed Professional Fee Claim.

139.   "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.B.

140.   "*Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated in accordance with Article II.B.3.

141.   "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

142.   "*Provisional Liquidator*" means John McKenna, as appointed under the Provisional Liquidator Appointment Order.

143. "***Provisional Liquidator Appointment Order***" means the order entered by the Bermuda Court on April 15, 2016 in the Bermuda Proceeding appointing the Provisional Liquidator.

144. "***Reinstated***" or "***Reinstatement***" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

145. "***Registration Rights Beneficiaries***" means each party to the Restructuring Support Agreement that receives 10% or more of the New Equity or otherwise reasonably determines that it is an "affiliate" of the Reorganized Debtors (as such term is defined in the Securities Act) and receives "restricted" or "control" (as such terms are defined in the Securities Act) New Equity.

146. "***Rejection Procedures Order***" means the order entered by the Court authorizing and approving procedures for assumption or rejection of certain of the Debtors' prepetition Executory Contracts and Unexpired Leases [Docket No. __].

147. "***Released Party***" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the First Lien Administrative Agent; (d) the First Lien Secured Parties; (e) the Restructuring Support Parties; (f) the Second Lien Indenture Trustee; (g) the Provisional Liquidator; and (h) with respect to each of the foregoing parties under (a) through (g) such Entity and its current and former Affiliates, and such Entity's current and former Affiliates' current and former directors, managers, officers, managed accounts and funds, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, subcontractors, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each solely in their capacity as such.

148. "***Releasing Party***" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the First Lien Administrative Agent; (d) the First Lien Secured Parties; (e) the Second Lien Indenture Trustee; (f) the Restructuring Support Parties; (g) the Provisional Liquidator; (h) all holders of Claims and Interests that are deemed to accept the Plan; (i) all holders of Claims and Interests who vote to accept the Plan; (j) all holders of Claims and Interests who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (k) all holders of Claims and Interests who vote to reject the Plan and who do not opt out of the releases provided by the Plan; and (l) with respect to each of the foregoing parties under (a) through (k), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, managed accounts and funds, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, subcontractors, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each solely in their capacity as such.

149. "***Reorganized Debtors***" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including New Parent.

150.    "***Reorganized EGC***" means EGC or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

151.    "***Reorganized EPL***" means EPL or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

152.    "***Reorganized EXXI Inc.***" means EXXI Inc. or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

153.    "***Restricted Cash***" means that certain $30,000,000 maintained by EPL in an account subject to a control agreement in favor of the First Lien Administrative Agent under the First Lien Credit Agreement.

154.    "***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated April 11, 2016, by and among the Debtors and the Restructuring Support Parties, as may be further amended, modified, or supplemented, from time to time. A copy of the Restructuring Support Agreement is attached as **Exhibit B** to the Disclosure Statement.

155.    "***Restructuring Support Parties***" means each Entity, other than a Debtor, that is party to the Restructuring Support Agreement.

156.    "***Restructuring***" shall have the meaning set forth in the Restructuring Support Agreement.

157.    "***Restructuring Transactions***" shall have the meaning set forth in Article IV.A.

158.    "***Royalty and Working Interests***" means the working interests granting the right to exploit oil and gas, and certain other royalty or mineral interests including but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, production payments, and all rights to payment or production arising from such interests.

159.    "***Royalty Order***" means the Final Order entered by the Court authorizing the payment or application of funds attributable to mineral payments and working interests [Docket No. 320].

160.    "***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Reorganized Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended by the Debtors (in each case, with the consent of the Majority Restructuring Support Parties) from time to time prior to the Confirmation Date.

161.    "***Schedule of Rejected Executory Contracts and Unexpired Leases***" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended by the Debtors (with the consent of the Majority Restructuring Support Parties) from time to time prior to the Confirmation Date.

162. "**Schedules**" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

163. "**Second Lien Indenture**" means that certain Indenture, dated as of March 12, 2015 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date), among EGC, each of the guarantors party thereto, and the Second Lien Indenture Trustee.

164. "**Second Lien Indenture Trustee**" means U.S. Bank, N.A, in its capacity as the trustee under the Second Lien Indenture.

165. "**Second Lien Notes**" means the Secured notes under the Second Lien Indenture.

166. "**Second Lien Notes Claim**" means any Claim against the Debtors on account of the Second Lien Notes under the Second Lien Indenture.

167. "**Second Lien Notes Deficiency Claim**" means any deficiency claim arising on account of the Second Lien Notes and the Second Lien Indenture.

168. "**Second Lien Notes Guaranty Claim**" means any Unsecured guarantee claim arising on account of the Second Lien Notes and the Second Lien Indenture.

169. "**Second Lien Noteholders**" means the holders of the Second Lien Notes, solely in their capacity as such.

170. "**Second Lien Prepetition Indebtedness**" means the aggregate principal amount of $1,450,000,000 in respect of the Second Lien Notes pursuant to, and in accordance with, the Second Lien Documents (as defined in the Interim Cash Collateral Order), plus accrued and unpaid interest, premiums, fees and costs and expenses, including, without limitation, attorney's fees, trustee's fees, other professional fees and disbursements**,** and other obligations owing under the Second Lien Documents, including all amounts due pursuant to Section 6.02 of the Second Lien Indenture (including, without limitation, the Applicable Premium (as defined in the Second Lien Indenture)).

171. "**Section 510(b) Claim**" means any Claim against a Debtor arising from (a) rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, (b) purchase or sale of such a security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

172. "**Secured**" means when referring to a Claim, a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff,

as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

173.    "*Secured Tax Claim*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

174.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

175.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

176.    "*Termination Date*" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

177.    "*Termination Event*" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

178.    "*Trade Claim*" means a Claim against the Debtors that is held by an entity (other than operators of oil and gas properties arising under operating agreements to which a Debtor is a party) arising on account of labor performed, or services, materials, goods or equipment furnished with respect to development, drilling, completion, maintenance, repair, operations or related activity on or with respect to any lands, material, machinery, supplies, improvements, oil and gas leases, or wells or pipelines owned, in whole or in part, by one or more of the Debtors.

179.    "*Trade Claim Settlement Distribution*" means (a) Cash in an amount equal to $0.75 on account of each dollar of an Allowed Trade Claim and (b) a release by the Debtors of all Avoidance Actions against the holders of Allowed Trade Claims.

180.    "*Trade Claim Settlement Release*" means a release of all third party working interest owners and other Persons by any holder of a Trade Claim of: (i) such holder's Trade Claims and (ii) any and all liability for, or enforcement of, any potential liens, Liens or Claims with respect to the property to which such Trade Claims, potential liens, Liens or Claims relate.

181.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

182.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

183.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim whose holder has not: (a) accepted such distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept such distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

18

184.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

185.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are "unimpaired" within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

186.    "*Unsecured*" means not Secured.

187.    "*Voting Deadline*" means July [27], 2016, the deadline for submitting votes to accept or reject the Plan as set by the Court pursuant to a Final Order.

188.    "*Voting Procedures*" means the procedures and instructions for voting on the Plan and related deadlines as set forth in the exhibits annexed to the Court order approving the Disclosure Statement.

189.    "*Warrant Agreement*" means the document governing the Warrant Package, in form and substance satisfactory to the Majority Restructuring Support Parties, the form of which shall be included in the Plan Supplement.

190.    "*Warrant Package*" means out-of-the-money warrants equal to an aggregate of up to 10% of the New Equity (subject to dilution from the Management Incentive Plan) with a maturity of 10 years and an equity strike price equal to (i) the principal amount of the Second Lien Notes Claims less the original issue discount of approximately $53.5 million, *plus* (ii) accrued and unpaid interest.

B.    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan and the Restructuring Support Agreement; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that

19

term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Cases.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided that* corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing, other than the Plan Supplement), the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL
## FEE CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s), with the consent of the Majority Restructuring Support Parties, agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims, (i) requests for payment of Administrative Claims arising in the time period between the Petition Date and the Administrative Claims Bar Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Administrative Claims Order no later than the Administrative Claims Bar Date, and (ii) requests for payment of Administrative Claims arising between the Administrative Claims Bar Date and the Effective Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Final Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such dates shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date or such other date fixed by the Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.

B.     *Professional Compensation*

    1.     Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be Filed and served on the Reorganized Debtors no later than 45 days after the Effective Date. All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Court, will be promptly paid from the Professional Fee Escrow Account up to its full Allowed amount. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Court.

    2.     Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount, which shall be funded by New Parent. The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals. The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors without any further action or order of the Court.

    3.     Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five business days before the Effective Date, *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

    4.     Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation

22

for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

C.      *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

D.      *Statutory Fees*

All fees payable pursuant to 28 U.S.C. §1930(a) shall be paid by the Debtors or Reorganized Debtors, as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or a final decree is issued, whichever occurs first. The Reorganized Debtors shall continue to file quarterly-post confirmation operating reports in accordance with the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Summary of Classification*

Claims and Interests, except for Administrative Claims, Professional Fee Claims, Cure Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth in Classes 1 through 15 shall be deemed to apply to each Debtor. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (i.e., there will be 15 Classes for each Debtor); *provided*, *that*, any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D below.

1.      Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

23

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 4 | EXXI Holdings Promissory Note Claims | Unimpaired | Presumed to Accept |
| 5 | First Lien Claims | Impaired | Entitled to Vote |
| 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 7 | EGC Unsecured Notes Claims | Impaired | Entitled to Vote |
| 8 | EPL Unsecured Notes Claims | Impaired | Entitled to Vote |
| 9 | EXXI Convertible Notes Claims | Impaired | Entitled to Vote |
| 10 | Trade Claims | Impaired | Entitled to Vote |
| 11 | General Unsecured Claims | Impaired | Entitled to Vote |
| 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote |
| 13 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 14 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 15 | EXXI Interests | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests*

    1.    <u>Class 1 – Other Priority Claims</u>

        a.    *Classification*: Class 1 consists of Other Priority Claims.

        b.    *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each holder thereof shall receive (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim or (ii) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

        c.    *Voting*: Class 1 is Unimpaired under the Plan. Each holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Other Priority Claims will not be entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 – Other Secured Claims</u>

        a.    *Classification*: Class 2 consists of Other Secured Claims.

b. *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each such holder shall receive, at the Debtors' election (with the consent of the Majority Restructuring Support Parties), either (i) Cash equal to the full Allowed amount of its Claim, (ii) Reinstatement of such holder's Allowed Other Secured Claim, (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or (iv) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

c. *Voting*: Class 2 is Unimpaired under the Plan. Each holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Other Secured Claims will not be entitled to vote to accept or reject the Plan.

3. <u>Class 3 –Secured Tax Claims</u>

a. *Classification*: Class 3 consists of Secured Tax Claims.

b. *Treatment*: Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Secured Tax Claim, each such holder shall receive, at the Debtors' election (with the consent of the Majority Restructuring Support Parties), either (i) Cash equal to the full Allowed amount of its Claim, (ii) Reinstatement of such holder's Allowed Secured Tax Claim, (iii) the return or abandonment of the collateral securing such Allowed Secured Tax Claim to such holder, or (iv) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

c. *Voting*: Class 3 is Unimpaired under the Plan. Each holder of a Secured Claim Tax will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Tax Claims will not be entitled to vote to accept or reject the Plan.

4. <u>Class 4 – EXXI Holdings Promissory Notes Claims</u>

a. *Classification*: Class 4 consists of EXXI Holdings Promissory Note Claims.

    b.     *Treatment*: On the Effective Date, the EXXI Holdings Promissory Note Claims shall be Reinstated.

    c.     *Voting*: Class 4 is Unimpaired under the Plan. Each holder of an EXXI Holdings Promissory Note Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of the EXXI Holdings Promissory Note Claims will not be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – First Lien Claims</u>

    a.     *Classification*: Class 5 consists of the First Lien Claims.

    b.     *Allowance*: The First Lien Claims shall be Allowed in the aggregate amount of the First Lien Prepetition Indebtedness.

    c.     *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, (i) all letters of credit issued under the First Lien Credit Agreement other than the Exxon LCs shall be Reinstated in accordance with their terms; (ii) the Exxon LCs shall be Reinstated in accordance with that certain letter agreement dated April 27, 2016 and (iii) except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed First Lien Claim, each such holder shall receive its *Pro Rata* share of (x) the Restricted Cash and (y) the Reorganized Debtors' obligations under the Exit Facility.

    d.     *Voting*: Class 5 is Impaired under the Plan. Holders of First Lien Claims will be entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Second Lien Notes Claims</u>

    a.     *Classification*: Class 6 consists of all Second Lien Notes Claims.

    b.     *Allowance*: The Second Lien Notes Claims shall be Allowed in the aggregate amount of the Second Lien Prepetition Indebtedness.

    c.     *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Second Lien Notes Claim, each such holder shall receive its Pro Rata share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package.

    d.    *Voting*: Class 6 is Impaired under the Plan. Each holder of an Allowed Second Lien Notes Claim will be entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – EGC Unsecured Notes Claims</u>

    a.    *Classification*: Class 7 consists of all EGC Unsecured Notes Claims.

    b.    *Treatment*: If Class 7 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EGC Unsecured Notes Claim, each holder of an Allowed EGC Unsecured Notes Claim shall receive its Pro Rata share of the EGC Warrant Package Allocation; *provided*, *however* that if Class 7 votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan.

    c.    *Voting*: Class 7 is Impaired under the Plan. Each holder of an Allowed EGC Unsecured Notes Claims will be entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – EPL Unsecured Notes Claims</u>

    a.    *Classification*: Class 8 consists of all EPL Unsecured Notes Claims.

    b.    *Treatment*: If Class 8 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EPL Unsecured Notes Claim, each holder of an Allowed EPL Unsecured Notes Claim shall receive its Pro Rata share of the EPL Warrant Package Allocation; *provided*, *however* that if Class 8 votes to reject the Plan, holders of EPL Unsecured Notes Claims will not receive a distribution under the Plan.

    c.    *Voting*: Class 8 is Impaired under the Plan. Each holder of an Allowed EPL Unsecured Notes Claim will be entitled to vote to accept or reject the Plan.

9.    <u>Class 9 – EXXI Convertible Notes Claims</u>

    a.    *Classification*: Class 9 consists of all EXXI Convertible Notes Claims.

    b.    *Treatment*: If Class 9 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EXXI Convertible Claim, each holder of an Allowed EXXI Convertible Notes Claims shall receive its Pro Rata share of the EXXI Warrant Package Allocation; *provided*, *however* that if Class 9 votes to

reject the Plan, holders of EXXI Convertible Notes Claims will not receive a distribution under the Plan.

    c.    *Voting*: Class 9 is Impaired under the Plan. Each holder of an Allowed EXXI Convertible Notes Claim will be entitled to vote to accept or reject the Plan.

10.    <u>Class 10 – Trade Claims</u>

    a.    *Classification*: Class 10 consists of all Trade Claims.

    b.    *Treatment*: Except to the extent that a holder of an Allowed Trade Claim agrees to less favorable treatment (with the consent of the Majority Restructuring Support Parties), in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Trade Claim and of and in exchange for each Allowed Trade Claim, each such holder shall, at its election, either (i) receive such holder's Trade Claim Settlement Distribution or (ii) to the extent the Bankruptcy Court or another court of competent jurisdiction enters a Final Order finding that such Allowed Trade Claim is Secured, Cash in the amount of such Secured Allowed Trade Claim.

        1.    If the holder of a Trade Claim elects to receive such holder's Trade Claim Settlement Distribution, (a) such election shall constitute the Trade Claim Settlement Release, (b) such holder shall be deemed to assign its Trade Claim and any liens or security interests securing such Trade Claims to the Reorganized Debtors, and (c) the Trade Claim Settlement Distribution on account of such Trade Claim shall be made on or about the later of (i) the Effective Date and (ii) the date such Trade Claim becomes Allowed.

        2.    If the holder of a Trade Claim elects not to receive the Trade Claim Settlement Distribution, the first payment on account of its Trade Claim shall be made on or about the date such Trade Claim is determined to be Secured pursuant to a Final Order, on which date such Trade Claim shall become Allowed. Thereafter, the holder of such Secured Allowed Trade Claim shall receive a second and final payment for the remainder of such Secured Allowed Trade Claim on the last Business Day of the following calendar quarter. If the holder of a Trade Claim elects not to receive the Trade Claim Settlement Distribution and any portion of its Claim is determined to be Unsecured pursuant to a Final Order, such Unsecured Claim will be treated as a General Unsecured Claim.

    c.    *Voting*: Class 10 is Impaired under the Plan. Each holder of an Allowed Trade Claim will be entitled to vote to accept or reject the Plan.

11. <u>Class 11 - General Unsecured Claims</u>

    a. *Classification*: Class 11 consists of all Allowed General Unsecured Claims.

    b. *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a Class 11 Allowed General Unsecured Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Class 11 Claim, each such holder shall receive its Pro Rata share of the General Unsecured Claims Distribution.

    c. *Voting*: Class 11 is Impaired under the Plan. Each holder of an Allowed General Unsecured Claim in Class 11 will be entitled to vote to accept or reject the Plan.

12. <u>Class 12 – Section 510(b) Claims</u>

    a. *Classification*: Class 12 consists of all Section 510(b) Claims.

    a. *Treatment*: Class 12 Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims.

    b. *Voting*: Class 12 is Impaired under the Plan.  Each holder of a Section 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan.

13. <u>Class 13 - Intercompany Claims</u>

    a. *Classification*: Class 13 consists of all Intercompany Claims.

    b. *Treatment*: Intercompany Claims shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, shall be cancelled. No distribution shall be made on account of any Intercompany Claims other than in the ordinary course of business of the Reorganized Debtors, as applicable.

    c. *Voting*: Intercompany Claims are either Unimpaired, in which case the holders of such Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the holders of such Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each

holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

14.   Class 14 - Intercompany Interests

a.   *Classification*: Class 14 consists of all Intercompany Interests.

b.   *Treatment*: Intercompany Interests shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, shall be cancelled. No distribution shall be made on account of any Intercompany Interests.

No distributions on account of Intercompany Interests are being made to the holders of such Intercompany Interests. Instead, to the extent Intercompany Interests are Reinstated under the Plan, such Reinstatement is solely for the purposes of administrative convenience, for the ultimate benefit of the holders of the New Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt: (1) to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall continue to be owned by the Reorganized Debtor that corresponds to the Debtor that owned such Intercompany Interests prior to the Effective Date; and (2) except as set forth in the Description of the Transaction Steps, no Interests in a Debtor or Non-Debtor Subsidiary, or Affiliate of a Debtor or Non-Debtor Subsidiary, held by a Non-Debtor Subsidiary or a Non-Debtor Affiliate of a Debtor will be affected by the Plan.

c.   *Voting*: Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

15.   Class 15 – EXXI Interests

a.   *Classification*: Class 15 consists of all EXXI Interests.

b.   *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, all EXXI Interests will be extinguished in accordance with the Description of the Transaction Steps and the holders of EXXI Interests shall not receive or retain any distribution, property, or other value on account of their EXXI Interests.

c.   *Voting*: Class 15 is Impaired under the Plan. Each holder of an EXXI Interest will be conclusively deemed to have rejected the Plan pursuant to

30

section 1126(g) of the Bankruptcy Code. Therefore, each holder of an EXXI Interests will not be entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.      *Elimination of Vacant Classes*

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Voting Classes*; *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

G.      *Subordinated Claims*

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors, with the consent of the Majority Restructuring Support Parties, shall take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate, the Restructuring Support Agreement and the Plan

(the "**Restructuring Transactions**"), including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) all transactions necessary to provide for the purchase of some or substantially all of the assets or Interests of any of the Debtors, which transactions shall be structured in the most tax efficient manner, including in whole or in part as a taxable transaction for United States federal income tax purposes, as determined by the Debtors and the Majority Restructuring Support Parties; (5) the execution and delivery of the Exit Facility Documents; (6) the consummation of the New Money Contribution; and (7) all other actions that the Debtors, the Reorganized Debtors, or the Majority Restructuring Support Parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B.     *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan as follows:

1.     Issuance and Distribution of New Equity

The New Equity, including options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized on the Effective Date without the need for any further corporate action and without any further action by the holders of Claims or Interests.

All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, any claimant's acceptance of the New Equity, including any issuance and distribution following the Effective Date on account of the Warrant Package, shall be deemed to constitute its agreement to the terms of the New Shareholders' Agreement.

2.     Exit Facility

On the Effective Date, the Reorganized Debtors will enter into the Exit Facility in accordance with the terms of the Exit Facility Term Sheet. The Reorganized Debtors may use the proceeds of the Exit Facility for any purpose permitted by the Exit Facility Documents, including the funding of distributions under the Plan and satisfaction of ongoing working capital needs.

The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith),

and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

C.     *Distributions to Holders of Trade Claims and General Unsecured Claims*

Distributions to holders of Allowed Trade Claims and Allowed General Unsecured Claims shall be funded from Cash on hand available on the applicable distribution date.

D.     *Corporate Existence*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Organizational Documents.  For the avoidance of doubt, Reorganized EXXI shall have no assets or operations, and the Provisional Liquidator shall seek entry of an order by the Bermuda Court liquidating Reorganized EXXI as soon as practicable following the Effective Date in accordance with the Description of the Transaction Steps.

E.     *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the Exit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the Reorganized Debtors may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Reorganized Debtors. The Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by this Plan, shall be given prior to the presentation of such Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

F.     *Cancellation of Existing Securities*

Except as otherwise provided in the Plan: (1) the obligations of the Debtors under the First Lien Credit Agreement, the Second Lien Indenture, the EGC Unsecured Notes Indentures, the EPL Unsecured Notes Indenture, the EXXI Convertible Notes Indenture, the EGC Intercompany Note, all EXXI Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; *provided that* the

extinguishment of EXXI Interests shall occur pursuant to Bermuda law in connection with the Bermuda Proceeding and as set forth in the Description of the Transaction Steps; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; *provided that* notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; *provided*, *further*, that nothing in this section shall effectuate a cancellation of any New Equity, Intercompany Interests, or Intercompany Claims.

On and after the Effective Date, all duties and responsibilities of the First Lien Administrative Agent under the First Lien Credit Agreement, the Second Lien Indenture Trustee under the Second Lien Indenture, the EGC Unsecured Notes Indenture Trustee under the respective EGC Unsecured Notes Indentures, the EPL Unsecured Notes Indenture Trustee under the EPL Unsecured Notes Indenture, and the EXXI Convertible Notes Indenture Trustee under the EXXI Convertible Notes Indenture shall be discharged unless otherwise specifically set forth in or provided for under the Plan or the Plan Supplement.

If the record holder of the Second Lien Notes, EGC Unsecured Notes, EPL 8.25% Senior Notes, or the EXXI 3.0% Senior Convertible Notes is DTC or its nominee or another securities depository or custodian thereof, and such Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial owner of such Notes shall be deemed to have surrendered its Notes upon surrender of such global security by DTC or such other securities depository or custodian thereof.

G.    *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable: (1) entry into the Exit Facility; (2) execution and delivery of the Exit Facility Documents; (3) consummation of the New Money Contribution; (4) the issuance of the New Equity; (5) appointment of the directors and officers for New Parent and the other Reorganized Debtors; (6) the right of the New EXXI Board to adopt the Management Incentive Plan on terms and conditions determined by the New EXXI Board in accordance with Article IV.N of the Plan; (7) implementation of the Restructuring Transactions; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of New Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, New Parent, or the other Reorganized Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of

the Debtors, New Parent or the other Reorganized Debtors, as applicable. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, New Parent, or the other Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of New Parent and the other Reorganized Debtors, including the Exit Facility Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court. The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

H.     *New Organizational Documents*

        To the extent required under the Plan or applicable non-bankruptcy law, New Parent and the other Reorganized Debtors will, on or as soon as practicable after the Effective Date, file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities. After the Effective Date, New Parent and the other Reorganized Debtors, as applicable, may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation and their respective New Organizational Documents.

        On the Effective Date, the New Organizational Documents, substantially in the forms to be filed with the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions, such terms and provisions being satisfactory to the Majority Restructuring Support Parties. If the New Shareholders' Agreement is put in place, any Person that receives shares of New Equity pursuant to the Plan shall be deemed to have duly executed and delivered to New Parent a counterpart to the New Shareholders' Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

I.     *Directors and Officers of the Reorganized Debtors*

        As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. As set forth in the Restructuring Support Agreement, the initial New Parent Board shall consist of: (a) John D. Schiller Jr. as the Chief Executive Officer of New Parent; and (b) six additional Persons selected by the Majority Restructuring Support Parties. Successors will be elected in accordance with the New Organizational Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that will serve as an officer of New Parent or any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of New Parent and each of the other Reorganized Debtors.

J.      *Consultation with Provisional Liquidator*

The Debtors shall consult and liaise with the Provisional Liquidator with respect to all matters related to the Plan, including, but not limited to, the Confirmation Order, the Plan Supplement, the Definitive Transaction Documents, and any amendments thereto, in accordance with and to the extent contemplated by the Provisional Liquidator Appointment Order.

K.      *Effectuating Documents*; *Further Transactions*

On and after the Effective Date, New Parent and each of the other Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Equity, in the name of and on behalf of New Parent or the other Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

L.      *Exemption from Certain Taxes and Fees*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a Security (including, without limitation, of the New Equity) or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

M.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action,

as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, without limitation, pursuant to Article VIII hereof, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.L include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the the applicable Reorganized Debtor. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

N.      *Director and Officer Liability Insurance*

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each such D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

O.      *Management Incentive Plan*

The Management Incentive Plan will be a comprehensive equity based award plan with the New Parent Board to formulate the types of equity based awards (including stock option and restricted stock units) on terms and conditions determined by the New Parent Board. The Confirmation Order shall authorize the New Parent Board to adopt and enter into the Management Incentive Plan, on the terms set forth in this Article IV.N. The equity based awards

under the Management Incentive Plan shall dilute all of the New Equity, on terms set forth in the Restructuring Support Agreement and the Plan Supplement.

Awards under the Management Incentive Plan will be awarded to the Reorganized Debtors' officers, directors, employees, and consultants at the discretion of the New Board; *provided*, *however*, that 3% of the Management Equity Pool will be allocated by the New Board to such officers, directors, employees, and consultants no later than 60 days after the Effective Date on terms and conditions determined by the New Board, including the type of equity based awards.  Subject to the foregoing, the New Board will determine the additional terms of the Management Incentive Plan after the Effective Date, including the allocation, granting, and vesting of applicable awards under the Management Incentive Plan.

P.     *Employee and Retiree Benefits*

Except as otherwise provided in the Plan or the Plan Supplement, and subject to the consent of the Majority Restructuring Support Parties (which shall be determined prior to the Confirmation Date) all written employment, severance, retirement, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors and the Non-Debtor Subsidiaries, including any key employee incentive plans and/or key employee retention plans that may be approved by the Court in the Chapter 11 Cases and any items approved as part of the Confirmation Order (including, for the avoidance of doubt, all obligations arising from the Chapter 11 Compensation Order), retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors, on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided that* the foregoing shall not apply to any equity-based compensation, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Q.     *Payment of Fees and Expenses of the First Lien Administrative Agent*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the First Lien Administrative Agent and its advisors, including counsel, without application to or approval of the Court.

R.      *Payment of Fees and Expenses of the Second Lien Indenture Trustee*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Second Lien Indenture Trustee and its advisors, including counsel, without application to or approval of the Court. For the avoidance of doubt, nothing herein affects the Second Lien Indenture Trustee's right to exercise any charging lien arising under and in accordance with the Second Lien Indenture to obtain payments of its fees and expenses and the fees and expenses of its professionals.

S.      *Payment of Fees and Expenses of the Restructuring Support Parties*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Restructuring Support Parties and their advisors, including counsel, without application to or approval of the Court and in accordance with the terms of the Restructuring Support Agreement.

T.      *Preservation of the Charging Lien of the ECG Unsecured Notes Indenture Trustees, EPL Unsecured Notes Indenture Trustee, and EXXI Convertible Notes Indenture Trustee*

Each of the ECG Unsecured Notes Indenture Trustees, the EPL Unsecured Notes Indenture Trustee, and the EXXI Convertible Notes Indenture Trustee shall be entitled to assert its charging lien arising under and in accordance with the applicable indenture to obtain payment of its respective fees and expenses and the fees and expenses of its professionals.

U.      *Preservation of Royalty and Working Interests*

Notwithstanding any other provision in the Plan, but subject in all respect to all payments authorized and made pursuant to the Royalty Order, on and after the Effective Date all Royalty and Working Interests shall be fully preserved and remain in full force and effect in accordance with the terms of the relevant granting instruments or other governing documents applicable to such Royalty and Working Interests, which granting instruments and governing documents shall remain in full force and effect, and no Royalty and Working Interests or any liabilities and obligations arising therefrom, including payment obligations, whether arising before or after the Petition Date, shall be compromised or discharged by the Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors or their designated assignee in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and

Unexpired Leases; (2) those that have been previously rejected by a Final Order, including those that are subject to a notice issued pursuant to the Rejection Procedures Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. For the avoidance of doubt, Debtors will assume all of their OCS mineral leases from the BOEM (and will not seek to abandon any OCS leases).

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Majority Restructuring Support Parties, alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three (3) days' notice to the applicable non-Debtor counterparties.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be promptly served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Court pursuant to the Court's order approving the Disclosure Statement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within the earliest to occur of (1) thirty days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection or (2) thirty days after notice of any rejection that occurs after the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or any Proof of Claim to the contrary**. Claims arising from the rejection of the Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.11 of the Plan.

41

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable counterparties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or assumption and assignment or related Cure Claim must be Filed, served and <u>actually received</u> by the Debtors at least seven (7) days before the Confirmation Hearing**. In the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such time as the Cure Notices referred to above have been distributed, a separate Cure Notice of proposed assumption or assumption and assignment and the proposed amount of the Cure Claim with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a hearing will be set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or assumption and assignment or the proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment and the Cure Claim. Payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, to such counterparty of the amount set forth on the applicable Cure Notice shall, as a matter of law, satisfy any and all monetary defaults under the applicable Executory Contract or Unexpired Lease. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or assumption and assignment, such dispute shall be resolved by a Final Order of the Court.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or the Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, subject to the consent of the Majority Restructuring Support Parties, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date. After such Executory Contract or Unexpired Lease is added to the Schedule of Rejected Executory Contracts and Unexpired Leases, the applicable counterparty shall be served with a notice of rejection of its Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

D.    *Indemnification Obligations*

As of the Effective Date, the Indemnification Obligations shall be deemed to be Executory Contracts and rejected by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code.

E.    *Insurance Policies*

Without limiting Article IV.M, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

F.    *Modifications*, *Amendments*, *Supplements*, *Restatements*, *or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases, with the consent of the Majority Restructuring Support Parties, shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim (or such holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions

a.      Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims and Interests. The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

b.      Delivery of Distributions in General

Distributions to holders of Allowed Claims shall be made to the holders of record as of the Distribution Record Date by the Debtors or the Reorganized Debtors, as applicable, as follows: (1) to the signatory set forth on the last Proof of Claim Filed by such holder or other representative identified therein (or at the last known addresses of such holder if the Debtors have been notified in writing of a change of address); (2) at the address set forth in any written notice of address changes delivered to the Reorganized Debtors after the Effective Date; (3) at the address reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized

Debtors have not received a written notice of a change of address; or (4) to any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

<div align="center">c.      Delivery of Distributions to First Lien Lenders</div>

Any and all distributions to holders of First Lien Claims as of the Distribution Record Date shall be governed by the First Lien Credit Agreement. The First Lien Administrative Agent shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within three (3) business days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of First Lien Claims as of the Distribution Record Date, including the address at which each such holder is authorized to receive its distribution under the Plan and the amount of First Lien Claims held by each such holder.

<div align="center">d.      Delivery of Distributions to Second Lien Noteholders</div>

Any and all distributions to the holders of the Second Lien Notes Claims as of the Distribution Record Date shall be governed by the Second Lien Indenture. The Second Lien Indenture Trustee shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within three (3) business days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of Second Lien Notes Claims as of the Distribution Record Date, including the amount of the Second Lien Notes Claims held by each such holder. Distributions to the holders of the Second Lien Notes Claims shall be deemed to have been made when reflected in the Reorganized Debtors' stock register according to the information provided by the Second Lien Indenture Trustee.

<div align="center">e.      Delivery of Distributions to EGC Unsecured Notes Indenture Trustee</div>

All distributions to the holders of the EGC Unsecured Notes Claims as of the Distribution Record Date shall be deemed completed when made to the EGC Unsecured Notes Indenture Trustee, which shall be deemed to be the holder of all EGC Unsecured Notes Claims for purposes of distributions to be made hereunder. The Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EGC Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI.D.1.d, the EGC Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EGC Unsecured Notes Claims. For the avoidance of doubt, distributions to holders of the EGC Unsecured Notes Claims pursuant to this Article VI.D.1.d shall be made by the Indenture Trustee.

f.      Delivery of Distributions to EPL Unsecured Notes Indenture Trustee

All distributions to the holders of the EPL Unsecured Notes Claims as of the Distribution Record Date shall be deemed completed when made to the Indenture Trustee, which shall be deemed to be the holder of all EPL Unsecured Notes Claims for purposes of distributions to be made hereunder. The EPL Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EPL Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI.D.1.d, the EPL Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EPL Unsecured Notes Claims. For the avoidance of doubt, distributions to the holders of EPL Unsecured Notes Claims pursuant to this Article VI.D.1.d shall be made by the EPL Unsecured Notes Indenture Trustee.

g.      Delivery of Distributions to EXXI Convertible Notes Indenture Trustee

All distributions to the holders of the EXXI Convertible Notes Claims as of the Distribution Record Date shall be deemed completed when made to the EXXI Convertible Notes Indenture Trustee, which shall be deemed to be the holder of all EXXI Convertible Notes Claims for purposes of distributions to be made hereunder. The EXXI Convertible Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EXXI Convertible Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI.D.1.d, the EXXI Convertible Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EXXI Convertible Notes Claims. For the avoidance of doubt, distributions to the holders of EXXI Convertible Notes Claims pursuant to this Article VI.D.1.d shall be made by the Indenture Trustee.

2.      Minimum Distributions

No fractional shares of New Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of shares of New Equity shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Equity to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $50.00 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder shall be forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtors or the Reorganized Debtors, as applicable, shall have determined the then-current address of such holder, at which

time such distribution shall be made to such holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of this Article VI.D.3, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) without need for a further order by the Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

C.      *Registration or Private Placement Exemption*

Except as otherwise set forth immediately below, all shares of New Equity issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of New Equity issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Equity issued pursuant to section 1145 of the Bankruptcy Code (a) is not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Equity from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. **New Equity issued to holders of Second Lien Notes Claims in exchange for such Claims, and the New Equity underlying the Warrant Package shall be issued in reliance on section 1145 of the Bankruptcy Code. The New Equity underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.**

On the Effective Date, the Registration Rights Beneficiaries and New Parent shall enter into a registration rights agreement in form and substance acceptable to (i) the Majority Restructuring Support Parties, (ii) the Registration Rights Beneficiaries, and (iii) New Parent. The registration rights agreement shall provide the Registration Rights Beneficiaries with certain demand registration rights (including with respect to underwritten offerings) and with piggyback registration rights. The registration rights agreement shall also provide that on or before the date that is 60 days after the Effective Date, New Parent shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the New Equity held by the Registration Rights Beneficiaries. The registration rights agreement shall contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Equity to be held through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan

and Confirmation Order with respect to the treatment of such applicable portion of the New Equity, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity is exempt from registration.

D.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors or the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

E.      *Allocations*

Each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan (cash or value) to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion.

F.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

G.      *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor of any such Claim it may have against the holder of such Allowed Claim.

H.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to Debtors or the Reorganized Debtors, as applicable, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.    Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims*

On or after the Effective Date, each of the Reorganized Debtors shall have any and all rights and defenses its predecessor Debtor had with respect to any Claim immediately prior to the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, by order of the Court, shall together have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

D.      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

E.      *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be filed by any party, shall be Filed on or before the Claims Objection Deadline.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**Except as provided herein (including with respect to any counterparties to rejected Executory Contracts or Unexpired Leases who are required to file Proofs of Claim after the rejection of their contracts or leases), any and all Proofs of Claim or requests for payment of Administrative Claims, as applicable, Filed after the applicable Claims Bar Date, Administrative Claims Bar Date, Final Administrative Claims Bar Date, Governmental Bar Date, and applicable deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

H.      *No Distributions Pending Allowance*

No payment or distribution provided under the Plan shall be made on account of a Disputed Claim or portion thereof, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals shall be paid to the holder of such Allowed Claim on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in herein.

J.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus applicable interest. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as such Debtor's Chapter 11 Case is closed, dismissed, or converted.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims against, and Interests in, all Debtors, including all controversies relating to the contractual, legal, and subordination rights that a holder of an Allowed Claim against a Debtor may have with respect to such Allowed Claim or any distribution to be made on account of such Allowed Claim, including:

1.      the treatment of the EGC Intercompany Note and the distributions associated therewith;

2.      any dispute regarding the appropriate allocation of general and administrative costs across the Debtors' Estates;

3.      any challenges to transfers made by the Debtors to any related entities;

4.      the value and allocation of the Warrant Package; and

5.      the releases, exculpations, and injunctions provided herein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.     *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.     *Term of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

D.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), the New Money Contribution (to the extent applicable), or in any other contract, instrument, agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors. In addition, at the Debtors' or Reorganized Debtors' sole expense, the First Lien Administrative Agent and the Second Lien Indenture Trustee shall execute and deliver all documents reasonably requested by the Reorganized Debtors, or the administrative agent(s) for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.**

E.    *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, and the Reorganized Debtors from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the First Lien Credit Agreement, the Second Lien Indenture, the Intercreditor Agreement, the Interim Cash Collateral Order and the Final Cash Collateral Order (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal**

54

opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, the Definitive Documentation, the Bermuda Proceeding, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth herein do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions, and (ii) nothing in this provision shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or cause of action released pursuant to such releases.

F.      *Releases by Holders of Claims and Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, its Estate, Reorganized Debtor, and Released Party from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the First Lien Credit Agreement, the Second Lien Indenture, the Intercreditor Agreement, the Interim Cash Collateral Order and the Final Cash Collateral Order (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any

legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, the Definitive Documentation, the Bermuda Proceeding, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions, and (ii) nothing in this provision shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring Transactions; and (7) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such releases.

G.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation of votes with respect to this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Filing of

56

the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Bermuda Proceeding, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.    *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

I.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Recoupment*

In no event shall any holder of an Allowed Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

K.      *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

L.      *Reimbursement or Contribution*

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Confirmation Date*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      An order approving the Disclosure Statement shall have been entered by the Court in form and substance acceptable to the Debtors, the Majority Restructuring Support Parties, and the First Lien Administrative Agent and shall have become a Final Order;

2.      An order approving the Debtors' assumption of the Restructuring Support Agreement shall have been entered by the Court in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties;

3.      The Confirmation Order shall have been approved by the Court in form and substance acceptable to the Debtors and Majority Restructuring Support Parties;

4.      The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, each in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties, shall have been Filed subject to the terms hereof; and

5.      To the extent the Debtors' projected cash or liquidity on hand at emergence (excluding, for the avoidance of doubt, the Restricted Cash, the reduction in letters of credit, and any liquidity available under the Exit Facility) is less than Minimum Emergence Liquidity (as defined in the Exit Facility Term Sheet), the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have consented to the material terms of the New Money Contribution, which terms shall be disclosed in the Plan Supplement; *provided*, *however*, that nothing herein shall constitute a commitment by the First Lien Lenders or the Second Lien Noteholders to fund or otherwise provide such New Money Contribution.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      Entry of the Confirmation Order in form and substance satisfactory to the Debtors and the Majority Restructuring Support Parties, and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

2.      The Bermuda Court shall have entered an order recognizing the Plan under Bermuda law;

3.      All of the Restructuring Support Parties' reasonable and documented professional fees and out-of-pocket expenses incurred in connection with the Restructuring Transactions, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall have been paid by the Debtors in accordance with the Restructuring Support Agreement;

4.      All fees ordered to be paid pursuant to the Final Cash Collateral Order, including the First Lien Administrative Agent's reasonable and documented professional fees shall have been paid or will be paid prior to or contemporaneously with the Effective Date in accordance with the terms of the Final Cash Collateral Order.

5.      The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties and made in accordance with the Article X.A of the Plan;

6.      The Exit Facility Documents in form and substance acceptable to the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

7.      All documentation effectuating the New Money Contribution, to the extent deemed necessary prior to Confirmation, in form and substance acceptable to the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Money Contribution shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Money Contribution shall be deemed to occur concurrently with the occurrence of the Effective Date;

8.      The Definitive Documentation shall be executed and satisfactory to the Majority Restructuring Support Parties in accordance with Section 3 of the Restructuring Support Agreement;

9.      All conditions precedent to the issuance of the New Equity, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

10.      The New Organizational Documents, in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties, have been duly filed with the applicable authorities in the relevant jurisdictions;

11.      All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions; *provided*, *however* that consummation of the Bermuda Proceeding shall not be a condition to the Effective Date;

12.      All documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements (including, without limitation, the Exit Facility Documents); and

13.     All Allowed Professional Fee Claims approved by the Court shall have been paid in full and the Professional Fee Escrow Account shall have been funded in the Professional Fee Reserve Amount.

C.     *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors, the Majority Restructuring Support Parties, and the First Lien Administrative Agent without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan.

D.     *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

E.     *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims. If the Effective Date shall not have occurred by September 2, 2016, it shall be a termination event under the Restructuring Support Agreement entitling, but not requiring, the Majority Restructuring Support Parties to terminate the Restructuring Support Agreement (as more fully set forth therein), in which case the Effective Date may not occur.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments*

Subject to the limitations contained herein and the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the terms of the Restructuring Support Agreement, the Debtors expressly reserve their right (with the consent of the Majority Restructuring Support Parties) to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the

Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right (with the consent of the Majority Restructuring Support Parties) to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the Non-Debtor Subsidiaries; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries; or (iv) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

# ARTICLE XI.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections relating to any of the foregoing;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or

Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Debtors (with the consent of the Majority Restructuring Support Parties) or the Reorganized Debtors, as applicable, amending, modifying, or supplementing, pursuant to Article V hereof, the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the Restructuring Support Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Restructuring Support Agreement;

9.      enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1 hereof;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.      enforce all orders previously entered by the Court;

22.      hear any other matter not inconsistent with the Bankruptcy Code;

23.      enter an order concluding or closing the Chapter 11 Cases; and

24.      enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, with the consent of the Majority Restructuring Support Parties, the Debtors may File with the Court such agreements and other documents, in form and substance satisfactory to the Majority Restructuring Support Parties, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, with the consent of the Majority Restructuring Support Parties, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve automatically, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the Committee after the Effective Date.

D.    *Reservation of Rights*

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any holder of any Claim with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any claimant with respect to any Claims or Interests.

E.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| **Reorganized Debtors** | **Energy XXI Ltd** |
| | 1021 Main Street, Suite 2626 |
| | Houston, Texas 77002 |
| | Attn:  John D. Schiller, Jr. |

65

| | |
|---|---|
| **Attorneys to the Debtors** | **Vinson & Elkins LLP**<br>First City Tower<br>1001 Fannin, Suite 2500<br>Houston, Texas 77002-6760<br>Attn:  Harry Perrin<br><br>and<br><br>**Vinson & Elkins LLP**<br>666 Fifth Avenue, 26th Floor<br>New York, New York  10103-0040<br>Attn:  David S. Meyer<br>        Lauren R. Kanzer |
| **United States Trustee** | **Office of the United States Trustee<br>for the Southern District of Texas**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002<br>Attn:  Hector Duran, Esq. |
| **Counsel to the Ad Hoc Committee of<br>Second Lien Noteholders** | **Milbank, Tweed, Hadley & McCloy LLP**<br>28 Liberty Street<br>New York, NY 10005<br>Attn:  Dennis E. Dunne<br>        Samuel A. Khalil |
| **Proposed Attorneys to the<br>Committee** | **Latham & Watkins LLP**<br>885 Third Avenue<br>New York, NY 10022-4834<br>Attn:  Mitchell A. Seider<br>        Adam J. Goldberg |

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Restructuring Support Agreement, and the Exit Facility Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://dm.epiq11.com/EXL or the Court's website at www.txs.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors and the Majority Restructuring Support Parties. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Majority Restructuring Support Parties' consent; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.     *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

M.     *Waiver or Estoppel*

Each holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Notice and Claims Agent prior to the Confirmation Date.

* * * *

Respectfully submitted, as of the date first set forth above,

Dated: June 14, 2016

ENERGY XXI LTD
on behalf of itself and all other Debtors


/s/
John D. Schiller, Jr.
President and Chief Executive Officer
1021 Main Street, Suite 2626
Houston, Texas 77002

## <u>Exhibit 1</u>

**Exit Facility Term Sheet**

**Project Bluewater**

**RBL RESTRUCTURING TERM SHEET**

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTS.

| | |
|---|---|
| **Treatment of RBL During Chapter 11** | ■ ~$99mm drawn amount at EPL remains outstanding<br><br>   – Current payment of interest at the pre-petition non-default contract rate (LIBOR + 3.75%), in cash, for the duration of the case default interest would accrue through an additional 2.00% PIK interest<br><br>■ ~$228mm of LCs issued at EGC remains outstanding<br><br>   – Current payment of interest at the pre-petition non-default contract rate (3.75%), in cash, for the duration of the case<br><br>■ Outstanding existing LCs under the RBL facility may be replaced with reduced LCs |
| **Mandatory Liquidity Condition for Exit Financing** | ■ Condition precedent to confirmation / emergence that the reorganized Company has liquidity of at least $90 million, consisting of cash and/or committed financing, upon emergence after all restructuring costs and claims due at emergence paid ("Minimum Emergence Liquidity")<br><br>   – Any financing used to meet the liquidity commitment described above must be junior in priority to the Exit Financing (described below)<br><br>■ Incremental liquidity created by reducing LCs (e.g., New Funded Debt, as described below) will not count towards meeting the Minimum Emergence Liquidity<br><br>■ If the Company, the RBL Lenders, and the Ad Hoc 2L Committee agree to implement a swap or put program, such parties (each institution acting in its individual capacity) agree to negotiate in good faith regarding a possible reduction of the Minimum Emergence Liquidity. For the avoidance of doubt, nothing herein shall obligate any RBL Lender to facilitate a swap or put program. |

| Treatment of RBL Under the Plan of Reorganization | ■ $30mm of EPL restricted cash will be paid at emergence to permanently reduce the pre-petition EPL subfacility balance |
|---|---|
| | ■ Conversion of the remaining RBL obligations into a new exit financing facility (the "Exit Financing") comprising two tranches: |
| | (i) Conversion of remaining drawn amount of ~$69mm[1] plus accrued default interest into a new term loan (the "Exit 1L Term Loan") with the Reorganized Company[2] with the following terms: |
| |     – Maturity: 3 years from date of emergence |
| |     – Rate: LIBOR + 4.5% annual interest rate, payable monthly |
| |     – Amortization: See "Amortization Covenant" below |
| | (ii) Conversion of the EGC sub-facility into a new EGC sub-facility with outstanding LCs deemed issued thereunder |
| |     – Maturity: 3 years |
| |     – Rate: 4.5% annual interest rate, payable on schedule consistent with EGC subfacility |
| |     – Amortization: none |
| |     – Existing letters of credit may be renewed or replaced (in each case, in an outstanding amount not to exceed the outstanding amount of the existing letter of credit).  Availability under the exit facility shall be permanently reduced by one-half of the amount of any reduction resulting from replacement or cancellation of an outstanding letter of credit |
| |         o Amount of cancellation or reduction that does not permanently reduce capacity will be available by the RBL lenders under the Exit Financing to fund new liquidity (the "New Funded Debt") |
| | ■ New Funded Debt in excess of $25 million subject to borrowing base redetermination (e.g., EPL+EGC borrowing base as compared to New Funded Debt) |

---

[1] Reflects $30 million of paydown using EPL restricted cash.

[2] All of the borrowers and guarantors under the existing RBL Facility (including EPL and its subsidiaries) shall be joint and severally liable as guarantors for all obligations under both Exit Facility tranches, which obligations shall be secured by substantially all of the Reorganized Company's assets.

| | |
|---|---|
| **Covenants** | ■ **Financial Maintenance Covenants** <br><br> Current Ratio: 1.0x <br>     –   Calculated as (i) unrestricted cash plus accounts receivable plus prepaid expenses; <u>divided by</u> (ii) accounts payable plus accrued expenses, consistent with the definition of Current Ratio in the existing pre-petition credit agreement <br><br>     –   Holiday for four full fiscal quarters, with the first test performed at the end of the following quarter[3] <br><br> First Lien Leverage Ratio: 4.0x <br>     –   Calculated as (i) first lien debt (<u>e.g.</u>, Exit 1L Term Loan plus EGC sub-facility, assuming all existing junior debt is converted to equity at emergence); <u>divided by</u> (ii) LTM EBITDA <br><br>     –   Holiday for four full fiscal quarters, with the first test performed at the end of the following quarter**Error! Bookmark not defined.** <br><br> ■ **Amortization Covenant (i.e., not a maintenance covenant)** <br><br> PV-9 Asset Coverage: 1.5x <br>     –   Calculated as (i) Adjusted PV-9 value; <u>divided by</u> (ii) first lien debt (assuming all existing junior debt is converted to equity at emergence) <br><br>     –   Adjusted PV-9 value (i) to include add-back of (a) discounted P&A obligations associated with restricted cash backstopping P&A liabilities, and (b) 50% of total amount of LCs directly related to P&A liabilities; and (ii) to include limit that PUDs make up no more than 30% of Adjusted 1P PV-9 value <br><br>     –   Price deck to be utilized in calculating Adjusted PV-9 value cannot be lower than forward strip-curve as of the date of the test, and 100% of hedges will be included in the calculation <br><br>     –   If triggered, amortization will be 30% per annum of the Exit 1L Term Loan (7.5% in any quarter when such amortization is triggered) <br><br>        o   Holiday for four full fiscal quarters, with the first test performed at the end of the following quarter**Error! Bookmark not defined.**; |

---

[3] For example, if the company were to emerge in September 2016, the four full periods in which the holiday would take effect would be the quarters ending December 2016, March 2017, June 2017, and September 2017, and the first testing period would be the quarter ending December 2017.

| | tested quarterly thereafter |
|---|---|
| **Timeline** | ■ No later than September 2, 2016, the Debtors shall consummate the transactions contemplated by a Plan acceptable to the RBL Lenders and the Ad Hoc 2L Committee (the date of such consummation, the "<u>Effective Date</u>")<br><br>■ Milestones acceptable to RBL Lenders to be established |

# **EXHIBIT B**

**Restructuring Support Agreement**

# ENERGY XXI LTD

## RESTRUCTURING SUPPORT AGREEMENT

### April 11, 2016

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto, which includes, without limitation, the Term Sheet (as defined below) attached hereto as **Exhibit A**, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"),[1] dated as of April 11, 2016, is entered into by and among: (i) Energy XXI Ltd ("***EXXI***"), Energy XXI Gulf Coast, Inc. ("***EGC***"), EPL Oil & Gas, Inc. ("***EPL***"), and those certain additional subsidiaries of EXXI listed on **Schedule 1** of the Term Sheet (such subsidiaries, EXXI, EGC, and EPL each a "***Debtor***" and, collectively, the "***Debtors***");[2] and (ii) holders of the senior secured second lien notes (the "***Second Lien Noteholders***") issued pursuant to that certain Indenture, dated as of March 12, 2015 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "***Second Lien Indenture***"), for the 11.00% senior secured second lien notes due 2020 among EGC, each of the guarantors party thereto, and U.S. Bank, N.A., as trustee (and any Second Lien Noteholder that may become in accordance with Section 13 and/or Section 14 hereof) signatories hereto (collectively, the "***Restructuring Support Parties***"). This Agreement collectively refers to the Debtors and the Restructuring Support Parties as the "***Parties***" and each individually as a "***Party***."

## RECITALS

WHEREAS, it is anticipated that certain restructuring transactions (the "***Restructuring Transactions***"), including a joint pre-arranged plan of reorganization for the Debtors on terms consistent with the restructuring term sheet attached hereto as **Exhibit A** (the "***Term Sheet***") and incorporated herein by reference pursuant to Section 2 hereof (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement, the "***Plan***")[3], will be implemented through jointly-administered voluntary cases commenced by the Debtors (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), pursuant to the Plan, which will be filed by the Debtors in the Chapter 11 Cases.

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and

---

[1] Unless otherwise noted, capitalized terms used but not immediately defined herein shall have the meanings ascribed to them at a later point in this Agreement or in the Term Sheet (as defined herein), as applicable.

[2] Until the occurrence of the Termination Date, every entity that is a Debtor in the Chapter 11 Cases shall be a party to this Agreement.

[3] The Plan shall be filed in accordance with the Milestones (as defined below) set forth in Section 4 of this Agreement.

sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.    **RSA Effective Date**. This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "***RSA Effective Date***") that this Agreement has been executed by all of the following: (a) each Debtor; and (c) Restructuring Support Parties holding, in aggregate, at least 63.0% in principal amount outstanding of all claims against the Debtors arising on account of the Second Lien Indenture (the "***Second Lien Notes Claims***").

2.    **Exhibits and Schedules Incorporated by Reference**. Each of the exhibits attached hereto and any schedules to such exhibits (collectively, the "***Exhibits and Schedules***") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules. In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

3.    **Definitive Documentation**.

(a)    The definitive documents and agreements governing the Restructuring Transactions (collectively, the "***Definitive Documentation***") shall include:

(i)    the Plan (and all exhibits thereto), including any plan supplement documents (including, without limitation, documents identifying the officers and directors of the reorganized Debtors, the governance documents for the reorganized Debtors, and any equityholders' agreements with respect to the reorganized Debtors);

(ii)    the confirmation order with respect to the Plan (the "***Confirmation Order***");

(iii)    the related disclosure statement (and all exhibits thereto) with respect to the Plan (the "***Disclosure Statement***");

(iv)    the solicitation materials with respect to the Plan (collectively, the "***Solicitation Materials***");

(v)    an order authorizing the assumption of this Agreement (the "***RSA Assumption Order***");

(vi)    (A) the interim order authorizing use of cash collateral (the "***Interim Cash Collateral Order***") and (B) the final order authorizing use of cash collateral (the "***Final Cash Collateral Order***" and, together with the Interim Cash Collateral Order, the "***Cash Collateral Orders***"); and

2

(vii)    the motions seeking approval of each of the above.

(b)    The Definitive Documentation identified in Section 3(a) will, after the RSA Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including all exhibits hereto) and be in form and substance satisfactory to those Restructuring Support Parties (in their sole discretion) who hold, in aggregate, at least 66.6% in principal amount outstanding of the Second Lien Notes Claims held by the Restructuring Support Parties (the "***Majority Restructuring Support Parties***").

4.    **Milestones**. As provided in and subject to Section 6, the Debtors shall implement the Restructuring Transactions on the following timeline (each deadline, a "***Milestone***"):

(a)    no later than April 14, 2016 at 10:00 a.m. (Eastern Time), the Debtors shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court (such filing date, the "***Petition Date***");

(b)    no later than April 14, 2016, EXXI will file a winding up petition with the Bermuda Court commencing the Bermuda Proceeding;

(c)    on the Petition Date, the Debtors shall file with the Bankruptcy Court (i) a motion seeking entry of the Interim Cash Collateral Order and the Final Cash Collateral Order; and (ii) a motion seeking to assume this Agreement (the "***RSA Assumption Motion***");

(d)    no later than April 18, 2016, the Bankruptcy Court shall have entered the Interim Cash Collateral Order;

(e)    no later than May 16, 2016, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; and (iii) a motion (the "***Disclosure Statement and Solicitation Motion***") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***");

(f)    no later than May 25, 2016, the Bankruptcy Court shall have entered the Final Cash Collateral Order;

(g)    no later than July 1, 2016, the Bankruptcy Court shall have entered an order authorizing the assumption of this Agreement (the "***RSA Assumption Order***");

(h)    no later than July 1, 2016, (i) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion; and (ii) no later than five

3

(5) business days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Debtors shall have commenced solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan;

(i)     no later than August 8, 2016, the Bankruptcy Court shall have commenced the Confirmation Hearing;

(j)     no later than August 19, 2016, the Bankruptcy Court shall have entered the Confirmation Order; and

(k)     no later than September 2, 2016, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "***Effective Date***"), it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Plan and the Term Sheet) shall be conditions precedent to the occurrence of the Effective Date.

It is understood and the Parties agree that any parallel proceeding for EXXI and any of its Bermudian affiliates in Bermuda shall not be subject to the Milestones set forth in this <u>Section 4</u> (other than the Milestone set forth in <u>Sub-Clause (b)</u> of <u>Section 4</u>) and the Parties shall use reasonable best efforts to consummate any restructuring in Bermuda as promptly as possible in accordance with the Term Sheet. For the avoidance of doubt, the Debtors may not rely on any delay in consummating any restructuring in Bermuda for EXXI and any of its Bermudian affiliates to excuse their performance of any Milestone or to invoke a Debtor Termination Event.

Subject to the individual termination rights set forth in <u>Sub-Clause (a) and (b)</u> of <u>Section 9</u>, the Debtors may extend a Milestone with the express prior written consent of the Majority Restructuring Support Parties.

5.     <u>**Commitment of Restructuring Support Parties.**</u> Each Restructuring Support Party shall (severally and not jointly), solely as it remains the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims held by it, from the RSA Effective Date until the occurrence of a Termination Date (as defined in <u>Section 11</u>) applicable to such Restructuring Support Party:

(a)     use commercially reasonable efforts to support and cooperate with the Debtors to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and the Term Sheet (but without limiting consent, approval, or termination rights provided in this Agreement and the Definitive Documentation), including: (i) voting all of its claims against, or interests in, as applicable, the Debtors now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter has voting control over) to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials, as approved

4

consistent with the Bankruptcy Code upon receipt of Solicitation Materials approved by the Bankruptcy Court; (ii) timely returning a duly-executed ballot in connection therewith; and (iii) not "opting out" of any releases under the Plan;

(b)     not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; *provided*, *however*, that the votes of the Restructuring Support Parties shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement; and

(c)     use commercially reasonable efforts to support and not object to, delay, impede, or take any other action to interfere with the Restructuring Transactions (including the entry by the Bankruptcy Court of the Interim Cash Collateral Order or the Final Cash Collateral order), or propose, file, support, or vote for any restructuring, workout, or chapter 11 plan for any of the Debtors other than the Restructuring Transactions and the Plan (but without limiting consent, approval, or termination rights provided in this Agreement and the Definitive Documentation).

Notwithstanding anything herein to the contrary, nothing in this Agreement shall require any Restructuring Support Party to take any action or refrain from taking any action that is inconsistent with such Restructuring Support Party's obligations under that certain Intercreditor Agreement, dated as of March 12, 2015, between The Royal Bank of Scotland plc, as Priority Lien Agent, and U.S. Bank National Association, as Second Lien Collateral Trustee.

Notwithstanding anything herein to the contrary, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (w) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising rights or remedies specifically reserved herein, (x) be construed to limit any Restructuring Support Party's rights under any applicable indenture, credit agreement, other loan document, and/or applicable law or to prohibit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions, *provided*, *however*, that any delay or other impact on consummation of the Restructuring Transactions contemplated by the Plan caused by a Restructuring Support Party's opposition to any relief that is inconsistent with such Restructuring Transactions, a motion by the Debtors to enter into a material executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior consent of the Majority Restructuring Support Parties, or any relief that is adverse to interests of the Restructuring Support Parties sought by the Debtors (or any other party) shall not constitute a violation of this Agreement, or (y) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted

5

under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

6.  **Commitment of the Debtors**.

(a)  Subject to Sub-Clause (b) and (c) of this Section 6, each of the Debtors (i) agrees to (A) support and make reasonable best efforts to complete the Restructuring Transactions set forth in the Plan and this Agreement, (B) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of the Term Sheet, the Plan and this Agreement, and (C) make reasonable best efforts to complete the Restructuring Transactions set forth in the Plan in accordance with each Milestone set forth in Section 4 of this Agreement, and (ii) shall not undertake any action inconsistent with the adoption and implementation of the Plan and the speedy confirmation thereof, including, without limitation, filing any motion to reject this Agreement.

(b)  Notwithstanding anything to the contrary herein, the Debtors shall use their best efforts to obtain the treatment for the First Lien Claims as set forth in the Term sheet.

(c)  Notwithstanding anything to the contrary herein, nothing in this Agreement shall prevent the directors, officers, or managers of any Debtor (in such person's capacity as a director, officer, or manager of such Debtor) from taking or refraining from taking any action that, after receiving advice from counsel, it is obligated to take or refrain from taking in the performance of its fiduciary obligations under applicable law.

(d)  Timely file a formal objection, in form and substance reasonably acceptable to the Majority Restructuring Support Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases.

(e)  Timely file a formal objection, in form and substance reasonably acceptable to the Majority Restructuring Support Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable.

(f)  Each of the Debtors agrees that to the extent it offers one or more Restructuring Support Parties the right to participate in any investment, financing, or similar transaction (including, without limitation, a DIP

financing, an exit financing, a rights offering, or a sale of the applicable Debtor's debt instruments), all other Restructuring Support Parties shall have the right to participate in such transaction, in accordance with their respective percentage interests, at the same price and on the same terms and conditions.

(g)     The Debtors may receive (but not solicit) proposals or offers for any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Restructuring Transactions (an "***Alternative Transaction***") from other parties and discuss such Alternative Transactions received; *provided*, *however*,  that the Debtors shall provide a copy of any written offer or proposal (and notice of any oral offer or proposal) for an Alternative Transaction received to the legal counsel and financial advisors to Ad Hoc Second Lien Committee (as defined below) within one (1) day of the Debtors' or their advisors' receipt of such offer or proposal.

For the avoidance of doubt, nothing in this Section 6 shall be construed to limit or affect in any way (y) any Restructuring Support Party's rights under this Agreement, including upon occurrence of any Termination Event or (z) the Debtors' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding financing in the Chapter 11 Cases; *provided*, *however*, that to the extent the Debtors engage in any such marketing efforts, discussions, and/or negotiations, they shall provide updates to the Restructuring Support Parties regarding such efforts including answering any and all information and diligence requests regarding such efforts, discussions, and/or negotiations; *provided further*, *however*, that the Restructuring Support Parties shall have a right of first refusal to provide any such financing in the Chapter 11 Cases.

7.     **Restructuring Support Party Termination Events**. The Majority Restructuring Support Parties shall have the right, but not the obligation, upon notice to the other Parties, to terminate the obligations of the Restructuring Support Parties under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by the Majority Restructuring Support Parties on a prospective or retroactive basis (each, a "***Restructuring Support Party Termination Event***"):

(a)     the failure to meet any of the Milestones in Section 4 unless (i) such failure is the direct result of any act, omission, or delay on the part of any Restructuring Support Party in violation of its obligations under this Agreement or (ii) such Milestone is extended in accordance with Section 4;

(b)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

7

(c)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(d)     any Debtor (i) files, amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is inconsistent with this Agreement or are otherwise in a form and substance not reasonably satisfactory to the Majority Restructuring Support Parties, (ii) suspends or revokes the Restructuring Transactions without the prior consent of the Majority Restructuring Support Parties, or (iii) publicly announces its intention to take any such acts listed in (i) or (ii) of this Sub-Clause (d);

(e)     any Debtor files or publicly announces that it will file or joins in or supports any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any assets, without the prior written consent of the Majority Restructuring Support Parties;

(f)     the issuance of any ruling or order by any governmental authority, including the Bankruptcy Court, or any other court of competent jurisdiction, or other regulatory authority, enjoining or otherwise making impractical the substantial consummation of the Restructuring Transactions on the terms and conditions set forth in the Term Sheet or the Plan, or the commencement of any action by any governmental authority or other regulatory authority that could reasonably be expected to enjoin or otherwise make impractical the substantial consummation of the Restructuring Transactions on the terms and conditions set forth in the Term Sheet or the Plan; *provided*, *however*, that the Debtors shall have 10 business days after issuance of such ruling, order, or action to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, and (ii) is acceptable to the Majority Restructuring Support Parties;

(g)     the Debtors file any motion authorizing the use of cash collateral that is not in the form of the Interim Cash Collateral Order or Final Cash Collateral Order or otherwise consented to by the Majority Restructuring Support Parties;

(h)     a breach by any Debtor of any representation, warranty, or covenant of such Debtor set forth in this Agreement (it being understood and agreed that any actions required to be taken by the Debtors that are included in the Term Sheet attached to this Agreement but not in this Agreement are to be considered "***covenants***" of the Debtors, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in the Term Sheet to be re-copied in this Agreement) that (to the extent curable) remains uncured for a period of five (5) business days after the

8

receipt by the Restructuring Support Parties or the Debtors (as applicable) of written notice of such breach; *provided*, *however*, that the Debtors shall provide written notice of such breach promptly upon becoming aware of such breach following reasonable inquiry;

(i) a breach by a Restructuring Support Party outside of the Majority Restructuring Support Parties of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring Transactions or the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by such Restructuring Support Party of notice and description of such breach;

(j) either (i) any Debtor or any other Restructuring Support Party files a motion, application, or adversary proceeding (or any Debtor or other Restructuring Support Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of the Second Lien Notes Claims or the liens securing such claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of any Restructuring Support Party with respect to any of the foregoing causes of action or proceedings;

(k) any Debtor terminates its obligations under and in accordance with this Agreement;

(l) any board, officer, or manager (or party with authority to act) of a Debtor (or the Debtors themselves) takes any action in furtherance of the rights available to it (or them) under <u>Section 6(b)</u> of this Agreement that are inconsistent with the Restructuring Transactions as contemplated by the Term Sheet attached hereto as **<u>Exhibit A</u>**;

(m) notwithstanding anything to the contrary in the Term Sheet, any Debtor proposes treatment for the claims against the Debtors arising on account of the First Lien Credit Agreement (the "***First Lien Claims***") that is not consented to by the Majority Restructuring Support Parties;

(n) upon any event of default under the Cash Collateral Orders that is not cured within the requisite cure period provided by the Cash Collateral Orders;

(o) any of the orders approving this Agreement, the use of cash collateral, the Plan, or the Disclosure Statement are reversed, stayed, dismissed, vacated,

9

or reconsidered without the consent of the Majority Restructuring Support Parties, are modified or amended in a manner that is inconsistent with this Agreement or not reasonably satisfactory to the Majority Restructuring Support Parties, or a motion for reconsideration, reargument, or rehearing is granted;

(p)      any debtor-in-possession financing is entered into on terms that are not reasonably acceptable to the Majority Restructuring Support Parties;

(q)      the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

(r)      the Bankruptcy Court denies approval of the RSA Assumption Motion;

(s)      the failure of any documentation to be "***Definitive Documentation***," as defined in Section 3 of this Agreement or otherwise comply with Section 3; or

(t)      the occurrence of any other material breach of this Agreement or the Term Sheet not otherwise covered in this list by any Debtor that has not been cured (if susceptible to cure) within five (5) business days after written notice to the Debtors of such breach by the Majority Restructuring Support Parties asserting such termination.

Notwithstanding anything to the contrary herein, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any of the Termination Events in this Section 7 shall result in an automatic termination of this Agreement, to the extent the Majority Restructuring Support Parties would otherwise have the ability to terminate this Agreement in accordance with Section 7, three (3) business days following such occurrence unless waived in writing by the Majority Restructuring Support Parties.

8.      **The Debtors' Termination Events**. Each Debtor may, upon notice to the Restructuring Support Parties, terminate its obligations under this Agreement upon the occurrence of any of the following events (each a "***Debtor Termination Event***," and together with the Restructuring Support Party Termination Events, the "***Termination Events***"), in which case this Agreement shall terminate with respect to all Parties, subject to the rights of the Debtors to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a Debtor Termination Event:

(a)      a breach by a Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring Transactions or the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for

10

a period of 10 business days after the receipt by the Restructuring Support Parties of notice and description of such breach;

(b)    the occurrence of a breach of this Agreement by any Restructuring Support Party that has the effect of materially impairing any of the Debtors' ability to effectuate the Restructuring Transactions and has not been cured (if susceptible to cure) within 10 business days after notice to all Restructuring Support Parties of such breach and a description thereof;

(c)    upon notice to the Restructuring Support Parties, if the board of directors or board of managers, as applicable, of a Debtor determines, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties; or

(d)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; *provided*, *however*, that the Debtors have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement.

9.    **Individual Termination**.  Any Restructuring Support Party may terminate this Agreement as to itself only in the event that (a) the Milestone set forth in Sub-Clause (e) of Section 4 is not met, (b) the Milestone set forth in Sub-Clause (k) of Section 4 is not met, or (c) any Definitive Document is filed or executed that specifically provides, with respect to distributions under the Plan, for the allocation for tax purposes between principal and interest in a manner that is not acceptable to such Restructuring Support Party, in each case by giving ten (10) business days' notice to the Debtors and the other Restructuring Support Parties within five (5) business days of such missed Milestone, filing, or execution.

10.    **Mutual Termination; Automatic Termination**. This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among (a) each of the Debtors and (b) the Restructuring Support Parties. Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically upon the occurrence of the Effective Date.

11.    **Effect of Termination**. The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 7, 8, 9 or 10 of this Agreement shall be referred to, with respect to such Party, as a "***Termination Date***." Upon the occurrence of a Termination Date, the terminating Party's and, solely in the case of a Termination Date in accordance with Section 10, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Party or Parties hereto shall be released from all commitments, undertakings, and agreements hereunder; *provided*, *however*, that each of the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) the Debtors' obligations in Section 15 of this Agreement accrued up

11

to and including such Termination Date; and (c) <u>Sections 11</u>, <u>16</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>24</u>, <u>25</u>, <u>26</u>, <u>32</u>, <u>33</u>, and <u>34</u> hereof.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

12.     **Cooperation and Support**. The Debtors shall provide draft copies of all "first day" motions, applications, and other documents that any Debtor intends to file with the Bankruptcy Court to counsel to the Restructuring Support Parties at least five (5) business days prior to the date when such Debtor intends to file such document.  Counsel to the Restructuring Support Parties shall use commercially reasonable efforts to provide all comments to all such documents by no later than two (2) calendar days prior to the date when the Debtors intend to file such documents, and counsel to the respective Parties shall consult in good faith regarding the form and substance of any such proposed filing with the Bankruptcy Court. The Debtors will provide draft copies of all other material pleadings any Debtor intends to file with the Bankruptcy Court to counsel to the Restructuring Support Parties at least two (2) business days prior to filing such pleading to the extent practicable. Counsel to the Restructuring Support Parties shall use commercially reasonable efforts to provide all comments to such pleadings by no later than one (1) calendar day prior to the date when the Debtor intends to file such document, to the extent practicable, and counsel to the respective Parties shall consult in good faith regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree to negotiate in good faith the Definitive Documentation (including the Cash Collateral Orders) that is subject to negotiation and completion, consistent with <u>Sub-Clause (b)</u> of <u>Section 3</u> hereof and that notwithstanding anything herein to the contrary, the Definitive Documentation, including any motions or orders related thereto, shall be consistent with this Agreement and otherwise shall be in form and substance reasonably satisfactory to the Majority Restructuring Support Parties.  The Debtors shall make reasonable best efforts to (i) provide to the Restructuring Support Parties' advisors, and direct its employees, officers, advisors and other representatives to provide the Restructuring Support Parties' advisors, (A) reasonable access (without any material disruption to the conduct of the Debtors' businesses) during normal business hours to the Debtors' books and records, (B) reasonable access to the management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, and (C) timely and reasonable responses to all reasonable diligence requests; and (ii) promptly notify the Restructuring Support Parties of any governmental or third party litigations, investigations or hearings against, or communications with, any of the Debtors.

13.     **Transfers of Claims and Interests**.

(a)     No Restructuring Support Party shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's claims against any Debtor subject to this Agreement, as applicable, in whole or in part, or (ii) deposit any of such Restructuring Support Party's claims against any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "***Transfer***" and the Restructuring

Support Party making such Transfer is referred to herein as the "**Transferor**"), unless such Transfer is to another Restructuring Support Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Debtors a Transferee Joinder substantially in the form attached hereto as **Exhibit B** (the "**Transferee Joinder**"). With respect to claims against or interests in a Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Restructuring Support Party, as applicable, set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this <u>Sub-Clause (a)</u> of this <u>Section 13</u> shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors and/or any Restructuring Support Party, and shall not create any obligation or liability of any Debtor or any other Restructuring Support Party to the purported transferee.

(b) Notwithstanding <u>Sub-Clause (a)</u> of this <u>Section 13</u>, (i) an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to be or become a Restructuring Support Party to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against any Debtor, as applicable, by a Restructuring Support Party to a transferee; *provided that* such transfer by a Restructuring Support Party to a transferee shall be in all other respects in accordance with and subject to <u>Sub-Clause (a)</u> of this <u>Section 13</u>; and (ii) to the extent that a Restructuring Support Party, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any Debtor from a holder of such claim who is not a Restructuring Support Party, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Restructuring Support Party in accordance with this <u>Section 13</u>. For purposes of this <u>Sub-Clause (b)</u>, a "**Qualified Marketmaker**" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against any of the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

14. **Further Acquisition of Claims or Interests**. Except as set forth in <u>Section 13</u>, nothing in this Agreement shall be construed as precluding any Restructuring Support Party or any of its affiliates from acquiring additional First Lien Claims, Second Lien Notes Claims,

unsecured notes claims, existing equity interests, or interests in the instruments underlying the First Lien Claims, Second Lien Notes Claims, unsecured notes claims, or existing equity interests; *provided*, *however*, that any additional First Lien Claims, Second Lien Notes Claims, unsecured notes claims, existing equity interests, or interests in the underlying instruments acquired by any Restructuring Support Party and with respect to which such Restructuring Support Party is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Agreement. Upon any such further acquisition, such Restructuring Support Party shall promptly notify EXXI and counsel to the Ad Hoc Second Lien Committee.

15. **Fees and Expenses**. Subject to <u>Section 10</u>, the Debtors shall pay or reimburse when due all reasonable and documented fees and expenses of the following (regardless of whether such fees and expenses were incurred before or after the Petition Date): (a) Milbank, Tweed, Hadley & McCloy LLP ("***Milbank***"), as counsel to an *ad hoc* committee of the Second Lien Noteholders (the "***Ad Hoc Second Lien Committee***"), in accordance with the terms of that certain fee letter dated as of March 16, 2016, (b) Houlihan Lokey Capital, Inc. ("***Houlihan***"), as financial advisor to the Ad Hoc Second Lien Committee, in accordance with the terms of that certain fee letter dated as of February 10, 2016; and (c) any local counsel and industry consultants or specialists as may reasonably be necessary to advise the Ad Hoc Second Lien Committee in connection with the Restructuring Transactions.

16. **Consents and Acknowledgments**. Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for consents to the Plan. The acceptance of the Plan by each of the Restructuring Support Parties will not be solicited until such Parties have received the Disclosure Statement and related ballots in accordance with applicable law, and will be subject to sections 1125, 1126 and 1127 of the Bankruptcy Code.

17. **Representations and Warranties**.

(a) Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i) it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii) the execution, delivery and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable

14

to it, or its certificate of incorporation, or bylaws, or other organizational documents in any material respect;

(iv)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(v)    it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "*Securities Act*"), with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement; and

(vi)    it (A) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power(s) of authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; or (C) does not directly or indirectly own any claims against any Debtor other than as identified below its name on its signature page hereof.

(b)    Each Debtor hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Debtors) that the following statements are true, correct, and complete as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent director(s) or

15

manager(s), as applicable, of each of the corporate entities that comprise the Debtors;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(v)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code and, to the extent applicable, approval by the Bankruptcy Court, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vi)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

18.    **Survival of Agreement**. Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Debtors and in contemplation of possible chapter 11 filings by the Debtors and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

19.    **Waiver**. If the transactions contemplated herein are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed

16

as a waiver by any Party of any or all of such Party's rights, other than as provided in Section 16, and the Parties expressly reserve any and all of their respective rights. The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, the Term Sheet, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

20.     **Relationship Among Parties**. Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint. No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.  The Parties acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.  No action taken by any Restructuring Support Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Restructuring Support Parties are in any way acting in concert or as such a "group."

21.     **Specific Performance**. It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

22.     **Governing Law & Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require or permit the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in the federal or state courts located in the City of New York, Borough of Manhattan, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for

17

recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

23. **Waiver of Right to Trial by Jury**. Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement. Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

24. **Successors and Assigns**. Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

25. **No Third-Party Beneficiaries**. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

26. **Notices**. All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing. Any notice of termination or breach shall be delivered to all other Parties.

(a) If to any Debtor:

Energy XXI Ltd
Attn: John D. Schiller
1021 Main, Suite 2626
Houston, TX 77002
Tel: (713) 351-3000
Fax: (713) 351-33000
Email: jschiller@energyxxi.com

*With a copy to:*

Vinson & Elkins L.L.P.
Attn: Harry A. Perrin
1001 Fannin Street
Houston, TX 10022-4611
Tel: (713) 758-2222
Fax: (713) 758-2346
Email: hperrin@velaw.com

Vinson & Elkins L.L.P.
Attn:   David S. Meyer
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel:     (212) 237-0000
Fax:     (212) 237-0100
Email: dmeyer@velaw.com

(b)     If to a Restructuring Support Party:

To the address set forth on its signature page hereto

*with a copy to*

Milbank, Tweed, Hadley & McCloy LLP
Attn:   Dennis F. Dunne and Samuel A. Khalil
28 Liberty Street
New York, NY 10005
Tel:     (212) 530-5000
Fax:     (212) 530-5219
Email: ddunne@milbank.com
          skhalil@milbank.com

27.     **Entire Agreement**. This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

28.     **Amendments**. Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without the prior written consent of the Debtors and the Majority Restructuring Support Parties.

29.     **Reservation of Rights**.

(a)     Except as expressly provided in this Agreement or the Term Sheet, including Section 5(a) of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties.

(b)     Without limiting Sub-Clause (a) of this Section 29 in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement and the Term Sheet, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to Section 18 of this Agreement. The Term Sheet, this Agreement, the Plan, and any related document shall in no

19

event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

30.     **Counterparts**. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

31.     **Other Support Agreements**.  Until the Termination Date, no Debtor shall enter into any other restructuring support agreement related to a partial or total restructuring of the Debtors' obligations unless such support agreement is consistent in all respects with the Term Sheet and is acceptable to the Majority Restructuring Support Parties.

32.     **Public Disclosure**. This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; *provided*, *however*, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein without the express written consent of the other Parties; *provided further*, *however*, that no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Restructuring Support Party without such Restructuring Support Party's prior written consent.

33.     **Headings**. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

34.     **Interpretation**. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

[*Signatures and exhibits follow.*]

[Signature Pages Redacted]

## Schedule 1 to Restructuring Support Agreement

### Debtors

1. Anglo-Suisse Offshore Pipeline Partners, LLC
2. Delaware EPL of Texas, LLC
3. Energy Partners Ltd., LLC
4. Energy XXI GOM, LLC
5. Energy XXI Gulf Coast, Inc.
6. Energy XXI Holdings, Inc.
7. Energy XXI, Inc.
8. Energy XXI Leasehold, LLC
9. Energy XXI Ltd
10. Energy XXI Natural Gas Holdings, Inc.
11. Energy XXI Offshore Services, Inc.
12. Energy XXI Onshore, LLC
13. Energy XXI Pipeline, LLC
14. Energy XXI Pipeline II, LLC
15. Energy XXI Services, LLC
16. Energy XXI Texas Onshore, LLC
17. Energy XXI USA, Inc.
18. EPL of Louisiana, L.L.C.
19. EPL Oil & Gas, Inc.
20. EPL Pioneer Houston, Inc.
21. EPL Pipeline, L.L.C.
22. M21K, LLC
23. MS Onshore, LLC
24. Natural Gas Acquisition Company I, LLC
25. Nighthawk, L.L.C.
26. Soileau Catering, LLC

**Exhibit A** to the Restructuring Support Agreement

**Term Sheet**

# ENERGY XXI LTD
## Restructuring Term Sheet

This term sheet (the "***Term Sheet***") sets forth the principal terms of a proposed financial restructuring transaction (the "***Restructuring***") of the existing debt and other obligations of Energy XXI Ltd ("***EXXI***"), Energy XXI Gulf Coast, Inc. ("***EGC***"), EPL Oil & Gas, Inc. ("***EPL***"), and those certain additional subsidiaries of EXXI listed on **Schedule 1** of that certain Restructuring Support Agreement dated April 11, 2016 (the "***Restructuring Support Agreement***").[1] Subject to the Restructuring Support Agreement, the Restructuring will be implemented by the Plan, filed in connection with the Debtors' Chapter 11 Cases.

**THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE PLAN AND THE RELATED DEFINITIVE DOCUMENTATION GOVERNING THE RESTRUCTURING IDENTIFIED IN THE RESTRUCTURING SUPPORT AGREEMENT. SUCH DEFINITIVE DOCUMENTATION, ALL MOTIONS, AND RELATED ORDERS AND THE PLAN SOLICITATION DOCUMENTS SHALL SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE, THE RESTRUCTURING SUPPORT AGREEMENT, AND THIS TERM SHEET.**

**THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING. THE STATEMENTS CONTAINED HEREIN ARE PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE, AND NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE LENDERS, DEBTORS, AND ANY CREDITOR PARTY.**

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

| **TERMS AND CONDITIONS OF THE PLAN** |
|---|
| **A.   Key Terms** |

| Debtors | EXXI, EGC, and EPL and those certain additional subsidiaries of EXXI listed on **Schedule 1** of the Restructuring Support Agreement. |
|---|---|
|  | After the Effective Date (as defined herein), the reorganized Debtors shall be referred to collectively as the "***Reorganized Debtors***," EGC shall be referred to as "***Reorganized EGC***," and EPL shall be referred to as "***Reorganized EPL***." |
| **Effective Date** | The date on which all the conditions to consummation of the Plan have been satisfied in full or waived with the consent of the Majority Restructuring Support Parties, and the Plan becomes effective.  On the Effective Date, the Reorganized Debtors shall be reorganized pursuant to the Plan in accordance with and pursuant to the Bankruptcy Code. |
| **EGC Unsecured Notes Claims** | "***EGC Unsecured Notes Claims***" refers collectively to claims arising on account of:<br><br>• the 9.25% senior unsecured notes due December 15, 2017 (the "***9.25% EGC Unsecured Notes***") issued pursuant to that certain indenture, dated December 17, 2010 (the "***9.25% Senior Notes Indenture***"), among EGC, the guarantors and Wilmington Trust, National Association, as trustee;<br><br>• the 7.75% senior unsecured notes due June 15, 2019 (the "***7.75% Senior Notes***") issued pursuant to that certain indenture, dated February 25, 2011 (the "***7.75% Senior Notes Indenture***"), among EGC, the guarantors and Wilmington Trust, National Association, as trustee;<br><br>• the 7.50% senior unsecured notes due December 15, 2021 (the "***7.50% Senior Notes***") issued pursuant to that certain indenture, dated September 26, 2013 (the "***7.50% Senior Notes Indenture***"), among EGC, the guarantors and Wilmington Trust, National Association, as trustee; and<br><br>• the 6.875% senior unsecured notes due March 15, 2024 (the "***6.875% Senior Notes***") issued pursuant to that certain an indenture, dated May 27, 2014 (the "***6.875% Senior Notes Indenture***"), among EGC, the guarantors |

| | |
|---|---|
| | and Wilmington Trust, National Association, as trustee. |
| **EPL Unsecured Notes Claims** | "*EPL Unsecured Notes Claims*" refers collectively to claims arising on account of the 8.25% senior unsecured notes due February 15, 2018 (the "*8.25% Senior Notes*") under that certain indenture dated as of February 14, 2011 (the "*8.25% Senior Notes Indenture*") and that certain supplemental indenture dated as of April 18, 2014 (the "*8.25% Senior Notes Supplemental Indenture*") among EPL, the guarantors party thereto, and U.S. Bank National Association, as trustee. |
| **EXXI Convertible Notes Claims** | "*EXXI Convertible Notes Claims*" refers collectively to claims arising on account of the 3.0% senior convertible notes due on December 15, 2018 (the "*3.0% Senior Convertible Notes*") issued pursuant to that certain indenture dated as of November 22, 2013 (the "*3.0% Senior Convertible Notes Indenture*"), among EXXI and Wilmington Trust, National Association, as trustee. |
| **First Lien Claims** | "*First Lien Claims*" refers collectively to claims arising on account of the First Lien Credit Agreement. |
| **First Lien Lenders** | "*First Lien Lenders*" refers collectively to the lenders party to that certain Second Amended and Restated First Lien Credit Agreement, dated as of May 5, 2011, by and among EGC, each of the guarantors party thereto, Wells Fargo Bank, N.A. as administrative agent, and the lenders and agents from time-to-time party thereto (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "*First Lien Credit Agreement*"). |
| **New Equity** | On the Effective Date, new common stock in the New Parent (the "*New Equity*") shall be issued and distributed as described herein. |
| **New Parent** | "*New Parent*" refers to Reorganized EGC, or such other entity as determined by the Debtors and the Majority Restructuring Support Parties, which entity will hold, directly or indirectly, substantially all of the assets of EXXI and its subsidiaries. |
| **Petition Date** | The date on which the Debtors commence their Chapter 11 Cases, to occur on or before April 14, 2016 at 10:00 a.m. (Eastern Time). |
| **Plan Supplement** | "*Plan Supplement*" refers, collectively, to the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments |

| | referred to therein, ancillary or otherwise, including, without limitation, the Management Incentive Plan and the Transaction Steps, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before 10 business days prior to the Confirmation Hearing. |
|---|---|
| **Second Lien Noteholders** | "***Second Lien Noteholders***" refers collectively to the holders of the Second Lien Notes Claims. |
| **Second Lien Notes Claims** | "***Second Lien Notes Claims***" refers collectively to claims arising on account of the second lien senior secured notes issued pursuant to that certain Indenture, dated as of March 12, 2015 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "***Second Lien Indenture***"), among EGC, each of the guarantors party thereto, and U.S. Bank, N.A. |
| **Venue** | The United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"). |
| **Warrant Package** | Out-of-the-money warrants equal to an aggregate of up to 10% of the New Equity (subject to dilution from the Management Incentive Plan) with a maturity of 10 years and an equity strike price equal to (i) the principal amount of the Second Lien Notes Claims less the original issue discount of approximately $53.5 million, ***plus*** (ii) accrued and unpaid interest (the "***Warrant Package***"). Subject to the other provisions of this Term Sheet, the Warrant Package shall be divided amongst the classes of EGC Unsecured Notes Claims, EPL Unsecured Notes Claims, and EXXI Convertible Notes Claims, consistent with their respective legal entitlements. |
| **B.   Treatment of Certain Claims and Interests under the Chapter 11 Plan** | |
| **Other Priority Claims** | Each holder of an allowed priority claim (other than a priority tax claim or administrative claim) shall receive either:  (a) cash equal to the full allowed amount of its claim or (b) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties. |
| **Other Secured Claims[2]** | Each holder of a secured claim (other than a priority tax claim, First Lien Claim, or Second Lien Notes Claim) shall receive, at |

---

[2]  To be determined on a debtor-by-debtor basis.

4

| | the Debtors' election and with the consent of the Majority Restructuring Support Parties, either: (a) cash equal to the full allowed amount of its claim, (b) reinstatement of such holder's claim, (c) the return or abandonment of the collateral securing such claim to such holder, or (d) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties. |
|---|---|
| **First Lien Claims**[3] | The Debtors shall use their best efforts to obtain the following treatment for the holders of First Lien Claims: <br><br> – At emergence, drawn amount either (i) remains outstanding or (ii) is refinanced no earlier than the Effective Date with a new facility with terms acceptable to the Majority Restructuring Support Parties; *provided, however* that (a) $228 million of letters of credit usage remains outstanding and (b) other terms including a borrowing base redetermination holiday that are acceptable to the Debtors and the Majority Restructuring Support Parties. <br><br> If the Debtors are unable to obtain the foregoing treatment, the Debtors shall use their best efforts to obtain treatment acceptable to the Debtors and Majority Restructuring Support Parties. |
| **Second Lien Notes Claims** | Holders of Second Lien Notes Claims shall receive their *pro rata* share of 100% of the New Equity on account of such Second Lien Notes Claims, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package. |
| **EGC Unsecured Notes Claims** | If the class of EGC Unsecured Notes Claims votes to accept the Plan, holders of EGC Unsecured Notes Claims shall receive their *pro rata* share of the Warrant Package; *provided, however* that if the class of EGC Unsecured Notes Claims votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan. |
| **EPL Unsecured Notes Claims** | If the class of EPL Unsecured Notes Claims votes to accept the Plan, holders of EPL Unsecured Notes Claims shall receive their *pro rata* share of the Warrant Package; *provided, however* that if the class of EPL Unsecured Notes Claims votes to reject the Plan, holders of EPL Unsecured Notes Claims will not receive a |

---

[3] Subject to ongoing negotiations with the First Lien Lenders.

| | distribution under the Plan. |
|---|---|
| **EXXI Convertible Notes Claims** | If the class of EXXI Convertible Notes Claims votes to accept the Plan, holders of EXXI Convertible Notes Claims shall receive their *pro rata* share of the Warrant Package; *provided, however* that if the class of EXXI Convertible Claims votes to reject the Plan, holders of EXXI Convertible Claims will not receive a distribution under the Plan. |
| **General Unsecured Claims** | To be determined for all Debtors on terms satisfactory to the Debtors and the Majority Restructuring Support Parties. |
| **EXXI Preferred Stock** | EXXI Preferred Stock shall be cancelled and extinguished, and holders of EXXI Preferred Stock shall not receive or retain any property or assets on account of such interests. |
| **EXXI Common Stock** | EXXI Common Stock shall be cancelled and extinguished, and holders of EXXI Common Stock shall not receive or retain any property or assets on account of such interests. |
| **Intercompany Claims** | Intercompany Claims shall be reinstated, compromised, or cancelled, at the option of the Debtors with the consent of the Majority Restructuring Support Parties. |
| **Intercompany Interests** | Intercompany Interests shall be reinstated, compromised, or cancelled, at the option of the Debtors with the consent of the Majority Restructuring Support Parties; *provided that* existing equity interests in the entity designated as New Parent as set forth herein, if a Debtor entity, shall be cancelled in accordance with the Transaction Steps. |
| **C.   Other Restructuring Provisions** | |
| **Bermuda Proceeding** | Concurrently with filing a chapter 11 petition with the Bankruptcy Court, EXXI will file a wind-up petition commencing an official liquidation proceeding under the laws of Bermuda (the "***Bermuda Proceeding***") before the Bermudian court (the "***Bermuda Court***"). The Bermuda Proceeding will be implemented pursuant to the transaction steps (the "***Transaction Steps***"), which Transaction Steps shall be filed with the Bankruptcy Court in connection with the filing of the Plan Supplement. |
| **Restructuring Timeline** | The Restructuring described herein will take place in accordance with the Milestones set forth in <u>Section 4</u> of the Restructuring Support Agreement. |

6

| | |
|---|---|
| **Conditions Precedent to the Effective Date** | The Plan shall contain customary conditions to effectiveness in form and substance to be agreed upon, including, without limitation: |
| | (i)     the Confirmation Order shall have been entered, and the Confirmation Order shall have become a final order that is not stayed; |
| | (ii)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions; *provided*, *however* that consummation of the Bermuda Proceeding shall not be a condition to the Effective Date; and |
| | (iii)   the   Definitive   Documentation   relating   to   the Restructuring shall be executed and satisfactory to the Majority Restructuring Support Parties in accordance with <u>Section 3</u> of the Restructuring Support Agreement. |
| **Plan as a Bankruptcy Rule 9019 Settlement of All Issues** | The Debtors and the Restructuring Support Parties acknowledge and agree that the Plan shall be treated as a settlement pursuant to Bankruptcy Rule 9019 (the "***9019 Settlement***") of various issues, controversies, and disputes.  The Plan shall be deemed a motion to approve the 9019 Settlement. To the extent that the Plan is not approved, the issues, controversies, and disputes listed above, among others, may be the subject of litigation between and/or among the Restructuring Support Parties and the Debtors, among others, and nothing in this Term Sheet or the Plan or Disclosure Statement (or any settlement negotiations) may be used by any party as evidence (or otherwise) with regard thereto, including, without limitation, with regard to the strengths or weaknesses of any of the various parties' positions, arguments, or claims. To that end, to the extent that the Plan is not approved, this Term Sheet shall be deemed null and void and of no further force and effect. |
| **Releases and Exculpation** | <u>Releases</u>: <br><br> To the fullest extent permitted by applicable law, the Plan shall include a full mutual release from liability in favor of the Debtors, the Restructuring Support Parties, and all of the Debtors' and the Restructuring Support Parties' respective current and former   officers   and   directors,   professionals,   advisors, accountants,   attorneys,   investment   bankers,   consultants, employees, agents and other representatives, from any claims and causes of action related to or in connection with the Debtors, the Debtors' out-of-court restructuring efforts, the Restructuring, the |

| | Restructuring Support Agreement, the Chapter 11 Cases, or the Plan arising on or prior to the Effective Date; *provided*, *however*, that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification claims against the Debtors or any of its insurance carriers or any rights as beneficiaries of any insurance policies.<br><br>**Exculpation**:<br><br>To the fullest extent permitted by applicable law, the Plan shall include customary exculpation provisions in favor of the Debtors, the Restructuring Support Parties, and each of the Debtors' and the Restructuring Support Parties' respective current and former officers and directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives, with respect to any liability relating to the Debtors, the Debtors' out-of-court restructuring efforts, the Restructuring, the Restructuring Support Agreement, the Chapter 11 Cases, or the Plan arising prior to the Effective Date; *provided*, *however*, that no party shall be exculpated from any claim or cause of action that was a result of such party's gross negligence, willful misconduct, or bad faith, as determined by a final order of a court of competent jurisdiction.<br><br>For the avoidance of doubt, subject to the terms and conditions of the Restructuring Support Agreement, the release and exculpation provisions shall be included in the Plan as described herein and, as such, shall only become effective on the Effective Date. |
|---|---|
| **Injunction** | Ordinary and customary injunction provisions shall be included in the Plan and Confirmation Order. |
| **Management** | Prior to the Effective Date, the Debtors will negotiate the terms and conditions of an amended and restated employment agreement with John D. Schiller as Chief Executive Officer of New Parent (the "***CEO***"), which terms and conditions shall be subject to the prior written consent of the Majority Restructuring Support Parties, and the form of which shall be included in the Plan Supplement. |
| **Governance** | The board of directors of New Parent (the "***New Board***") shall be designated by the Majority Restructuring Support Parties and shall consist of 7 persons, one of whom shall be John D. Schiller as CEO.<br><br>At the election of the Majority Restructuring Support Parties, the Reorganized Debtors shall enter into a shareholders agreement |

8

| | |
|---|---|
| | and/or a registration rights agreement, each on terms reasonably acceptable to the Majority Restructuring Support Parties. |
| **KEIP/KERP** | To the extent necessary, the Debtors and the Majority Restructuring Support Parties will negotiate in good faith the terms and conditions of a key employee incentive plan and a key employee retention plan, provided that any such plan shall be subject to approval by the Bankruptcy Court. |
| **Management Incentive Plan** | The Plan Supplement shall include a long-term management incentive plan (the "***Management Incentive Plan***") for the Reorganized Debtors.  Such Management Incentive Plan will reserve up to 8% of the total New Equity on a fully diluted basis (the "***Equity Pool***").  The Management Incentive Plan will be a comprehensive equity based award plan with the New Board to formulate the types of equity based awards (including stock option and restricted stock units) on terms and conditions determined by the New Board.  Awards under the Management Incentive Plan will be awarded to the Reorganized Debtors' officers, directors, employees, and consultants at the discretion of the New Board; provided, however, that 3% of the Equity Pool will be allocated by the New Board to such officers, directors, employees, and consultants no later than 60 days after the Effective Date on terms and conditions determined by the New Board, including the type of equity based awards.  Subject to the foregoing, the New Board will determine the additional terms of the Management Incentive Plan after the Effective Date, including the allocation, granting, and vesting of applicable awards under the Management Incentive Plan. |
| **BOEM Long Range Plan** | It is anticipated that the Debtors will assume all of their OCS mineral leases from the Bureau of Ocean Energy Management ("***BOEM***") (and will not seek to abandon any OCS leases) and as adequate assurance for the BOEM lease assumption, the Debtors will continue to: (a) fund and perform ongoing P&A work as contemplated by its Idle Iron Plan and (b) perform their obligations under that certain Long Range Plan agreed to between the Debtors and BOEM and dated February 29, 2016 during the pendency of their Chapter 11 Cases and in connection with the consummation of the Restructuring. |
| **Executory Contracts and Unexpired Leases** | The Debtors may not assume, assume and assign, or reject executory contracts or unexpired leases without the prior written consent of the Majority Restructuring Support Parties. |

| Tax Provisions | The Plan shall provide that each holder of an allowed claim shall have the option to apply such holder's pro rata share of consideration under the Plan (cash or value) to satisfy outstanding principal of or accrued interest on its allowed claim, as such allocation is determined by such holder in its sole discretion.<br><br>The Debtors shall use their best efforts to effectuate the terms and conditions of the Restructuring in a tax efficient manner reasonably satisfactory to the Majority Restructuring Support Parties. |

**Exhibit B** to the Restructuring Support Agreement

**Form of Transferee Joinder**

**Form of Transferee Joinder**

This joinder (this "***Joinder***") to the Restructuring Support Agreement (the "***Agreement***"),[4] dated as of **[__]**, 2016, by and among (i) Energy XXI Ltd ("***EXXI***"), Energy XXI Gulf Coast, Inc. ("***EGC***"), EPL Oil & Gas, Inc. ("***EPL***") and each of the subsidiaries set forth in **Exhibit A** to the Agreement (such subsidiaries, EXXI, EGC, and EPL each a "***Debtor***" and, collectively the "***Debtors***"), and (ii) the Restructuring Support Parties, is executed and delivered by [_____] (the "***Joining Party***") as of [_____].

1.      Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties, as applicable.

2.      Representations and Warranties.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 17 of the Agreement to each other Party.

3.      Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require or permit the application of the law of any other jurisdiction.

4.      Notice.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

---

[4] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

**[JOINING PARTY]**


By:

Name:

Title:

Holdings: $_____ of Debt
             Under the First Lien Credit Agreement

Holdings: $_____ of Debt
             Under the Second Lien Indenture

Holdings: $_____ of Debt
             Under the 9.25% Indenture

Holdings: $_____ of Debt
             Under the 7.75% Indenture

Holdings: $_____ of Debt
             Under the 7.5% Indenture

Holdings: $_____ of Debt
             Under the 6.875% Indenture

Holdings: $_____ of Debt
             Under the 8.25% Indenture

Holdings: $_____ of Debt
             Under the 3.0% Indenture

Holdings: _____
             shares of Common Equity

Holdings: _____
             shares of Preferred Equity

**<u>Annex 1</u> to the Form of Transferee Joinder**

**Restructuring Support Agreement**

## EXHIBIT C

**Corporate Structure Chart**



Energy XXI Ltd (Bermuda)
Energy XXI (US Holdings) Limited (Bermuda)
Energy XXI International Limited (Bermuda)
Energy XXI Malaysia, Limited (Bermuda)
Energy XXI, Inc. (DE)
Energy XXI Offshore Services, Inc. (DE)
Energy XXI USA, Inc. (DE) *limited recourse guaranty
Energy XXI Insurance Limited (Bermuda)
Energy XXI Natural Gas Holdings, Inc. (DE)
Energy XXI M21K, LLC (DE)
Natural Gas Acquisition Company I, LLC (DE)
Energy XXI Gulf Coast, Inc. (DE)
Energy XXI Services, LLC (DE)
Energy XXI GOM, LLC (DE)
MS Onshore, LLC (DE)
EPL Oil & Gas, Inc. (DE)
Energy XXI GIGS Services, LLC (DE)
Energy XXI Holdings, Inc. (DE)
Energy XXI Texas Onshore, LLC (DE)
Energy XXI Leasehold, LLC (DE)
Energy XXI Onshore, LLC (DE)
M21K, LLC (DE)
Energy XXI Pipeline, LLC (DE)
Soileau Catering, LLC (DE)
Energy XXI Pipeline II, LLC (DE)
Delaware EPL of Texas, LLC (DE)
EPL of Louisiana, L.L.C. (LA)
EPL Pipeline, L.L.C. (DE)
Energy Partners Ltd., LLC (DE)
Nighthawk, L.L.C. (LA)
EPL Pioneer Houston, Inc. (TX)
Anglo-Suisse Offshore Pipeline Partners, LLC (DE)
Key
- Borrower under the RBL
- Guarantor of EPL obligations under the RBL
- Guarantor of EGC obligations under the RBL
- Issuer of the EGC Notes
- Guarantor of the EGC Notes
- Issuer of the EPL Notes
- Guarantor of the EPL Notes
- Issuer of the Convertible Notes
- Non-Debtor

# **EXHIBIT D**

**Disclosure Statement Order**

# **EXHIBIT E**

## **Liquidation Analysis**

# INTRODUCTION

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests" of creditors test, the Debtors, with the assistance of their proposed restructuring advisor, Opportune LLP ("**Opportune**"), have prepared the following hypothetical liquidation analysis (the "*Liquidation Analysis*"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Proposed Joint Chapter 11 Plan of Reorganization* to which this Liquidation Analysis is attached.

# Statement of Limitations

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would likely not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in a chapter 7 liquidation, including but not limited to the uncertainty of the currently volatile oil and gas pricing environment.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants.  NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REFLECTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' ASSETS ON A GOING CONCERN BASIS.  WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL CHAPTER 7 LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) COULD BE LESS, FEWER CLAIMS COULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS COULD BE ASSUMED BY THE BUYER(S).

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' financial statements.  In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 cases, but which could be asserted and allowed in a

Chapter 7 liquidation, including unpaid Chapter 11 Administrative Claims, and Chapter 7 administrative claims such as wind down costs and trustee fees.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Methodology:**

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to Chapter 7 cases on August 31, 2016 (the "***Chapter 7 Conversion Date***").  Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited consolidating balance sheets of the Debtors as of March 31, 2016, and those values, in total, are assumed to be representative of the Debtors' approximate assets and liabilities as of the Chapter 7 Conversion Date.  It is assumed that, on the Chapter 7 Conversion Date, the Bankruptcy Court appoints a Chapter 7 trustee (the "***Trustee***") who would sell all of the Debtors' major assets and distribute the cash proceeds, net of liquidation-related costs, to creditors in accordance with relevant law.  There can be no assurance that the recoveries realized from the sale of the assets would, in fact, approximate the amounts reflected in this Liquidation Analysis.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously as possible (generally at distressed prices), taking into account the best interests of stakeholders.

Value in liquidation is assumed to be driven by, among other things: (a) the accelerated time frame in which the business units are marketed and sold; (b) negative partner and vendor reaction; (c) the loss of key personnel; (d) acceleration of security for decommissioning costs and/or liabilities associated with certain assets; and (e) the general forced nature of the sale.

**Global Notes & Assumptions:**

1.  The Liquidation Analysis assumes the Debtors would be liquidated on an entity-by-entity basis except for each of Energy XXI Gulf Coast, Inc. (other than EPL Oil & Gas, Inc.) and EPL Oil & Gas, Inc.'s respective subsidiaries which have been consolidated into their respective parents.

2.  The following entities have been excluded from the Liquidation Analysis since they do not have separate general ledgers or hold material assets: Natural Gas Acquisition Company, LLC and EXXI Offshore Services, Inc.

3.  The following entities have been excluded from the Liquidation Analysis since they hold no material assets: Energy XXI Inc., Energy XXI Natural Gas Holdings Inc.

4. **Dependence on unaudited financial statements** – Proceeds available for recovery are based upon the unaudited financial statements and balance sheets of the Debtors as of March 31, 2016, unless otherwise noted.  Cash balances have been rolled forward through to the Effective Date to take into account cash flows from the Petition Date to the Chapter 7 Conversion Date.

5. **Chapter 7 Liquidation Costs & Length of Liquidation Process** – The Debtors have assumed that liquidation would take approximately 4-6 months in order to pursue orderly sales of substantially all the remaining oil and gas assets, monetize and collect receivables as well as other assets on the balance sheet, and otherwise administer and close the estates, including the parallel proceeding currently pending in the Bermuda Court.  In an actual liquidation, the wind down process and time period(s) could vary significantly, thereby impacting recoveries.  For example, the uncertain duration and potential outcomes of the process to liquidate and allow Claims, including priority, contingent, litigation, rejection, and other Claims could substantially impact both the timing and the amounts of the distributions of asset proceeds to creditors.  Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such liquidation.

   Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Chapter 7 Trustee, including expenses associated with selling the Debtors' assets, would be entitled to payment in full prior to any distributions to Chapter 11 Administrative Claims and Other Priority Claims. The estimates used in the Liquidation Analysis for these expenses include estimates for operational expenses and certain legal, accounting and other professionals, as well as an assumed 3% fee payable to a Chapter 7 trustee based on the amount of liquidated assets. It is assumed that Chapter 7 administrative and priority claims, post-petition operational expenses and professional fees, and Chapter 7 trustee fees are entitled to payment in full prior to any distribution to holders of RBL Claims and Other Secured Claims.

6. **Distribution of Net Proceeds** – Chapter 11 Administrative Claim amounts and Priority Claim amounts, trustee fees and other such claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of those proceeds will be made available to pay General Unsecured Claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

7. **Additional Claims** – The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist under a Plan absent a liquidation.  These types of administrative and priority Claims have not been accounted for in the Liquidation Analysis but it is important to note these will need to be paid in full before any balance of liquidation proceeds would be available to pay General Unsecured Claims.

   Examples of these kinds of Claims include various potential employee Claims (for such items as severance and potential WARN Act liabilities), tax liabilities, Claims related to the rejection of unexpired leases and executory contracts, new bonding or letters of credit for plugging and

abandoning ("P&A") liabilities, and other potential Allowed Claims.  These additional Claims could be significant; some may be administrative expenses, others may be entitled to priority in payment over General Unsecured Claims. The most significant of these Claims would be the P&A liabilities due to the offshore nature of the Debtors' operations and the respective BOEM and BSEE regulations, and such obligations to the extent the P&A occurs post-petition and during the liquidation period may be administrative expenses.  In addition, the Liquidation Analysis does not include any potential adequate protection claims that could be asserted by either the First Lien Lenders or the Second Lien Noteholders.

8.  **Preference or fraudulent transfers** – No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions due to, among other issues, the costs of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

9.  **Litigation Costs** – Additional costs for potential litigation have not been incorporated in the Liquidation Analysis. This includes costs potentially associated with an action to re-characterize the EGC Senior Note Claims.

10. This liquidation analysis does not take into account any adequate protection claims that secured creditors could assert in a Chapter 7 scenario on account of their collateral's diminution in value.

**Energy XXI Ltd and Related Debtors**
Liquidation Analysis
*($ in thousands)*                                               Entity:                              **Energy XXI Ltd**

| | Total Claim | Notes | Net Book Value | Low % BV | Low $ | High % BV | High $ |
|---|---|---|---|---|---|---|---|
| **Liquidation Value Breakdown** | | | | | | | |
| **Assets** | | | | | | | |
| Cash and Cash Equivalents | | A | $16,592 | 100.0% | $16,592 | 100.0% | $16,592 |
| Accounts Receivable | | B | 42 | – | – | – | – |
| Other Current Assets | | C | 508 | – | – | – | – |
| Property and Equipment | | D | – | – | – | – | – |
| Other Non-Current Assets | | E | – | – | – | – | – |
| Other Assets | | F | – | – | – | – | – |
| Intercompany Receivable (Energy XXI USA Inc.) | | | – | – | – | – | – |
| **Gross Liquidation Proceeds** | | | **$17,141** | | **$16,592** | | **$16,592** |
| **Liquidation Costs** | | | | | | | |
| Net Wind-Down Operating Expenses | | G | | | ($6,380) | | ($4,720) |
| Trustee Fees | | H | | | – | | – |
| Trustee Legal & Financial Advisors | | I | | | – | | – |
| **Total Liquidation Costs** | | | | | **($6,380)** | | **($4,720)** |
| **Proceeds Available for Distribution** | | | | | **$10,212** | | **$11,872** |

| | Total Claim | Notes | | Low % Claim | Low $ | High % Claim | High $ |
|---|---|---|---|---|---|---|---|
| **Distribution of Liquidation Proceeds** | | | | | | | |
| **Proceeds Available for Distribution** | | | | | $10,212 | | $11,872 |
| Less: Post-Petition P&A | $19,602 | J | | | – | | – |
| **Remaining Proceeds for Distribution:** | | | | | **$10,212** | | **$11,872** |
| **Less: Secured Claims** | | | | | | | |
| **1st Lien** | | | | | | | |
| EGC RBL (LCs) | $228,000 | K | | – | $– | – | $– |
| EGC Guarantee of EPL RBL | $3.2 - 44.1mm | K | | – | – | – | – |
| EPL RBL | 99,412 | K | | – | – | – | – |
| Promissory Note | 4,006 | K | | – | – | – | – |
| Pre-Petition M&M Liens (Encumbered Reserve Allocation) | 35,889 | L | | – | – | – | – |
| Post-Petition M&M Liens (Encumbered Reserve Allocation) | 36,217 | L | | – | – | – | – |
| **2nd Lien** | | | | | | | |
| Second Lien Notes Claims | 1,542,641 | M | | – | – | – | – |
| EGC Intercompany Note Claim | 360,527 | M | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$10,212** | | **$11,872** |
| **Less: Administrative Claims** | 3,703 | O | | | – | | – |
| **Remaining Proceeds for Distribution:** | | | | | **$10,212** | | **$11,872** |
| **Plus: Add'l Value From Unencumbered Assets:** | | | | | | | |
| EGC Intercompany Note | | N | | | | | |
| Unencumbered PP&E | | P | | | | | |
| **Remaining Proceeds for Distribution:** | | | | | **$10,212** | | **$11,872** |
| **Less: Priority Recoveries From Unencumbered Assets** | | | | | | | |
| Pre-Petition M&M Liens (Unencumbered Reserve Allocation) | $1,047 | L | | – | – | – | – |
| Post-Petition M&M Liens (Unencumbered Reserve Allocation) | 785 | L | | – | – | – | – |
| Post-Petition Inspections/Maintenance (Unencumbered Allocation) | | G | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$10,212** | | **$11,872** |
| **Less: Unsecured & Other Claims** | | | | | | | |
| EXXI 3.0% Senior Convertible Notes Claims | $366,628 | O | | 0.3% | $1,247 | 0.4% | $1,450 |
| EPL 8.25% Senior Notes Claims | 216,527 | O | | – | – | – | – |
| EGC Senior Notes Claims (Total) | 754,508 | O | | 0.3% | 2,566 | 0.4% | 2,983 |
| Surety Bond Claims | 338,647 | p | | 0.3% | 1,152 | 0.4% | 1,339 |
| Second Lien Notes Deficiency Claims | $1.46 - 1.54B | p | | – | – | – | – |
| Second Lien Notes Guarantee Claims | 1,542,641 | p | | 0.3% | 5,247 | 0.4% | 6,100 |
| General Unsecured Claims | 16,880 | p | | 0.3% | | 0.4% | |
| Intercompany Payable (Energy XXI USA Inc.) | | | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |

**Energy XXI Ltd and Related Debtors**
Liquidation Analysis
*($ in thousands)*                                                          Entity:                          **Energy XXI USA, Inc.**

| | Total Claim | Notes |
|---|---|---|
| **Liquidation Value Breakdown** | | |

| | | | Net Book Value | Low | | High | |
|---|---|---|---|---|---|---|---|
| | | | | % BV | $ | % BV | $ |
| **Assets** | | | | | | | |
| Cash and Cash Equivalents | | A | $1,667 | 100.0% | $1,667 | 100.0% | $1,667 |
| Accounts Receivable | | B | 337 | 50.0% | 169 | 75.0% | 253 |
| Other Current Assets | | C | – | – | – | – | – |
| Property and Equipment | | D | – | – | – | – | – |
| Other Non-Current Assets | | E | – | – | – | – | – |
| Other Assets | | F | 4,127 | – | – | – | – |
| Intercompany Receivable (Energy XXI USA Inc.) | | | – | – | – | – | – |
| **Gross Liquidation Proceeds** | | | **$6,131** | | **$1,835** | | **$1,920** |
| **Liquidation Costs** | | | | | | | |
| Net Wind-Down Operating Expenses | | G | | | ($195) | | ($130) |
| Trustee Fees | | H | | | (12) | | (16) |
| Trustee Legal & Financial Advisors | | I | | | (3) | | (8) |
| **Total Liquidation Costs** | | | | | **($210)** | | **($153)** |
| **Proceeds Available for Distribution** | | | | | **$1,625** | | **$1,766** |

| | | | | Low | | High | |
|---|---|---|---|---|---|---|---|
| **Distribution of Liquidation Proceeds** | | | | | | | |
| | | | | % Claim | $ | % Claim | $ |
| **Proceeds Available for Distribution** | | | | | **$1,625** | | **$1,766** |
| Less: Post-Petition P&A | $19,602 | J | | | – | | – |
| **Remaining Proceeds for Distribution:** | | | | | **$1,625** | | **$1,766** |
| **Less: Secured Claims** | | | | | | | |
| **1st Lien** | | | | | | | |
| EGC RBL (LCs) | $228,000 | K | | – | $– | – | $– |
| EGC Guarantee of EPL RBL | $3.2 - 44.1mm | K | | – | – | – | – |
| EPL RBL | 99,412 | K | | – | – | – | – |
| Promissory Note | 4,006 | K | | – | – | – | – |
| Pre-Petition M&M Liens (Encumbered Reserve Allocation) | 35,889 | L | | – | – | – | – |
| Post-Petition M&M Liens (Encumbered Reserve Allocation) | 36,217 | L | | – | – | – | – |
| **2nd Lien** | | | | | | | |
| Second Lien Notes Claims | 1,542,641 | M | | – | – | – | – |
| EGC Intercompany Note Claim | 360,527 | M | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$1,625** | | **$1,766** |
| **Less: Administrative Claims** | 3,703 | O | | 100% | 225 | 100% | 225 |
| **Remaining Proceeds for Distribution:** | | | | | **$1,400** | | **$1,541** |
| **Plus: Add'l Value From Unencumbered Assets:** | | | | | | | |
| EGC Intercompany Note | | N | | | | | |
| Unencumbered PP&E | | P | | | | | |
| **Remaining Proceeds for Distribution:** | | | | | **$1,400** | | **$1,541** |
| **Less: Priority Recoveries From Unencumbered Assets** | | | | | | | |
| Pre-Petition M&M Liens (Unencumbered Reserve Allocation) | $1,047 | L | | – | – | – | – |
| Post-Petition M&M Liens (Unencumbered Reserve Allocation) | 785 | L | | – | – | – | – |
| Post-Petition Inspections/Maintenance (Unencumbered Allocation) | | G | | | | | |
| **Remaining Proceeds for Distribution:** | | | | | **$1,400** | | **$1,541** |
| **Less: Unsecured & Other Claims** | | | | | | | |
| EXXI 3.0% Senior Convertible Notes Claims | $366,628 | O | | – | $– | – | $– |
| EPL 8.25% Senior Notes Claims | 216,527 | O | | – | – | – | – |
| EGC Senior Notes Claims (Total) | 754,508 | O | | – | – | – | – |
| Surety Bond Claims | 338,647 | P | | | | | |
| Second Lien Notes Deficiency Claims | $1.46 - 1.54B | P | | – | – | – | – |
| Second Lien Notes Guarantee Claims | 1,542,641 | P | | – | – | – | – |
| General Unsecured Claims | 16,880 | P | | – | – | – | – |
| Intercompany Payable (Energy XXI USA Inc.) | | | | – | 1,400 | – | 1,541 |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |

**Energy XXI Ltd and Related Debtors**
Liquidation Analysis
*($ in thousands)*                                                   Entity:                          **Energy XXI Holdings, Inc.**

| | Total Claim | Notes | | | | | |
|---|---|---|---|---|---|---|---|
| **Liquidation Value Breakdown** | | | | | | | |
| | | | Net Book | Low | | High | |
| | | | Value | % BV | $ | % BV | $ |
| **Assets** | | | | | | | |
| Cash and Cash Equivalents | | A | $– | | $– | | $– |
| Accounts Receivable | | B | – | | – | | – |
| Other Current Assets | | C | 48 | 41.7% | 20 | 62.5% | 30 |
| Property and Equipment | | D | 4,502 | 50.0% | 2,251 | 75.0% | 3,377 |
| Other Non-Current Assets | | E | – | | – | | – |
| Other Assets | | F | – | | – | | – |
| Intercompany Receivable (Energy XXI USA Inc.) | | | – | | – | | – |
| **Gross Liquidation Proceeds** | | | **$4,550** | | **$2,271** | | **$3,407** |
| **Liquidation Costs** | | | | | | | |
| Net Wind-Down Operating Expenses | | G | | | ($195) | | ($130) |
| Trustee Fees | | H | | | (91) | | (125) |
| Trustee Legal & Financial Advisors | | I | | | (45) | | (102) |
| **Total Liquidation Costs** | | | | | **($332)** | | **($358)** |
| **Proceeds Available for Distribution** | | | | | **$1,939** | | **$3,049** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Distribution of Liquidation Proceeds** | | | | | | | |
| | | | | Low | | High | |
| | | | | % Claim | $ | % Claim | $ |
| **Proceeds Available for Distribution** | | | | | $1,939 | | $3,049 |
| Less: Post-Petition P&A | $19,602 | J | | | – | | – |
| **Remaining Proceeds for Distribution:** | | | | | **$1,939** | | **$3,049** |
| **Less: Secured Claims** | | | | | | | |
| **1st Lien** | | | | | | | |
| EGC RBL (LCs) | $228,000 | K | | – | $– | – | $– |
| EGC Guarantee of EPL RBL | $3.2 - 44.1mm | K | | – | | – | |
| EPL RBL | 99,412 | K | | – | | – | |
| Promissory Note | 4,006 | K | | 48.4% | 1,939 | 76.1% | 3,049 |
| Pre-Petition M&M Liens (Encumbered Reserve Allocation) | 35,889 | L | | – | – | – | – |
| Post-Petition M&M Liens (Encumbered Reserve Allocation) | 36,217 | L | | – | – | – | – |
| **2nd Lien** | | | | | | | |
| Second Lien Notes Claims | 1,542,641 | M | | – | | – | |
| EGC Intercompany Note Claim | 360,527 | M | | – | | – | |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Less: Administrative Claims** | 3,703 | O | | – | | – | |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Plus: Add'l Value From Unencumbered Assets:** | | | | | | | |
| EGC Intercompany Note | | N | | | | | |
| Unencumbered PP&E | | P | | | | | |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Less: Priority Recoveries From Unencumbered Assets** | | | | | | | |
| Pre-Petition M&M Liens (Unencumbered Reserve Allocation) | $1,047 | L | | – | – | – | – |
| Post-Petition M&M Liens (Unencumbered Reserve Allocation) | 785 | L | | – | – | – | – |
| Post-Petition Inspections/Maintenance (Unencumbered Allocation) | | G | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Less: Unsecured & Other Claims** | | | | | | | |
| EXXI 3.0% Senior Convertible Notes Claims | $366,628 | O | | – | $– | – | $– |
| EPL 8.25% Senior Notes Claims | 216,527 | O | | – | | – | |
| EGC Senior Notes Claims (Total) | 754,508 | O | | – | | – | |
| Surety Bond Claims | 338,647 | P | | – | | – | |
| Second Lien Notes Deficiency Claims | $1.46 - 1.54B | P | | – | – | – | – |
| Second Lien Notes Guarantee Claims | 1,542,641 | P | | – | – | – | – |
| General Unsecured Claims | 16,880 | P | | – | – | – | – |
| Intercompany Payable (Energy XXI USA Inc.) | | | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |

**Energy XXI Ltd and Related Debtors**
Liquidation Analysis
*($ in thousands)*                                       Entity:                    **Energy XXI Services, LLC**

| | Total Claim | Notes | | | | | |
|---|---|---|---|---|---|---|---|
| **Liquidation Value Breakdown** | | | | | | | |
| | | | Net Book | Low | | High | |
| | | | Value | % BV | $ | % BV | $ |
| **Assets** | | | | | | | |
| Cash and Cash Equivalents | | A | $– | | $– | | $– |
| Accounts Receivable | | B | – | | – | | – |
| Other Current Assets | | C | 3,271 | 22.5% | 735 | 36.6% | 1,199 |
| Property and Equipment | | D | 12,043 | 7.5% | 899 | 7.5% | 899 |
| Other Non-Current Assets | | E | – | | – | | – |
| Other Assets | | F | 2,370 | 1.3% | 30 | 1.9% | 45 |
| Intercompany Receivable (Energy XXI USA Inc.) | | | – | | | | |
| **Gross Liquidation Proceeds** | | | **$17,684** | | **$1,664** | | **$2,143** |
| **Liquidation Costs** | | | | | | | |
| Net Wind-Down Operating Expenses | | G | | | ($780) | | ($520) |
| Trustee Fees | | H | | | (73) | | (88) |
| Trustee Legal & Financial Advisors | | I | | | (33) | | (64) |
| **Total Liquidation Costs** | | | | | **($886)** | | **($672)** |
| **Proceeds Available for Distribution** | | | | | **$777** | | **$1,471** |

| | | | Low | | High | |
|---|---|---|---|---|---|---|
| **Distribution of Liquidation Proceeds** | | | | | | |
| | | | % Claim | $ | % Claim | $ |
| **Proceeds Available for Distribution** | | | | **$777** | | **$1,471** |
| Less: Post-Petition P&A | $19,602 | J | | – | | – |
| **Remaining Proceeds for Distribution:** | | | | **$777** | | **$1,471** |
| **Less: Secured Claims** | | | | | | |
| **1st Lien** | | | | | | |
| EGC RBL (LCs) | $228,000 | K | – | $– | – | $– |
| EGC Guarantee of EPL RBL | $3.2 - 44.1mm | K | – | – | – | – |
| EPL RBL | 99,412 | K | – | – | – | – |
| Promissory Note | 4,006 | K | – | – | – | – |
| Pre-Petition M&M Liens (Encumbered Reserve Allocation) | 35,889 | L | – | – | – | – |
| Post-Petition M&M Liens (Encumbered Reserve Allocation) | 36,217 | L | – | – | – | – |
| **2nd Lien** | | | | | | |
| Second Lien Notes Claims | 1,542,641 | M | – | – | – | – |
| EGC Intercompany Note Claim | 360,527 | M | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | **$777** | | **$1,471** |
| Less: Administrative Claims | 3,703 | O | 29% | 777 | 55% | 1,471 |
| **Remaining Proceeds for Distribution:** | | | | **$–** | | **$–** |
| **Plus: Add'l Value From Unencumbered Assets:** | | | | | | |
| EGC Intercompany Note | | N | | | | |
| Unencumbered PP&E | | P | | | | |
| **Remaining Proceeds for Distribution:** | | | | **$–** | | **$–** |
| **Less: Priority Recoveries From Unencumbered Assets** | | | | | | |
| Pre-Petition M&M Liens (Unencumbered Reserve Allocation) | $1,047 | L | – | – | – | – |
| Post-Petition M&M Liens (Unencumbered Reserve Allocation) | 785 | L | – | – | – | – |
| Post-Petition Inspections/Maintenance (Unencumbered Allocation) | | G | | | | |
| **Remaining Proceeds for Distribution:** | | | | **$–** | | **$–** |
| **Less: Unsecured & Other Claims** | | | | | | |
| EXXI 3.0% Senior Convertible Notes Claims | $366,628 | O | – | $– | – | $– |
| EPL 8.25% Senior Notes Claims | 216,527 | O | – | – | – | – |
| EGC Senior Notes Claims (Total) | 754,508 | O | – | – | – | – |
| Surety Bond Claims | 338,647 | p | – | – | – | – |
| Second Lien Notes Deficiency Claims | $1.46 - 1.54B | p | – | – | – | – |
| Second Lien Notes Guarantee Claims | 1,542,641 | p | – | – | – | – |
| General Unsecured Claims | 16,880 | p | – | – | – | – |
| Intercompany Payable (Energy XXI USA Inc.) | | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | **$–** | | **$–** |

**Energy XXI Ltd and Related Debtors**
Liquidation Analysis
*($ in thousands)*                                                Entity:        **Energy XXI Gulf Coast, Inc and its subsidiaries**
                                                                                 **( other than EPL)**

| | Total Claim | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|

### Liquidation Value Breakdown

| | | | Net Book Value | Low % BV | Low $ | High % BV | High $ |
|---|---|---|---|---|---|---|---|

**Assets**

| | | | Net Book Value | % BV | $ | % BV | $ |
|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | | A | $137,148 | 100.0% | $137,148 | 100.0% | $137,148 |
| Accounts Receivable | | B | 57,080 | 71.7% | 40,904 | 82.6% | 47,150 |
| Other Current Assets | | C | 9,872 | 7.3% | 716 | 14.2% | 1,398 |
| Property and Equipment | | D | 388,221 | 27.3% | 106,053 | 51.8% | 201,053 |
| Other Non-Current Assets | | E | 26,361 | – | – | – | – |
| Other Assets | | F | 9,321 | – | – | – | – |
| Intercompany Receivable (Energy XXI USA Inc.) | | | – | | 1,400 | | 1,541 |
| **Gross Liquidation Proceeds** | | | **$628,003** | | **$286,221** | | **$388,290** |

**Liquidation Costs**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Net Wind-Down Operating Expenses | | G | | | ($39,929) | | ($26,619) |
| Trustee Fees | | H | | | (4,495) | | (7,558) |
| Trustee Legal & Financial Advisors | | I | | | (2,981) | | (7,534) |
| **Total Liquidation Costs** | | | | | **($47,406)** | | **($41,711)** |
| **Proceeds Available for Distribution** | | | | | **$238,815** | | **$346,579** |

### Distribution of Liquidation Proceeds

| | | | | Low % Claim | Low $ | High % Claim | High $ |
|---|---|---|---|---|---|---|---|
| **Proceeds Available for Distribution** | | | | | **$238,815** | | **$346,579** |
| Less: Post-Petition P&A | $19,602 | J | | | 529 | | 529 |
| **Remaining Proceeds for Distribution:** | | | | | **$238,286** | | **$346,050** |

**Less: Secured Claims**

**1st Lien**

| | | | | % Claim | $ | % Claim | $ |
|---|---|---|---|---|---|---|---|
| EGC RBL (LCs) | $228,000 | K | | 77.6% | $177,030 | 100.0% | $228,000 |
| EGC Guarantee of EPL RBL | $3.2 - 44.1mm | K | | 77.6% | 34,240 | 100.0% | 3,160 |
| EPL RBL | 99,412 | K | | – | – | – | – |
| Promissory Note | 4,006 | K | | – | – | – | – |
| Pre-Petition M&M Liens (Encumbered Reserve Allocation) | 35,889 | L | | 77.6% | 15,441 | 100.0% | 19,886 |
| Post-Petition M&M Liens (Encumbered Reserve Allocation) | 36,217 | L | | 77.6% | 11,576 | 100.0% | 14,909 |

**2nd Lien**

| | | | | % Claim | $ | % Claim | $ |
|---|---|---|---|---|---|---|---|
| Second Lien Notes Claims | 1,542,641 | M | | – | – | 5.2% | 80,096 |
| EGC Intercompany Note Claim | 360,527 | M | | – | – | | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| Less: Administrative Claims | 3,703 | O | | – | – | | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |

**Plus: Add'l Value From Unencumbered Assets:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EGC Intercompany Note | | N | | | $– | | $– |
| Unencumbered PP&E | | P | | | 5,582 | | 10,582 |
| **Remaining Proceeds for Distribution:** | | | | | **$5,582** | | **$10,582** |

**Less: Priority Recoveries From Unencumbered Assets**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Pre-Petition M&M Liens (Unencumbered Reserve Allocation) | $1,047 | L | | 100.0% | $1,047 | 100.0% | $1,047 |
| Post-Petition M&M Liens (Unencumbered Reserve Allocation) | 785 | L | | 100.0% | 785 | 100.0% | 785 |
| Post-Petition Inspections/Maintenance (Unencumbered Allocation) | | G | | | 819 | | 546 |
| **Remaining Proceeds for Distribution:** | | | | | **$2,932** | | **$8,205** |

**Less: Unsecured & Other Claims**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EXXI 3.0% Senior Convertible Notes Claims | $366,628 | O | | – | $– | – | $– |
| EPL 8.25% Senior Notes Claims | 216,527 | O | | | | | |
| EGC Senior Notes Claims (Total) | 754,508 | O | | 0.1% | 837.1 | 0.3% | 2,416 |
| Surety Bond Claims | 338,647 | p | | 0.1% | 376 | 0.3% | 1,084 |
| Second Lien Notes Deficiency Claims | $1.46 - 1.54B | p | | 0.1% | 1,712 | 0.3% | 4,683 |
| Second Lien Notes Guarantee Claims | 1,542,641 | p | | – | – | | – |
| General Unsecured Claims | 16,880 | p | | 0.1% | 7 | 0.3% | 21 |
| Intercompany Payable (Energy XXI USA Inc.) | | | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |

**Energy XXI Ltd and Related Debtors**
Liquidation Analysis
*($ in thousands)*                                      Entity:                    **EPL Oil & Gas, Inc. and its subsidiaries**

| | Total Claim | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|

**Liquidation Value Breakdown**

| | | | Net Book | Low | | High | |
|---|---|---|---|---|---|---|---|
| | | | Value | % BV | $ | % BV | $ |
| **Assets** | | | | | | | |
| Cash and Cash Equivalents | | A | $– | – | $– | – | $– |
| Accounts Receivable | | B | 35,706 | 75.7% | 27,033 | 83.7% | 29,895 |
| Other Current Assets | | C | 3,127 | – | – | – | – |
| Property and Equipment | | D | 389,939 | 17.4% | 67,948 | 30.2% | 117,948 |
| Other Non-Current Assets | | E | 30,030 | 100.0% | 30,030 | 100.0% | 30,030 |
| Other Assets | | F | 608 | – | – | – | – |
| Intercompany Receivable (Energy XXI USA Inc.) | | | – | | – | | – |
| **Gross Liquidation Proceeds** | | | **$459,410** | | **$125,011** | | **$177,873** |
| **Liquidation Costs** | | | | | | | |
| Net Wind-Down Operating Expenses | | G | | | ($23,590) | | ($15,727) |
| Trustee Fees | | H | | | (3,774) | | (5,359) |
| Trustee Legal & Financial Advisors | | I | | | (2,500) | | (5,336) |
| **Total Liquidation Costs** | | | | | **($29,864)** | | **($26,422)** |
| **Proceeds Available for Distribution** | | | | | **$95,148** | | **$151,451** |

**Distribution of Liquidation Proceeds**

| | | | | Low | | High | |
|---|---|---|---|---|---|---|---|
| | | | | % Claim | $ | % Claim | $ |
| **Proceeds Available for Distribution** | | | | | **$95,148** | | **$151,451** |
| Less: Post-Petition P&A | $19,602 | J | | | 19,073 | | 19,073 |
| **Remaining Proceeds for Distribution:** | | | | | **$76,075** | | **$132,378** |
| **Less: Secured Claims** | | | | | | | |
| **1st Lien** | | | | | | | |
| EGC RBL (LCs) | $228,000 | K | | – | $– | – | $– |
| EGC Guarantee of EPL RBL | $3.2 - 44.1mm | K | | | | | |
| EPL RBL | 99,412 | K | | 55.6% | 55,315 | 96.8% | 96,253 |
| Promissory Note | 4,006 | K | | | | | |
| Pre-Petition M&M Liens (Encumbered Reserve Allocation) | 35,889 | L | | 55.6% | 8,904 | 96.8% | 15,494 |
| Post-Petition M&M Liens (Encumbered Reserve Allocation) | 36,217 | L | | 55.6% | 11,856 | 96.8% | 20,631 |
| **2nd Lien** | | | | | | | |
| Second Lien Notes Claims | 1,542,641 | M | | – | – | – | – |
| EGC Intercompany Note Claim | 360,527 | M | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Less: Administrative Claims** | 3,703 | O | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Plus: Add'l Value From Unencumbered Assets:** | | | | | | | |
| EGC Intercompany Note | | N | | | | | |
| Unencumbered PP&E | | P | | | | | |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Less: Priority Recoveries From Unencumbered Assets** | | | | | | | |
| Pre-Petition M&M Liens (Unencumbered Reserve Allocation) | $1,047 | L | | – | – | – | – |
| Post-Petition M&M Liens (Unencumbered Reserve Allocation) | 785 | L | | – | – | – | – |
| Post-Petition Inspections/Maintenance (Unencumbered Allocation) | | G | | | | | |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |
| **Less: Unsecured & Other Claims** | | | | | | | |
| EXXI 3.0% Senior Convertible Notes Claims | $366,628 | O | | – | $– | – | $– |
| EPL 8.25% Senior Notes Claims | 216,527 | O | | – | – | – | – |
| EGC Senior Notes Claims (Total) | 754,508 | O | | – | – | – | – |
| Surety Bond Claims | 338,647 | p | | | | | |
| Second Lien Notes Deficiency Claims | $1.46 - 1.54B | p | | – | – | – | – |
| Second Lien Notes Guarantee Claims | 1,542,641 | p | | – | – | – | – |
| General Unsecured Claims | 16,880 | p | | – | – | – | – |
| Intercompany Payable (Energy XXI USA Inc.) | | | | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | | **$–** | | **$–** |

**Energy XXI Ltd and Related Debtors**
Liquidation Analysis
*($ in thousands)*                                      Entity:                          **Consolidated**

| | Total Claim | Notes | | | | |
|---|---|---|---|---|---|---|
| **Liquidation Value Breakdown** | | | | | | |
| | | | **Low** | | **High** | |
| | | | % BV | $ | % BV | $ |
| **Assets** | | | | | | |
| Cash and Cash Equivalents | | A | 100.0% | $155,406 | 100.0% | $155,406 |
| Accounts Receivable | | B | 73.1% | 68,106 | 83.0% | 77,298 |
| Other Current Assets | | C | 8.7% | 1,471 | 15.6% | 2,627 |
| Property and Equipment | | D | 22.3% | 177,151 | 40.7% | 323,276 |
| Other Non-Current Assets | | E | 53.3% | 30,030 | 53.3% | 30,030 |
| Other Assets | | F | 0.2% | 30 | 0.3% | 45 |
| Intercompany Receivable (Energy XXI USA Inc.) | | | | 1,400 | | 1,541 |
| **Gross Liquidation Proceeds** | | | | **$433,595** | | **$590,224** |
| **Liquidation Costs** | | | | | | |
| Net Wind-Down Operating Expenses | | G | | ($71,069) | | ($47,846) |
| Trustee Fees | | H | | (8,445) | | (13,146) |
| Trustee Legal & Financial Advisors | | I | | (5,564) | | (13,045) |
| **Total Liquidation Costs** | | | | **($85,078)** | | **($74,036)** |
| **Proceeds Available for Distribution** | | | | **$348,517** | | **$516,188** |
| **Distribution of Liquidation Proceeds** | | | | | | |
| | | | **Low** | | **High** | |
| | | | % Claim | $ | % Claim | $ |
| **Proceeds Available for Distribution** | | | | **$348,517** | | **$516,188** |
| Less: Post-Petition P&A | $19,602 | J | | 19,602 | | 19,602 |
| **Remaining Proceeds for Distribution:** | | | | **$328,915** | | **$496,586** |
| **Less: Secured Claims** | | | | | | |
| **1st Lien** | | | | | | |
| EGC RBL (LCs) | $228,000 | K | 77.6% | $177,030 | 100.0% | $228,000 |
| EGC Guarantee of EPL RBL | $3.2 - 44.1mm | K | 34.4% | 34,240 | 3.2% | 3,160 |
| EPL RBL | 99,412 | K | 55.6% | 55,315 | 96.8% | 96,253 |
| Promissory Note | 4,006 | K | 48.4% | 1,939 | 76.1% | 3,049 |
| Pre-Petition M&M Liens (Encumbered Reserve Allocation) | 35,889 | L | 67.8% | 24,345 | 98.6% | 35,380 |
| Post-Petition M&M Liens (Encumbered Reserve Allocation) | 36,217 | L | 64.7% | 23,432 | 98.1% | 35,540 |
| **2nd Lien** | | | | | | |
| Second Lien Notes Claims | 1,542,641 | M | – | – | 5.2% | 80,096 |
| EGC Intercompany Note Claim | 360,527 | M | – | – | – | – |
| **Remaining Proceeds for Distribution:** | | | | **$12,615** | | **$15,109** |
| **Less: Administrative Claims** | 3,703 | O | 27.1% | 1,002 | 45.8% | 1,696 |
| **Remaining Proceeds for Distribution:** | | | | **$11,612** | | **$13,413** |
| **Plus: Add'l Value From Unencumbered Assets:** | | | | | | |
| EGC Intercompany Note | | N | | $– | | $– |
| Unencumbered PP&E | | P | | 5,582 | | 10,582 |
| **Remaining Proceeds for Distribution:** | | | | **$17,194** | | **$23,995** |
| **Less: Priority Recoveries From Unencumbered Assets** | | | | | | |
| Pre-Petition M&M Liens (Unencumbered Reserve Allocation) | $1,047 | L | 100.0% | $1,047 | 100.0% | $1,047 |
| Post-Petition M&M Liens (Unencumbered Reserve Allocation) | 785 | L | 100.0% | 785 | 100.0% | 785 |
| Post-Petition Inspections/Maintenance (Unencumbered Allocation) | | G | | 819 | | – |
| **Remaining Proceeds for Distribution:** | | | | **$14,544** | | **$21,618** |
| **Less: Unsecured & Other Claims** | | | | | | |
| EXXI 3.0% Senior Convertible Notes Claims | $366,628 | O | 0.3% | $1,247 | 0.4% | $1,450 |
| EPL 8.25% Senior Notes Claims | 216,527 | O | – | – | – | – |
| EGC Senior Notes Claims (Total) | 754,508 | O | 0.5% | 3,403 | 0.7% | 5,399 |
| Surety Bond Claims | 338,647 | p | 0.5% | 1,528 | 0.7% | 2,423 |
| Second Lien Notes Deficiency Claims | $1.46 - 1.54B | p | 0.1% | 1,712 | 0.3% | 4,683 |
| Second Lien Notes Guarantee Claims | 1,542,641 | p | 0.3% | 5,247 | 0.4% | 6,100 |
| General Unsecured Claims | 16,880 | p | 0.0% | 7 | 0.1% | 21 |
| Intercompany Payable (Energy XXI USA Inc.) | | | – | 1,400 | | 1,541 |
| **Remaining Proceeds for Distribution:** | | | | **$–** | | **$–** |

**Specific Notes to the Liquidation Analysis:**

Total claim represents the sum of the claims of each entity.  The percentages and recovery amounts are based on each entity on a standalone basis.


***Gross Liquidation Proceeds -***

A.  Cash & Cash Equivalents
    The liquidation proceeds of cash and equivalents for all entities holding cash is estimated to be 100% of the pro forma balance.  The pro forma balance as of August 31, 2016 is based on the latest pro forma business plan projections prepared by the Debtors and their advisors.


B.  Accounts Receivable
    The analysis of accounts receivable relates to the sale of oil and gas, amounts due from joint interest billing partners, and other receivables.  For the purposes of the Liquidation Analysis, the accounts receivable balances are assumed to be have a blended recovery of approximately 70% - 85%.


C.  Other Current Assets
    Other current assets primarily includes prepaid insurance, professional retainers, and other deposits.  In a liquidation, professional retainers are assumed to be recoverable after satisfying pre-petition fees and expenses.  Prepaid insurance balances were assumed to have minimal to zero recovery.


D.  Property, Plant & Equipment
    1)  Oil and Gas Properties
        The gross sale proceeds assumed realizable from the valuation of the oil and gas properties were based on the income approach via the discounted cash flow method.  The reserve reports utilized are run as of May 4, 2016 (effective date of April 1, 2016) using the NYMEX strip as of April 29, 2016 for the commodity price forecast.  Adjustments were made to the reserve report for risking, inflation, and federal income taxes.  The projected cash flows were discounted to present value based on a weighted average cost of capital estimated using comparable companies.  Further adjustments were made for general & administrative expenses, plugging & abandonment expenses, and lease operating expenses that are not included in the reserve report.
        The market approach, via the precedent transaction method, was considered as a secondary valuation approach.  However, this approach was not relied upon as there have only been a few transactions that have occurred in the shallow water Gulf of Mexico region since commodity prices began declining in late 2014.
        The valuation conducted for this liquidation analysis indicates a range of approximately $180 million to $330 million, net of royalties for the oil and gas properties for EXXI in the aggregate, or $68 million to $118 million for EPL and $112 million to $212 million for EGC including the unencumbered properties. This valuation of oil and gas properties does not take into account BOEM (Bureau of Ocean Energy Management) and BSEE (Bureau of Safety and Environmental Enforcement) considerations, which could negatively impact

the consideration received in a liquidation scenario. BOEM regulations are expected to become less favorable to the industry through higher bonding requirements, which could negatively impact offshore deal values.

2) Other
Other PP&E includes office furniture, computer equipment, software licenses, vehicle leases, and the aircraft with nominal recovery of $3 million to $4 million.

E. Other Non-Current Assets
Non-current assets consist of long-term restricted cash held at various entities.  $30M is maintained by EPL in an account subject to a control agreement in favor of the First Lien Agent under the First Lien Credit Agreement.  The remaining $25M is held at EGC which is deemed unrecoverable since it is a surety bond deposit.

F. Other Assets
Consists of deferred lease costs, deferred compensation holdings, and surety bond deposits.  In a liquidation scenario, there would no recovery to these pool of assets.

*Liquidation Adjustments –*

G. Net Wind-Down Operating Expenses

The Liquidation Analysis assumes the Chapter 7 liquidation process will take 4-6 months to complete.  Corporate payroll and administrative costs during the liquidation are based on the assumption that certain limited functions would be required during the liquidation process for an orderly wind-down of the business and sale and transfer of oil and gas assets.  Examples of such costs incurred during a Chapter 7 liquidation would include, but are not limited to, expenses associated with: salary or hourly compensation and retention or bonus program to maintain key personnel, rent, and utilities.  This Liquidation Analysis does not incorporate any severance costs from the termination of employees.  In a Chapter 7 scenario, the BSEE will likely increase its frequency of inspections from annual to quarterly, which could increase the operating costs to a potential buyer if the increased frequency of inspections continue after the properties are sold in a liquidation.

Under the laws of Bermuda, Energy XXI Ltd will incur costs related to the liquidation of the entities in the corporate chain.  These costs have been included in the Liquidation Analysis for Energy XXI Ltd.

H. Trustee Fees
Compensation for the Chapter 7 Trustee would be limited to fee guidelines in section 326(a) of the Bankruptcy Code.  The Debtors have assumed trustee fees of 3% of the gross proceeds from the liquidation (excluding cash).

I.   Trustee Legal & Financial Advisors
     Compensation for the Chapter 7 trustee's professionals (counsel and other legal, financial, and professional services) during the Chapter 7 Case are estimated to be between 2% and 3% of total liquidation proceeds (excluding cash).

**Claims –**

J.   Post-Petition P&A
     The Debtor has scheduled commitments to perform P&A work post-petition and during the liquidation process, which buyers would require to be completed in order to agree to purchase the assets.  As such, values are reduced for this P&A prior to calculating claim recovery.

K.   First Lien Secured Claims
     First Lien Secured Claims consist of the letters of credit at EGC of $228M (including the Exxon LCs, which are assumed to be drawn for the purposes of this Liquidation Analysis), the $99M outstanding under the First Lien Credit Agreement at EPL (the "***EPL RBL***"), and the EXXI Holdings Promissory Note of $4M.  Claims on account of the Letters of Credit, if drawn, at EGC are projected to receive a recovery of 75% - 100%.  Due to the EPL RBL being impaired in a low case scenario, it is assumed the First Lien Lenders would assert a guarantee Claim at EGC for the impaired balance (the "***First Lien Guarantee Claim***").  The recovery for the EPL RBL is estimated to be 90% - 100%, inclusive of the RBL's First Lien Guarantee Claim at EGC.  As per this Liquidation Analysis, the EXXI Holdings Promissory Note recovery is 50% - 75%, but it is likely that the noteholder would likely select to lift the stay and foreclose on the asset (airplane).

L.   Trade Claims
     The Debtor believes there will be Trade Claims in which the claim holder may be able to assert lien rights under applicable law.  These holders of claims will be required to provide evidence they can assert lien rights under applicable law in connection with the claims reconciliation process.  In the event that each of these claim holders can assert valid secured claims, this pool of pre-petition claims is estimated to be $37M for encumbered and unencumbered assets, with a blended recovery of 70% - 100%, a recovery of 75% - 100% at EGC, and a recovery of 55% - 95% at EPL.  The pool of post-petition claims is also estimated to be $37M for the encumbered and unencumbered assets, with a blended recovery of 65% - 100%.

M.   Second Lien Secured Claims
     Second Lien Secured Claims consist of the $1.45B Second Lien Notes Claim at EGC and the $325M EGC Intercompany Note at EPL. The $1.45B Second Lien Notes Claim at EGC is estimated to receive 0% - 5% recovery and therefore the Second Lien Noteholders will assert a Second Lien Guarantee Claim at Energy XXI Ltd and a Second Lien Notes Deficiency Claim at EGC (discussed in Section P). The recovery on the EGC Intercompany Note is estimated to be 0% and as discussed in more detail in Section P, the value (along with the unencumbered PPE) would be distributed pari-passu amongst the Unsecured Claim holders at EGC.

N. Administrative Claims

The Debtors estimate there would be approximately $4M in administrative claims during the liquidation period consisting of general and administrative expenses and severance and franchise taxes. The Liquidation Analysis projects a blended recovery rate of approximately 25-45%.

O. Senior Notes Claims

The "Senior Notes Claims" consist of a total of $732.6M EGC Unsecured Notes, $213.7M EPL Unsecured Notes and $363M of EXXI 3.0% Senior Convertible Notes. Since the EGC Unsecured Notes receive less than 1% recovery, they can assert guarantee Claims against Energy XXI Ltd, where their recovery is estimated at less than 1%. The EXXI 3.0% Senior Convertible Notes are projected to receive less than 1% recovery while the EPL Unsecured Notes are projected to get no recovery due to the EGC Intercompany Note.

P. General Unsecured Claims & Other

These General Unsecured Claims consist of all other Unsecured Claims.

1) The Second Lien Guarantee Claim at Energy XXI Ltd and Second Lien Deficiency Claim at EGC were both asserted due to a 5% recovery for the Second Lien Notes at EGC in the high case. The value of the Second Lien Guarantee Claim is equal to the face value of the Second Lien Notes Claim, while the value of the Second Lien Deficiency Claim is the face value of the Second Lien Notes claim less the recovery on that claim.

2) The Surety Bond Claim is asserted due to the assumption that in a liquidation all bonds would be required to be paid to fulfill P&A liabilities. Value in the waterfall is reduced by the P&A liabilities from work during the case, which also reduce the unsecured claims asserted by the bonds. The Surety Bond Claims are estimated to get less than 1% recovery. The short term P&A liabilities have been accounted for as administrative claims in Section J.

3) All unsecured liabilities that the Debtors do not anticipate will have liens asserted against them are classified as general unsecured claims for purposes of this Liquidation Analysis. This pool of claims is estimated to be $17M, with close to zero recovery.

4) All remaining General Unsecured Claims are estimated to less than 1% recovery.

# **EXHIBIT F**

**Financial Projections**

### Financial Projections

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared financial projections (the "Projections") for the remainder of fiscal year 2016 through 2019 (the "Projection Period"). The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF FRESH START ACCOUNTING, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

## 1) General Assumptions

### a. Overview

The Debtors and their subsidiaries are an independent oil and gas company engaged primarily in the exploration for and the exploitation, acquisition, development and production of oil, natural gas, and natural gas liquids predominantly in offshore properties in the Gulf of Mexico.

### b. Presentation

The Projections are presented on a consolidated basis, including estimates of operating results for Debtor and non-Debtor entities, combined.

### c. Accounting Policies

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements and projections. The Debtors did not prepare the Financial Projections with a view toward compliance with published guidelines of the Securities and Exchange Commission or guidelines established by the FASB, particularly for reorganization accounting. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to ASC 852-10, as issued by the American Institute of Public Accountants.

### d. Methodology

The Projections incorporate Managements' operating assumptions and capital plan, with input provided by key personnel from the Debtors' operating business lines across various functions. The projections assume sufficient capital to achieve such business plan as detailed fully below.

### e. Plan Consummation

The operating assumptions assume that the Plan will be confirmed and consummated by August 31, 2016.

## 2) Assumptions With Respect to the Projected Income Statement

### a. Production

Oil, natural gas liquids, and natural gas volumes based on production estimates by Management. Production forecasts are based on Management's business plan, which seeks to optimize drilling of new wells consistent with expected capital availability, based on communications with the Company's equity owners after the Effective Date.

**b.  Commodity Pricing**

Based on May 25, 2016 New York Mercantile Exchange ("NYMEX") strip pricing for crude oil and natural gas. Assumptions regarding realized pricing (i.e., "differentials") from NYMEX, are based on both input from Management and existing contracts.

**c.  Operating Costs**

The forecasts for Lease Operating Expenses ("LOE"), transportation expenses and production taxes are based on historical expenses and future production estimates, incorporating cost reduction estimates interpreted by Management and reserve engineers, with guidance from field operations.

Consolidated operating expenses are expected to decrease from $493 million in FY 2015 to $412 million in FY 2016 to $374 million in FY 2017 to $356 million in FY 2018 and to $347 million in FY 2019.

**d.  Income Taxes**

Taxes are projected to remain at an effective rate near zero throughout the projection period due to the impact of deductions for depletion, depreciation, intangible drilling costs, and NOLs.

**e.  General and Administrative**

General and Administrative Costs ("G&A") are primarily comprised of labor costs and other expenses associated with the Debtors' corporate overhead. Projected G&A is based on historical G&A costs, adjusted for recent cost reduction efforts. G&A, prior to any capitalization, is expected to decrease from an approximate $117 million in FY 2015 to $106 million in FY 2016 to $77 million in FY 2017 to $72 million in FY 2018 and to $72 million in FY 2019 due to increases in overall cost efficiency.

**f.  EBITDA**

Earnings Before Interest, Taxes, Depreciation and Amortization expense ("EBITDA") is projected to improve over time due to several factors, including:

- increasing production levels due to newly drilled wells from the Company's go-forward drilling program;
- increasing realized prices on production over time as predicted by NYMEX strip prices;
- operating leverage of fixed costs being spread over increased production

**3)  Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

The projected Consolidated Balance Sheets were developed using March 31, 2016 unaudited financial results as a starting point and are adjusted on a go-forward basis, incorporating projected results from operations and cash flows over the Projected Period.

**a.  Pro Forma Adjustments Related to Emergence**

The Reorganized EXXI Pro Forma Balance Sheet as of the Effective Date shows (a) the adjusted balance sheet for the Debtors as of the assumed Effective Date of August 31, 2016, prior to giving effect to the Plan and (b) a balance sheet reflecting certain pro forma adjustments that would result from consummation of the Plan. These adjustments primarily relate to the conversion of Second Lien Secured Claims into common equity and the treatment given to First Lien Secured Claims and Senior Notes Claims in exchange for their debt obligations as more fully described in the Plan and the Disclosure Statement. The Debtors' adjusted August 31, 2016 balance sheet was developed based on the March 31, 2016 unaudited balance sheet and projected results of operations and cash flows over the projected period to the assumed Effective Date of August 31, 2016.  On the Effective Date, actual balances may vary from balances reflected on the adjusted August 31, 2016 balance sheet due to the variance between actual results and forecasts through the Effective Date.  While the 2016 through 2019 Projections roll-forward the effect of such pro forma adjustments, fresh-start accounting pursuant to ASC 852-10 principles have not been applied and could materially impact the balances on the projected Pro Forma Balance Sheet.

**b.  Capital Expenditures**

Projections for capital expenditures were prepared with consideration of the Debtors' current drilling program and future estimates.  The fiscal 2017 capital budget is approximately $147 million, accounting for an anticipated decline of field capital costs from prior-year levels.  Capital expenditures in fiscal 2018 and 2019 are assumed to be approximately $188 and $208 million per year, respectively. These amounts exclude any capitalized G&A.

**c.  Working Capital**

Accounts receivable is projected based on historical patterns of cash receipts related to production revenue.  Accounts payable is projected based on historical patterns of days of payables outstanding.  Prepaid expenses are projected based on Management's estimated timing of when such expenses will be paid throughout the year.

**d.  Capital Structure**

Pro forma capital structure reflects the restructuring effectuated via the Plan.

[EXHIBITS BELOW]

# Energy XXI Ltd.

Consolidated Projected Balance Sheet (Unaudited)

($ in thousands)

| BALANCE SHEET | Pre-Reorg 8/31/2016 | Debt Discharge (a) | Equity Discharge (b) | Canceling Adjustments (c) | Reorg Adjustments (d) | New Capital (e) | Post-Reorg 8/31/2016 | As of June 30, 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | | | | | | |
| Cash and Cash Equivalents | 145,541 | | | | 550 | | 146,091 | 188,823 | 294,774 | 444,385 |
| Restricted cash, current | 9,710 | | | | | | 9,710 | 9,710 | 9,710 | 9,710 |
| Accounts Receivable, Net | 82,995 | | | | | | 82,995 | 85,767 | 95,463 | 93,813 |
| Prepaids & Other | 32,822 | | | | (550) | | 32,272 | 30,956 | 30,956 | 30,956 |
| Royalty Deposits | 2,168 | | | | | | 2,168 | 2,168 | 2,168 | 2,168 |
| **TOTAL CURRENT ASSETS** | $ 273,236 | $      - | $      - | $      - | $      - | $      - | $ 273,236 | $ 317,424 | $ 433,071 | $ 581,031 |
| **NON CURRENT ASSETS** | | | | | | | | | | |
| Restricted cash, long-term | 55,559 | | | | (30,031) | | 25,528 | 25,528 | 25,528 | 25,528 |
| Net Oil and Gas Properties (Full Cost Method) | 735,218 | | | | | | 735,218 | 697,630 | 665,697 | 653,423 |
| Other Net PPE (from "Other") | 16,981 | | | | | | 16,981 | 13,981 | 10,381 | 6,781 |
| Net Other Property, Plant and Equipment | 752,199 | - | - | - | - | - | 752,199 | 711,611 | 676,078 | 660,204 |
| Other Long Term Assets | 13,472 | | | | | | 13,472 | 13,472 | 13,472 | 13,472 |
| Goodwill | 832 | | | | | | 832 | 832 | 832 | 832 |
| Excess Reorganization Value | - | | | | 209,420 | | 209,420 | 209,420 | 209,420 | 209,420 |
| **TOTAL NON CURRENT ASSETS** | 822,062 | - | - | - | 179,388 | - | 1,001,451 | 960,863 | 925,329 | 909,456 |
| **TOTAL ASSETS** | 1,095,298 | - | - | - | 179,388 | - | 1,274,686 | 1,278,287 | 1,358,400 | 1,490,487 |
| **CURRENT LIABILITIES** | | | | | | | | | | |
| Accounts Payable | 39,251 | | | | | | 39,251 | 54,002 | 37,342 | 45,618 |
| Liabilities Subject to Compromise | 42,320 | | | (42,320) | | | - | - | - | - |
| Current Portion of Long Term Debt | - | | | | | | - | - | - | - |
| Amounts due joint interest owners | 2,633 | | | | | | 2,633 | 2,633 | 2,633 | 2,633 |
| Accrued Liabilities | 136,107 | (134,203) | | | | | 1,904 | 446 | 865 | 1,259 |
| ARO short-term | 52,546 | | | | | | 52,546 | 52,546 | 52,546 | 52,546 |
| Oil And Gas Revenues Held For Distribution | 20,883 | | | | | | 20,883 | 22,068 | 24,236 | 23,758 |
| **TOTAL CURRENT LIABILITIES** | 293,740 | (134,203) | | (42,320) | - | - | 117,216 | 131,695 | 117,622 | 125,814 |
| **NON CURRENT LIABILITIES** | | | | | | | | | | |
| Long-Term Debt | 2,864,152 | (2,759,288) | | | (30,031) | | 74,833 | 75,000 | 75,000 | 75,000 |
| ARO, long-term | 482,637 | | | | | | 482,637 | 505,423 | 518,023 | 530,623 |
| Other Long-Term Liabilities | 17,090 | | | (17,090) | | | - | - | - | - |
| **TOTAL NON CURRENT LIABILITIES** | 3,363,879 | (2,759,288) | - | (17,090) | (30,031) | - | 557,470 | 580,423 | 593,023 | 605,623 |
| **TOTAL LIABILITIES** | 3,657,619 | (2,893,491) | - | (59,410) | (30,031) | - | 674,686 | 712,118 | 710,645 | 731,437 |
| **SHAREHOLDERS' EQUITY** | | | | | | | | | | |
| Common Equity | 485 | - | (485) | | | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| Additional Paid-In Capital | 1,845,523 | | (1,845,523) | | | | - | - | - | - |
| Accumulated Deficit | (4,408,329) | 2,893,491 | 1,846,008 | 59,410 | 209,420 | (600,000) | 0 | (33,831) | 47,755 | 159,050 |
| **TOTAL SHAREHOLDERS' EQUITY** | (2,562,321) | 2,893,491 | - | 59,410 | 209,420 | - | 600,000 | 566,169 | 647,755 | 759,050 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | 1,095,298 | - | - | - | 179,388 | - | 1,274,686 | 1,278,287 | 1,358,400 | 1,490,487 |

Notes:

(a) Reflects the extinguishment of prepetition debt and associated accrued interest pursuant the Plan.

(b) Reflects the extinguishment of prepetition equity pursuant the Plan.

(c) Reflects the extinguishment of certain prepetition general unsecured claims pursuant to the Plan.

(d) Reflects the agreed upon conditions established pursuant the Plan including: utility deposit refund ($0.6 million) and paydown of the RBL ($30 million).  The Company estimates that cash may be approximately $40 million to $80 million lower due to payments to lien claimants, potential additional cash collateral postings, potential additional transaction expenses, and other contingencies.

(e) Reflects the issuance of New Equity pursuant to the Plan.

# Energy XXI Ltd.

## Consolidated Projected Income Statements (Unaudited)

($ in thousands)

| | Fiscal year ending June 30 | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| **TOTAL NET REVENUE** | $  643,811 | $  759,853 | $  780,421 |
| **COST OF OPERATIONS** | | | |
| Operating Expenses | 374,458 | 356,008 | 347,152 |
| G&A | 57,594 | 54,369 | 53,844 |
| Restructuring & One Time Charges | 26,328 | - | - |
| DD&A | 177,676 | 196,588 | 196,829 |
| Accretion of Asset Retirement Obligation | 57,600 | 57,600 | 57,600 |
| **Total Expenses** | $  693,656 | $  664,566 | $  655,426 |
| **INCOME / (LOSS) FROM OPERATIONS** | $  (49,844) | $  95,287 | $  124,995 |
| Interest (Income) Expense | 17,250 | 13,700 | 13,700 |
| **NET INCOME** | $  (67,094) | $  81,587 | $  111,295 |
| | | | |
| **ADJUSTED EBITDA** | | | |
| Net Income | (67,094) | 81,587 | 111,295 |
| + / (-) Interest (Income) Expense | 17,250 | 13,700 | 13,700 |
| + DD&A | 177,676 | 196,588 | 196,829 |
| + Accretion Expense | 57,600 | 57,600 | 57,600 |
| + Restructuring Costs | 26,328 | - | - |
| **ADJUSTED EBITDA (For Debt Covenant Testing)** | $  211,759 | $  349,475 | $  379,424 |

*Notes:*

(a) Priced using 5.25.16 Strip

# Energy XXI Ltd.

## Consolidated Projected Statement of Cash Flows (Unaudited)

($ in thousands)

| | Fiscal year ending June 30 | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| **CASH FLOW FROM OPERATING ACTIVITIES** | | | |
| Net Income / (Loss) | $ (67,094) | $ 81,587 | $ 111,295 |
| **Adjustments to Reconcile Net Income to Net Cash Provided by Operating Activities:** | | | |
| DD&A | 177,676 | 196,588 | 196,829 |
| Asset Retirement Obligation Accretion | 57,600 | 57,600 | 57,600 |
| PIK interest for RBL | 333 | - | - |
| **Net Change in Operating Assets and Liabilities:** | | | |
| Accounts Receivable, Net | (3,846) | (9,697) | 1,651 |
| Prepaids & Other | 833 | 0 | (0) |
| Restricted cash | 37,602 | - | - |
| Accounts Payable | 17,345 | (16,661) | 8,277 |
| Liabilities Subject to Compromise | - | - | - |
| Accrued Liabilities | (7,496) | 419 | 394 |
| Oil And Gas Revenues Held For Distribution | 1,603 | 2,169 | (479) |
| **NET CASH PROVIDED BY OPERATING ACTIVITIES** | $ 214,557 | $ 312,005 | $ 375,567 |
| **CASH FLOW FROM INVESTING ACTIVITIES** | | | |
| Capital Expenditures | (110,319) | (161,054) | (180,956) |
| Change in ARO, long-term | (55,572) | (45,000) | (45,000) |
| **NET CASH PROVIDED BY INVESTING ACTIVITIES** | $ (165,891) | $ (206,054) | $ (225,956) |
| **CASH FLOW FROM FINANCING ACTIVITIES** | | | |
| Proceeds from Long Term Debt | (30,032) | - | - |
| Proceeds From New Common Stock | - | - | - |
| **NET CASH PROVIDED BY FINANCING ACTIVITIES** | $ (30,032) | $ - | $ - |
| **TOTAL CASH FLOW** | | | |
| Cash And Cash Equivalents At Beginning Of Period | 170,189 | 188,823 | 294,774 |
| Change In Cash From Net Activities | 18,634 | 105,951 | 149,611 |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ 188,823 | $ 294,774 | $ 444,385 |

# EXHIBIT G

**Valuation Analysis**

**Enterprise Valuation of the Reorganized Debtors**

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.[1]  THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS.

Solely for purposes of the *Debtor's Proposed Joint Chapter 11 Plan of Reorganization* (the "Plan") and the *Disclosure Statement for the Debtor's Proposed Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement"), PJT Partners LP ("PJT"), as proposed investment banker and financial advisor to the Debtors, has estimated the total enterprise value (the "Total Enterprise Value") and implied equity value (the "Equity Value") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

In estimating the Total Enterprise Value of the Debtors, PJT met with the Debtors' senior management team to discuss the Debtors' operations and future prospects, reviewed the Debtors' historical financial information, reviewed certain of the Debtors' financial and operating data, including the Debtors' internal report, reviewed the Financial Projections (as defined below), and reviewed publicly-available third-party information.

The valuation information set forth in this section represents a valuation of the Reorganized Debtors based on the application of standard valuation techniques.  The estimated values set forth in this section: (a) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (b) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any person of the consideration to be received by such person under the Plan; (c) do not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan; and (d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the estimates set forth below, PJT has relied upon the accuracy, completeness, and fairness of financial and other information furnished by the Debtors.  PJT did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.

---

[1]  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement, to which this exhibit is attached as **Exhibit G**.

DRAFT
Privileged & Confidential
Attorney Work Product
Subject to FRE 408

The Debtors' financial projections for the Reorganized Debtors are attached as **Exhibit F** to the Disclosure Statement (the "Financial Projections"). The estimated values set forth herein assume that the Reorganized Debtors will achieve their Financial Projections in all material respects. PJT has relied on the Debtors' representation and warranty that the Financial Projections (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtors' best currently available estimates; and (d) reflect the good faith judgments of the Debtors. PJT does not offer an opinion as to the attainability of the Financial Projections. As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and PJT, and consequently are inherently difficult to project.

This report contemplates facts and conditions known and existing as of June 3, 2016. Events and conditions subsequent to this date, including updated projections or reserve reports, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, PJT has assumed that no material changes that would affect value will occur between June 3, 2016 and the contemplated Effective Date of August 31, 2016.

### Valuation Approach

PJT prepared a net asset value analysis to estimate the Total Enterprise Value for the Reorganized Debtors, which includes the following components:

1. Oil and Gas Reserves Value

2. Unallocated Costs (G&A, AROs, LOE)

3. Other Assets (NOLs)

### 1. Reserve Value

The value of the Debtors' oil and gas reserves[2] was estimated using a net asset value ("NAV") approach. The NAV analysis estimates the value of the Debtors' reserves by risk-adjusting categories in the Debtors' reserve report. The Debtors' reserve report calculates the present value of estimated net cash flows directly attributable to the Debtors' reserves. Future production volumes attributable to the reserves are estimated and multiplied by the projected realized price. Projected severance taxes (i.e., production taxes), ad valorem taxes, lease operating expenses, transportation expenses, and capital expenditures are then subtracted from revenue to calculate net cash flows. The net cash flows in the reserve report are discounted at an industry-standard discount rate of 10 percent. PJT then risk-adjusted the reserve categories by applying discounts as recommended by the Society of Petroleum Evaluation Engineers ("SPEE"). The value of the reserves assumes that the Debtors have access to capital required to realize the value of the reserves.

PJT believes a comparable company analysis is less relevant than NAV given few relevant comparables and the Debtors' distinct areas of operation, asset quality, asset maturity, future growth potential, oil/gas mix, and cost structure. Precedent transaction analysis is less relevant than NAV given few recent

---

[2] The reserve value incorporates the reserves as reflected in the Debtors' ARIES reserve database.

DRAFT
Privileged & Confidential
Attorney Work Product
Subject to FRE 408

offshore transactions in the Gulf of Mexico in the current commodity price environment.  Discounted cash flow analysis is less relevant than NAV since NAV utilizes present value of cash flows (but assumes a longer time horizon with greater precision), and captures relative risk of reserves more specifically than a blended discount rate.

## 2. Unallocated Costs

- ### General and Administrative Costs

To manage and develop the Debtors' reserves, the Debtors incur general and administrative costs.  These costs include employee compensation, professional services, corporate insurance, rent, utilities, and other expenses. PJT estimated the present value of general and administrative expenses that have not otherwise been included in the reserve report.  PJT then deducted the value of the unallocated general and administrative costs to derive the Total Enterprise Value.

- ### Unallocated ARO

A portion of projected asset retirement obligations is not captured in the Company's reserve report.  PJT estimated the present value (PV-10) of these obligations, classified them to the appropriate reserve category, and applied the appropriate riskings for those categories.  PJT then deducted the value of the unallocated AROs to derive the Total Enterprise Value.

- ### Unallocated LOE

A portion of the Company's operating expenses is not captured in the Company reserve reports.  This includes expenses related to maintenance and workovers and operational insurance excluded from the reserve report.  PJT estimated the present value (PV-10) of these items, classified them to the appropriate reserve category, and applied the appropriate riskings for those categories.  PJT then deducted the value of the unallocated LOE to derive the Total Enterprise Value.

## 3. Other Assets

- ### Net Operating Losses

The Company projects that all emergence NOLs will be used to offset cancellation of debt income (CODI) resulting from the consummation of the plan of reorganization. Accordingly, no value is attributed to such NOLs in the valuation.

### Total Enterprise Value and Implied Equity Value

As a result of the analysis described herein, PJT estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $550 million - $800 million, with a mid-point of $675 million.  Based on forecasted pro forma debt of $75 million immediately post-emergence, the Total Enterprise Value implies an Equity Value range of $475 - $725 million, with a mid-point of $600 million.

PJT estimated the Total Enterprise Value of Energy XXI Gulf Coast, Inc., together with its subsidiaries other than EPL Oil & Gas, Inc., ("EGC") to be approximately $350 million - $550 million, with a mid-point of $450 million.  PJT estimated the Total Enterprise Value of EPL Oil & Gas, Inc. and its subsidiaries ("EPL") to be approximately $200 million - $250 million, with a mid-point of $225 million.

# **EXHIBIT B**

**Amended Disclosure Statement**

**(Blackline)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 16-31928** |
| | § | |
| **ENERGY XXI LTD,** *et al.,* | § | **(Chapter 11)** |
| | § | |
| | § | **Jointly Administered** |
| **Debtors.**[1] | § | |

**AMENDED** DISCLOSURE STATEMENT FOR THE DEBTORS'
PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

| | |
|---|---|
| Harry A. Perrin (TX 15796800) | David S. Meyer (admitted *pro hac vice*) |
| Bradley R. Foxman (TX 24065243) | Jessica C. Peet (admitted *pro hac vice*) |
| Reese A. O'Connor (TX 24092910) | Lauren R. Kanzer (admitted *pro hac vice*) |
| First City Tower | 666 Fifth Avenue, 26th Floor |
| 1001 Fannin Street, Suite 2500 | New York, NY 10103-0040 |
| Houston, TX 77002-6760 | |

| | |
|---|---|
| Paul E. Heath (TX 09355050) | **VINSON & ELKINS LLP** |
| Trammell Crow Center | ~~PROPOSED~~ ATTORNEYS FOR THE DEBTORS |
| 2001 Ross Avenue, Suite 3700 | |
| Dallas, TX 75201 | **Dated:** ~~May 20,~~ June 14, 2016 |

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Anglo-Suisse Offshore Pipeline Partners, LLC (9562), Delaware EPL of Texas, LLC (9562), Energy Partners Ltd., LLC (9562), Energy XXI GOM, LLC (0027), Energy XXI Gulf Coast, Inc. (8595), Energy XXI Holdings, Inc. (1638), Energy XXI, Inc. (2108), Energy XXI Leasehold, LLC (8121), Energy XXI Ltd (9286), Energy XXI Natural Gas Holdings, Inc. (7517), Energy XXI Offshore Services, Inc. (4711), Energy XXI Onshore, LLC (0308), Energy XXI Pipeline, LLC (5863), Energy XXI Pipeline II, LLC (8238), Energy XXI Services, LLC (3999), Energy XXI Texas Onshore, LLC (0294), Energy XXI USA, Inc. (8552), EPL of Louisiana, L.L.C. (9562), EPL Oil & Gas, Inc. (9562), EPL Pioneer Houston, Inc. (9749), EPL Pipeline, L.L.C. (1048), M21K, LLC (3978), MS Onshore, LLC (8573), Natural Gas Acquisition Company I, LLC (0956), Nighthawk, L.L.C. (9562), and Soileau Catering, LLC (2767).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  1021 Main Street, Suite 2626, Houston, Texas 77002.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF ENERGY XXI AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN SECOND LIEN NOTEHOLDERS, AND ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH

STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND THESE STATEMENTS, INCLUDING THOSE RELATING TO THE INTENT, BELIEFS, PLANS OR EXPECTATIONS OF THE COMPANY ARE BASED UPON CURRENT EXPECTATIONS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS (THE "BANKRUPTCY COURT").

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................................. 1

II. OVERVIEW OF THE DEBTORS' OPERATIONS............................................................. 5

    A.    The Debtors' Business ........................................................................................ 5

    B.    The Debtors' History .......................................................................................... 6

    C.    The Debtors' Corporate Structure ...................................................................... 7

    D.    The Debtors' Operations .................................................................................... 7

    E.    Regulation of the Debtors' Business .................................................................. 8

    F.    Directors and Officers ........................................................................................ 9

    G.    The Debtors' Capital Structure ........................................................................ 10

III. KEY EVENTS LEADING TO CHAPTER 11 CASES.................................................... 14

    A.    Commodities Downturn and Industry Distress ................................................ 14

    B.    Deleveraging Initiatives ................................................................................... 15

    C.    Restructuring Negotiations ....................................................................... ~~15~~16

    D.    The Restructuring Support Agreement ............................................................ 16

IV. DEVELOPMENTS AND ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES........... 18

    A.    First Day Pleadings .......................................................................................... 18

    B.    Other Administrative Motions and Retention Applications.............................. 20

    C.    Appointment of Official Committee ......................................................... ~~20~~21

    D.    Ad Hoc Group of EPL Noteholders ................................................................ 21

    E.    Cash Collateral ................................................................................................. 21

    F.    RSA Assumption Motion.................................................................................. 22

    G.    *Motion to Appoint Equity Committee* ....................................................... *22*

    H.    Claims Bar Date.............................................................................. ~~22~~23

    ~~H~~I.    Schedules of Assets and Liabilities and Statements of Financial Affairs ................ ~~22~~23

    ~~I~~J.    Assumption and Rejection of Executory Contracts and Unexpired Leases.................. 23

    ~~J~~K.    Litigation Matters............................................................................................. 23

V. SUMMARY OF THE PLAN ............................................................................... ~~23~~24

    A.    Administrative Claims, Professional Fee Claims, and Priority Claims .............. ~~23~~24

    B.    Classification of Claims and Interests............................................................ ~~25~~26

    C.    Treatment of Claims and Interests ................................................................. ~~26~~27

    D.    Means for Implementation of the Plan........................................................... ~~32~~34

    E.    Treatment of Executory Contracts and Unexpired Leases............................. ~~40~~42

    F.    Provisions Governing Distributions ............................................................... ~~43~~45

i

G.  Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ................ ~~48~~50

H.  Settlement, Release, Injunction, and Related Provisions ........................................... ~~50~~52

I.  Conditions Precedent to Confirmation and Consummation of the Plan ...................... ~~57~~62

J.  Modification, Revocation, or Withdrawal of the Plan ................................................. ~~60~~64

K.  Retention of Jurisdiction ............................................................................................. ~~61~~65

L.  Miscellaneous Provisions ............................................................................................ ~~62~~67

VI. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES
LAWS ................................................................................................................................... ~~66~~70

A.  Legends ........................................................................................................................ ~~66~~71

VII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ................................................................................................................................... ~~67~~71

A.  Introduction ................................................................................................................. ~~67~~71

B.  Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ............... ~~68~~73

C.  Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims
...................................................................................................................................... ~~69~~74

D.  Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of
Claims .......................................................................................................................... ~~73~~78

E.  Information Reporting and Back-Up Withholding ....................................................... ~~77~~82

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ........................................................... ~~78~~83

A.  Certain Bankruptcy Law Considerations ..................................................................... ~~78~~83

B.  Additional Factors Affecting the Value of the Reorganized Debtors .......................... ~~81~~86

C.  Risks Relating to the Debtors' Business and Financial Condition ............................... ~~82~~86

D.  Factors Relating to Securities to Be Issued Under the Plan ........................................ ~~83~~88

E.  Additional Factors ....................................................................................................... ~~84~~89

IX. VOTING PROCEDURES AND REQUIREMENTS .............................................................. ~~85~~90

A.  Parties Entitled to Vote ............................................................................................... ~~85~~90

B.  Voting Procedures ....................................................................................................... ~~86~~91

C.  Voting Deadline ........................................................................................................... ~~87~~91

D.  Waivers of Defects, Irregularities, etc. ....................................................................... ~~88~~92

X. CONFIRMATION OF THE PLAN ........................................................................................ ~~88~~93

A.  Confirmation Hearing .................................................................................................. ~~88~~93

B.  Objections To Confirmation ........................................................................................ ~~89~~93

C.  Requirements for Confirmation of the Plan ................................................................. ~~90~~95

D.  Best Interests Test/Liquidation Analysis ..................................................................... ~~91~~96

E.  Feasibility .................................................................................................................... ~~92~~97

F.  Acceptance by Impaired Classes ................................................................................. ~~93~~97

G.      Additional Requirements for Nonconsensual Confirmation .......................................... ~~93~~98

H.      Valuation of the Debtors .............................................................................................. ~~94~~98

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................ ~~94~~99

A.      Alternative Plan of Reorganization .............................................................................. ~~94~~99

B.      Sale Under Section 363 of the Bankruptcy Code .......................................................... ~~94~~99

C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ............................. ~~95~~99

XII. CONCLUSION AND RECOMMENDATION .................................................................... ~~95~~99

## EXHIBITS

EXHIBIT A       Plan of Reorganization

EXHIBIT B       Restructuring Support Agreement

EXHIBIT C       Corporate Structure Chart

EXHIBIT D       Disclosure Statement Order

EXHIBIT E       Liquidation Analysis

EXHIBIT F       Financial Projections

EXHIBIT G ~~1~~   Valuation Analysis ~~for Energy XXI Ltd~~

~~EXHIBIT G-2   Valuation Analysis for Energy XXI Gulf Coast, Inc.~~

~~EXHIBIT G-3   Valuation Analysis for EPL Oil & Gas, Inc.~~

## I. INTRODUCTION

Energy XXI Ltd ("***Energy XXI***") and its 25 debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***") submit this disclosure statement (the "***Disclosure Statement***") pursuant to section 1125 of title 11 of the Bankruptcy Code in connection with the solicitation of votes on the *Debtors' Proposed Joint Chapter 11 Plan of Reorganization*, dated May 20, 2016 (the "***Plan***," attached hereto as **Exhibit A**).[2]  The Plan constitutes a separate chapter 11 plan for Energy XXI and each of the other Debtors. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.

The Debtors are commencing this solicitation after extensive discussions over the past several months among the Debtors and certain of their key creditor constituencies.  As a result of these negotiations, certain creditors holding approximately 63% of the Debtors' Second Lien Notes Claims entered into a restructuring support agreement (the "***Restructuring Support Agreement***") with the Debtors, a copy of which is attached hereto as **Exhibit B**.  Under the terms of the Restructuring Support Agreement, the Second Lien Noteholders who are, or later become, signatories to the Restructuring Support Agreement have agreed to a deleveraging transaction that would restructure the existing debt obligations of the Debtors in chapter 11 through the Plan (the "***Restructuring***").  The Restructuring is also supported by the Bureau of Ocean Energy Management ("***BOEM***") insofar as the Debtors represent that the Restructuring will permit the Debtors (and the Reorganized Debtors) to meet their obligations as offshore lessees and operators, including those obligations relating to financial assurance and decommissioning.

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes:  (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* Section V—Summary of the Plan below.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Payment in full in Cash or such other treatment as may be agreed to by the holder, the Debtors, and the Majority Restructuring Support Parties | Unimpaired | Presumed to Accept | 100% |

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

1

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|-------|--------------------------|-----------|------------------------|---------------|--------------------|
| 2 | Other Secured Claims | Payment in full in Cash, Reinstatement, return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or such other treatment as may be agreed to by the holder, the Debtors, and the Majority Restructuring Support Parties | Unimpaired | Presumed to Accept | 100% |
| 3 | Secured Tax Claims | Payment in full in Cash, Reinstatement, return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or such other treatment as may be agreed to by the holder, the Debtors, and the Majority Restructuring Support Parties | Unimpaired | Presumed to Accept | 100% |
| 4 | EXXI Holdings Promissory Note Claims | Reinstated | Unimpaired | Presumed to Accept | 100% |
| 5 | First Lien Claims | Letters of credit other than the Exxon LCs shall be Reinstated, the Exxon LCs shall be Reinstated in accordance with that certain letter agreement dated April 27, 2016, and holders shall receive their *pro rata* share of (x) the Restricted Cash and (y) the Reorganized Debtors' obligations under the Exit Facility | Impaired | Entitled to Vote | 100% |
| 6 | Second Lien Notes Claims | *Pro rata* share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package | Impaired | Entitled to Vote | 24.8 – 36.6%[3] |
| 7 | EGC Unsecured Notes Claims | *Pro rata* share of the EGC Warrant Package Allocation; *provided, however* that if Class 7 votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan | Impaired | Entitled to Vote | 1.2 – 4.6% |
| 8 | EPL Unsecured Notes Claims | *Pro rata* share of the EPL Warrant Package Allocation; *provided, however* that if Class 8 votes to reject the Plan, holders of EPL Unsecured Notes Claims will not receive a distribution under the Plan | Impaired | Entitled to Vote | 0.2 – 0.9% |

---

[3]     The Second Lien Notes Claims include any Claim against the Debtors on account of the Second Lien Notes, including the Second Lien Notes Deficiency Claim and Second Lien Notes Guaranty Claim.  The projected recovery to holders of Second Lien Notes is approximately 1.2-4.6% on account of the Second Lien Notes Deficiency Claim and 0.2-0.8% on account of the Second Lien Notes Guaranty Claim.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Voting Rights | Approx. % Recovery |
|---|---|---|---|---|---|
| 9 | EXXI Convertible Notes Claims | *Pro rata* share of the EXXI Warrant Package Allocation; *provided*, *however* that if Class 9 votes to reject the Plan, holders of EXXI Convertible Notes Claims will not receive a distribution under the Plan | Impaired | Entitled to Vote | 0.2 – 0.8% |
| 10 | Trade Claims | At the holder's election, either (A) such holder's Trade Claim Settlement Distribution (which election shall constitute the Trade Claim Settlement Release), which will be paid on the later of (i) the Effective Date and (ii) the date such Trade Claim becomes allowed or (B) Cash in the amount of its Secured Allowed Trade Claim (only to the extent the Bankruptcy Court or such other court of competent jurisdiction enters a Final Order finding that such Allowed Trade Claim is Secured), which will be paid in two parts, first on or about the date such Trade Claim is determined to be Secured pursuant to a Final Order, and then on the last Business Day of the following calendar quarter. | Impaired | Entitled to Vote | 75 – 100% |
| 11 | General Unsecured Claims | [▲]*Pro rata* share of the General Unsecured Claims Distribution | Impaired | Entitled to Vote | 0.2 – 4.6% |
| 12 | Section 510(b) Claims | No distribution | Impaired | Not Entitled to Vote | 0% |
| 13 | Intercompany Claims | Reinstated, or at the Reorganized Debtors' option cancelled | Unimpaired / Impaired | Not Entitled to Vote | N/A |
| 14 | Intercompany Interests | Reinstated, or at the Reorganized Debtors' option cancelled | Unimpaired / Impaired | Not Entitled to Vote | N/A |
| 15 | EXXI Interests | Extinguished | Impaired | Deemed to Reject | 0% |

All holders of Claims are encouraged to read Section V—Summary of the Plan below in its entirety, but certain important features of the treatment of Claims and Interests are highlighted here:

- Holders of Class 7 EGC Unsecured Notes Claims shall receive their *pro rata* share of the EGC Warrant Package Allocation if the class of Class of EGC Unsecured Notes Claims votes to accept the Plan. **If the class of EGC Unsecured Notes Claims votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan.**

- Holders of Class 8 EPL Unsecured Notes Claims shall receive their *pro rata* share of the EPL Warrant Package Allocation if the class of Class of EPL Unsecured Notes Claims votes to accept the Plan. **If the class of EPL Unsecured Notes Claims votes to reject the**

**Plan, holders of EPL Unsecured Notes Claims will not receive a distribution under the Plan.**

- Holders of Class 9 EXXI Convertible Notes Claims shall receive their *pro rata* share of the EXXI Warrant Package Allocation if the class of Class of EXXI Convertible Notes Claims votes to accept the Plan. **If the class of EXXI Convertible Notes Claims votes to reject the Plan, holders of EXXI Convertible Notes Claims will not receive a distribution under the Plan.**

- A holder of a Class 10 Trade Claim may elect to receive such holder's Trade Claim Settlement Distribution, which will be paid on the later of (i) the Effective Date and (ii) the date such Trade Claim becomes allowed. If the holder of a Trade Claim elects to receive such holder's Trade Claim Settlement Distribution, (a) such election shall constitute the Trade Claim Settlement Release and (b) such holder shall be deemed to assign its Trade Claims to the Reorganized Debtors.

- If a holder of a Class 10 Trade Claim elects not to receive the Trade Claim Settlement Distribution, the holder will receive Cash in the amount of its Secured Allowed Trade Claim only to the extent the Bankruptcy Court or such other court of competent jurisdiction enters a Final Order finding that such Allowed Trade Claim is Secured.  The Cash will be paid in two parts, first on or about the date such Trade Claim is determined to be Secured pursuant to a Final Order, and then on the last Business Day of the following calendar quarter.

**WHERE TO FIND ADDITIONAL INFORMATION**:  Energy XXI currently files annual, quarterly and current reports, proxy statements, and other information with the Securities and Exchange Commission (the "*SEC*").  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  The information included in the following filings incorporated by reference is deemed to be part of this Disclosure Statement, except for any information superseded or modified by information contained expressly in this Disclosure Statement.  You should not assume that the information in this Disclosure Statement is current as of any date other than the date on the first page of the Disclosure Statement.  Any information Energy XXI files under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1933, as amended, that updates information in the filings incorporated by reference will update and supersede that information:

- Annual Report on Form 10-K for the fiscal year ended June 30, 2015, filed on September 29, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015, filed on November 9, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2015, filed on February 16, 2016;

- Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2016, filed on May 10, 2016; and

- Current Reports on Form 8-K filed October 15, 2015, March 1, 2016, March 4, 2016, March 7, 2016, March 15, 2016, April 14, 2016, April 20, 2016, and May 18, 2016.

**DECIDING HOW TO VOTE ON THE PLAN**:  All holders of Claims are encouraged to read this Disclosure Statement, its exhibits, and the Plan carefully and in their entirety before, if applicable, deciding to vote either to accept or to reject the Plan.  This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan and developments concerning the Chapter 11 Cases.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE **VOTING DEADLINE OF [\_\_:\_\_] A.M./P.M., PREVAILING CENTRAL TIME, ON [\_\_\_\_], 2016**, UNLESS EXTENDED BY THE DEBTORS.  IF YOU HOLD YOUR CLAIMS THROUGH A NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE FOR RETURNING YOUR VOTING INSTRUCTIONS. UNLESS OTHERWISE INSTRUCTED, PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE OR YOUR VOTE WILL NOT BE COUNTED.

**EACH BALLOT ADVISES THAT CREDITORS WHO (A) VOTE TO ACCEPT THE PLAN OR (B) DO NOT VOTE OR VOTE TO REJECT THE PLAN AND DO NOT ELECT TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS SET FORTH IN ARTICLE VIII OF THE PLAN AND UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CAUSES OF ACTION.  CREDITORS WHO DO NOT GRANT THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN WILL NOT RECEIVE THE BENEFIT OF THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN.**

ARTICLE IX OF THIS DISCLOSURE STATEMENT PROVIDES ADDITIONAL DETAILS AND IMPORTATION INFORMATION REGARDING VOTING PROCEDURES AND REQUIREMENTS.  PLEASE READ ARTICLE IX OF THIS DISCLOSURE STATEMENT CAREFULLY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

> **THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.  THE DEBTORS AND THE AD HOC COMMITTEE OF SECOND LIEN NOTEHOLDERS BELIEVE THAT THE PLAN MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND REPRESENTS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  FURTHER, THE PLAN HAS THE SUPPORT OF BOEM, A SIGNIFICANT PARTY IN INTEREST IN THESE CHAPTER 11 CASES.**

## II. OVERVIEW OF THE DEBTORS' OPERATIONS

### A.     The Debtors' Business

Energy XXI is a publicly-traded, independent oil and natural gas exploration and production company founded by John D. Schiller, Jr. and two other investors.  Energy XXI and the other debtors , all of which are indirect wholly-owned domestic subsidiaries of Energy XXI, (collectively, the "***Company***") historically have engaged in the acquisition, exploration, development, and operation of oil and natural gas properties primarily offshore on the Gulf of Mexico Shelf (the "***GoM Shelf***"), as well as onshore in Louisiana.  Headquartered in Houston, Texas, the Debtors currently employ approximately 250 full-time employees, and utilize the services of an additional 1,000 specialized and trained field workers and

engineers through third-party service providers.  Based on production volume, the Debtors are one of the largest publicly-traded, independent operators on the GoM shelf.

As of March 31, 2016, the Company reported total assets of approximately $1.20 billion on its unaudited consolidated balance sheet, of which approximately $317 million were current assets.  The remaining $885 million in reported assets related primarily to oil and gas properties, other property and equipment, restricted cash, and other assets.   The Company reported consolidated net losses of approximately $1.72 billion for the nine months ended March 31, 2016.

### B.    The Debtors' History

Energy XXI was founded in July 2005 as an exempted company under the laws of Bermuda to serve as a vehicle for the acquisition of oil and gas reserves and related assets.  Since Energy XXI's formation, it has completed acquisitions and divestitures for aggregate cash consideration of more than $5 billion.  Energy XXI's most recent acquisitions are highlighted below.

#### 1.    *EPL Acquisition*

Energy XXI's most recent significant acquisition was of EPL Oil & Gas, Inc., a Delaware corporation ("***EPL***").  The EPL acquisition was completed on June 3, 2014, just before the precipitous decline in oil and gas prices, for approximately $2.3 billion, including the assumption of EPL debt.[34]  The EPL acquisition involved a merger whereby EPL became a wholly-owned subsidiary of Energy XXI Gulf Coast, Inc., a Delaware corporation and indirect wholly-owned subsidiary of Energy XXI ("***EGC***").  The assets acquired in the EPL acquisition are located on the GoM Shelf.

In connection with the EPL acquisition, each EPL stockholder had the right to elect to receive, for each share of EPL common stock held by that stockholder:  (a) cash, (b) Energy XXI common stock, or (c) a combination of cash and Energy XXI common stock.   Approximately 65% of the aggregate merger consideration was paid in cash and approximately 35% was paid in Energy XXI common stock.

Additionally, in connection with the acquisition of EPL, the Company's First Lien Credit Agreement was amended on September 5, 2014 (the "***Ninth Amendment***").  The Ninth Amendment increased the borrowing base under the First Lien Credit Agreement from $1.2 billion to $1.5 billion and established a separate sub-facility for EPL with a borrowing base of $475 million.[45]  At the time of the EPL acquisition, EPL had $510 million in aggregate principal amount of 8.25% senior unsecured notes due February 15, 2018, which were left in place at EPL post-merger, and as a result, became a part of the Company's capital structure.  As further described herein, this structure has resulted in debt obligations at both EPL and EGC[56] on account of EPL's assets.

---

[34]     In connection with the closing of the EPL transaction, EPL acquired an asset package consisting of certain shallow-water central GoM Shelf oil and natural gas interests in the South Pass 49 field from Energy XXI GOM for cash consideration of approximately $230 million.

[45]     The First Lien Credit Agreement was further amended, to among other things reduce the overall borrowing base and the EPL sub-facility, but the concept of an EPL sub-facility remains in place.

[56]     Energy XXI is also the obligor on certain senior unsecured convertible notes, which remain outstanding.

2.  *M21K Acquisition*

Energy XXI GOM, LLC, a Delaware limited liability company and indirect wholly-owned subsidiary of Energy XXI ("***Energy XXI GOM***") completed the acquisition of M21K, LLC ("***M21K***") in August 2015, pursuant to a stock purchase agreement whereby Energy XXI GOM acquired all of the remaining equity interests of M21K for consideration consisting of the assumption of all obligations and liabilities of M21K, including approximately $25.2 million associated with M21K's first lien credit facility, which was required to be paid at closing. Prior to this transaction, Energy XXI had owned a 20% interest in M21K though its investment in Energy XXI M21K, LLC.

C.    **The Debtors' Corporate Structure**

All of the Debtors are direct or indirect subsidiaries of Energy XXI. The Company's full corporate organization structure is detailed on **Exhibit C**, attached hereto. The following simplified organization chart depicts the Company's main business silos:

D.    **The Debtors' Operations**

The Company is primarily an oil-focused company, with more than 740,000 acres of leasehold interests. To that end, the Company owns and operates nine of the largest GoM Shelf oil fields ranked by total production: the West Delta 73 Field, the West Delta 30 Field, the South Timbalier 54 Field, the Grand Isle 16/18 Fields, the Main Pass 61/78 Fields, the Ship Shoal 208 Field, the South Pass 49 Field, the South Pass 78 Field, and the South Timbalier 21/54 fields.

Because the Company operates approximately 97% of its proved reserves, it is able to exercise significant control over the optimization of production, the timing and amount of capital expenditures, as well as the costs of its projects. Further, the Company's geographic concentration in the GoM Shelf enables the Company to realize cost synergies and more efficiently service its operations.

The Company markets substantially all of the oil and natural gas production from the properties it operates. The majority of this production is sold to a variety of purchasers under short-term contracts (less than 12 months) at market-based prices. As of the Petition Date, the Company's largest customers—Shell Trading Company, Chevron USA, and Trafigura Trading, LLC—accounted for approximately 75% of the Company's total oil and natural gas revenues.

Because the Company's revenues from production are driven largely by market-based prices, the Company historically has entered into hedging transactions to protect against fluctuations in commodity prices. These transactions have included pricing collars (a combination put and call option that locks in a fixed price range), puts and put spreads, and swap transactions. For the calendar year 2016, the Company had entered into oil price collars covering 14,000 barrels per day, as well as monthly three-way natural gas collars. These hedging transactions were terminated and monetized in March 2016 in connection with a waiver and amendment to the First Lien Credit Agreement. As of the Petition Date, the Company did not have any open hedge transactions.

The Company's operations are concentrated at three entities, Energy XXI GOM, LLC, a subsidiary of EGC, M21K, and EPL. Debtor Energy XXI Services, LLC ("***EXXI Services***") provides certain shared services to these entities and others, including management, legal, accounting, corporate secretarial, human resources, employee benefit administration, office space and other furniture and equipment management, and other support services. The costs of the services provided by EXXI Services are charged to certain of

the other Debtors who utilize the services pursuant to an intercompany services and cost allocation agreement, dated June 3, 2014.  For example, in the three months ended December 31, 2015 approximately $9 million was allocated to EPL, of which approximately $7.5 million was included in general and administrative expense.

### E.    Regulation of the Debtors' Business

#### 1.    *Outer Continental Shelf Regulations*

The Company's operations on the GoM Shelf include a substantial number of oil and gas leases issued by the U.S. Department of the Interior.  Operation of these leases is subject to regulation by ~~the Bureau of Ocean Energy Management ("*BOEM*")~~BOEM and the Bureau of Safety and Environmental Enforcement ("*BSEE*"), and requires compliance with BOEM and BSEE regulations and orders issued pursuant to various federal laws, including the Outer Continental Shelf Lands Act.  For offshore operations, lessees must obtain BOEM approval for exploration, development and production plans prior to the commencement of such operations.  In addition to permits required from other agencies such as the U.S. Environmental Protection Agency, lessees must obtain a permit from BSEE prior to commencing drilling and comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, plugging and abandonment of wells on the Outer Continental Shelf (the "*OCS*"), and removal of infrastructure facilities.

To cover the various obligations of lessees on the OCS, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production, BOEM generally requires that lessees post substantial bonds or provide other acceptable assurances that such obligations will be met, unless BOEM exempts the lessee from such financial assurance requirements.  In order to demonstrate its financial capability and provide assurances to BOEM, the Company is required to, among other things, provide surety bonds.  As of the Petition Date, the Debtors had approximately $388 million in outstanding surety bonds, of which approximately $226 million are lease and/or area bonds issued to BOEM and the remainder to third parties.  Additionally, Energy XXI GOM has delivered $225 million in issued, undrawn letters of credit in favor of Exxon Mobil Corporation ("*Exxon*"), the purpose of which is to guarantee any actual plugging and abandonment expenditures with respect to certain properties that Energy XXI GOM purchased from Exxon.[67]  Because the Company would be unable to operate its federal leases without satisfying its financial assurance obligations to BOEM, the Company's surety bond program is vitally important to its operations.

#### 2.    *BOEM Long Range Plan*

In April 2015, the Company received letters from BOEM stating that certain of its subsidiaries no longer qualified for the waiver of certain supplemental bonding requirements for potential offshore decommissioning and plugging and abandonment liabilities, and instead would be required to develop a tailored, long-term financial assurance plan to satisfy BOEM's new Notice to Lessees, or NTL, regarding financial assurances.  The letters notified Energy XXI that certain of its subsidiaries would be required to provide approximately $1.0 billion in supplemental financial assurance and/or bonding for their offshore oil and gas leases, rights-of-way, and rights-of-use and easements.  In June 2015, the Company reached an

---

[67]    Under a purchase and sale agreement dated December 1, 2010, Energy XXI GOM was required to deliver to Exxon three $75 million letters of credit to guarantee Energy XXI GOM's plugging and abandonment obligations with respect to the purchased properties.  These letters of credit will be re-determined at three year intervals such that the next redetermination will commence thirty days prior to the date that is three years from the Effective Date.

interim agreement with BOEM, whereby it provided $150.0 million of supplemental bonds issued to BOEM.

In October 2015, the Company received information from BOEM indicating that the Company could receive additional demands of supplemental financial assurance for amounts in addition to the $1.0 billion initially sought by the BOEM in April 2015, primarily relating to certain properties that were no longer exempt from supplemental bonding as a result of co-lessees losing their exemptions. After receiving this additional information from BOEM in October 2015, the Company had a series of discussions and exchanges of information with BOEM on the long-term financial assurance plan. In November 2015, Energy XXI submitted an initial proposal for a long-term plan to BOEM, and received a counter proposal at the end of the month. While the Company continued to work with BOEM on a long-term plan, the Company provided an additional $21 million of supplemental bonds to BOEM in December 2015.

The Company's discussions with BOEM culminated in the Company's submission of an updated version of the long-term financial assurance plan to BOEM for approval on February 2, 2016. BOEM accepted the revised plan on February 25, 2016. The long-term plan does not require any immediate additional bonding, but prior to July 1, 2016 the Company must develop a plan with respect to providing financial assurance for certain properties with co-lessees, as well as comply with certain other insurance and financial security obligations.

As noted in the Restructuring Support Agreement, it is anticipated that the Debtors will continue to (a) fund and perform plugging and abandonment work as contemplated in their Iron Idle Plan and (b) perform their obligations under that certain Long Range Plan agreed to between the Company and BOEM and dated February 25, 2016 during the pendency of the chapter 11 cases and in connection with consummation of the Restructuring.

### F.   Directors and Officers

Energy XXI's current board of directors is composed of James LaChance, Chairman, William Colvin, Cornelius Dupré, II, Hill A. Feinberg, Kevin Flannery, Scott A. Griffiths, and John D. Schiller, Jr.

EGC's current board of directors is composed of Bruce W. Busmire, John D. Schiller, Jr. and George C. Morris. Mr. Morris was appointed on March 29, 2016 as an additional member of the EGC board of directors, and as the sole member of an independent Special Committee of the EGC Board, was tasked with reviewing and evaluating, in connection with any potential restructuring transaction, the treatment of the EGC Unsecured Notes and the Second Lien Notes, the treatment of the EGC Intercompany Note, and any matters on which an actual conflict exists between EGC and its subsidiaries (other than EPL and its subsidiaries), on the one hand, and Energy XXI or its direct and indirect subsidiaries (with the exception of EGC and its direct subsidiaries, other than EPL and its subsidiaries), on the other hand.

EPL's current board of directors is composed of Bruce W. Busmire, John D. Schiller, Jr. and James R. Latimer, III. Mr. Latimer was appointed on March 8, 2016 as an additional member of the EPL board of directors, and as the sole member of an independent Special Committee of the EPL Board, is tasked with reviewing and evaluating, in connection with any potential restructuring transaction, the treatment of the EPL Unsecured Notes, the treatment of the EGC Intercompany Note, and any matters on which an actual conflict exists between EPL and any of the other Debtors.

Energy XXI's current senior management team is composed of John D. Schiller, Jr., President and Chief Executive Officer; Bruce W. Busmire, Chief Financial Officer; Antonio de Pinho, Chief Operating Officer; Hugh Menown, Executive Vice President and Chief Accounting Officer; Keith Acker, Senior Vice President—Production; Tom O'Donnell, Senior Vice President—Exploitation & Exploration; Kamil

Lodhi, Senior Vice President—Corporate Planning and Business Development; Bo Boyd, Senior Vice President—Legal & Corporate Secretary; Rick Fox, Senior Vice President—Controller; Kerry McDonough, Senior Vice President—Human Resources and Administration; Glen Priestley, Vice President—Treasury.

The composition of the board of directors and identity of the officers of each Reorganized Debtor, as well as the nature of any compensation to be paid to any director or officer who is an "insider" under the Bankruptcy Code, will be disclosed prior to the entry of the order confirming the Plan in accordance with 11 U.S.C. § 1129(a)(5).

### G.   The Debtors' Capital Structure

#### 1.   *Equity Ownership*

##### (a)   Preferred Stock

As of March 31, 2016, Energy XXI had issued and outstanding approximately 692,450 shares of 5.625% Perpetual Convertible Preferred Stock and approximately 3,000 shares of 7.25% Perpetual Convertible Preferred Stock (collectively, the "***Preferred Stock***"). Dividends on all Preferred Stock are payable quarterly and may be payable in cash, shares of common stock, or a combination thereof. In the event of a liquidation, winding-up or dissolution of the Company, holders of the Preferred Stock are entitled to receive a liquidation preference of $250 and $100 per share, respectively, plus any accumulated or accrued dividends to be paid out of the assets of the Company available for distribution before any payment is made to the Company's common stockholders. At the close of the quarter ended March 31, 2016, the Company suspended the quarterly dividends on its Preferred Stock.

##### (b)   Common Stock

As of the Petition Date, the Company has 97,507,056 outstanding shares of common stock, par value $0.005 per share. Since August 2007, the ordinary shares of Energy XXI have been traded on the NASDAQ Global Select Market (the "***NASDAQ***") under the symbol "EXXI." On April 14, 2016, Energy XXI received a letter from The NASDAQ Listing Qualifications Staff stating that the Staff had determined that the Company's securities would be delisted from NASDAQ. The decision was reached by the Staff under NASDAQ Listing Rules 5101, 5110(b) and IM-5101-1 as a result of the Company's announcement that it filed the Petitions (as defined below), the associated public interest concerns raised by the Petitions, concerns regarding the residual equity interest of the existing listed securities holders and concerns about the Company's ability to sustain compliance with all requirements for continued listing on NASDAQ. The trading of the Company's common stock was suspended at the opening of business on April 25, 2016, and a Form 25-NSE was filed with the SEC on May 19, 2016, which removed Energy XXI's securities from listing and registration on NASDAQ. The Company's common stock resumed trading on the OTC Markets Group Inc.'s OTC Pink (the "***OTC Pink***") under the symbol "EXXIQ" on April 25, 2016.

#### 2.   *Prepetition Secured Indebtedness*

##### (a)   Revolving Credit Facility

EGC and EPL are borrowers under that certain Second Amended and Restated First Lien Credit Agreement dated as of May 5, 2011 (as amended, the "***First Lien Credit Agreement***"), between EGC, EPL, the lenders party thereto (the "***First Lien Lenders***"), and Wells Fargo Bank, N.A., as administrative agent (the "***First Lien Agent***").

The reserve-based revolving credit facility (the "***Revolving Credit Facility***") under the First Lien Credit Agreement, as amended, has a maximum facility amount and borrowing base of approximately $327.1 million.  Approximately $99.4 million of the total borrowing base is allocated to the sub-facility established for EPL under the First Lien Credit Agreement.  The remaining approximately $227.7 million borrowing base at EGC is undrawn, but committed for issued and outstanding undrawn letters of credit, including $225 million in issued, undrawn letters of credit in favor of Exxon.  Accordingly, as of the Petition Date, there was no availability to draw on the Revolving Credit Facility.  The Revolving Credit Facility bears interest on the funded amount at a base rate of 6.25%.

EGC's obligations under the Revolving Credit Facility are guaranteed by each of EGC's subsidiaries, other than EPL and its subsidiaries, and Energy XXI USA, Inc. on a limited recourse basis.  EPL's obligations under the Revolving Credit Facility are guaranteed by EGC and each of its subsidiaries (other than EPL itself), and Energy XXI USA, Inc. on a limited recourse basis.  The Revolving Credit Facility generally is secured by a first priority lien and security interests on substantially all assets and capital stock of EGC and its subsidiaries (except that EPL and its subsidiaries do not provide security for EGC's obligations, only EPL's obligations), including a security interest in EGC's cash on hand and real property mortgages on at least 90% of the value of each of the proved reserves and proved developed producing reserves of EGC and its subsidiaries.

### (b)  Second Lien Notes

On March 12, 2015, EGC issued $1.45 billion aggregate principal amount of senior secured second lien notes due March 15, 2020 (the "***Second Lien Notes***").  The Second Lien Notes were issued under the indenture dated March 12, 2015 (the "***Second Lien Indenture***"), among EGC, as issuer, the guarantors, and U.S. Bank National Association, as trustee.  Interest under the Second Lien Notes is payable semi-annually in March and September, subject to a 30-day grace period.

The Second Lien Notes are guaranteed by Energy XXI, Energy XXI USA, Inc. on a limited recourse basis, MS Onshore, LLC, and Energy XXI GOM and its subsidiaries.  EPL and its subsidiaries are not guarantors of the Second Lien Notes.  The Second Lien Notes are secured by second-priority liens on substantially all assets of EGC and its subsidiaries (other than EPL and its subsidiaries) and all of Energy XXI USA, Inc.'s equity interest in EGC, in each case to the extent such assets secure the Revolving Credit Facility.

### (c)  EGC Intercompany Note

In connection with the offering of the Second Lien Notes, on March 12, 2015, EGC provided a $325 million secured second lien loan under a promissory note between EPL, as the maker, and EGC, as the payee (the "***EGC Intercompany Note***").  The EGC Intercompany Note bears interest at an annual rate of 10%, has a maturity date of October 9, 2018, and is secured by a second priority lien on certain assets of EPL that secure EPL's obligations under the First Lien Credit Agreement.

### (d)  Unencumbered Assets

The First Lien Lenders and Second Lien Noteholders do not have security interests in all of the Company's assets.  In particular, certain assets are either not part of the collateral package for either the First Lien Lenders or Second Lien Noteholders, are part of the collateral package, but such interest has not been perfected, or are assets pledged to other entities as collateral.  These unencumbered assets include (a) the Intercompany Note, which is not part of the First Lien Lenders' or Second Lien Noteholders' collateral package; (b) approximately $22.3 million in cash deposited in accounts that are not part of the collateral package; (c) certain real property interests not subject to mortgages or otherwise not perfected; (d)

11

commercial tort claims (if any), security interests in which have not been perfected; and (e) other personal property that is not part of the First Lien Lenders' or Second Lien Noteholders' collateral package.

### 3. *Prepetition Unsecured Indebtedness*

#### (a) 9.25% Senior Notes

EGC is party to that certain Senior Notes Indenture, dated as of December 17, 2010, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 9.25% Senior Notes due December 15, 2017 in the aggregate principal amount of $750 million (the "***9.25% Senior Notes***").

Interest under the 9.25% Senior Notes is payable semi-annually in June and December, subject to a 30-day grace period. The 9.25% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries. As of the Petition Date, a total of approximately $249.45 million in face amount of the 9.25% Senior Notes was outstanding

#### (b) 7.75% Senior Notes

EGC is party to that certain Senior Notes Indenture, dated as of February 25, 2011, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 7.75% Senior Notes due February 25, 2011 in the aggregate principal amount of $250 million (the "***7.75% Senior Notes***").

Interest under the 7.75% Senior Notes is payable semi-annually in June and December, subject to a 30-day grace period. The 7.75% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries. As of the Petition Date, a total of approximately $101.08 million in face amount of the 7.75% Senior Notes was outstanding.

#### (c) 7.50% Senior Notes

EGC is party to that certain Senior Notes Indenture, dated as of September 26, 2013, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 7.50% Senior Notes due December 15, 2021 in the aggregate principal amount of $500 million (the "***7.50% Senior Notes***").

Interest under the 7.50% Senior Notes is payable semi-annually in June and December, subject to a 30-day grace period. The 7.50% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries. As of the Petition Date, a total of approximately $238.07 million in face amount of the 7.50% Senior Notes was outstanding.

#### (d) 6.875% Senior Notes

EGC is party to that certain Senior Notes Indenture, dated as of May 27, 2014, by and among EGC, as issuer, each of the guarantors named therein, and Wilmington Trust, National Association, as successor trustee, pursuant to which the Company issued 6.875% Senior Notes due March 15, 2024 in the aggregate principal amount of $650 million (the "***6.875% Senior Notes***").

Interest under the 6.875% Senior Notes is payable semi-annually in March and September, subject to a 30-day grace period. The 6.875% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by Energy XXI and EGC's subsidiaries, other than EPL and its subsidiaries. As of the

Petition Date, a total of approximately $143.99 million in face amount of the 6.875% Senior Notes was outstanding.

### (e)  8.25% Senior Notes

On June 3, 2014, at the time of the EPL acquisition, the Company added EPL's pre-existing $510 million in aggregate principal amount of 8.25% senior unsecured notes due February 15, 2018 (the "***EPL Unsecured Notes***") under the Indenture dated as of February 14, 2011, by and among EPL, each of the guarantors named therein, and Delaware Trust Company, as successor trustee (the "***EPL Indenture***") to its capital structure.

Interest under the EPL Unsecured Notes is payable semi-annually in February and August, subject to a 30-day grace period.  The EPL Unsecured Notes are fully and unconditionally guaranteed on an unsecured senior basis by EPL's existing and future subsidiaries.  As of Petition Date, a total of approximately $213.68 million in face amount of the EPL Unsecured Notes was outstanding.

### (f)  3.0% Senior Convertible Notes

Energy XXI is party to that certain Senior Notes Indenture, dated as of May 27, 2014, among Energy XXI and Wilmington Savings Fund Society, FSB, as successor trustee, pursuant to which the Company issued 3.0% Senior Notes due December 15, 2018 in the aggregate principal amount of $400 million (the "***Convertible Notes***").  The Convertible Notes are convertible into cash, shares of common stock, or a combination of cash and shares of common stock, at the election of Energy XXI.

Prior to the Petition Date, certain holders of the Convertible Notes exercised their conversion rights and Energy XXI elected to convert their Convertible Notes into shares of common stock.  As of the Petition Date, a total of approximately $363.02 million in face amount of the Convertible Notes was outstanding.

### (g)  Trustee Succession

On March 30, 2016, Wilmington Trust, National Association, the successor trustee, replaced Wells Fargo Bank, National Association, the resigning trustee, as the trustee, registrar, paying agent, notes custodian, and conversion agent with respect to:  (i) the Second Lien Notes, (ii) the 9.25% Senior Notes, (iii) the 7.75% Senior Notes, (iv) the 7.50% Senior Notes, and (v) the Convertible Notes.

On May 3, 2016, Wilmington Savings Fund Society, FSB, the successor trustee, replaced Wilmington Trust, National Association as the trustee, and as of June 1, 2016, as registrar, paying agent, notes custodian and conversion agent on the Convertible Notes.

On May 17, 2016, Delaware Trust Company, the successor trustee, replaced U.S. Bank National Association as the trustee, registrar, paying agent and notes custodian on the EPL Unsecured Notes.

### (h)  Performance Bonds

As of the Petition Date, the Debtors have approximately $388 million in outstanding surety bonds, of which approximately $226 million are lease and/or area bonds issued to BOEM, and the remainder to third parties.  In connection with these bonds, certain of the Company's sureties have required collateral to be posted pursuant to the terms of certain indemnity agreements between the sureties and the Company.  As of the Petition Date, the Company had posted collateral totaling approximately $41.75 million.  The Company has not posted any additional collateral since the Petition Date.

## III.  KEY EVENTS LEADING TO CHAPTER 11 CASES

### A.  Commodities Downturn and Industry Distress

The Company's revenue streams, earnings, and cash flows have been significantly impacted by the sustained decrease in commodity prices since the second-half of calendar year 2014.  The scale of the oil price decline cannot be overstated.  Indeed, since July 2014, NYMEX-WTI oil prices have dropped nearly 65%—from approximately $105 a barrel as of July 1, 2014 to $36.79 a barrel as of April 1, 2016.[78]  Over the same period, Henry Hub spot prices for natural gas fell from approximately $4.45 per MMBtu to below $1.96 per MMBtu.[89]

These market conditions have affected oil and gas companies at every level, but exploration and production ("**E&P**") companies have been hit particularly hard.  In the United States, 35 E&P companies, with cumulative debt of nearly $18 billion, filed for bankruptcy protection between July 2014 and December 2015.[910]  And, since the start of the year through May 1, 2016, more than 25 additional independent E&P companies have filed for chapter 11, including, among others, Antero Energy Partners, LLC, Emerald Oil, Inc., Linn Energy LLC, Midstates Petroleum Company, Inc., New Source Energy Partners, LP, Osage Exploration and Development, Inc., Pacific Exploration & Production Corp., Penn Virginia Corp., Ultra Petroleum Corp., and Venoco, Inc.

With the continued market instability, numerous E&P companies have been forced to stop drilling new wells—the core of an E&P company's business—and cut capital expenditures, as it is not economically feasible to undertake capital intensive projects at current prices.[1011]  Others have been forced to sell off assets at severe discounts, or even stop operations altogether.  As outlined below, the Company took proactive steps to stave off such an outcome.  Notwithstanding these proactive initiatives, however, the Company along with the independent directors at EGC and EPL determined that commencing chapter 11 cases to implement the restructuring contemplated by the Restructuring Support Agreement will maximize value for its stakeholders.

### B.  Deleveraging Initiatives

Prior to the Petition Date, the Company initiated a series of operational and financial actions in reaction to the substantial and rapid decline of commodity prices, and with the goal of improving its liquidity position.  Early initiatives included:

- issuing the Second Lien Notes to reduce certain funded debt obligations and add incremental liquidity to the Company's balance sheet;

---

[78]    Source:  Bloomberg.

[89]    *Id.*

[910]    *See* DELOITTE CENTER FOR ENERGY SOLUTIONS, THE CRUDE DOWNTURN FOR EXPLORATION & PRODUCTION COMPANIES    4    (2016),    *available    at* http://www.deloitte.com/ru/en/pages/energy-and-resources/articles/2016/the-crude-downturn-exploration-production.html#.

[1011]    *See, e.g.*, Tess Stynes, *Anadarko Slashes Capital Spending Budget for 2016*, WALL STREET J., Mar. 1, 2016, http://www.wsj.com/articles/anadarko-slashes-capital-spending-budget-for-2016-1456846896.

- revising the original budget for the fiscal year ended June 30, 2015 of $850-$950 million (established in July 2014) several times between November 2014 and the fourth fiscal quarter to $640-$660 million.[11][12]

- reducing the fiscal year 2016 capital budget to a planned amount of $155-$160 million, as compared to actual capital expenditures in fiscal year 2015 (excluding acquisition activity) of approximately $649 million;[12][13]

- reducing field level operating costs, and bringing lease operating costs per barrel down by 34% from first quarter of fiscal year 2015 to second quarter of fiscal year 2016;

- suspending dividends on common stock and preferred stock;

- exploring various exchange offer opportunities;

- executing non-disclosure agreements and participating in discussions with numerous financial investors regarding potential out-of-court third-party financing or refinancing transactions;

- negotiating with the First Lien Lenders for temporary relief from certain financial covenants under the First Lien Credit Agreement;

- completing asset sales; and

- repurchasing notes at significant discounts to principal amounts in open market transactions.

### C.   Restructuring Negotiations

Given the uncertainty regarding future commodity prices, continued price declines, and the Company's unsustainable capital structure, Energy XXI's board of directors (the "***Board***") determined to hire PJT Partners LP ("***PJT***") and Vinson & Elkins LLP ("***V&E***") in February 2016 to explore additional strategic alternatives.  At this time, the Company and its advisors also began discussions with the First Lien Lenders and certain Second Lien Noteholders.  As the Debtors continued to evaluate all options and alternatives, the Debtors also hired Opportune LLP in February 2016 as restructuring advisor.

With the help of its advisors, the Company employed several additional strategies to ensure that its businesses were best positioned to compete in the offshore E&P industry going forward.  To achieve an orderly restructuring and maximize the value of its businesses, the Company and its advisors took a series of steps in a coordinated manner leading up to the filing of these chapter 11 cases.  These steps included:  (i) entering the grace period with respect to an approximately $8 million interest payment that was due on February 16, 2016 on the EPL Unsecured Notes; (ii) obtaining a waiver with respect to delivery of a compliance certificate under the First Lien Credit Agreement through March 14, 2016, avoiding an immediate event of default under the First Lien Credit Agreement; (iii) progressing restructuring negotiations with the advisors to the Second Lien Noteholders and the ad hoc committee of Second Lien Noteholders (the "***Ad Hoc Committee***"); (iv) appointing independent directors at EGC and EPL to ensure

---

[11][12]   Energy XXI's fiscal year runs from July 1 to June 30 of each year.  The Company is currently in the fourth quarter of fiscal year 2016.

[12][13]   The Debtors have subsequently increased the fiscal year 2016 capital budget.

that the interests of their respective stakeholders were appropriately considered to guarantee a value-maximizing result; (v) making the approximately $8 million interest payment on the EPL Unsecured Notes prior to the expiration of the grace period to provide further time for negotiations with the ad hoc committee of Second Lien Noteholders and the steering committee for the RBL Lenders; (vi) obtaining an extension of the waiver with respect to delivery of a compliance certificate under the First Lien Credit Agreement through April 14, 2016, again avoiding an immediate event of default under the First Lien Credit Agreement; and (vii) entering the grace period with respect to March 15, 2016 interest payments due on the Second Lien Notes and the 6.875% Senior Notes, which totaled more than $85 million and would have significantly impacted the Company's liquidity and ability to proceed in chapter 11 without additional financing. The Company also kept BOEM and other key stakeholders apprised of its actions throughout this period to ensure their cooperation with an orderly bankruptcy case.

### D.      The Restructuring Support Agreement

After extensive, arms'-length negotiations, the Company and the Ad Hoc Committee were able to agree on the terms of a comprehensive restructuring transaction. The key terms of this transaction are embodied in the Restructuring Support Agreement attached hereto as **Exhibit ~~D~~B**, which was signed on April 11, 2016 by the Debtors and a group of Second Lien Noteholders holding approximately 63% of the face value of the Second Lien Notes.

The Debtors entered into the Restructuring Support Agreement only after a robust review process by the members of each of the Debtors' boards of directors. Based upon regular updates to the Boards regarding the status of negotiations between the parties in the period leading up to the commencement of these chapter 11 cases, and upon rigorous review and negotiation of the Restructuring Support Agreement and the Term Sheet by the Boards, including the independent directors at EGC and EPL and their respective legal counsel, the Debtors determined that the terms of the Restructuring Support Agreement represent the best transaction available and will maximize value to all stakeholders.

The Restructuring Support Agreement contemplates that certain restructuring transactions will be implemented in accordance with terms consistent with the term sheet (the "***Term Sheet***") attached to the Restructuring Support Agreement. The key elements of the Term Sheet include:

- ***Reorganized EGC[13][14] becomes the New Parent and issues New Equity***. After the Effective Date, EGC becomes the "New Parent" and is referred to in the Term Sheet as "New Parent" or "Reorganized EGC." On the Effective Date, new common stock in EGC will be issued and distributed (the "***New Equity***"), and the New Parent will hold substantially all of the assets of Energy XXI and its subsidiaries.

- ***Second Lien Noteholders receive the New Equity***. The Second Lien Noteholders will receive 100% of the New Equity, subject to dilution in connection with the Warrant Package and Management Incentive Plan described below.

- ***Unsecured noteholders share in a Warrant Package***. The Warrant Package will consist of warrants equal to an aggregate of up to 10% of the New Equity,[14][15] with a maturity of 10 years and an agreed-upon strike price. The Warrant Package is divisible among the classes

---

[13][14]      The Debtors and the Majority Restructuring Support Parties have reserved the right to cause the New Parent to be an entity other than EGC pursuant to the Restructuring Support Agreement, and  it is possible that Reorganized EGC will not be the New Parent.

[14][15]      This 10% is subject to dilution from the Management Incentive Plan described in the Term Sheet.

of EGC Unsecured Notes Claims, EPL Unsecured Notes Claims, and EXXI Convertible Notes Claims, as defined in the Term Sheet. If, however, any such class votes to reject the Plan, it will not receive a distribution thereunder.

- ***CEO Schiller is retained***. John D. Schiller, Jr. has agreed to remain on the New Parent Board and to serve as the ~~CEO~~chief executive officer (the "*CEO*") of the New Parent.

- ***Energy XXI files a winding-up proceeding in Bermuda***. Energy XXI will file a winding-up petition and commence an official liquidation proceeding in Bermuda under Bermudian law.

- ***Restructuring takes place on an agreed schedule.*** The restructuring transactions will be conducted under a timeline set forth in the Restructuring Support Agreement, which requires the Debtors to file the Plan by May 16, 2016 and the Effective Date to occur no later than September 2, 2016.

- ***Releases***. The Plan will include mutual releases and exculpation provisions in favor of (a) the Debtors and their related persons, professionals, and entities, and (b) the Restructuring Support Parties and their related persons, professionals, and entities.

The Restructuring Support Agreement includes the following key milestones:[~~15~~16]

- no later than May 16, 2016, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; and (iii) a motion (the "***Disclosure Statement and Solicitation Motion***") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***");[~~16~~17]

- no later than May 25, 2016, the Bankruptcy Court shall have entered the Final Cash Collateral Order;

- no later than July 1, 2016, the Bankruptcy Court shall have entered an order authorizing the assumption of the Restructuring Support Agreement;

- no later than July 1, 2016, (i) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion; and (ii) no later than five (5) business days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Debtors shall have commenced solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan;

- no later than August 8, 2016, the Bankruptcy Court shall have commenced the Confirmation Hearing;

- no later than August 19, 2016, the Bankruptcy Court shall have entered the Confirmation Order; and

---

[~~15~~16]  The Restructuring Support Agreement contains additional milestones that have already been satisfied.

[~~16~~17]  This milestone was extended to May 20, 2016.

- no later than September 2, 2016, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "***Effective Date***"), it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Plan and the Term Sheet) shall be conditions precedent to the occurrence of the Effective Date.

It is important to note that the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement.  Specifically, Section 8(c) of the Restructuring Support Agreement provides that each Debtor may terminate its obligations thereunder if its board of directors (or board of managers, as applicable) determines that proceeding with the contemplated restructuring transactions "would be inconsistent with the exercise of its fiduciary duties."

## IV.  DEVELOPMENTS AND ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

Under the Restructuring Support Agreement, the Debtors agreed to commence the Chapter 11 Cases no later than April 14, 2016 (the "***Petition Date***").  The Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 by September 2, 2016.  ***No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.***

### A.    First Day Pleadings

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "***Petitions***"), the Debtors filed several motions (the "***First Day Pleadings***") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, insurers, and taxing authorities, among others, following the commencement of the Chapter 11 Cases.  On April 15, 2016, the Bankruptcy Court entered orders approving the following First Day Pleadings on a final basis:

- *Order Directing Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 23];

- *Order Granting Complex Chapter 11 Bankruptcy Case Treatment* [Docket No. 52];

- *Order (A) Granting Authority to File a Consolidated List of Creditors; (B) Granting Authority to File a Consolidated List of 50 Largest Unsecured Creditors' (C) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (D) Setting Bar Dates* [Docket No. 53];

- *Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 54];

- *Final Order (A) Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (III) Pay Independent Contractor Obligations, and (B) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations* [Docket No. 55];

- *Final Order Authorizing the Payment of Prepetition Taxes and Fees* [Docket No. 57]; and

- *Final Order Providing Adequate Assurance of Utility Payments* [Docket No. 59].

On the same day, the Bankruptcy Court entered orders approving other First Day Pleadings on an interim basis. On April 25, 2016, the Bankruptcy Court entered the *Final Order Authorizing the Debtors to Pay or Honor Prepetition Obligations to Critical Vendors* [Docket No. 136].

On May 19, 2016 and May 23, 2016, the Bankruptcy Court entered orders approving certain First Day Pleadings on a final basis, these included:

- *Final Order Authorizing the Debtors to Pay Prepetition Amounts Arising Under Insurance Policies* [Docket No. XXX346];

- *Final Order Authorizing the Debtors to Pay Prepetition Royalty and Working Interest Obligations, Delay Rentals, Joint Interest Billings, Transportation Costs, and Gas Buybacks* [Docket No. 320];

- *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates* [Docket No. 324]; and

- *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 And 507, Bankruptcy Rules 2002, 4001 and 9014 and Bankruptcy Local Rule 4001-1 (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* [Docket No. 319].

A final hearing on the Debtors' *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (C) Continue Intercompany Arrangements and (II) Granting Related Relief* [Docket No. 10] is currently scheduled for June 23, 2016.

The First Day Pleadings, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://dm.epiq11.com/EnergyXXI.

### B.    Other Administrative Motions and Retention Applications

The Debtors intend to file several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases. The Debtors have also filed the following applications (the "*Retention Applications*") to retain various professionals to assist them in the Chapter 11 Cases, including:

- *Application for Entry of an Order Authorizing the Retention and Employment of Vinson & Elkins LLP as the Debtors' Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 236];

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of BDO USA, LLP as Auditor for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* [Docket No. 237];

- *Application for Entry of an Order Authorizing the Retention and Employment of Conyers Dill & Pearman Limited as Special Bermuda Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* [Docket No. 238];

19

- *Application for Entry of an Order Authorizing the Retention and Employment of Gray Reed & McGraw, P.C. as Special Corporate Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 239];

- *Application for Entry of an Order Authorizing the Retention and Employment of KPMG LLP as Accounting Advisor* Nunc Pro Tunc *to the Petition Dat*e [Docket No. 240];

- *Application for Entry of an Order Authorizing the Retention and Employment of Locke Lord LLP as Special Counsel for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 241];

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Opportune LLP as Financial Advisor and Tax Advisor for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 242]; and

- *Application for Entry of an Order Authorizing the Retention and Employment of PJT Partners LP as Investment Banker for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Docket No. 243] (the "***PJT Application***"); and

- *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Special Corporate and Compensation Counsel for the Debtors and Debtors in Possession Effective* Nunc Pro Tunc *to the Petition Date* [Docket No. 268].

The Retention Applications, other than the PJT Application, have been approved by the Court.  *See* Docket Nos. 343-345 and 404-412.   A hearing on the ~~retention applications~~PJT Application is scheduled for June ~~9,~~23, 2016.

### C.    Appointment of Official Committee

On April 26, 2016, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 142], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "***Committee***") in the Chapter 11 Cases.   On June 3, 2016, the U.S. Trustee filed the *Notice of Reconstituted Committee of Unsecured Creditors* [Docket No. 395], notifying parties in interest that Committee had been reconstituted to include additional members.

The Committee is currently composed of the following members: (a) Wilmington Trust, National Association, as Indenture Trustee; (b) Axip Energy Services, LP; (c) Fab-Con, Incorporated; (d) Wellbore Fishing & Rental Tools, LLC; ~~and~~ (e) B&J Martin, Inc; (f) Wilmington Savings Fund Society, FSB, as Successor Indenture Trustee; and (g) Delaware Trust Company, as Successor Indenture Trustee.   The Committee has retained Latham & Watkins LLP and Heller, Draper, Patrick, Horn & Dabney, L.L.C. as its proposed legal counsel and FTI Consulting, Inc. as its proposed financial advisor, subject to Court approval.

The Debtors and its advisors have engaged in multiple telephonic meetings with the Committee and its advisors since the Committee was appointed in order to discuss, among other things, treatment of unsecured creditors under a chapter 11 plan and the Committee's investigation.   The Debtors and the Committee have scheduled at least one in-person meeting to discuss the Plan and these chapter 11 cases and anticipate further meetings will take place in the future.

### D. Ad Hoc Group of EPL Noteholders

As noted above in section III.C, the Debtors did not make an interest payment due on the EPL Unsecured Notes on February 15, 2016 and entered a 30-day grace period. At no point during the grace-period or when the interest payment was missed did any holder of EPL Unsecured Notes contact the Debtors. The Debtors eventually cured the defaulted interest payment prior to the expiration of the grace period, and again no holder of EPL Unsecured Notes contacted the Debtors. On May 3, 2016, however, Wilmer Cutler Pickering Hale and Dorr LLP ("*WilmerHale*") filed a statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure disclosing its representation of an ad hoc group of holders of EPL Unsecured Notes (the "*EPL Noteholder Group*"). The EPL Noteholder Group filed an objection [Docket No. 178] to the Debtors' *Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors' Use of Cash Collateral, (B) Granting Adequate Protection to the Prepetition Secured Parties, (C) Modifying the Automatic Stay, and (D) Granting Related Relief*.

The Debtors and its advisors have attempted to be as cooperative as possible to accommodate the EPL Noteholder Group to date. The Debtors anticipate further discussions and meetings will take place with the EPL Noteholder Group in the future to discuss the Plan and the treatment of the EPL Unsecured Notes thereunder.

### E. Cash Collateral

On April 15, 2016, the Bankruptcy Court entered an *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 And 507, Bankruptcy Rules 2002, 4001 and 9014 and Bankruptcy Local Rule 4001-1 (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* [Docket No. 66] (the "*Interim Cash Collateral Order*"). The Interim Cash Collateral Order authorized the Debtors to use cash collateral for disbursements set forth in the Budget (as defined in the Interim Cash Collateral Order).

Prior to the hearing on the Final Cash Collateral Order (as defined below), the Debtors received a number of filed objections to entry of the Final Cash Collateral Order, as well as informal comments from the Committee and the trustee for the EGC Unsecured Notes. The majority of these objections were resolved prior to the hearing on May 19, 2016.

On May 19, 2016, over the objection of certain parties, including the EPL Noteholder Group, the Bankruptcy Court entered a *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 And 507, Bankruptcy Rules 2002, 4001 and 9014 and Bankruptcy Local Rule 4001-1 (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* [Docket No. 319] (the "*Final Cash Collateral Order*"). The Final Cash Collateral Order, among other things, authorizes the Debtors to use cash collateral for disbursements set forth in the Budget (as defined in the Final Cash Collateral Order).

### F. RSA Assumption Motion

As described more fully herein, before commencing the Chapter 11 Cases, the Debtors and certain holders of Second Lien Notes Claims worked diligently to negotiate the terms of a global restructuring. The result of these efforts was the Restructuring Support Agreement executed prior to the filing of the Petitions on April 11, 2016, the material terms of which are incorporated in the Plan. The Restructuring Support Agreement binds the support of the Restructuring Support Parties for the Restructuring so long as the Debtors satisfy the milestone deadlines and other conditions contained in the Restructuring Support Agreement. The Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement.

Specifically, Section 8(c) of the Restructuring Support Agreement provides that each Debtor may terminate its obligations thereunder if its board of directors (or board of managers, as applicable) determines that proceeding with the contemplated restructuring transactions "would be inconsistent with the exercise of its fiduciary duties."

On April 14, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume the Restructuring Support Agreement* [Docket No. 43] (the "**RSA Assumption Motion**"). Pursuant to the RSA Assumption Motion, the Debtors request entry of an order authorizing the Debtors to assume the prepetition Restructuring Support Agreement among the Debtors and the Restructuring Support Parties. A hearing on the RSA Assumption Motion ~~is scheduled for June 23,~~was originally scheduled to be heard on June 23, 2016, but has been postponed to a date to be determined.

### G.   Motion to Appoint Equity Committee

On June 2, 2016, an ad hoc group of equity holders (the "*Ad Hoc Equityholder Group*") filed a motion seeking to appoint an official committee of equity holders pursuant to section 1102(a)(2) of the Bankruptcy Code [Docket No. 389] (the "*Equity Committee Motion*"). The Ad Hoc Equityholder Group, who represents less than 1% of Energy XXI's total equity, contacted the U.S. Trustee prior to filing the Equity Committee Motion regarding appointment of an equity committee, but the U.S. Trustee has declined to appoint an equity committee unless it becomes clear that equity will receive a distribution. *See* ¶ 9, Equity Committee Motion.

The Equity Committee Motion is opposed by the Debtors, the Committee, the Ad Hoc Committee, and the First Lien Agent, all of whom filed objections to the Motion. *See* Docket Nos. 470, 472, 484, 491. An emergency hearing on the Motion is set for June 15, 2016.

### H.   ~~G.~~Claims Bar Date

On April 15, 2016, the Bankruptcy Court entered the *Order (A) Granting Authority to File a Consolidated List of Creditors; (B) Granting Authority to File a Consolidated List of 50 Largest Unsecured Creditors' (C) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (D) Setting Bar Dates* [Docket No. 53] (the "**Bar Date Order**"). The Bar Date Order sets <u>August 8, 2016 at 5:00 p.m. (Central Time)</u> as the general bar date and deadline by which unsecured creditors must file proofs of claim. The Bar Date order sets <u>October 11, 2016 at 5:00 p.m. (Central Time)</u> as the government bar date and deadline by which governmental entities holding claims against the Debtors must file proofs of claim.

The Debtors intend to file a motion to establish procedures for filing proofs of claim, which is intended to streamline the claims process and eliminate the need for certain creditors to file proofs of claim.

### I.   ~~H.~~Schedules of Assets and Liabilities and Statements of Financial Affairs

On April 15, 2016, the Bankruptcy Court entered the *Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 54] (the "**SOFA Extension Order**"). The SOFA Extension Order extended the deadline for the Debtors to file Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (collectively, the "**Schedules and Statements**") to May 28, 2016, without prejudice to the Debtors' right to seek an additional extension upon cause shown therefor.

The Debtors ~~intend to file~~filed their Schedules and Statements on ~~or before~~ May 28, 2016, providing creditors and other parties in interest ample time to review the Schedules and Statements prior to the hearing to approve this Disclosure Statement.

### **J.**   ~~I.~~**Assumption and Rejection of Executory Contracts and Unexpired Leases**

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into hundreds of Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.

The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of their Executory Contracts and Unexpired Leases to be carried out as of the Effective Date, but may also elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.

### **K.**   ~~J.~~**Litigation Matters**

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

As discussed in more detail below in section V.H, the Debtors' CEO borrowed funds in 2007, 2009, and 2014, from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services, and in 2014 from Norman Louie, a former member of the board of directors of Energy XXI, who, at the time of the loan, was a managing director at Mount Kellett Capital Management LP.  At the time of the loan, Mount Kellett was majority owner of Energy XXI M21K, LLC, a non-debtor in the Chapter 11 Cases, as described above in section II.B.2, and owned 6.3% of Energy XXI's common stock.  As a result of the loans, the disinterested members of the Energy XXI board of directors conducted an independent investigation, as detailed below in section V.H.  The investigation did not reveal any illegal activity or any impact on the Debtors' financial reporting or financial statements.  Further details regarding the loans and the internal investigation can be found in the Current Report on Form 8-K filed on October 15, 2015 (the "***October 15, 2015 8-K***") and the Annual Report on Form 10-K filed on September 29, 2015 (the "***2015 10-K***"), both of which are incorporated herein by reference.

In February 2015, the SEC began a non-public investigation of a third party.  Upon learning of the Norman Louie loan during that investigation, the SEC requested information from Energy XXI and Mr. Schiller about the Norman Louie loan and Mr. Schiller's pledge of his Energy XXI stock.  The SEC later requested information from Energy XXI and Mr. Schiller about the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services.  The Debtors and their directors, officers, managers and employees have cooperated fully with the SEC, and will continue to do so, in connection with the SEC's investigation of the Norman Louie loan, the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its

23

subsidiaries with services, the pledge of Energy XXI stock, and Energy XXI's obligations under the applicable securities laws. To date, the SEC has not brought any formal claims against Mr. Schiller or Energy XXI, nor has any Debtor received a notice from the SEC identifying any potential actions to be brought, but it is possible that they may do so in the future. The Debtors believe that any such claims against Energy XXI would be classified as General Unsecured Claims under the Plan and would be subject to discharge, settlement, and release in connection with the Chapter 11 Cases.

## V.  SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.

### A.      Administrative Claims, Professional Fee Claims, and Priority Claims

#### 1.   *Treatment of Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s), with the consent of the Majority Restructuring Support Parties, agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, (i) requests for payment of Administrative Claims arising in the time period between the Petition Date and the Administrative Claims Bar Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Administrative Claims Order no later than the Administrative Claims Bar Date, and (ii) requests for payment of Administrative Claims arising between the Administrative Claims Bar Date and the Effective Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Final Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such dates shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date or such other date fixed by the Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.

#### 2.  *Professional Compensation*

##### (a)  **Final Fee Applications**

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be Filed and served on the Reorganized Debtors no later than 45 days after the Effective Date. All such final requests will be

subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Court, will be promptly paid from the Professional Fee Escrow Account up to its full Allowed amount.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Court.

### (b)  Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount, which shall be funded by New Parent.  The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals. The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors without any further action or order of the Court.

### (c)  Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five business days before the Effective Date, *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### (d)  Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

### 3.  *Treatment of Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### 4. *Statutory Fees*

All fees payable pursuant to 28 U.S.C. §1930(a) shall be paid by the Debtors or Reorganized Debtors, as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or a final decree is issued, whichever occurs first. The Reorganized Debtors shall continue to file quarterly-post confirmation operating reports in accordance with the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession.

### B. Classification of Claims and Interests

### 1. *Summary of Classification of Claims and Interests*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 4 | EXXI Holdings Promissory Note Claims | Unimpaired | Presumed to Accept |
| 5 | First Lien Claims | Impaired | Entitled to Vote |
| 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 7 | EGC Unsecured Notes Claims | Impaired | Entitled to Vote |
| 8 | EPL Unsecured Notes Claims | Impaired | Entitled to Vote |
| 9 | EXXI Convertible Notes Claims | Impaired | Entitled to Vote |
| 10 | Trade Claims | Impaired | Entitled to Vote |
| 11 | General Unsecured Claims | Impaired | Entitled to Vote |
| 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote |
| 13 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 14 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote |
| 15 | EXXI Interests | Impaired | Deemed to Reject |

### C. Treatment of Claims and Interests

### 1. *Class 1: Other Priority Claims*

(a) *Classification*: Class 1 consists of Other Priority Claims.

26

**(b)** *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each holder thereof shall receive (A) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim or (B) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

**(c)** *Voting*: Class 1 is Unimpaired under the Plan. Each holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Other Priority Claims will not be entitled to vote to accept or reject the Plan.

**2.  *Class 2:  Other Secured Claims***

**(a)** *Classification*: Class 2 consists of Other Secured Claims.

**(b)** *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each such holder shall receive, at the Debtors' election (with the consent of the Majority Restructuring Support Parties), either (a) Cash equal to the full Allowed amount of its Claim, (b) Reinstatement of such holder's Allowed Other Secured Claim, (c) the return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or (d) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

**(c)** *Voting*: Class 2 is Unimpaired under the Plan. Each holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Other Secured Claims will not be entitled to vote to accept or reject the Plan.

**3.  *Class 3:  Secured Tax Claims***

**(a)** *Classification*: Class 3 consists of Secured Tax Claims.

**(b)** *Treatment*: Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Secured Tax Claim, each such holder shall receive, at the Debtors' election (with the consent of the Majority Restructuring Support Parties), either (a) Cash equal to the full Allowed amount of its Claim, (b) Reinstatement of such holder's Allowed Secured Tax Claim, (c) the return or abandonment of the collateral securing such Allowed Secured Tax Claim to such holder, or (d) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Majority Restructuring Support Parties.

**(c)** *Voting*: Class 3 is Unimpaired under the Plan. Each holder of a Secured Claim Tax will be conclusively presumed to have accepted the Plan pursuant to section

1126(f) of the Bankruptcy Code. Therefore, holders of Secured Tax Claims will not be entitled to vote to accept or reject the Plan.

**4.** ***Class 4: EXXI Holdings Promissory Note Claims***

    **(a)** *Classification*: Class 4 consists of EXXI Holdings Promissory Note Claims.

    **(b)** *Treatment*: On the Effective Date, the EXXI Holdings Promissory Note Claims shall be Reinstated.

    **(c)** *Voting*: Class 4 is Unimpaired under the Plan. Each holder of an EXXI Holdings Promissory Note Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of the EXXI Holdings Promissory Note Claims will not be entitled to vote to accept or reject the Plan.

**5.** ***Class 5: First Lien Claims***

    **(a)** *Classification*: Class 5 consists of the First Lien Claims.

    **(b)** *Allowance*: The First Lien Claims shall be Allowed in the aggregate amount of the First Lien Prepetition Indebtedness.

    **(c)** *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, (i) all letters of credit issued under the First Lien Credit Agreement other than the Exxon LCs shall be Reinstated in accordance with their terms; (ii) the Exxon LCs shall be Reinstated in accordance with that certain letter agreement dated April 27, 2016 and (iii) except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed First Lien Claim each such holder shall receive its *Pro Rata* share of (x) the Restricted Cash and (y) the Reorganized Debtors' obligations under the Exit Facility.

    **(d)** *Voting*: Class 5 is Impaired under the Plan. Holders of First Lien Claims will be entitled to vote to accept or reject the Plan.

**6.** ***Class 6: Second Lien Notes Claims***

    **(a)** *Classification*: Class 6 consists of all Second Lien Notes Claims.

    **(b)** *Allowance*: The Second Lien Notes Claims shall be Allowed in the aggregate amount of the Second Lien Prepetition Indebtedness.

    **(c)** *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment with the consent of the Majority Restructuring Support Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Second Lien Notes Claim, each such holder shall receive its *Pro Rata* share of 100%

of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package.

    **(d)** *Voting*: Class 6 is Impaired under the Plan. Holders of Allowed Second Lien Notes Claims will be entitled to vote to accept or reject the Plan.

**7.** ***Class 7:  EGC Unsecured Notes Claims***

    **(a)** *Classification*: Class 7 consists of all EGC Unsecured Notes Claims.

    **(b)** *Treatment*: If Class 7 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EGC Unsecured Notes Claim, each holder of an Allowed EGC Unsecured Notes Claim shall receive its Pro Rata share of the EGC Warrant Package Allocation; *provided*, *however* that if Class 7 votes to reject the Plan, holders of EGC Unsecured Notes Claims will not receive a distribution under the Plan.

    **(c)** *Voting*: Class 7 is Impaired under the Plan. Holders of Allowed EGC Unsecured Notes Claims will be entitled to vote to accept or reject the Plan.

**8.** ***Class 8:  EPL Unsecured Notes Claims***

    **(a)** *Classification*: Class 8 consists of all EPL Unsecured Notes Claims.

    **(b)** *Treatment*: If Class 8 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EPL Unsecured Notes Claim, each holder of an Allowed EPL Unsecured Notes Claim shall receive its Pro Rata share of the EPL Warrant Package Allocation; *provided*, *however* that if Class 8 votes to reject the Plan, holders of EPL Unsecured Notes Claims will not receive a distribution under the Plan.

    **(c)** *Voting*: Class 8 is Impaired under the Plan. Each holder of Allowed EPL Unsecured Notes Claim will be entitled to vote to accept or reject the Plan.

**9.** ***Class 9:  EXXI Convertible Notes Claims***

    **(a)** *Classification*: Class 9 consists of all EXXI Convertible Notes Claims.

    **(b)** *Treatment*: If Class 9 votes to accept the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed EXXI Convertible Claim, each holder of an Allowed EXXI Convertible Notes Claims shall receive its Pro Rata share of the EXXI Warrant Package Allocation; *provided*, *however* that if Class 9 votes to reject the Plan, holders of EXXI Convertible Notes Claims will not receive a distribution under the Plan.

    **(c)** *Voting*: Class 9 is Impaired under the Plan. Each holder of Allowed EXXI Convertible Notes Claim will be entitled to vote to accept or reject the Plan.

**10. Class 10:  Trade Claims**

(a) *Classification*: Class 10 consists of all Trade Claims.

(b) *Treatment*: Except to the extent that a holder of an Allowed Trade Claim agrees to less favorable treatment (with the consent of the Majority Restructuring Support Parties), in full and final satisfaction, compromise, settlement, release, and discharge of and of each Allowed Trade Claim and of and in exchange for each Allowed Trade Claim, each such holder shall, at its election, either (i) receive such holder's Trade Claim Settlement Distribution or (ii) to the extent the Bankruptcy Court or another court of competent jurisdiction enters a Final Order finding that such Allowed Trade Claim is Secured, Cash in the amount of such Secured Allowed Trade Claim.

    1)     If the holder of a Trade Claim elects to receive such holder's Trade Claim Settlement Distribution, (a) such election shall constitute the Trade Claim Settlement Release, (b) such holder shall be deemed to assign its Trade Claims and any liens or security interests securing such Trade Claims to the Reorganized Debtors, and (c) the Trade Claim Settlement Distribution on account of such Trade Claim shall be made on or about the later of (i) the Effective Date and (ii) the date such Trade Claim becomes Allowed.

    2)     If the holder of a Trade Claim elects not to receive the Trade Claim Settlement Distribution, the first payment on account of its Trade Claim shall be made on or about the date such Trade Claim is determined to be Secured pursuant to a Final Order, on which date such Trade Claim shall become Allowed. Thereafter, the holder of such Secured Allowed Trade Claim shall receive a second and final payment for the remainder of such Secured Allowed Trade Claim on the last Business Day of the following calendar quarter. If the holder of a Trade Claim elects not to receive the Trade Claim Settlement Distribution and any portion of its Claim is determined to be Unsecured pursuant to a Final Order, such Unsecured Claim will be treated as a General Unsecured Claim.

(c) *Voting*: Class 10 is Impaired under the Plan. Each holder of an Allowed Trade Claim will be entitled to vote to accept or reject the Plan.

**11. Class 11:  General Unsecured Claims**

(a) *Classification*: Class 11 consists of all Allowed General Unsecured Claims.

(b) *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a Class 11 Allowed General Unsecured Claim agrees to a less favorable treatment with the consent of the Majority Restructuring Parties, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Class 11 Claim, each such holder shall receive [•]its Pro Rata share of the General Unsecured Claims Distribution.

(c) *Voting*: Class 11 is Impaired under the Plan. Each holder of a General Unsecured Claim in Class 11 will be entitled to vote to accept or reject the Plan.

**12.  Class 12:  Section 510(b) Claims**

    **(a)** *Classification*: Class 12 consists of all Section 510(b) Claims.

    **(b)** *Treatment*: Class 12 Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims.

    **(c)** *Voting*: Class 12 is Impaired under the Plan.  Each holder of a Section 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan.

**13.  Class 13:  Intercompany Claims**

    **(a)** *Classification*: Class 13 consists of all Intercompany Claims.

    **(b)** *Treatment*: Intercompany Claims shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, shall be cancelled. No distribution shall be made on account of any Intercompany Claims other than in the ordinary course of business of the Reorganized Debtors, as applicable.

    **(c)** *Voting*: Intercompany Claims are either Unimpaired, in which case the holders of such Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the holders of such Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

**14.  Class 14:  Intercompany Interests**

    **(a)** *Classification*: Class 14 consists of all Intercompany Interests.

    **(b)** *Treatment*: Intercompany Interests shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, shall be cancelled. No distribution shall be made on account of any Intercompany Interests.  No distributions on account of Intercompany Interests are being made to the holders of such Intercompany Interests. Instead, to the extent Intercompany Interests are Reinstated under the Plan, such Reinstatement is solely for the purposes of administrative convenience, for the ultimate benefit of the holders of the New Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt: (1) to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall continue to be owned by the Reorganized Debtor that corresponds to the Debtor that owned such Intercompany Interests prior to the Effective Date; and (2) except as set forth in the Description of the Transaction Steps, no Interests in a Debtor or Non-Debtor Subsidiary, or Affiliate of a Debtor or Non-Debtor Subsidiary,

31

held by a Non-Debtor Subsidiary or a Non-Debtor Affiliate of a Debtor will be affected by the Plan.

(c) *Voting*: Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

**15.  *Class 15:  EXXI Interests***

(a) *Classification*: Class 15 consists of all EXXI Interests.

(b) *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, all EXXI Interests will be extinguished in accordance with the Description of the Transaction Steps and the holders of EXXI Interests shall not receive or retain any distribution, property, or other value on account of their EXXI Interests.

(c) *Voting*: Class 15 is Impaired under the Plan. Each holder of an EXXI Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an EXXI Interests will not be entitled to vote to accept or reject the Plan.

**16.  *Special Provision Governing Unimpaired Claims***

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

**17.  *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

**18.  *Elimination of Vacant Classes***

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**19.  *Voting Classes; Presumed Acceptance by Non-Voting Classes***

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**20.  *Subordinated Claims***

32

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### D.      Means for Implementation of the Plan

#### 1.    *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors, with the consent of the Majority Restructuring Support Parties, shall take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate, the Restructuring Support Agreement and the Plan (the "***Restructuring Transactions***"), including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) all transactions necessary to provide for the purchase of some or substantially all of the assets or Interests of any of the Debtors, which transactions shall be structured in the most tax efficient manner, including in whole or in part as a taxable transaction for United States federal income tax purposes, as determined by the Debtors and the Majority Restructuring Support Parties; (5) the execution and delivery of the Exit Facility Documents; (6) the consummation of the New Money Contribution; and (7) all other actions that the Debtors, the Reorganized Debtors, or the Majority Restructuring Support Parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

#### 2.    *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan as follows:

##### (a)  Issuance and Distribution of New Equity

The New Equity, including options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized on the Effective Date without the need for any further corporate action and without any further action by the holders of Claims or Interests.

All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, any claimant's acceptance of the New Equity, including any issuance and distribution following the Effective Date on account of the Warrant Package, shall be deemed to constitute its agreement to the terms of the New Shareholders' Agreement.

**(b) Exit Facility**

On the Effective Date, the Reorganized Debtors will enter into the Exit Facility in accordance with the terms of the Exit Facility Term Sheet. The Reorganized Debtors may use the proceeds of the Exit Facility for any purpose permitted by the Exit Facility Documents, including the funding of distributions under the Plan and satisfaction of ongoing working capital needs.

The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3. *Distributions to Holders of Trade Claims and General Unsecured Claims*

Distributions to holders of Allowed Trade Claims and Allowed General Unsecured Claims shall be funded from Cash on hand available on the applicable distribution date.

### 4. *Corporate Existence*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Organizational Documents. For the avoidance of doubt, EXXI shall have no assets or operations, and the Provisional Liquidator

shall seek entry of an order by the Bermuda Court liquidating EXXI as soon as practicable following the Effective Date in accordance with the Description of the Transaction Steps.

### 5.   *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the Exit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the Reorganized Debtors may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Reorganized Debtors. The Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by this Plan, shall be given prior to the presentation of such Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

### 6.   *Cancellation of Existing Securities*

Except as otherwise provided in the Plan: (1) the obligations of the Debtors under the First Lien Credit Agreement, the Second Lien Indenture, the EGC Unsecured Notes Indentures, the EPL Unsecured Notes Indenture, the EXXI Convertible Notes Indenture, the EGC Intercompany Note, all EXXI Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; *provided that* the extinguishment of EXXI Interests shall occur pursuant to Bermuda law in connection with the Bermuda Proceeding and as set forth in the Description of the Transaction Steps; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any

35

indebtedness or obligation of the Debtors shall be released and discharged; *provided that* notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided, further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; *provided, further*, that nothing in this section shall effectuate a cancellation of any New Equity, Intercompany Interests, or Intercompany Claims.

On and after the Effective Date, all duties and responsibilities of the First Lien Administrative Agent under the First Lien Credit Agreement, the Second Lien Indenture Trustee under the Second Lien Indenture, the EGC Unsecured Notes Indenture Trustee under the respective EGC Unsecured Notes Indentures, the EPL Unsecured Notes Indenture Trustee under the EPL Unsecured Notes Indenture, and the EXXI Convertible Notes Indenture Trustee under the EXXI Convertible Notes Indenture shall be discharged unless otherwise specifically set forth in or provided for under the Plan or the Plan Supplement.

If the record holder of the Second Lien Notes, EGC Unsecured Notes, EPL 8.25% Senior Notes, or the EXXI 3.0% Senior Convertible Notes is DTC or its nominee or another securities depository or custodian thereof, and such Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial owner of such Notes shall be deemed to have surrendered its Notes upon surrender of such global security by DTC or such other securities depository or custodian thereof.

### 7.  *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable: (1) entry into the Exit Facility; (2) execution and delivery of the Exit Facility Documents; (3) consummation of the New Money Contribution; (4) the issuance of the New Equity; (5) appointment of the directors and officers for New Parent and the other Reorganized Debtors; (6) the right of the New EXXI Board to adopt the Management Incentive Plan on terms and conditions determined by the New EXXI Board in accordance with Article IV.N of the Plan; (7) implementation of the Restructuring Transactions; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of New Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, New Parent, or the other Reorganized Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, New Parent or the other Reorganized Debtors, as applicable. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, New Parent, or the other Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of New Parent and the other Reorganized Debtors, including the Exit Facility Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court. The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

### 8.  *New Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, New Parent and the other Reorganized Debtors will, on or as soon as practicable after the Effective Date, file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities. After the Effective Date, New Parent and the other Reorganized Debtors, as applicable, may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation and their respective New Organizational Documents.

On the Effective Date, the New Organizational Documents, substantially in the forms to be filed with the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions, such terms and provisions being satisfactory to the Majority Restructuring Support Parties. If the New Shareholders' Agreement is put in place, any Person that receives shares of New Equity pursuant to the Plan shall be deemed to have duly executed and delivered to New Parent a counterpart to the New Shareholders' Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

### 9. *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. As set forth in the Restructuring Support Agreement, the initial New Parent Board shall consist of: (a) John D. Schiller Jr. as the Chief Executive Officer of New Parent; and (b) six additional Persons selected by the Majority Restructuring Support Parties. Successors will be elected in accordance with the New Organizational Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that will serve as an officer of New Parent or any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of New Parent and each of the other Reorganized Debtors.

### 10. *Consultation with Provisional Liquidator*

The Debtors shall consult and liaise with the Provisional Liquidator with respect to all matters related to the Plan, including, but not limited to, the Confirmation Order, the Plan Supplement, the Definitive Transaction Documents, and any amendments thereto, in accordance with and to the extent contemplated by the Provisional Liquidator Appointment Order.

### 11. *Effectuating Documents; Further Transactions*

On and after the Effective Date, New Parent and each of the other Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Boards, are authorized to and may issue,

execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Equity, in the name of and on behalf of New Parent or the other Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

### 12. *Exemption from Certain Taxes and Fees*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a Security (including, without limitation, of the New Equity) or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

### 13. *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, without limitation, pursuant to Article VIII of the Plan, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.L of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the the applicable Reorganized Debtor. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

### 14. *Director and Officer Liability Insurance*

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each such D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

### 15. *Management Incentive Plan*

The Management Incentive Plan will be a comprehensive equity based award plan with the New Parent Board to formulate the types of equity based awards (including stock option and restricted stock units) on terms and conditions determined by the New Parent Board. The Confirmation Order shall authorize the New Parent Board to adopt and enter into the Management Incentive Plan, on the terms set forth in Article IV.N of the Plan. The equity based awards under the Management Incentive Plan shall dilute all of the New Equity, on terms set forth in the Restructuring Support Agreement and the Plan Supplement.

Awards under the Management Incentive Plan will be awarded to the Reorganized Debtors' officers, directors, employees, and consultants at the discretion of the New Board; *provided*, *however*, that 3% of the Management Equity Pool will be allocated by the New Board to such officers, directors, employees, and consultants no later than 60 days after the Effective Date on terms and conditions determined by the New Board, including the type of equity based awards. Subject to the foregoing, the New Board will determine the additional terms of the Management Incentive Plan after the Effective Date, including the allocation, granting, and vesting of applicable awards under the Management Incentive Plan.

### 16. *Employee and Retiree Benefits*

Except as otherwise provided in the Plan or the Plan Supplement, and subject to the consent of the Majority Restructuring Support Parties (which shall be determined prior to the Confirmation Date) all written employment, severance, retirement, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors and the Non-Debtor Subsidiaries, including any key employee incentive plans and/or key employee retention plans that may be approved by the Court in the Chapter 11 Cases and any items approved as part of the Confirmation Order (including, for the avoidance of doubt, all obligations arising from the Chapter 11 Compensation Order), retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors, on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided that* the foregoing shall not apply to any equity-based compensation, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13)

of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 17. *Payment of Fees and Expenses of the First Lien Administrative Agent*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the First Lien Administrative Agent and its advisors, including counsel, without application to or approval of the Court.

### 18. *Payment of Fees and Expenses of Second Lien Indenture Trustee*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Second Lien Indenture Trustee and its advisors, including counsel, without application to or approval of the Court. For the avoidance of doubt, nothing herein affects the Second Lien Indenture Trustee's right to exercise any charging lien arising under and in accordance with the Second Lien Indenture to obtain payments of its fees and expenses and the fees and expenses of its professionals.

### 19. *Payment of Fees and Expenses of the Restructuring Support Parties*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Restructuring Support Parties and their advisors, including counsel, without application to or approval of the Court and in accordance with the terms of the Restructuring Support Agreement.

### 20. *Preservation of the Charging Lien of the EGC Unsecured Notes Indenture Trustees, EPL Unsecured Notes Indenture Trustee, and EXXI Convertible Notes Indenture Trustee*

Each of the ECG Unsecured Notes Indenture Trustees, the EPL Unsecured Notes Indenture Trustee, and the EXXI Convertible Notes Indenture Trustee shall be entitled to assert its charging lien arising under and in accordance with the applicable indenture to obtain payment of its respective fees and expenses and the fees and expenses of its professionals.

### 21. *Preservation of Royalty and Working Interests*

Notwithstanding any other provision in the Plan, but subject in all respect to all payments authorized and made pursuant to the Royalty Order, on and after the Effective Date all Royalty and Working Interests shall be fully preserved and remain in full force and effect in accordance with the terms of the relevant granting instruments or other governing documents applicable to such Royalty and Working Interests, which granting instruments and governing documents shall remain in full force and effect, and no Royalty and Working Interests or any liabilities and obligations arising therefrom, including payment obligations, whether arising before or after the Petition Date, shall be compromised or discharged by the Plan.

### E.       Treatment of Executory Contracts and Unexpired Leases

#### 1.     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors or their designated assignee in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order, including those that are subject to a notice issued pursuant to the Rejection Procedures Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.  For the avoidance of doubt, Debtors will assume all of their OCS mineral leases from the BOEM (and will not seek to abandon any OCS leases).

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Majority Restructuring Support Parties, alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three (3) days' notice to the applicable non-Debtor counterparties.

#### 2.     *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be promptly served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Court pursuant to the Court's order approving the Disclosure Statement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within the earliest to occur of (1) thirty days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection or (2) thirty days after notice of any rejection that occurs after the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or any Proof of Claim to the contrary**. Claims arising from the rejection of the Executory Contracts or Unexpired Leases

shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.11 of the Plan.

### 3.   *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or assumption and assignment or related Cure Claim must be Filed, served and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. In the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such time as the Cure Notices referred to above have been distributed, a separate Cure Notice of proposed assumption or assumption and assignment and the proposed amount of the Cure Claim with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a hearing will be set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or assumption and assignment or the proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment and the Cure Claim. Payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, to such counterparty of the amount set forth on the applicable Cure Notice shall, as a matter of law, satisfy any and all monetary defaults under the applicable Executory Contract or Unexpired Lease. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or assumption and assignment, such dispute shall be resolved by a Final Order of the Court.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or the Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, subject to the consent of the Majority Restructuring Support Parties, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date. After such Executory Contract or Unexpired Lease is added to the Schedule of Rejected Executory Contracts and Unexpired Leases, the applicable counterparty shall be served with a notice of rejection of its Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

### 4.   *Indemnification Obligations*

As of the Effective Date, the Indemnification Obligations shall be deemed to be Executory Contracts and rejected by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code.

### 5.   *Insurance Policies*

Without limiting Article IV.M of the Plan, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

### 6.  *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases, with the consent of the Majority Restructuring Support Parties, shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.  *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8.  *Nonoccurence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code

### 9.  *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

### F.  **Provisions Governing Distributions**

### 1.  *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim (or such holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed

Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2.  *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

#### (a)  Delivery of Distributions

##### 1)      Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims and Interests. The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

##### 2)      Delivery of Distributions in General

Distributions to holders of Allowed Claims shall be made to the holders of record as of the Distribution Record Date by the Debtors or the Reorganized Debtors, as applicable, as follows: (1) to the signatory set forth on the last Proof of Claim Filed by such holder or other representative identified therein (or at the last known addresses of such holder if the Debtors have been notified in writing of a change of address); (2) at the address set forth in any written notice of address changes delivered to the Reorganized Debtors after the Effective Date; (3) at the address reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) to any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

##### 3)      Delivery of Distributions to First Lien Lenders

Any and all distributions to holders of First Lien Claims as of the Distribution Record Date shall be governed by the First Lien Credit Agreement. The First Lien Administrative Agent shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within three (3) business days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of First Lien Claims as of the Distribution Record Date, including the address at which each such holder is authorized to receive its distribution under the Plan and the amount of First Lien Claims held by each such holder.

##### 4)      Delivery of Distributions to Second Lien Noteholders

Any and all distributions to the holders of the Second Lien Notes Claims as of the Distribution Record Date shall be governed by the Second Lien Indenture. The Second Lien Indenture Trustee shall

cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within three (3) business days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of Second Lien Notes Claims as of the Distribution Record Date, including the amount of the Second Lien Notes Claims held by each such holder. Distributions to the holders of the Second Lien Notes Claims shall be deemed to have been made when reflected in the Reorganized Debtors' stock register according to the information provided by the Second Lien Indenture Trustee.

        5)        Delivery of Distributions to EGC Unsecured Notes Indenture Trustee

All distributions to the holders of the EGC Unsecured Notes Claims as of the Distribution Record Date shall be deemed completed when made to the EGC Unsecured Notes Indenture Trustee, which shall be deemed to be the holder of all EGC Unsecured Notes Claims for purposes of distributions to be made hereunder. The Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EGC Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI.D.1.d, the EGC Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EGC Unsecured Notes Claims. For the avoidance of doubt, distributions to holders of the EGC Unsecured Notes Claims pursuant to Article VI.D.1.d of the Plan shall be made by the Indenture Trustee.

        6)        Delivery of Distributions to EPL Unsecured Notes Indenture Trustee

All distributions to the holders of the EPL Unsecured Notes Claims as of the Distribution Record Date shall be deemed completed when made to the Indenture Trustee, which shall be deemed to be the holder of all EPL Unsecured Notes Claims for purposes of distributions to be made hereunder. The EPL Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EPL Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI.D.1.d of the Plan, the EPL Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EPL Unsecured Notes Claims. For the avoidance of doubt, distributions to the holders of EPL Unsecured Notes Claims pursuant to Article VI.D.1.d of the Plan shall be made by the EPL Unsecured Notes Indenture Trustee.

        7)        Delivery of Distributions to EXXI Convertible Notes Indenture Trustee

All distributions to the holders of the EXXI Convertible Notes Claims as of the Distribution Record Date shall be deemed completed when made to the EXXI Convertible Notes Indenture Trustee, which shall be deemed to be the holder of all EXXI Convertible Notes Claims for purposes of distributions to be made hereunder. The EXXI Convertible Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed EXXI Convertible Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI.D.1.d of the Plan, the EXXI Convertible Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed EXXI Convertible Notes Claims. For the avoidance of doubt, distributions to the holders of EXXI Convertible Notes Claims pursuant to Article VI.D.1.d of the Plan shall be made by the Indenture Trustee.

    **(b) Minimum Distributions**

No fractional shares of New Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of shares of New Equity shall be rounded as follows: (a) fractions of one-half or greater shall be

rounded to the next higher whole number, and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Equity to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $50.00 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder shall be forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

### (c)  Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtors or the Reorganized Debtors, as applicable, shall have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of Article VI.D.3 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) without need for a further order by the Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

### 3.  *Registration or Private Placement Exemption*

Except as otherwise set forth immediately below, all shares of New Equity issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of New Equity issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Equity issued pursuant to section 1145 of the Bankruptcy Code (a) is not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Equity from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. **New Equity issued to holders of Second Lien Notes Claims in exchange for such Claims, and the New Equity underlying the Warrant Package shall be issued in reliance on section 1145 of the Bankruptcy Code.  The New Equity underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.**

On the Effective Date, the Registration Rights Beneficiaries and New Parent shall enter into a registration rights agreement in form and substance acceptable to (i) the Majority Restructuring Support Parties, (ii) the Registration Rights Beneficiaries, and (iii) New Parent. The registration rights agreement shall provide the Registration Rights Beneficiaries with certain demand registration rights (including with respect to underwritten offerings) and with piggyback registration rights. The registration rights agreement shall also provide that on or before the date that is 60 days after the Effective Date, New Parent shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the

New Equity held by the Registration Rights Beneficiaries. The registration rights agreement shall contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Equity to be held through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan and Confirmation Order with respect to the treatment of such applicable portion of the New Equity, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity is exempt from registration.

### 4. *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors or the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### 5. *Allocations*

Each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan (cash or value) to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion.

### 6. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 7. *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor of any such Claim it may have against the holder of such Allowed Claim

### 8. *Claims Paid or Payable by Third Parties*

### (a) Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to Debtors or the Reorganized Debtors, as applicable, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### (b) Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

### (c) Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### G.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### 1.    *Allowance of Claims*

On or after the Effective Date, each of the Reorganized Debtors shall have any and all rights and defenses its predecessor Debtor had with respect to any Claim immediately prior to the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

### 2. *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, by order of the Court, shall together have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

### 3. *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

### 4. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

### 5. *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be filed by any party, shall be Filed on or before the Claims Objection Deadline.

### 6. *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

Except as provided herein (including with respect to any counterparties to rejected Executory Contracts or Unexpired Leases who are required to file Proofs of Claim after the rejection of their contracts or leases), any and all Proofs of Claim or requests for payment of Administrative Claims, as applicable,

Filed after the applicable Claims Bar Date, Administrative Claims Bar Date, Final Administrative Claims Bar Date, Governmental Bar Date, and applicable deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

### 7. *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

### 8. *No Distributions Pending Allowance*

No payment or distribution provided under the Plan shall be made on account of a Disputed Claim or portion thereof, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII of the Plan, unless and until such Disputed Claim becomes an Allowed Claim.

### 9. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals shall be paid to the holder of such Allowed Claim on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in herein.

### 10. *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus applicable interest. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as such Debtor's Chapter 11 Case is closed, dismissed, or converted.

## H.     Settlement, Release, Injunction, and Related Provisions

### 1. *Compromise and Settlement of Claims, Interests, and Controversies*

#### (a) Compromise and Settlement

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims against, and Interests in, all Debtors, including all controversies

relating to the contractual, legal, and subordination rights that a holder of an Allowed Claim against a Debtor may have with respect to such Allowed Claim or any distribution to be made on account of such Allowed Claim, including:

      1.  the treatment of the EGC Intercompany Note and the distributions associated therewith;

      2.  any dispute regarding the appropriate allocation of general and administrative costs across the Debtors' Estates;

      3.  any challenges to transfers made by the Debtors to any related entities;

      4.  the value and allocation of the Warrant Package; and

      5.  the releases, exculpations, and injunctions provided herein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**(b) EGC Intercompany Note**

The Debtors and their respective Boards have proposed to allocate out-of-the-money warrants equal to an aggregate of 0.5% of the New Equity issued pursuant to the Warrant Package to the EPL Noteholders in exchange for cancellation of the EGC Intercompany Note. Although it is the Debtors' position that EGC's creditors have a superior claim to EPL's assets as between EGC's creditors and holders of the EPL Unsecured Notes (the "***EPL Unsecured Noteholders***"), the Company has proposed this allocation in an effort structure a fully consensual plan and to resolve any potential litigation concerning the EGC Intercompany Note.[17][18]

Although the EPL Unsecured Noteholders made no attempts to contact the Debtors prior to the Petition Date when the Debtors missed the February 15 interest payment due on the EPL Unsecured Notes and only organized and began communicating with the Debtors after the Petition Date, the Debtors anticipate that the EPL Unsecured Noteholders will seek to challenge the EGC Intercompany Note. Specifically, the Debtors anticipate that the EPL Unsecured Noteholders will take the position that the EGC Intercompany Note should not be considered debt, and should instead be recharacterized as equity, such that the EPL Unsecured Noteholders would have a superior claim to EPL's assets as between the EPL Unsecured Noteholders and EGC. Courts apply various multi-factor tests to determine whether to recharacterize debt as equity in bankruptcy proceedings. To analyze whether a court is likely to recharacterize the EGC Intercompany Note, the Debtors' counsel reviewed the underlying transaction documents as well as email communications concerning the EGC Intercompany Note between February 1,

---

[17][18]  As discussed in ~~Section~~section II.G of ~~the~~this Disclosure Statement, the EGC Intercompany Note is secured by a second priority lien on certain assets of EPL that secure EPL's obligations under the First Lien Credit Agreement.

2015 and February 2016 from Company representatives and counsel involved in the transaction. The Debtors' counsel also interviewed Company representatives and counsel involved in the transaction concerning the EGC Intercompany Note and the background of the transaction.

The Debtors submit that the EGC Intercompany Note is properly considered a debt instrument and is not subject to recharacterization as equity under the multi-factor recharacterization analysis. Factors favoring a determination of debt include that the EGC Intercompany Note appears on its face to be a debt instrument and contains formal indicia of debt, including a fixed interest rate, quarterly interest payments, and a fixed maturity date that can be accelerated upon an event of default. In addition, the EGC Intercompany Note was the result of extensive negotiations between sophisticated parties and various mechanisms ensure EGC's unconditional right to repayment, including that the Note is secured by substantially all of EPL's and its subsidiaries' assets and has priority over general unsecured creditors. Contemporaneous communications and interviews with Company representatives involved in the transaction further demonstrate that the parties intended to structure the EGC Intercompany Note as a debt instrument.

The Debtors recognize that the EPL Unsecured Noteholders may be able to point to certain factors in the recharacterization analysis to support a determination that the EGC Intercompany Note was an equity contribution, including EGC's control over EPL at the time of the transaction and EPL's failure to pay interest on the EGC Intercompany Note. Although the Debtors submit that such factors are insufficient to recharacterize the EGC Intercompany Note as equity, the Debtors' proposed allocation of the Warrant Package takes into consideration that there is some risk associated with certain factors in the recharacterization analysis as well as the risk inherent in any litigation. The proposed allocation also takes into consideration the inherent value and efficiency associated with avoiding time-consuming litigation in favor of a chapter 11 plan that proposes a settlement of such controversies.

The independent Special Committees of both the EPL board of directors and the EGC board of directors reviewed the terms of this settlement and approved it.

### (c) Debtor Releases

As described below, the Plan provides for, among other things, releases by the Debtors of the Released Parties, including the Debtors, their current and former officers and directors, and their Affiliates.

At a hearing on June 10, 2016 before Judge Martin Isgur, Judge Isgur requested that the Debtors supplement their disclosures with respect to the Debtors' release of claims against insiders of the Debtors to provide additional information about any such claims and the reasons that the Debtors have proposed the releases. The Debtors include these additional disclosures to address Judge Isgur's request and provide parties in interest with additional information regarding the Debtor releases contained in the Plan.

As a general matter, the Debtors are not aware of any meritorious claims held by the Debtors against the current or former directors, officers, managers, or employees, or any of the other Released Parties. The Debtors have, however, attempted to identify and analyze potential claims herein.

First, as disclosed in Energy XXI's 2015 10-K and October 15, 2015 8-K, in 2015 the Board learned that in 2007, 2009, and 2014, Energy XXI's CEO borrowed funds from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services. The Board also learned that Norman Louie, one of Energy XXI's former directors, made a personal loan to Mr. Schiller in 2014 before Mr. Louie became a director of Energy XXI. At the time the loan was made, Mr. Louie was a managing director at Mount Kellett Capital Management LP, which at the time, and as of June 30, 2015, owned a majority interest in Energy XXI M21K and 6.3% of Energy XXI's common stock. The

loans made in 2014 are still outstanding.  Since Mr. Schiller did not disclose any of these loans (collectively, the "**Loans**") before they were made, the Board determined that he did not comply with the procedural requirements of Energy XXI's Code of Business Conduct and Ethics.  Upon learning of Mr. Schiller's loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services, the disinterested members of the Board engaged independent legal counsel, Sidley Austin LLP, to conduct an internal investigation, with the assistance of outside forensic accountants, Berkeley Research Group, to review these loans and Energy XXI's vendor procurement processes (the "**Independent Investigation**").

The Independent Investigation did not uncover any illegal activity on the part of any director, officer, manager, or employee of Energy XXI or any impact on Energy XXI's financial reporting or financial statements; however, the Board concluded that this noncompliance was a material weakness in its control environment given the leadership position of this officer, the visibility and importance of his actions to Energy XXI's overall system of controls, and the significance with which Energy XXI viewed this nondisclosure.  To better align the corporate governance policies of Energy XXI with industry best practices, the Board approved a number of actions to strengthen Energy XXI's policies and procedures relating to the Debtor's business conduct; the pledging and hedging of Energy XXI stock by the Debtors' officers and directors; and vendor procurement.  The recommended changes to the corporate governance policies and procedures were the result of an extensive review of best practices and comparable policies among and outside of Energy XXI's peer group and were intended to prevent actions that might result in even the appearance of conflicts of interest among the management and directors.  The Board's belief that periodic reassessment and policy improvements are important to good governance and part of its ongoing responsibilities led it to revise its policies and procedures as follows:

- *Revision of Code of Business Conduct and Ethics*.  Energy XXI's Code of Business Conduct and Ethics was updated to include, among other things, (a) an express prohibition on personal loans from Energy XXI's vendors in the future (other than ordinary course loans from financial institutions), (b) procedures for soliciting or accepting charitable contributions from entities doing business with Energy XXI, (c) clarifying the precise procedures for reporting potential conflicts of interest and requesting waivers, and (d) independent oversight from a chief compliance officer (a position being currently filled by the Chairman of the Board of Directors and the Lead Independent Director) and, in the case of executive officers and directors, the Audit Committee.

- *Prohibition on Pledging Company Shares*.  Energy XXI's policies with respect to the pledging and hedging of Energy XXI's shares by directors and officers were revised. These revisions included, among other things, (a) express prohibitions on pledges and margin loans relating to Energy XXI's shares and (b) express prohibitions on hedging transactions and short sales related to Energy XXI's shares.

- *Vendor Procurement Policies*.  A vendor procurement policy was adopted to provide enhanced scrutiny from the chief compliance officer and the Audit Committee of instances in which there is even the appearance of a conflict of interest between Energy XXI and any of its vendors.  Among other things, in such instances competitive bids are required absent an emergency, and the chief compliance officer must review and approve the terms of the proposed arrangement, including the proposed scope of work and compensation to be paid to the vendor.  The Audit Committee is copied on any such approval.

- *Training*.  The Board also directed Energy XXI to implement a comprehensive training program for Energy XXI's officers and employees, to inform them of these new policies and the importance of compliance.

Accordingly, based upon the findings of the Independent Investigation and their own review, the Debtors believe there is no basis for a claim against the directors, officers, managers, or employees of the Debtors in connection with the Loans, and that the Debtors' release of any such hypothetical direct or derivative claims that could be asserted with respect to the Loans is appropriate.

The Debtors have been cooperating with the SEC in connection with a non-public investigation of a third-party. Upon learning of the Norman Louie loan during that investigation, the SEC requested information from Energy XXI and Mr. Schiller about the Norman Louie loan and Mr. Schiller's pledge of his Energy XXI stock. The SEC later requested information from Energy XXI and Mr. Schiller about the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services. The Debtors and their directors, officers, managers, and employees have cooperated fully with the SEC, and will continue to do so, in connection with the SEC's investigation of the Norman Louie loan, the loans from personal acquaintances or their affiliates, certain of whom provided Energy XXI and certain of its subsidiaries with services, the pledge of Energy XXI stock, and Energy XXI's obligations under the applicable securities laws. To date, no claim has been brought against the Debtors or any directors, officers, managers, or employees of any Debtor relating to the Loans, nor has any Debtor received a notice from the SEC identifying any potential actions to be brought. The Debtors believe that, to the extent asserted, any potential claims by the SEC against Energy XXI would be subject to discharge in connection with these Chapter 11 Cases and treated as General Unsecured Claims. The SEC is not a Releasing Party under the Plan and is not providing a release of any of the Released Parties.

Second, the Debtors' release of claims against all current or former directors, officers, managers, or employees includes a release of any claims or causes of action arising under chapter 5 of the Bankruptcy Code or "avoidance actions." The Debtors' Schedules and Statements detail payments made to insiders of the Debtors, including directors and officers, within one year before the Petition Date (the look back period for preference actions under section 547 of the Bankruptcy Code). The Debtors believe that these payments, including bonus payments, were a valid exercise of the Debtors' business judgment, are supported by the advice of independent, third-party advisors and the Compensation Committee of Energy XXI's board of directors, made up entirely of independent directors, and are subject to certain other defenses. Moreover, the Debtors believe that the damage to the Debtors' business and management team in pursuing such claims would outweigh any potential benefit or recovery that could be achieved.

The Debtors are not aware of any other potential claims held by the Debtors against the current or former directors, officers, managers, or employees, or any of the other Released Parties. However, to the extent such claims may exist, the Debtors believe that the Debtor releases pursuant to section 1123(b) are in the best interest of their estates, as required by courts in the Fifth Circuit. *See, e.g., In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006). Courts in the Fifth Circuit generally determine whether a release is "in the best interest of the estate" by reference to the following factors: (i) the probability of success of litigation; (ii) the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment; (iii) the interest of creditors with proper deference to their reasonable views; and (iv) the extent to which the settlement is truly the product of arm's-length negotiations. *See Mirant*, 348 B.R. at 739-40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355-56 (5th Cir. 1997)). The Debtors believe these factors weigh in favor of the releases.

First, as outlined above and as previously disclosed as part of their public filings with the SEC, the Board has taken extensive steps to analyze potential claims the Debtors could bring against the Released Parties, including John D. Schiller, Jr. The Independent Investigation, combined with the independent third-party advice the Compensation Committee utilized to make its compensation decisions for 2015 and 2016, support the Debtors' conclusion that there are no valuable claims being released pursuant to the Plan,

and therefore a low probability of success of receiving a meaningful recovery from litigation on account of any such claims.

Second, any hypothetical recovery on causes of action pursued by the Debtors, or on their behalf, against directors and officers would be a substantial distraction to the Debtors' business operations and would be costly both in terms of actual dollars spent and in terms of time spent on litigation. Moreover, such causes of action would likely garner a negative reaction from BOEM, which places significant importance on the Debtors' management team, particularly the Debtors' founder and CEO, John D. Schiller, Jr., and views the Debtors—including their senior management team—as a model operator in the Gulf of Mexico. An adverse reaction from BOEM, as a result of litigation pursuing claims that lack merit against the Debtors' current or former officers and directors, could negatively impair value for all of the Debtors' stakeholders and tighten the Debtors' valuable and necessary liquidity for operations.

Third, the creditors who would be the primary beneficiaries of any successful litigation claim against the Released Parties would be the Second Lien Noteholders – creditors who hold an unsecured deficiency claim in excess of $1.3 billion on Second Lien Notes that were issued in March 2015. The Second Lien Noteholders could, hypothetically, assert adequate protection claims against the proceeds of any and all Avoidance Actions successfully prosecuted against the Released Parties to the extent of any diminution in value during the Chapter 11 cases. Nonetheless, the Second Lien Noteholders support the releases embodied in the Plan. The Debtors' unsecured noteholders do not currently support the releases included in the Plan, nor do they support the Warrant Package proposed to be allocated on account of their claims or the EGC Intercompany Note Settlement. This reality will not change based on the Debtor releases, which facilitate maximizing value for all stakeholders, including the unsecured noteholders. The unsecured noteholders, and other voting creditors, are also not required to consent to the releases in the Plan and can opt out of the third-party releases to preserve any hypothetical claims they believe they can assert.

Fourth, the Debtors' releases, third-party releases, and exculpation provisions were an important element of the negotiations between the Debtors and the Ad Hoc Committee, and are supported by the Debtors and certain key stakeholders, including the Ad Hoc Committee and the steering committee of the First Lien Lenders. Therefore, the Debtors believe the significant cost and distraction of pursuing claims against the Debtors' directors and officers would outweigh any resulting recovery to the Debtors, and their stakeholders, from actions brought against the Debtors' directors and officers. The Ad Hoc Committee, on account of the Second Lien Noteholders proposed to be the owners of the Reorganized Debtors after the Effective Date, also believes post-confirmation date litigation against existing officers and directors will be detrimental to the value of the Reorganized Debtors and their operations and a significant distraction after emergence.

Based on the foregoing, the Debtors believe that the Debtor releases in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by courts in the Fifth Circuit.

### 2. *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan

on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### 3. *Term of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

### 4. *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), the New Money Contribution (to the extent applicable), or in any other contract, instrument, agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors. In addition, at the Debtors' or Reorganized Debtors' sole expense, the First Lien Administrative Agent and the Second Lien Indenture Trustee shall execute and deliver all documents reasonably requested by the Reorganized Debtors, or the administrative agent(s) for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.**

### 5. *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, and the Reorganized Debtors from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts,**

the Debtors' intercompany transactions, the First Lien Credit Agreement, the Second Lien Indenture, the Intercreditor Agreement, the Interim Cash Collateral Order and the Final Cash Collateral Order (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, the Definitive Documentation, the Bermuda Proceeding, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth herein do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions, and (ii) nothing in this provision shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in ~~this~~ Article VIII.E of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or cause of action released pursuant to such releases.

### 6.    *Releases by Holders of Claims and Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, its Estate, Reorganized Debtor, and Released Party from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the First Lien Credit Agreement, the Second Lien Indenture, the Intercreditor Agreement, the Interim Cash Collateral Order and the Final Cash Collateral Order (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in

this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, the Definitive Documentation, the Bermuda Proceeding, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions, and (ii) nothing in this provision shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring Transactions; and (7) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such releases.

7. *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation of votes with respect to this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the related agreements, instruments, and other documents (including the Definitive

Documentation), the Bermuda Proceeding, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 8. *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

### 9. *Protection Against Discriminatory Treatment*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or

the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

### 10. *Recoupment*

In no event shall any holder of an Allowed Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 11. *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

### 12. *Reimbursement or Contribution*

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### I.  **Conditions Precedent to Confirmation and Consummation of the Plan**

### 1. *Conditions Precedent to the Confirmation Date*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.    An order approving the Disclosure Statement shall have been entered by the Court in form and substance acceptable to the Debtors, the Majority Restructuring Support Parties, and the First Lien Administrative Agent and shall have become a Final Order;

2.      An order approving the Debtors' assumption of the Restructuring Support Agreement shall have been entered by the Court in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties;

3.      The Confirmation Order shall have been approved by the Court in form and substance acceptable to the Debtors and Majority Restructuring Support Parties;

4.      The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, each in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties, shall have been Filed subject to the terms hereof; and

5.      To the extent the Debtors' projected cash or liquidity on hand at emergence (excluding, for the avoidance of doubt, the Restricted Cash, the reduction in letters of credit, and any liquidity available under the Exit Facility) is less than Minimum Emergence Liquidity (as defined in the Exit Facility Term Sheet), the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have consented to the material terms of the New Money Contribution, which terms shall be disclosed in the Plan Supplement; *provided, however,* that nothing herein shall constitute a commitment by the First Lien Lenders or the Second Lien Noteholders to fund or otherwise provide such New Money Contribution.

## 2.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      Entry of the Confirmation Order in form and substance satisfactory to the Debtors and the Majority Restructuring Support Parties, and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

2.      The Bermuda Court shall have entered an order recognizing the Plan under Bermuda law;

3.      All of the Restructuring Support Parties' reasonable and documented professional fees and out-of-pocket expenses incurred in connection with the Restructuring Transactions, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall have been paid by the Debtors in accordance with the Restructuring Support Agreement;

4.      All fees ordered to be paid pursuant to the Final Cash Collateral Order, including the First Lien Administrative Agent's reasonable and documented professional fees shall have been paid or will be paid prior to or contemporaneously with the Effective Date in accordance with the terms of the Final Cash Collateral Order.

5.      The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties and made in accordance with the Article X.A of the Plan;

6.      The Exit Facility Documents in form and substance acceptable to the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall

have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

7.      All documentation effectuating the New Money Contribution, to the extent deemed necessary prior to Confirmation, in form and substance acceptable to the Debtors, the First Lien Administrative Agent, and the Majority Restructuring Support Parties shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Money Contribution shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Money Contribution shall be deemed to occur concurrently with the occurrence of the Effective Date;

8.      The Definitive Documentation shall be executed and satisfactory to the Majority Restructuring Support Parties in accordance with Section 3 of the Restructuring Support Agreement;

9.      All conditions precedent to the issuance of the New Equity, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

10.     The New Organizational Documents, in form and substance acceptable to the Debtors and the Majority Restructuring Support Parties, have been duly filed with the applicable authorities in the relevant jurisdictions;

11.     All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions; *provided*, *however* that consummation of the Bermuda Proceeding shall not be a condition to the Effective Date;

12.     All documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements (including, without limitation, the Exit Facility Documents); and

13.     All Allowed Professional Fee Claims approved by the Court shall have been paid in full and the Professional Fee Escrow Account shall have been funded in the Professional Fee Reserve Amount.

### 3.   *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors, the Majority Restructuring Support Parties, and the First Lien Administrative Agent without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan

### 4.   *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### 5.   *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.  If the Effective Date shall not have occurred by September 2, 2016, it shall be a termination event under the Restructuring Support Agreement entitling, but not requiring, the Majority Restructuring Support Parties to terminate the Restructuring Support Agreement (as more fully set forth therein), in which case the Effective Date may not occur.

### J.      Modification, Revocation, or Withdrawal of the Plan

#### 1.   *Modification and Amendments*

Subject to the limitations contained herein and the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the terms of the Restructuring Support Agreement, the Debtors expressly reserve their right (with the consent of the Majority Restructuring Support Parties) to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

#### 2.   *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

#### 3.   *Revocation or Withdrawal of the Plan*

The Debtors reserve the right (with the consent of the Majority Restructuring Support Parties) to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the Non-Debtor Subsidiaries; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries; or (iv) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

K.      **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections relating to any of the foregoing;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Debtors (with the consent of the Majority Restructuring Support Parties) or the Reorganized Debtors, as applicable, amending, modifying, or supplementing, pursuant to Article V hereof, the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the Restructuring Support Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Restructuring Support Agreement;

9.      enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1 of the Plan;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Court;

22.     hear any other matter not inconsistent with the Bankruptcy Code;

23.     enter an order concluding or closing the Chapter 11 Cases; and

24.     enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

**L.      Miscellaneous Provisions**

**1.  *Immediate Binding Effect***

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises,

releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

### 2. *Additional Documents*

On or before the Effective Date, with the consent of the Majority Restructuring Support Parties, the Debtors may File with the Court such agreements and other documents, in form and substance satisfactory to the Majority Restructuring Support Parties, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, with the consent of the Majority Restructuring Support Parties, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3. *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve automatically, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the Committee after the Effective Date.

### 4. *Reservation of Rights*

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any holder of any Claim with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any claimant with respect to any Claims or Interests.

### 5. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 6. *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

**Reorganized Debtors**            **Energy XXI Ltd**
                                    1021 Main Street, Suite 2626
                                    Houston, Texas 77002
                                    Attn:   John D. Schiller, Jr.

66

| ~~Proposed~~ **Attorneys to the Debtors** | **Vinson & Elkins LLP** |
| | First City Tower |
| | 1001 Fannin, Suite 2500 |
| | Houston, Texas 77002-6760 |
| | Attn:  Harry A. Perrin |
| | |
| | and |
| | |
| | **Vinson & Elkins LLP** |
| | 666 Fifth Avenue, 26th Floor |
| | New York, New York  10103-0040 |
| | Attn:  David S. Meyer |
| |         Jessica C. Peet |
| |         Lauren R. Kanzer |
| **United States Trustee** | **Office of the United States Trustee** |
| | **for the Southern District of Texas** |
| | 515 Rusk Street, Suite 3516 |
| | Houston, Texas 77002 |
| | Attn:  Hector Duran, Esq. |
| **Counsel to the Ad Hoc Committee of** | **Milbank, Tweed, Hadley & McCloy LLP** |
| **Second Lien Noteholders** | 28 Liberty Street |
| | New York, NY 10005 |
| | Attn:  Dennis E. Dunne |
| |         Samuel A. Khalil |
| **Proposed Attorneys to the Committee** | **Latham & Watkins LLP** |
| | 885 Third Avenue |
| | New York, NY 10022-4834 |
| | Attn:  Mitchell A. Seider |
| |         Adam J. Goldberg |

### 7.   *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8.   *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Restructuring Support Agreement, and the Exit Facility Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 9. *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://dm.epiq11.com/EXL or the Court's website at www.txs.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

### 10. *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors and the Majority Restructuring Support Parties. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Majority Restructuring Support Parties' consent; and (3) nonseverable and mutually dependent.

### 11. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### 12. *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

### 13. *Waiver or Estoppel*

Each holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Notice and Claims Agent prior to the Confirmation Date.

## VI.   TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The issuance and the distribution under the Plan of New Equity will be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  The Plan provides for the distribution of New Equity to the Holders of Second Lien Notes Claims and in connection with the Management Incentive Plan and the distribution of Warrants among the classes of EGC Unsecured Notes Claims, EPL Unsecured Notes Claims, and EXXI Convertible Notes Claims.  The New Equity may be resold without registration under the Securities Act or federal securities laws pursuant to the exemption provided by ~~section~~Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash or property.  Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan for persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

***In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.***

### A.   Legends

To the extent certificated, certificates evidencing the New Equity held by holders of 10% or more of the New Equity will bear a legend substantially in the form below:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS ENERGY XXI RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## VII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to the holders of Allowed Second Lien Notes Claims, EGC Unsecured Notes Claims, EPL Unsecured Notes Claims, and EXXI Convertible Notes Claims.

This discussion is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the Plan to the Debtors or any holder of a Claim or Interest.  The Debtors will not seek a ruling from the Internal Revenue Service (the "***IRS***") and have not obtained an opinion of counsel regarding any tax consequences of the Plan to the Debtors or any holder of a Claim or Interest.  No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), or the tax consequences arising under the laws of any foreign, state, local or other jurisdiction or any income tax treaty.

This discussion does not apply to holders of Claims that are otherwise subject to special treatment under the Tax Code, such as: financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; certain former U.S. citizens or long-term residents; persons who hold Claims as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons who received their Claims upon exercise of employee unit options or otherwise as compensation; and holders not entitled to vote on the Plan. The following discussion assumes that holders hold their Claims as "capital assets" (as defined in section 1221 of the Tax Code).

For purposes of this discussion, a "U.S. holder" is a beneficial owner of a Second Lien Notes Claim, EGC Unsecured Notes Claim, EPL Unsecured Notes Claim, or EXXI Convertible Notes Claim, that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (i) the administration of which is subject to the primary supervision of a U.S. court and that has one or more United States persons that have the authority to control all

substantial decisions of the trust or (ii) that has made a valid election under applicable U.S. Treasury regulations to be treated as a United States person.

A "Non-U.S. holder" is a beneficial owner of a Claim that is an individual, corporation, estate or trust that is not a U.S. holder.

THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

## B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

As of June 30, 2015, the Debtors' consolidated U.S. net operating loss ("**NOL**") carryover was estimated to be approximately $1.02 billion. During the tax year ending on June 30, 2016, the Debtors expect to generate approximately $1.49 billion of cancellation of indebtedness income ("**CODI**") as a result of debt repurchases for less than the adjusted issue price of such debt. The Debtors expect to generate additional NOLs during the tax year ending on June 30, 2016, but the amount is uncertain.  These NOLs and certain other tax attributes may be subject to limitations on their use and significantly reduced as a result of CODI generated by debt repurchases during the tax year ending on June 30, 2016 and upon implementation of the Plan.

### 1.     *Cancellation of Debt and Reduction of Tax Attributes*

It is anticipated that the Plan will result in cancellation of a significant portion of the Debtors' outstanding indebtedness. Absent an exception, the Debtors would generally recognize CODI upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. However, with respect to CODI generated upon implementation of the Plan, the Debtors anticipate that they will not be required to include any amount of such CODI in gross income, because the discharge of debt will occur pursuant to a proceeding under title 11 of the Bankruptcy Code.

The Debtors expect that they will be required to reduce their tax attributes by the amount of CODI that is excluded from gross income, in accordance with the methodology set forth in the Treasury regulations addressing such reduction for consolidated groups.  Generally, tax attributes are reduced in the following order: (a) NOLs and NOL carryovers; (b) certain tax credit carryovers; (c) net capital losses and capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. However, the Debtors may elect to first reduce the basis of their depreciable assets, in which case the limitation on reduction in tax basis in assets described above in (d) will not apply.

The Debtors expect that their NOLs and other tax attributes will be substantially reduced or eliminated as a result of the Debtors' excluded CODI.  However, the exact amount of excluded CODI, and the resulting tax attribute reduction amount, will depend in part on the fair market value of the New Equity and the New Warrants (as defined below), which cannot be known with certainty as of the date hereof, and the manner in which the Restructuring Transactions are implemented.

### 2.     *Limitation of NOL Carryforwards and Other Tax Attributes*

If a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change" under section 382 of the Tax Code (an "**Ownership Change**") the amount of its

pre-ownership change NOLs and/or built-in losses (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally is subject to an annual limitation (the "**Annual Limitation**").

The Debtors anticipate that the issuance of the New Equity under the Plan will result in an Ownership Change. However, as a result of the Chapter 11 Cases, the Debtors expect that a modification to the standard Annual Limitation will apply. Consequently, the Debtors' Annual Limitation should equal the product of (a) the fair market value of the stock of the corporation after taking into account the increase in value from any surrender or cancellation of Claims in the Chapter 11 Cases and (b) the applicable "long-term tax-exempt rate" (*e.g.*, 2.27% for May 2016).

Any NOLs generated in any post-Effective Date taxable year (including the portion of the taxable year of the Ownership Change following the Effective Date) should not be subject to this limitation. If an additional Ownership Change occurs after the Effective Date, the Reorganized Debtors' use of their Pre-Change Losses may be adversely affected.

### 3.  *Alternative Minimum Tax*

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. NOL carryovers can only offset up to 90% of AMT income in computing AMT. In addition, an Ownership Change that occurs with respect to a Debtor having a net unrealized built-in loss in its assets may cause the Debtor's aggregate tax basis in its assets to be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date, the effect of which may increase the amount of AMT owed by the Debtors.

### C.  **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims**

#### 1.  *U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Second Lien Notes Claims*

##### (a)  **U.S. Federal Income Tax Consequences to U.S. Holders of a Tax-Free Exchange**

It has not yet been determined whether New Parent will be Reorganized EGC, Reorganized EXXI Inc. or another entity.  Such determination shall be made by the Debtors and the Majority Restructuring Support Parties prior to the Effective Date.  As a result, the following discussion describes the U.S. federal income tax consequences associated with the likely potential alternatives.

1)  U.S. Federal Income Tax Consequences to U.S. Holders of a Tax-Free Recapitalization

Pursuant to the Plan, each U.S. holder of an Allowed Second Lien Notes Claim shall receive a pro rata share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package.  If Reorganized EGC is the New Parent, whether and to what extent the U.S. holder of a Second Lien Notes Claim recognizes gain or loss as a result of the exchange of its claim for the New Equity depends, in part, on whether the exchange qualifies as tax-free recapitalization under the Tax Code (a "**Recapitalization**").  Whether an exchange of such holder's Second Lien Notes Claim for New Equity in Reorganized EGC qualifies as a tax-free Recapitalization with respect to such holder further depends on whether debt underlying the Second Lien Notes Claim surrendered is treated as a "security" for purposes of the Tax Code.

Whether a debt instrument constitutes a "security" depends on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is one important factor. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. While the term of an instrument is often viewed as an important factor, there are numerous other factors that should also be considered in determining whether a debt instrument is a security. To the extent the Debtors are required to take a position, they intend to treat the Second Lien Notes as a security for federal income tax purposes. However, because of the inherently factual nature of this determination, each U.S. holder of a Claim is urged to consult its tax advisor regarding whether debt underlying a Second Lien Notes Claim constitutes a security for federal income tax purposes.

To the extent the exchange of a Second Lien Notes Claim for New Equity in Reorganized EGC qualifies as a Recapitalization, a U.S. holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section VII.C.3. of this Disclosure Statement). Such U.S. holder's total combined tax basis in its New Equity received should equal the U.S. holder's tax basis in the Second Lien Notes Claim surrendered therefor increased by gain, if any, recognized by such U.S. holder in the exchange. A U.S. holder's holding period for the New Equity should include its holding period for the Second Lien Notes Claim surrendered (except to the extent any New Equity is allocable to accrued but unpaid interest, in which case its holding period in the New Equity would begin on the day following the Effective Date).

<div align="center">

2)   U.S. Federal Income Tax Consequences to U.S. Holders of a Section 351 Exchange

</div>

Pursuant to the Plan, each U.S. holder of an Allowed Second Lien Notes Claim shall receive a pro rata share of 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package. If Reorganized EXXI Inc. is the New Parent, whether and to what extent the U.S. holder of a Second Lien Notes Claim recognizes gain or loss as a result of the exchange of its claim for the New Equity depends, in part, on whether the exchange qualifies as a tax-free transfer of property to New Parent in exchange for New Equity pursuant to Section 351 of the Tax Code (a "***351 Exchange***"). A transfer of property to a corporation in exchange for stock in such corporation will be treated as a 351 Exchange if, immediately after the transfers, the transferors of property, in the aggregate, are "in control" of the transferee corporation. For this purpose, control means ownership of 80% or more of the total voting power of the voting stock of the transferee corporation and 80% or more of each class of non-voting stock. If Reorganized EXXI Inc. is the New Parent, the Plan provides that holders of Allowed Second Lien Notes Claims will transfer their Claims to New Parent in exchange for 100% of the New Equity, subject to dilution from New Equity issued in connection with the Management Incentive Plan and the Warrant Package. Because the New Equity issued to holders of Allowed Second Lien Notes Claim should constitute "control" of New Parent for purposes of Section 351 of the Tax Code, if Reorganized EXXI Inc. is the New Parent, the exchange of Allowed Second Lien Notes Claims for New Equity is expected to qualify as a 351 Exchange. To the extent the exchange of a Second Lien Notes Claim for New Equity qualifies as a 351 Exchange, a U.S. holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section VII.C.3. of this Disclosure Statement). Such U.S. holder's total combined tax basis in its New Equity received should equal the U.S. holder's tax basis in the Second Lien Notes Claim surrendered therefor increased by gain, if any, recognized by such U.S. holder in the exchange. A U.S. holder's holding period for its interest in the New Equity should include the holding period for the Second Lien Notes Claim surrendered therefor (except to the extent any New Equity is allocable to accrued but unpaid interest, in which case its holding period in the New Equity would begin on the day following the Effective Date).

<div align="center">73</div>

### (b) U.S. Federal Income Tax Consequences to U.S. Holders in a Taxable Exchange

To the extent the exchange is not a Recapitalization or a 351 Exchange, a U.S. holder of a Second Lien Notes Claim will be treated as exchanging such Claim for New Equity in a taxable exchange. Accordingly, each U.S. holder of such Second Lien Notes Claim should recognize gain or loss equal to the difference between the fair market value of New Equity received in exchange for the Claim and such U.S. holder's adjusted basis, if any, in such Claim. Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. holder previously has claimed a bad debt deduction with respect to its Claim. See Sections VII.C.3. and VII.C.4. of this Disclosure Statement, entitled "Accrued Interest" and "Market Discount." A U.S. holder's tax basis in any New Equity received should equal the fair market value of such New Equity as of the date such New Equity is distributed to the holder. A U.S. holder's holding period for the New Equity received should begin on the day following the Effective Date.

### 2. *U.S. Federal Income Tax Consequences to U.S. Holders of Allowed EGC Unsecured Notes Claims, Allowed EPL Unsecured Notes Claims and Allowed EXXI Convertible Notes Claims*

The holders of the EGC Unsecured Notes Claims, the EPL Unsecured Notes Claims and the EXXI Convertible Notes Claims (collectively, the "**Unsecured Notes Claims**") will receive a Pro Rata share of the EGC Warrant Package Allocation, the EPL Warrant Package Allocation, or the EXXI Warrant Package Allocation, respectively (the "**New Warrants**"). Except as discussed below, a U.S. holder of Unsecured Notes Claims should be treated as exchanging such Unsecured Notes Claims for the New Warrants in a fully taxable exchange. U.S. holders of Unsecured Notes Claims will recognize gain or loss equal to the difference between the value of the New Warrants received and the respective holder's adjusted basis, if any, in such Unsecured Notes Claims surrendered in the exchange. The gain or loss recognized generally would be long-term capital gain or loss if the U.S. holder has held its interest in the Debtor for more than one year at the time of the exchange. A U.S. holder's tax basis in the New Warrants received should equal the fair market value of such interests. A U.S. holder's holding period for the New Warrants received on the Effective Date would begin on the day following the Effective Date.

However, if Reorganized EGC is the New Parent, the receipt of New Warrants by holders of the EGC Unsecured Notes Claims may qualify as a Recapitalization. Whether an exchange of such holder's EGC Unsecured Notes Claims for New Warrants in Reorganized EGC qualifies as a tax-free Recapitalization with respect to such holder further depends on whether debt underlying the EGC Unsecured Notes Claims surrendered is treated as a "security" for purposes of the Tax Code. To the extent the Debtors are required to take a position, they intend to treat the EGC Unsecured Notes Claims as a security for federal income tax purposes. However, because of the inherently factual nature of this determination, each U.S. holder of a Claim is urged to consult its tax advisor regarding whether debt underlying an EGC Unsecured Notes Claim constitutes a security for federal income tax purposes.

To the extent the exchange of EGC Unsecured Notes Claims for New Warrants qualifies as a Recapitalization, a U.S. holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section VII.C.3. of this Disclosure Statement). Such U.S. holder's total combined tax basis in its New Warrants received should equal the U.S. holder's tax basis in the EGC Unsecured Notes Claims surrendered therefor increased by gain, if any, recognized by such U.S. holder in the exchange. A U.S. holder's holding period for the New Warrants should include its holding period for the EGC Unsecured Notes Claims surrendered (except to the extent

any New Equity is allocable to accrued but unpaid interest, in which case its holding period in the New Equity would begin on the day following the Effective Date).

### 3. *Accrued Interest*

To the extent that any amount received by a U.S. holder of a Claim is attributable to accrued but unpaid interest (including accrued original issue discount ("*OID*")) on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. holder as ordinary interest income (to the extent not already taken into income by the U.S. holder). Conversely, a U.S. holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest (including accrued OID) was previously included in the U.S. holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the plan, each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion. The IRS could take the position that the consideration received by a holder should be allocated in a manner other than as determined by such holder.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 4. *Market Discount*

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount. Any gain recognized by a U.S. holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued).

If Reorganized EGC is the New Parent, to the extent that the Allowed Claims that were acquired with market discount are exchanged in a Recapitalization for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount. If, however, Reorganized EXXI Inc. is the New Parent, to the extent that the Allowed Claims that were acquired with market discount are exchanged in a transaction that qualifies as a 351 Exchange, the U.S. holder may be required to recognize any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) to the extent of any deemed gain. However, the tax law is unclear on this point.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

**5.** ***U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Equity and the New Warrants***

### (a) Distributions on New Equity

The gross amount of any distribution of cash or property made to a U.S. holder with respect to New Equity generally will be includible in gross income by a U.S. holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed our current and accumulated earnings and profits, the distribution (i) will be treated as a non-taxable return of the U.S. holder's adjusted basis in the New Equity and (ii) thereafter as capital gain. Dividends received by non-corporate U.S. holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a corporate U.S. holder and certain other requirements are satisfied.

### (b) Exercise of New Warrants

U.S. holders of New Warrants generally will not realize gain or loss upon the exercise of the New Warrants into New Equity. A U.S. holder's basis in the New Equity received upon the exercise of such U.S. holder's New Warrants will equal the sum of (i) the U.S. holder's tax basis in the New Warrants and (ii) the strike price. A U.S. holder's holding period in the New Equity received on exercise of New the Warrants will begin on the date of exercise of the New Warrants.

### (c) Sale, Exchange, or Other Taxable Disposition of New Equity or New Warrants

For U.S. federal income tax purposes, a U.S. holder generally will recognize gain or loss on the sale, exchange, or other taxable disposition of any of its New Equity or New Warrants in an amount equal to the difference, if any, between the amount realized for the New Equity or the New Warrants and the U.S. holder's adjusted tax basis in the New Equity or the New Warrants. Subject to the rules discussed above under Section VII.C.4., entitled "Market Discount," any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has a holding period in the New Equity or the New Warrants of more than one year as of the date of disposition. Non-corporate U.S. holders may be eligible for reduced rates of taxation on long-term capital gains.

**6.** ***Medicare Tax***

Certain U.S. holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on the consummation of the Plan to such U.S. holders and the ownership and disposition of any consideration to be received under the Plan.

**D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims**

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. holders. The rules governing the U.S. federal income tax consequences to Non-U.S. holders are complex. Each Non-U.S. holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. holders and the ownership and disposition of the New Equity and the New Warrants, as applicable.

### 1. *Gain Recognition*

Whether a Non-U.S. holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders. Subject to the rules discussed below under Sections VII.D.6. and VII.E., entitled "FATCA" and "Information Reporting and Back-Up Withholding," any gain realized by a Non-U.S. holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met, or (ii) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States).

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain realized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described in Section VII.D.3., entitled "Income or Gain Effectively Connected with a U.S. Trade or Business."

### 2. *Accrued Interest*

Subject to the rules discussed below under Sections VII.D.6. and VII.E., entitled "FATCA" and "Information Reporting and Back-Up Withholding," payments attributable to U.S. source accrued but unpaid interest (including OID) to a Non-U.S. holder generally will not be subject to U.S. federal income tax and will be exempt from withholding under the "portfolio interest" exemption if the Non-U.S. holder properly certifies to its foreign status (generally, by providing the withholding agent IRS Form W-8BEN or W-8BEN-E prior to payment), and:

(i)     the Non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of the Debtor's stock entitled to vote;

(ii)     the Non-U.S. holder is not a "controlled foreign corporation" that is a "related person" with respect to the Debtor;

(iii)     the Non-U.S. holder is not a bank whose receipt of interest on the notes is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of the Non-U.S. holder's trade or business; and

(iv)     such interest is not effectively connected with the Non-U.S. holder's conduct of a U.S. trade or business.

A Non-U.S. holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or lower applicable income tax treaty rate) on payments that are attributable to accrued but unpaid interest (including accrued OID). For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If any accrued but unpaid interest is effectively connected income, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described in Section VII.D.3., entitled "Income or Gain Effectively Connected with a U.S. Trade or Business."

### 3. *Income or Gain Effectively Connected with a U.S. Trade or Business*

If any interest or gain realized by a Non-U.S. holder on the exchange of its Claims is effectively connected with such holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, the holder maintains a permanent establishment in the United States to which such interest or gain is attributable), then the interest income or gain will be subject to U.S. federal income tax at regular graduated income tax rates generally in the same manner as if you were a U.S. holder. Effectively connected income will not be subject to U.S. federal withholding tax if you satisfy certain certification requirements by providing to the applicable withholding agent a properly executed IRS Form W-8ECI (or successor form), In addition, if such a Non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 4. *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of New Equity or the New Warrants*

#### (a) Dividends on New Equity

Any distributions made with respect to New Equity will constitute dividends for U.S. federal income tax purposes to the extent of New Parent's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent those distributions exceed our current and accumulated earnings and profits, the distributions will be treated as a non-taxable return of capital to the extent of the Non-U.S. holder's tax basis in our common stock and thereafter as capital gain from the sale or exchange of such New Equity. Subject to the rules discussed above under Section VII.D.3., entitled "Income or Gain Effectively Connected with a U.S. Trade or Business," and below under Sections VII.D.5. and VII.D.6., entitled "FIRPTA" and "FATCA," any distribution made to a Non-U.S. holder on the New Equity generally will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the distribution unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced treaty rate, a Non-U.S. holder must provide the applicable withholding agent with an IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) certifying qualification for the reduced rate.

Dividends paid to a Non-U.S. holder that are effectively connected with a trade or business conducted by the Non-U.S. holder in the United States (and, if required by an applicable income tax treaty, are treated as attributable to a permanent establishment maintained by the Non-U.S. holder in the United States) generally will be taxed on a net income basis at the rates and in the manner generally applicable to United States persons (as defined under the Code). Such effectively connected dividends will not be subject to U.S. withholding tax if the non-U.S. holder satisfies certain certification requirements by providing the applicable withholding agent a properly executed IRS Form W-8ECI certifying eligibility for exemption. If the non-U.S. holder is a non-U.S. corporation, it may also be subject to a branch profits tax (at a 30% rate or such lower rate as specified by an applicable income tax treaty).

#### (b) Sale, Redemption, or Repurchase of New Equity or the New Warrants

Subject to the rules discussed below under Sections VII.D.6. and VII.E., entitled "FATCA" and "Information Reporting and Back-Up Withholding," a Non-U.S. holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of any of its

New Equity or New Warrants, including any gain resulting from a non-dividend distribution in excess of the holder's tax basis in their New Equity, unless (i) the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States), or (iii) New Parent is or has been during a specified testing period a USRPHC (as defined below).

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain realized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. holder, and a Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). If the third exception applies, the Non-U.S. holder will be subject to U.S. federal income tax and U.S. federal withholding tax as discussed in Section VII.D.5, entitled "FIRPTA."

### (c)  Exercise of the New Warrants

In general, it is not expected that the exercise of the New Warrants into New Equity will cause a Non-U.S. holder to recognize gain or loss under the Tax Code. However, each Non-U.S. holder is urged to consult its own tax advisor prior to the exercise of the New Warrants into New Equity and prior to a sale or disposition of New Equity acquired by such exercise, including regarding FIRPTA reporting requirements to the IRS relating to such exercise.

### 5.  *FIRPTA*

Under the Foreign Investment in Real Property Tax Act of 1980 ("*FIRPTA*"), gain or loss of a foreign person on a disposition of a United States real property interest ("*USRPI*") is deemed to be effectively connected with a trade or business carried on in the United States and subject to U.S. federal income tax. A USRPI includes any interest (other than solely as a creditor) in a domestic corporation if the domestic corporation is a United States real property holding corporation ("*USRPHC*"). Common stock that is regularly traded on an established securities market is, however, excepted from treatment as a USRPI if any class of stock of the corporation is regularly traded on an established securities market and the holder of such stock does not, at any time during an applicable measuring period, own more than 5% of that class of stock (the "*5% Public Shareholder Exception*").  In addition, if a non-regularly traded interest is convertible into common stock that is regularly traded on an established securities market, such non-regularly traded interest is excepted from treatment as a USRPI if on the date on which a holder acquired such interest it does not have a fair market value greater than 5% of the regularly traded class of stock into which it is convertible (the "*5% Convertible Exception*" and together with the 5% Public Shareholder Exception, the "*5% Exception*").

If the common stock of the corporation were not considered to be regularly traded on an established securities market during the calendar year in which the relevant disposition by a Non-U.S. holder occurs, the Non-U.S. holder (regardless of the percentage of common stock owned or the fair market value of the non-regularly traded interest convertible into common stock) would be subject to U.S. federal income tax on a taxable disposition of the common stock or the non-regularly traded interest convertible into common stock, and a 15% withholding tax would apply to the gross proceeds from such disposition.

The Debtors expect that New Parent will be a USRPHC.  Accordingly, the New Equity and the New Warrants will be treated as USRPIs, unless a Non-U.S. holder qualifies for the 5% Exception. Following the Effective Date, the New Parent may take steps to create a market for the New Equity, but no assurances can be given that New Parent will take such steps or, that if they do, the New Parent's actions will permit certain Non-U.S. holders to rely on the 5% Exception with respect to their New Equity.

**NON-U.S. HOLDERS SHOULD CONSULT THEIR INDEPENDENT TAX ADVISORS TO DETERMINE WHETHER THE NEW EQUITY AND/OR THE NEW WARRANTS ARE SUBJECT TO FIRPTA.**

### 6. *FATCA*

The Foreign Account Tax Compliance Act ("***FATCA***") imposes a 30% withholding tax on "withholdable payments", in each case if paid to a "foreign financial institution" or a "non-financial entity" (each as defined in the Code) (including in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Code) or provides the applicable withholding agent with a certification identifying the direct and indirect substantial United States owners of the entity (in either case, generally on an IRS Form W-8BEN-E), or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation (such as an IRS Form W-8BEN-E). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes.

For this purpose, "withholdable payments" are generally U.S. source payments of (i) fixed or determinable, annual or periodical income (including interest on debt instruments issued on or after July 1, 2014 and dividends on shares of New Equity) and (ii) gross proceeds from the sale or other disposition of any property of a type which can produce U.S. source interest or dividends (if such sale or other disposition occurs after December 31, 2018). Because the debt underlying the EGC Unsecured Notes Claim or EPL Unsecured Notes Claim was issued prior to July 1, 2014, FATCA will not apply a holder with respect to the exchange of its EGC Unsecured Notes Claim or EPL Unsecured Notes Claim.

Each Non-U.S. holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. holder's U.S. federal income tax consequences under the Plan.

### E.   Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. holder, such U.S. holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. holder, such Non-U.S. holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

In addition, from an information reporting perspective, the Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## VIII.  CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The risk factors below should not be regarded as the only risks associated with the Debtors' businesses or the Plan and its implementation.  Documents filed with the SEC may contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A.       Certain Bankruptcy Law Considerations

#### 1.  *General*

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure the parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' ability to develop and execute their business plan, their financial condition, and their liquidity.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.   *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3.   *The Conditions Precedent to the Confirmation Date and/or Effective Date of the Plan May Not Occur*

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

### 4.   *The Debtors May Fail to Satisfy Voting Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 5.   *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 6.   *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 7.   *The Debtors May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to nonaccepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 8.   *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 9.   *Risk of Termination of the Restructuring Support Agreement*

The Restructuring Support Agreement contains certain provisions that give the Majority Restructuring Support Parties the ability to terminate the Restructuring Support Agreement if various

conditions are satisfied, such as the failure to meet of the proposed milestones or the conversion of one or more of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code.  Should a termination event occur, all obligations of the Restructuring Support Parties under the Restructuring Support Agreement will terminate, except that any party's termination solely with respect to itself will not result in the termination of the Restructuring Support Agreement with respect to any other party.  Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, employees, and major customers.

**10.** ***Conversion into Cases under Chapter 7 of the Bankruptcy Code***

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.  See the Liquidation Analysis attached hereto as ~~**Exhibits  G-1**~~, ~~**G-2**~~, and ~~**G-3**~~**Exhibit E** for further discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

**B.**     **Additional Factors Affecting the Value of the Reorganized Debtors**

**1.** ***The Total Amount of Claims Could Be More than Projected***

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than what the Debtors have estimated, which, in turn, could cause the value of distributions to be reduced substantially.

**2.** ***Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary***

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

**C.**     **Risks Relating to the Debtors' Business and Financial Condition**

**1.** ***Risks Associated with the Debtors' Business and Industry***

The risks associated with the Debtors' business and industry are more fully described in the Debtors' SEC filings, including:

- Annual Report on Form 10-K for the fiscal year ended June 30, 2015, filed on September 29, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015, filed on November 9, 2015;

- Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2015, filed on February 16, 2016; and

- Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2016, filed on May 10, 2016.

The risks associated with the Debtors' business and industry described in the Debtors' filings with the SEC include, but are not limited to, the following:

- domestic and foreign supplies of oil and natural gas;

- price and quantity of foreign imports of oil and natural gas;

- actions of the Organization of Petroleum Exporting Countries and other state-controlled oil companies relating to oil and natural gas price and production controls;

- level of global oil and natural gas exploration and production activity;

- the effects of government regulation and permitting and other legal requirements;

- costs associated with perfecting title for mineral rights in some of our properties;

- competition in the oil and gas industry;

- uncertainties in estimating our oil and gas reserves and net present values of those reserves;

- uncertainties in exploring for and producing oil and gas, including exploitation, development, drilling and operating risks;

- political conditions in or affecting other oil-producing and natural gas-producing countries, including the current conflicts in the Middle East and conditions in South America and Russia;

- weather conditions;

- technological advances affecting oil and natural gas production and consumption; and

- overall U.S. and global economic conditions.

### 2. *Liquidity During and After the Chapter 11 Cases*

Although the Debtors lowered their capital budget and reduced the scale of their operations significantly, their business remains capital intensive.  In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in

connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors believe that they will have sufficient cash on hand and cash flow from operations to continue to fund the Reorganized Debtors' operations after emergence from chapter 11.

The Debtors current liquidity may not be sufficient to allow the Debtors to satisfy their obligations related to the Chapter 11 Cases, proceed with the confirmation of a chapter 11 plan of reorganization, and/or emerge from bankruptcy. While the Debtors have an agreement in principal with the First Lien Administrative Agent on the terms of the Exit Facility, the Debtors can provide no assurance that they will be able to secure interim financing or exit financing, if needed, to meet their liquidity needs or, if sufficient funds are available, that any financing offered to the Debtors will be on terms acceptable to the Debtors.

### 3.   *Post-Effective Date Indebtedness*

Following the Effective Date, the Reorganized Debtors will have significantly reduced their outstanding secured indebtedness, but will still have debt outstanding under the First Lien Credit Agreement. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D.   **Factors Relating to Securities to Be Issued Under the Plan**

### 1.   *Market for Securities*

On April 14, 2016, Energy XXI received a letter from The NASDAQ Listing Qualifications Staff stating that the Staff had determined that the Company's securities would be delisted from NASDAQ. The decision was reached by the Staff under NASDAQ Listing Rules 5101, 5110(b) and IM-5101-1 as a result of Chapter 11 Cases, the associated public interest concerns raised by the Petitions, concerns regarding the residual equity interest of the existing listed securities holders, and concerns about the Company's ability to sustain compliance with all requirements for continued listing on NASDAQ. Trading of the Company's common stock was suspended at the opening of business on April 25, 2016, and a Form 25-NSE was filed with the SEC on May 19, 2016, which removed Energy XXI's securities from listing and registration on NASDAQ. EXXI Common Stock is currently trading on the OTC Pink under the symbol "EXXIQ" as of April 25, 2016.

New Parent may seek listing of the New Equity on a national exchange upon consummation of the Plan. There can be no assurance that any public market for the New Equity will exist in the future or that New Parent will be successful with such listing. Until listed on a national exchange, the OTC Pink is a significantly more limited market than NASDAQ, and the quotation of the New Equity on the OTC Pink may result in a less liquid market available for existing and potential shareholders to trade shares of New Equity. This could further depress the trading price of New Equity and could also have a long-term adverse effect on New Parent's ability to raise capital.

### 2.   *Potential Dilution*

The ownership percentage represented by the New Equity distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the Management Incentive

Program and the exercise of any Warrants issued under the Plan, as well as the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtors could adversely affect the value of the New Equity issuable upon such conversion. The amount and dilutive effect of any of the foregoing could be material.

### 3.  *Equity Interests Subordinated to the Reorganized Debtors' Indebtedness*

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity would rank below all debt claims against the Reorganized Debtors. As a result, holders of New Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### 4.  *Implied Valuation of New Equity Not Intended to Represent the Trading Value of the New Equity*

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Equity in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New Equity is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Equity to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity in the public or private markets.

### E.    Additional Factors

### 1.  *The Debtors Could Withdraw Plan*

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2.  *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.  *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that

are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. *No Legal or Tax Advice Is Provided by this Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of Claims or Interests should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. *No Admission Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6. *Certain Tax Consequences*

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, *see* Section VII hereof.

## IX. VOTING PROCEDURES AND REQUIREMENTS

### A. Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

The claims in the following classes (collectively, the "***Voting Classes***") are entitled to vote to accept or reject the Plan:

- Class 5– First Lien Claims

- Class 6 – Second Lien Notes Claims

- Class 7 – EGC Unsecured Notes Claims

- Class 8 – EPL Unsecured Notes Claims

- Class 9 – EXXI Convertible Notes Claims

- Class 10 – Trade Claims

- Class 11 – General Unsecured Claims

The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

### B.    Voting Procedures

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in certain exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> **PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

***Date***") t                                                                                                                       ***cord*** ccept
or impa

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, the applicable standards for tabulating Ballots, and opting out of the releases set forth in the Plan.

The Debtors have engaged Epiq Bankruptcy Solutions ("***Epiq***") as their claims, noticing, solicitation, and balloting agent (the "***Solicitation Agent***") to assist in, among other things, the transmission of voting materials and in the tabulation of votes with respect to the Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF __:__ A.M./P.M., PREVAILING CENTRAL TIME, ON _____, 2016, UNLESS EXTENDED BY THE DEBTORS.  IF YOU HOLD YOUR CLAIMS THROUGH A NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE FOR RETURNING YOUR VOTING INSTRUCTIONS.   UNLESS OTHERWISE INSTRUCTED,**

**PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE OR YOUR VOTE WILL NOT BE COUNTED.**

      **EACH BALLOT ADVISES THAT CREDITORS WHO (A) VOTE TO ACCEPT THE PLAN OR (B) DO NOT VOTE OR VOTE TO REJECT THE PLAN AND DO NOT ELECT TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS SET FORTH IN ARTICLE VIII OF THE PLAN AND UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CAUSES OF ACTION. CREDITORS WHO DO NOT GRANT THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN WILL NOT RECEIVE THE BENEFIT OF THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN.**

      Delivery of a Ballot by facsimile, e-mail or any other electronic means will not be accepted. Ballots returnable to the Solicitation Agent must be returned by the Voting Deadline with an original signed copy to:

| **Via First Class Mail:** | **Via Hand Delivery or Overnight Courier:** |
|---|---|
| Energy XXI Ltd Ballot Processing c/o Epiq Bankruptcy Solutions, LLC P.O. Box 4422 Beaverton, OR 97076-4422 | Energy XXI Ltd Ballot Processing c/o Epiq Bankruptcy Solutions, LLC 10300 SW Allen Blvd. Beaverton, OR 97005 |

      FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT NO LATER THAN [____], 2016 AT [   :   ] A.M./P.M. (PREVAILING CENTRAL TIME).

      The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

      **D.**    **Waivers of Defects, Irregularities, etc.**

      Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Solicitation Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.

      Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors determine, unless otherwise ordered by the Bankruptcy Court.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will the Debtors or any other person incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will

not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## X.  CONFIRMATION OF THE PLAN

### A.  Confirmation Hearing

Pursuant to sections 1128 and 1129 of the Bankruptcy Code, the Bankruptcy Court has scheduled a ~~hearing~~Confirmation Hearing to consider confirmation of the Plan ~~(the "*Confirmation Hearing*")~~.  The Confirmation Hearing has been scheduled to be heard on _____, 2016 at __:__ a.m./p.m. (Prevailing Central Time) in Courtroom 400 of the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.  The Confirmation Hearing may be adjourned from time-to-time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

In addition, the Bankruptcy Court has set the deadline to object to the confirmation of the Plan as _____, 2016 at __:__ a.m./p.m. (Prevailing Central Time) (the "*Objection Deadline*").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections and responses to the Plan, if any, must be served and filed as to be received on or before the Objection Deadline in the manner described below.  For the avoidance of doubt, an objection to the Plan filed with the Bankruptcy Court will not be considered a vote to reject the Plan.

### B.  Objections To Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth in interest may object to the confirmation of a plan. Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

1)             The Debtors and Counsel to the Debtors:

Energy XXI Ltd
1021 Main Street, Suite 2626
Houston, Texas 77022
Attn:   Bo Boyd

– and –

Vinson & Elkins LLP
First City Tower
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Attn:   Harry A. Perrin and Bradley R. Foxman
Tel:    (713) 758-2222
Email:  hperrin@velaw.com; bfoxman@velaw.com

– and –

91

Vinson & Elkins LLP
666 Fifth Avenue
New York, New York 10103-0040
Attn:   David S. Meyer, Jessica C. Peet, and Lauren R. Kanzer
Tel:    (212) 237-0000
Email:  dmeyer@velaw.com; jpeet@velaw.com; lkanzer@velaw.com

2)          The United States Trustee:

Office of the U.S. Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002
Attn:   Hector Duran

3)          The Ad Hoc Committee of Second Lien Noteholders:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attn:   Samuel Khalil and Matthew Brod
Tel:    (212) 530-5000
Email:  skhalil@milbank.com; mbrod@milbank.com

4)          The First Lien Agent:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:   Ana Alfonso
Tel:    (212) 728-8000
Email:  aalfonso@willkie.com

– and –

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2310
Houston, Texas 77002
Attn:   Jennifer Hardy
Tel:    (713) 510-1700
Email:  jhardy2@willkie.com

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### C.      Requirements for Confirmation of the Plan

The requirements for Confirmation of the Plan pursuant section 1129(a) of the Bankruptcy Code include, without limitation, whether:

1)          the Plan complies with the applicable provisions of the Bankruptcy Code;

92

2)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

3)     the Plan has been proposed in good faith and not by any means forbidden by law;

4)     any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

5)     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

6)     with respect to each Class of Claims or Interests, each holder of an impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

7)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

8)     except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

9)     at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

10)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

11)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### D.      Best Interests Test/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

Attached hereto as **Exhibit E** and incorporated herein by reference are liquidation analyses (collectively, the "*Liquidation Analysis*") prepared by the Debtors with the assistance of Opportune LLP ("*Opportune*"), the Debtors' financial advisor. The Liquidation Analysis provides the Debtors analysis with respect to separate liquidations of each of: Energy XXI and its affiliates, EGG and its subsidiaries (other than EPL and its subsidiaries), and EPL and its subsidiaries. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial reduction in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit E** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### E.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

For purposes of determining whether the Plan meets this requirement, the Debtors, with the assistance of Opportune, have analyzed their ability to meet their obligations under the Plan. As part of this

94

analysis, the Debtors have prepared a projected consolidated income statement, which includes the consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "**_Financial Projections_**") for the period beginning July 1, 2016 and continuing through June 30, 2019.  The Financial Projections are based on an assumed Effective Date of August 31, 2016 and certain assumptions regarding the Debtors' ability to obtain Exit Financing.  To the extent that the Effective Date occurs before or after August 31, 2016, recoveries on account of Allowed Claims could be impacted. Creditors and other interested parties should review Article VIII of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit F** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe they will be a viable operation following the Chapter 11 Cases Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## F.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[18][19]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

## G.      Additional Requirements for Nonconsensual Confirmation

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

---

[18][19] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

1.   *No Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.

2.   *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

H.   **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  The valuation analyses are set forth in ~~Exhibits G-1, G-2, and G-3~~**Exhibit G** attached hereto (together, the "*Valuation Analysis*") and incorporated herein by reference.

## XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.   If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

A.   **Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

###### B.      Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Class 5, and in certain instances Class 6, would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property.[1920]  In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 4, 5, and 6 would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds could be used to pay holders of Claims in Classes 7 through 15.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan.

###### C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit E**.

As noted in Section X.D of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

## XII.  CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:   ~~May 20,~~ June 14, 2016
          Houston, Texas

                              ENERGY XXI LTD
                              on behalf of itself and all other Debtors


                              \s\ _____
                              John D. Schiller Jr.
                              President and Chief Executive Officer
                              1021 Main Street, Suite 2626
                              Houston, Texas 77002

---

[1920]     Pursuant to that certain Intercreditor Agreement dated as of March 12, 2015 between Wells Fargo Bank, N.A., as priority lien agent, and EGC, the Priority Lien Agent (as defined in the Intercreditor Agreement) is given the exclusive right to credit bid; i.e. holders of Claims in Class 4 would not be entitled to credit bid.

## EXHIBIT A

**Plan of Reorganization**

## **EXHIBIT B**

**Restructuring Support Agreement**

## EXHIBIT C

**Corporate Structure Chart**

## **EXHIBIT D**

**Disclosure Statement Order**

**<u>EXHIBIT E</u>**

**Liquidation Analysis**

## **EXHIBIT F**

**Financial Projections**

## EXHIBIT G ~~1~~

**Valuation Analysis** ~~for Energy XXI Ltd~~**EXHIBIT G-2**

~~Valuation Analysis for Energy XXI Gulf Coast, Inc.~~**EXHIBIT G-3**

~~Valuation Analysis for EPL Oil & Gas, Inc.~~