UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO: 16-31928 |
| | ) | CHAPTER 11 |
| | ) | |
| ENERGY XXI, LTD, ET AL., | ) | Houston, Texas |
| | ) | |
| | ) | Tuesday, August 23, 2016 |
| Debtors. | ) | |
| | ) | (11:47 a.m. to 1:41 p.m.) |

HEARING

BEFORE THE HONORABLE DAVID R. JONES,
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES:</u>                   (Continued on page 2)

For Debtors:                 JORDAN W. LEU, ESQ.
                             REESE A. O'CONNOR, ESQ.
                             Vinson Elkins, LLP
                             1001 Fannin St., Suite 2500
                             Houston, TX 77002

                             BRADLEY R. FOXMAN, ESQ.
                             HARRY A. PERRIN. ESQ.
                             Vinson Elkins, LLP
                             Trammell Crow Center
                             2001 Ross Avenue, Suite 3700
                             Dallas, TX 75201

Courtroom Deputy/ECRO:    Diyana Staples

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**          (CONTINUED)

Debtors:                      DAVID S. MEYER, ESQ.
                              JESSICA C. PEET, ESQ.
                              Vinson Elkins, LLP
                              666 Fifth Avenue, 26th Floor
                              New York, NY 10103


Wilmington Trust:             TODD MYERS, ESQ.
                              Cole Schotz
                              301 Commerce St., Suite 1700
                              Fort Worth, TX 76102


Delaware Trust                PHILIP D. ANKER, ESQ.
as Indenture Trustee,         CHRISTOPHER LOONEY, ESQ.
et al.:                       DENNIS L. JENKINS, ESQ.
                              Wilmer Cutler Pickering, et al.
                              7 World Trade Center
                              250 Greenwich Street
                              New York, NY 10007


Prosperity Bank:              ADAM R. SWONKE, ESQ.
                              Well Cuellar
                              440 Louisiana, Suite 718
                              Houston, TX 77002


Ad Hoc Group of EGC           GREGORY M. STARNER, ESQ.
Unsecured Noteholders:        JOEL ANDROPHY, ESQ.
                              White & Case
                              1155 Avenue of the Americas
                              New York, NY 10036


Ad Hoc Committee of           EDWARD L. ROTHBERG, ESQ.
Equity Holders:               Hoover Slovacek
                              Galleria Tower II
                              5051 Westheimer, Suite 1200
                              Houston, TX 77056


Wells Fargo:                  ANA ALFONSO, ESQ.
                              Willkie Farr Gallagher
                              600 Travis St., Suite 2310
                              Houston, TX 77002


Official Committee of         CHRISTOPHER R. HARRIS, ESQ.
Unsecured Creditors:          HEATHER WALLER, ESQ.
                              ADAM J. GOLDBERG, ESQ.
                              Latham & Watkins
                              330 N. Wabash Avenue, Suite 2800
                              Chicago, IL 60611

3

**APPEARANCES FOR:**          (CONTINUED)


Ad Hoc Committee of          ANDREW M. LE BLANC, ESQ.
Second Lien Lenders:         SAMUEL KHALIL, ESQ.
                             Milbank Tweed Hadley & McCloy
                             28 Liberty Street
                             New York, NY 10005

4

**Houston, Texas; Tuesday, August 23, 2016; 11:47 a.m.**

**(Call to Order)**

THE CLERK:  All rise.

THE COURT:  Thank you, everyone.  Please be seated.

All right.  Who's the keeper of all the info?

MR. MEYER:  I guess that would start with me, your Honor.

THE COURT:  Fair enough.

MR. MEYER:  David Meyer, Vinson and Elkins, on behalf of the debtors.  I'm here with my colleagues, Jessica Peet, Jordan Leu, Reese O'Connor, Brad Foxman, with Matt Moran and Harry Perrin.

THE COURT:  Thank you, folks.  Do you want to just give me an update with where we are?

MR. MEYER:  Sure.  Why don't I do that.

Your Honor, first of all, thank you for your patience as we've been working through a handful of issues over the course of the last couple of hours and over the last couple of days as well.

THE COURT:  Yeah.  Sure.

MR. MEYER:  We have a handful of items on the agenda today.  The principal reason that we originally scheduled this date was status conference with respect to plan confirmation, so perhaps I'll start there.  That necessarily dovetails with the standing motions that were filed for today, first by the E

5

-- EPL Ad Hoc Group, then by the EGC Ad Hoc Group, and we have two other items on the plan -- on the agenda today, for one, the motion with respect to Prosperity and a contract objection motion.

So, I'll start with the status conference, your Honor.  And thank you to your chambers, as well, for assisting us work through dates and potential options here.  Here is what we -- where we currently sit, which is we would keep our dates set for September 13th and 14th.  We currently have those established for plan confirmation.

THE COURT:  Right.

MR. MEYER:  Given where we currently are, as part of the discovery process and just where this case sits generally --

THE COURT:  Uh-huh.

MR. MEYER:  -- in the absence of a change, we anticipate that we will need more than two days for confirmation.  And, so, as a consequence of that, we've also requested and been advised that you're free on September 21st and 22nd, as well as the morning of September 23rd.  And in advance of all of that, your Honor, we would request that we schedule a pretrial status conference for September 6th, that we also understand is available based on your calendar.

THE COURT:  Let's see.  All right.  Let's go back. Looks like there may have been a slight miscommunication, but

6

I -- I think we can get there.  I have the afternoon of the 21st, not the whole day.  On the 22nd, I can move a couple of things.  We can probably start -- we can start, you know, 9:15-ish, 9:30-ish.  What I would probably suggest is that we go through the normal lunch hour just so you have maximum use of time.  I've got a 2:00 o'clock individual Chapter 11 confirmation hearing.  It just can't take very long, and my thought would be is that, you know, we'll just schedule lunch around that and you all can take a break while I handle that, if that works for everybody.  It will be a late lunch, but I can't imagine that would be that bad.  We can start a little later if we need to.  And, then -- and I have time on -- I have a significant chunk of time on the 23rd, so I can certainly give you those three days, if that helps.

MR. MEYER:  I think that's (indiscernible), your Honor.  I think that that's --

THE COURT:  All right.

MR. MEYER:  -- consistent with the general discussion we discussed -- the general schedule we discussed with the plan objecting parties.  I think that --

THE COURT:  But the goal would still be to start on the 13th?

MR. MEYER:  Correct.  That's right, your Honor.

THE COURT:  All right.

MR. MEYER:  And I think that, based on the

7

discussions today, that's -- there is an agreement between each of the plan objecting parties.

There is going to be a pretrial status conference on the 6th, and people may make different arguments at that point in time, to be clear, but as it relates to today and what we were targeting today and the purpose of it being, that's where we sit.

THE COURT:  No, fair enough.  And on the status conference for the 6th, how much time were you thinking?  And I'm not going to hold a stopwatch.  I'm just trying to schedule.  Is this a 30-minute?  Is it a three-hour?  What do you anticipate?

MR. MEYER:  From my standpoint, your Honor, and -- and -- I would anticipate that we're going to be on the shorter side than the longer -- the longer side.

THE COURT:  All right.  Everybody agree with that?

Mr. Anker?

MR. ANKER:  Philip Anker, Wilmer Cutler Pickering Hale and Dorr, your Honor, for Delaware Trust as EPL --

THE COURT:  And I didn't mean to pick on you; it's just over the years I've --

Can we turn the microphone around?  She can't hear you.  It's out in the front.

I didn't mean to pick on you.  It's just over the years I have learned that you are a pretty good estimator of

8

time.  That's all I was -- the only reason I looked to you.

MR. ANKER:  I hope I'll be good to my past experience.  I suspect that it could be longer than that, but I don't think it's three hours.  I do want to underscore, your Honor -- and I think on this I speak for all the objectors, but if not, they should speak up.

THE COURT:  Sure.

MR. ANKER:  We do think it makes sense at the moment, and we are hopeful that we can go forward on the 13th and 14th. We're hopeful that we will be able to persuade your Honor that the plan that is currently on the table is not confirmable, and so that we can move forward, and I think you've seen evidence there are substantial negotiations going on of an alternative --

THE COURT:  Sure.

MR. ANKER:  -- plan, and I would like a few minutes to chat about that, not right this second.

THE COURT:  Sure.

MR. ANKER:  I do think in terms of the 6th, just to give you a sense, there have been depositions every day.  There are two, maybe three deps. scheduled tomorrow and each day the rest of the week.  And I certainly think the debtors have been operating in good faith.  Having said that -- and, again, I'm not at all suggesting this is anything other than what happens in the real world -- we got 18,000 pages of new documents the

9

other day that we haven't had a chance to go through, but they may well require witnesses who have already been deposed to be redeposed.  The schedule in terms of sort of when we're likely to get done fact discovery has slipped easily a week, if not two.  And I want to just give the Court a heads up that it is possible -- I'm not predicting it -- it is possible that on the 6th some or all of the objecting parties will have a different view on whether the 13th or 14th works.

THE COURT:  Right.

MR. ANKER:  But at the moment I don't think any of us are in a position to say to your Honor it doesn't work, period, full stop.

THE COURT:  Got it.  So, with respect to the scheduling conference on the 6th, that is a normal travel afternoon for me to Corpus.  But what I would propose is this, is to give you an 11:00 o'clock, and I'll just go ahead and reserve the late flight Tuesday night, so you'll have five hours max.  I hope we don't need it, but if we do and there are other issues develop and there's need for emergency consideration of whatever might occur, you've got a significant block of time.  Does that work for everybody?

MR. MEYER:  It certainly works for me, your Honor.

MR. SPEAKER:  Yes, sir.

THE COURT:  All right.  All right.  So, Ms. Staples, if you'd set a scheduling conference --

10

(Voices and whispers off the record)

THE COURT:  No, understood.  We'll set -- we'll set a scheduling conference or a status conference for September the 6th at 11:00 o'clock.  Then, with respect to continued days for confirmation, let's go ahead and block out -- I think you'd already done this -- yeah, block out the 21st from 11:00 o'clock forward, the 22nd from -- we'll block out from 9:15 forward with the understanding that we've got that issue at 2:00 o'clock, and then the 23rd we'll block out from 9:00 until 2:30, and then, dependent upon if you need it -- I haven't yet figured out if the 3:00 o'clock is ten minutes or two hours.  I just -- I haven't figured that out yet.  That work?

MR. MEYER:  Yes, it does, your Honor.  Thank you.

THE COURT:  All right.  What else can -- what else do we need to address today?

MR. MEYER:  Well --

THE COURT:  Do we still have discovery issues that we need to deal with?

MR. MEYER:  We do.  There are a couple of discovery items that we will address; a couple items before that, your Honor.

THE COURT:  Okay.

MR. MEYER:  First, the standing motion that was filed by the EPL Ad Hoc Group; they have agreed that that motion will

11

be carried to the confirmation hearing set for September 13th as well.  The creditors committee supports that adjournment of that motion, too.  The Ad Hoc EGC Group, you may recall, your Honor, they filed a motion in response to the EPL motion predicated on if the EPL group was granted standing, that the Ad Hoc EGC Group should be granted standing.  They have not agreed to that adjournment.  They would like to prosecute their motion today, so we will be talking about that a little bit, and --

**THE COURT:**  Well, let me just -- and hopefully this will facilitate some additional discussions.  The way that I look at this, and I -- I know that a transcript was gotten of what I said in *Midstates*, and, you know, I don't pretend to be the most eloquent in the world, but I meant what I said there, and I think it applies here.  I don't see how standing can coexist with a proposed compromise embodied in a plan.  If the debtor fails, then the debtor fails, and then all bets are off. And I think I've made that -- if I haven't made it pretty clear, I'm, hopefully, reiterating that concept again.  But in terms -- and I think that if the plan fails, I think that the movants will almost, by definition, have established the necessary criteria for standing.  I'm not saying it's -- I'm not making that determination today, but it's going to be an uphill battle if the plan fails for the debtor to convince me that the requirements for standing haven't been met, because at

12

that point we have a failed compromise, we have a debtor,

and -- we have two debtors in untenable positions, at least in

terms of being able to evaluate those claims in a different

manner.

So, my inclination, I'm not going to proceed forward

with a prosecution of the standing motion today.  I think it

would be a waste of everybody's time.  I came out prepared this

morning to talk about continuing those to confirmation.  It

only makes sense.  It's -- the issues are intertwined, so -- if

that causes anybody heartburn, I'll certainly hear it.  I'll

hear arguments, but you're going to be -- it's going to be a

tough battle to get me to hear that today ahead of

confirmation, because I just think I'm going to hear the same

thing twice.  I mean, maybe in a different form, but it's --

substantively, it's the same thing.  You know, that's -- those

are my thoughts.

**MR. MEYER:**  Thank you, your Honor.  Those certainly

reflect our views based on the papers, as well.

A couple of additional points for your Honor related

to scheduling and housekeeping.  Our scheduling order, there is

a -- there was for the plan objectors a milestone that expert

reports would be provided by this Friday, August 26th.  In

connection with these discussions, we've agreed to -- and I

should, more importantly, say the plan objectors have agreed

to -- extend that deadline to this upcoming Monday,

13

August 29th, at 6:00 p.m. central time.

THE COURT:  All right.

MR. MEYER:  And the corollary to -- and that is to in part address the concern that Mr. Anker reflected that we'll talk about a little bit with respect to the finer points of the discovery disputes, as well as the corresponding date for our rebuttal reports to come in would be extended to Tuesday, September 6th, at 2:00 p.m. central time, that being -- it had previously been the preceding Friday, September 2nd.

THE COURT:  So, that -- that will fall after our status conference.  Do we want to reverse those?  Or -- I don't know what is going to come up.  Do you want to have that status conference later in the day so that you can then, if there are expert issues that you see and you need to raise -- I know you're not going to have a lot of time, but --

MR. ANKER:  Your Honor, I think that's a very thoughtful and good suggestion.  That would make sense.  It would give us a little bit of time to at least digest those reports, so if that would be agreeable to your Honor, it would be good for us.

THE COURT:  It's fine with me.  You have the whole day.  When would you like to -- when would you like to start?  Seems to me it would make a whole lot of sense, if you all can agree, is that you get the rebuttals maybe by noon and you have the hearing at 2:00.  And that -- that gives you a couple

14

hours.

MR. ANKER:  I see a (indiscernible) --

MR. MEYER:  I'm a -- I'm a very reasonable guy, your Honor, and I also read body language well, and so, yes, that's amenable to us.

THE COURT:  All right.  So, and are we going to embody this in an agreed order, or are we simply just going to make the announcements on the record?

MR. MEYER:  I'm comfortable -- we made the representations on the record.  I think everybody is acting in good faith with respect to these changes.  I don't think there is anything that we need to do more formally than that, your Honor.

THE COURT:  All right.  So, rebuttal -- rebuttal reports by noon.  We'll move the scheduling hearing on the 6th till 2:00, and that way if something major exists we can just take it up then.

**(Pause)**

MR. MEYER:  Thank you, your Honor.

THE COURT:  Uh-huh.

MR. MEYER:  I will step back and just take a couple -- make a couple observations for today's hearing based on a couple of the discussions associated with the intercompany note, plus the creditors committee's exclusivity objection that was filed on Friday night, and that dovetails with some of

15

Mr. Anker's comments, before go to the agenda for the rest of the day.

And I think, your Honor, the first day we came into your courtroom here, we provided a very detailed overview of the company's capital structure, and one of the items we had flagged that we anticipated would become a key issue in these cases is the second intercompany note --

**THE COURT:**  Right.

**MR. MEYER:**  -- from EPL to EGC.  And it's an important reason, your Honor, one of several, why independent directors are at both boxes and that independent directors have separate counsel.  And just by way of refresher, EGC has Mr. George Morris as its independent director, and he's engaged Andrews Kurth as his counsel, and Jim Latimer at EPL is the EPL independent director, and he has engaged Porter Hedges as his counsel.  As part of our standing objection, your Honor, we did attach the resolutions that appointed Mr. Morris and Mr. Latimer, respectively, as effectively restructuring committees of one to deal with any issues in which there are conflicts between EGC and EPL.

**THE COURT:**  Uh-huh.

**MR. MEYER:**  And, so, while we made that prediction to your Honor -- and the WilmerHale group had the -- WilmerHale was representing a smaller ad hoc group at that particular point in time -- as a reminder, the unsecured noteholders in

16

this case had not organized prior to the petition date.  It was a very unique circumstance in which an interest payment was missed in February on the EPL bonds; that interest payment was cured in March; and ultimately the company, as you know, filed in April.  And, similarly, on the ad hoc EGC side, an interest payment was missed in March and ultimately not made, in part leading to the commencement of these cases in April.

And, so, I give that backdrop just for where we are and where we're going.  It's no surprise that we have ad hoc groups in a big fight about this nuanced issue.

**THE COURT:**  Sure.

**MR. MEYER:**  I'd also note that there has been significant turnover, we believe, in the bond group from -- well, for (indiscernible) various points in time between the time the second intercompany note was issued and where we sit today, including during the course of these cases.  And I think your Honor appropriately noted that what we've done here is seek to settle all disputes that are raised in the standing motion as part of our -- the plan that's been filed and as -- we agree with your Honor that that will be taken up in connection with confirmation, and there is also no dispute that discovery on these issues remain and is ongoing.  John Schiller is going to be deposed tomorrow.  He is the company's CEO, as you know.  He's also a board member at both EGC and EPL, and he's a 30(b)(6) witness on certain topics, too.  And Mr. Morris

17

and Mr. Latimer will be deposed on Thursday and Friday of this week, respectively.  And, so, there is no question that parties in interest will have their ability to object to confirmation if they want to do so on this particular point, and the Court will take a good, hard look at that.

The other comment that I make, quickly, your Honor, relates to the exclusivity objection that was filed on Friday night.  We filed our short statement yesterday leading up to today's status conference, and I would emphasize that, as (indiscernible) -- and I don't want to belabor the point, but we had not received proposals and we still have not received any term sheet from any particular party.  And it's unquestioned that the debtor controls exclusivity at this point.  And we're going to take a hard look at that particular issue.  The fact that outlines of proposals were included in exclusivity objections in advance of today's hearing, people know where we are.  We're in constant communication with folks. If there is a proposal to be had, and there is an idea that somebody has, the appropriate way for that to be channeled in the best interests of the company and all of the stakeholders is through the debtors as estate fiduciaries.  The company and its directors, as well as the independents, take those fiduciary duties very seriously.  There is a robust fiduciary out in the restructuring support agreement that reflects exactly that.

18

And, so, I think, you know, your Honor, as a general tenor, we wanted to make sure we explained that to the Court, but I think an important point that I would also raise is, while we'll continue to have those discussions -- and I don't think there is any question that we have been, in particular, very active in all of those with various parties, and most specifically, the advisers to the creditors committee -- we also believe that the plan that's currently been proposed is confirmable.  And, of course, that's not an issue for today, but we believe that the plan will satisfy the requirements of Section 1129 and can be confirmed.

So, with that, your Honor, I will turn the podium over.  I think it's likely to Mr. Anker first to comment on his standing motion, as well as some other items, to Mr. Goldberg to discuss the standing motion, and then Mr. Starner.

**THE COURT:**  Let me -- and just to -- because I -- if you folks are talking, I want that to continue, and I don't want to say something or do something that changes the balance of those negotiations.  With respect to exclusivity today, having read everything, what I was contemplating doing was, to the extent that it's required, extending exclusivity through what would now be the 23rd.  I've said it multiple times, and I've said it different ways.  I'm going to give the debtor its shot.  I haven't yet been able to assess your chances of success; I just don't know.  But I'm going to give the debtor

19

its shot to either negotiate some of the issues down to where they're manageable, or if you think that you can just beat everybody, I'm going to give you that shot.  And I don't want the existence of another plan or other discussions to get in the way of that.  I want that to be fully vetted.

What I will do on the 23rd in terms of plan alternatives or anything else -- and that's just assuming, Mr. Anker, that you take all the time that I've given you; the end of confirmation, be it the 13th, 14th, or the 23rd -- what I will do at that point with respect to plan alternatives and -- and, you know, allowing other folks to file plans is going to depend on what I hear, in large part.  And, so, my thought is, you know, I'm not going to say you've got -- you know, that you've got exclusivity through the end of the year.

**MR. MEYER:**  Uh-huh.

**THE COURT:**  And what I'm telling you is, I'll give it to you through the end of the confirmation process, and I'm going to watch and I'm going to listen and I'm going to then ask for arguments and try to figure out the right thing to do going forward.

**MR. MEYER:**  Uh-huh.

**THE COURT:**  That -- that's kind of my thought on the process.  I don't --

**MR. MEYER:**  So, I think, your Honor, actually, we've thought about it very similarly.  We filed our exclusivity

20

motion several weeks back now.  And the objection deadline that was part of the bridge order that we reached with the plan objecting parties --

THE COURT:  Uh-huh.

MR. MEYER:  -- contemplates that our exclusive period to file a Chapter 11 plan is extended through the earlier of the end of confirmation or September 30th or a date on or around that date, with the theory being that we were protected to be able to go prosecute our plan, and if we don't succeed, then we reserve whatever rights we have to request a further extension of exclusivity --

THE COURT:  Right.

MR. MEYER:  -- other parties reserve whatever rights they have to either object to that extension request or to move to terminate exclusivity.  And, so, your Honor has entered a bridge order to that effect, so I think we're largely --

THE COURT:  We're already through the end of September, so I'm -- I don't know why I had in my mind that that was still an issue.  So, we're good through September 30?

MR. MEYER:  That's correct.  The way that it works, just to be -- and I'll let Mr. Goldberg comment if he feels --

THE COURT:  Okay.

MR. MEYER:  -- I'm getting the words wrong here, but it's -- the exclusivity extension itself contemplates that our motion that we filed would be heard either on the earlier or of

21

immediately following the confirmation hearing, the conclusion of the confirmation hearing, or around September 30th.  And I say "around" because that's based on the availability of the Court.

THE COURT:  All right.  I'll just tell you, and I'm -- I'm going to be asking the questions once we conclude the hearing on confirmation, assuming that I don't confirm it.  So, I mean, I want everybody to have that on their list of things to be prepared for.  Because I do think everybody deserves an answer.  I mean, if you don't -- if you have difficulty -- you all were in here when you heard my 9:15.  You know, that's real life.  Those are folks who can't make the car payment and who are in a house that's $50,000 under water.  Those are the people that get affected most by all of this.  And, so, I'm not going to delay it.  You know, if you can win, you can win.  If you can't, I'm going to look for the next best winner.  And I'm going to do that quickly.  So, everybody -- you know, if you can't -- if you don't prevail, be ready to talk about Plan B.  I'm not going to -- not going to give everybody two weeks to go figure out what the plan is; you'd better have Plan B in your pocket when you come.

MR. MEYER:  Uh-huh.

THE COURT:  Fair enough?

MR. MEYER:  That's fair enough, your Honor, and --

THE COURT:  Okay.

22

MR. MEYER:  -- that's probably why, one, we believe we'll be able to confirm the plan, and, two, that's why the order is set up exactly in that manner.

THE COURT:  Got it.  Okay.

MR. GOLDBERG:  Good morning, your Honor.

THE COURT:  Good morning.

MR. GOLDBERG:  For the record, Adam Goldberg of Latham and Watkins on behalf of the official committee of unsecured creditors.

THE COURT:  Yes, sir.

MR. GOLDBERG:  I'm joined today with -- by Christopher Harris and Heather Waller from Latham, as well as Tristan Manthey and Billy Patrick from Heller Draper.

THE COURT:  Good afternoon, folks.  I -- actually, when I came out, I thought all of this had been resolved, so I apologize for -- I thought I was going to get an announcement that everything was all agreed to, and that's why I didn't take appearances, so my -- my error.

MR. GOLDBERG:  Understood, your Honor, and we -- and we did make quite a bit of progress.

THE COURT:  Sure.

MR. GOLDBERG:  If I might be heard for just a minute or two to respond to -- I think --

THE COURT:  Of course.

MR. GOLDBERG:  -- it's important to note that the

EXCEPTIONAL REPORTING SERVICES, INC

23

committee shares the debtor's desire to move quickly, as well as your Honor's desire to move quickly.  We did see real life here today in the courtroom, and the members of our committee, including trade creditors, are very deeply vested in the future of this company and are looking forward to a speedy reorganization.  I would say that the debtor -- the committee shares also the debtor's desire to move forward with the confirmation hearings, although for a somewhat different reason, because our view is that defeat of the plan is the fastest way to advance towards confirmation.

To frame the landscape of these cases for your Honor, we filed our exclusivity objection on Friday.  Two important points to note there.  One, which I think the debtors did not bring up, is that the committee has worked with unsecured creditors towards -- to safeguard the estates through a standby DIP financing facility to provide liquidity in the event that there is a destructive storm and the debtor needs to bridge until the time when its insurers honor their obligations.  As a result of those efforts, the debtors have now received a term sheet for a standby DIP facility from a global investment bank, and we'd encourage the debtors to work with them and other potential financing sources on that term sheet.

Second, the committee has been engaged with creditors and other parties to develop a confirmable plan that would maximize value for unsecured creditors.  Our exclusivity

24

objection describes a framework that would be designed to pay the second lien noteholders in new debt and cash at a value to which they have agreed and support under the debtor's plan through -- through new money investments by unsecured creditors.  What that reflects, your Honor, is that groups have organized not only to litigate, but also to speak with their checkbooks and bring new value and underwrite greater value for all unsecured creditors.

So, in sum, we look forward to progressing with confirmation hearing as quickly as possible so that the estates can benefit for the opportunity for unsecured creditors to bring that new value to the table.  And to sustain that process, we think it prudent that the debtors should engage with financing sources over a potential liquidity facility to guard the estates in light of the hurricane risks that the debtors have described and because, at least in the committee's view, the current plan will not result in confirmation.

**THE COURT:**  All right.  And, so, what do you think it is that I ought to be doing that's different than what I've indicated my thought process is?

**MR. GOLDBERG:**  I think your Honor has set out exactly what we'd like to hear, which is that we will move forward with confirmation and that we'll take stock of where we stand at that point.  In the meantime, you know, we have expressed our views that the debtors engage with financing sources on a

25

potential DIP facility and that we think that's the prudent approach for the time being.

THE COURT:  All right.  Thank you.

MR. GOLDBERG:  Thank you, your Honor.

THE COURT:  Mr. Anker?

MR. ANKER:  Philip Anker again, your Honor, and I'm joined by my partner, Dennis Jenkins, and my colleague, Chris Looney.

Your Honor, I rise only to say a few things, some of which are small and concrete and some of which are bigger picture perhaps, more unconcrete.  I would ask that the Court -- and I think it's implicit in what you said -- but we would request that the standing motions be continued to the confirmation hearing rather than after the confirmation hearing.  We read what you said in *Midstate*.  I was prepared to argue today, but I like to think I listen to judges, and I thought you were going to say exactly what you said, and that's why we were prepared to continue it.

THE COURT:  Okay.

MR. ANKER:  But we agree it's the flip side of a coin.  And we agree with the proposition that if this plan does not get confirmed, and we firmly we believe it will not be, that we need to move forward in that direction.

THE COURT:  All right.

MR. ANKER:  Second, then, I hate to be the bearer of

26

bad news rather than good news -- I'm not sure anyone in this courtroom is comfortable that at the end of the 23rd the confirmation hearing will be done.  I think there are different views on how many witnesses there are.

THE COURT:  All right.

MR. ANKER:  But I want to give you a fair warning.  I just think people thought, rather than put days on your calendar today and mess it up so you couldn't deal with other cases, we'd take stock then.  But I'm going to make a prediction.  My prediction is we're not done then --

THE COURT:  Got it.

MR. ANKER:  -- to be candid.

THE COURT:  No, I appreciate you telling me that.

MR. ANKER:  It may be different views.

Third, look, every time everyone rises here -- and I, therefore, don't mean to be critical -- part of what you try to do is influence the Court, and Mr. Meyer is a very skilled advocate, and he did that.  So, if you would bear with me, just bear with me one minute while I try to do the same, albeit in a different direction.

We've heard about these independent directors, and we will take their depositions.  But there was unequivocal testimony under oath yesterday by their financial advisor, and this is almost a direct quote:  "The plan was fully negotiated before they were appointed."  Asked twice; same answer given

27

both times.  That's the reality of the record here.  What they're going to tell you about is how when it came to negotiating the crumbs left on the table between the EGC bonds and us, you know, one half of one percent of the equity, they ended up negotiating that between the two independent directors.  But when it came to giving the lion's share of everything to the two L's, that was negotiated without any EPL or EGC unsecured creditor around.  You're going to hear a lot of testimony like that.  I'm not going to give you a preview of all of it, but what I've heard this week has been, frankly, startling about the lack of serious negotiations and serious diligence.

Let me say this to the Court.  We take seriously exactly what you said and what Mr. Goldberg said, which is we don't want to be at ground zero if at the end of the 23rd, or whatever day it is, your Honor says, "This plan is not confirmable."  So, what we will be doing in the interim, although we understand exclusivity is extended, is working hard.  My partner, Mr. Jenkins -- we heard you loud and clear about the concern about a hurricane.  That's what caused everyone on our side to say, "Can we deal with that issue and protect this estate?"  Mr. Jenkins sent over that proposal from a bank which is a member of our group.  We have not heard a response from the debtor.  But we're prepared to negotiate to provide contingent financing that takes that issue off the

28

table, and we hope and expect that the debtor will respond.

We are working on a plan structure that has the support of the EPL notes, the EGC notes, and reflects a settlement of the EGC intercompany, but really reflects one other critical point. And that is that there is a fundamental disagreement on value. The debtor's value of the whole enterprise is a fraction of the view on, to my left, this side of the table, of the enterprise. And we heard yesterday out of the PGT expert that the two L's think it's worth less. And when different people have different views on value, the way to solve that problem is they get what they think it's worth and we get what -- we take the upside if we're right. And, so, the basic structure that we have in mind is we will take out their claims on, frankly, the debtor's valuation, which is higher than the two L's. And, so, if the two L's really believe it, they should be sending us thank you notes, not fighting it. And if they fight it, their actions will speak louder than their words about what they really think value is.

We have retained management, management to come into place; management that is familiar with these assets, in fact, operated these assets before -- the EPL assets, at least -- before Energy XXI's acquisition of EPL. We are cognizant of the need to deal with employees, to deal with BOEM. We have -- we're working hard on each and every one of those issues to come up with a comprehensive alternative so if you agree with

29

us at confirmation -- and I understand it's confirmation of their plan; you're not going to litigate alternatives plans --

THE COURT:  Right.

MR. ANKER:  -- but we will be ready to go.  And I can assure you there will be a lot of evidence on why this plan is not confirmable.

THE COURT:  Got it.

MR. ANKER:  Thank you, your Honor.

THE COURT:  Let me ask you this.  Have you -- have you tailored -- let's just -- just so I can think about this in my mind, have you tailored your plan such that it can coexist with the approved disclosure statement, or do you -- are you contemplating an entirely new process?

MR. ANKER:  One answer, your Honor, is I've given no thought to the issue.  That's a direct answer.  I think to the extent the disclosure statement describes a background history of these companies, one could take it largely and cut and paste.  There are assertions in there by the Debtor about disputed facts that we might say different people have different views.

To the extent the disclosure statement, however, has within it -- and I'm giving you off-the-cuff reactions -- as it always would, a description of a plan, that would have to be different.

THE COURT:  Well, it has to be supplemented but there

30

are --

MR. ANKER:  Sure.

THE COURT:  -- there are conclusions and logical extensions based on valuations and some other things that you might take issue with.  And what I was really trying to figure out was, are we going to need to -- if the Debtors can't confirm their plan and don't have a deal or whatever it turns out to be, are we starting from scratch where we've got to start anew or what -- what's in your game plan if you'll share that?

MR. ANKER:  Your Honor, we will -- I pledge to the Court.  We will work to come up with a mechanism and a process that takes maximum advantage of the work that has been done to date so we don't end up reinventing the wheel and it moves as expeditiously as possible but also gives everyone due process.

THE COURT:  Okay.

MR. ANKER:  Certainly we can do that.  Supplemental disclosure statements are prepared all the time.  Certainly a lot of the discovery that has occurred to date, if not all of it, would be applicable.  We think we could move quite expeditiously down a different route.

THE COURT:  What I would also ask that you do is, as you think through that plan, if you would spend -- because I think it will be time well-spent -- spend a little time talking to the U.S. Trustee.  My guess is -- not my guess.  Mr. Duran

31

has a pretty good sense of how I deal with shortening deadlines and that sort of thing.  It just -- I think that getting his input as to what he would be comfortable with so that if we get there, you can have that number in mind so -- as I start to look at what a Plan B looks like.  I would greatly appreciate that.

MR. ANKER:  We very much appreciate your Honor's guidance and we will do that.  Thank you, your Honor.

THE COURT:  All right, thank you.

MR. STARNER:  Your Honor, Greg Starner, White & Case, on behalf of the EGC note group.  I wanted to address some of the points Mr. Anker raised and also discuss a little bit the standing motion.  I certainly heard your Honor's position with respect to that motion.

Let me start with the alternative plan.  I think Mr. Anker hit the highlights.  He basically outlined for the Court kind of what the framework looks like but that is a very large, complex, you know, plan that the parties are working very hard to put together.  A lot of parties are involved with that but -- and obviously this is happening in parallel with preparation for a very contested confirmation hearing which we certainly are prepared to go forward with.

We just note that in terms of what the plan looks like, you know, sort of the commitment is to ensure that the company's operations continue seamlessly with respect to this

32

alternative plan.  And on the hurricane issue, your Honor, I think Mr. Anker did address that very well.  What I will say is we took it very seriously.  We spent a lot of time digging into the issue trying to understand what the company's coverage looked like, what kind of management and mitigation was in place for that and the DIP financing was something that was put together with the goal of trying to address some of those risks, your Honor.

Just with respect to the standing motion, if I may, your Honor.

**THE COURT:**  Sure.

**MR. STARNER:**  I heard what the Court's position with respect to the timing of it.  You know, I just wanted to briefly outline why we thought it was important to kind of talk about this a little bit today and we're happy to address it at the confirmation hearing again.  But the context here really is -- and it touches a little bit on the Debtors coming forward and pointing to their special committee and some of the process that occur here because, you know, seeking confirmation and asking the Court to approve certain imbedded settlements really doesn't address the process that was in place here.

You know, we were entitled to have unconflicted fiduciaries with disinterested counsel and what we had here was the primary unencumbered asset at EGC is this intercompany note where it was effectively the same management and the same

33

advisors on both sides of that note.

THE COURT:  Why does the process -- why is the process not directly at issue when that 9019 is evaluated, if you will?  I mean, there's -- inherent in that is a requirement of good faith and Circuit cases all reference, you know, arm's length negotiation and a fair and open process and, you know, all the pluses and minuses were weighed and there really was a true, if you will, sort of, you know, give and a take in terms of reaching a deal.  Why doesn't that put the process right square in the middle and available for everyone to take a shot at?

MR. STARNER:  It does, your Honor.  I think you're absolutely right and, frankly, the 9019 issue, we would suggest to the Court it's really subject to entire fairness because you had people on both sides of that issue but the issue is the process leading up to the plan.  The plan that has been proposed --

THE COURT:  Right.

MR. STARNER:  -- is a product of this conflicted process.

THE COURT:  Right.

MR. STARNER:  And so we think it's very important to talk about what was that process and trying to even put in place fixes if we can.

THE COURT:  Right.

34

**MR. STARNER:** I mean, this is a potential -- not a cure-all but it is a fix providing standing to an unconflicted fiduciary to at least deal with these issues on the intercompany note.

**THE COURT:** Aren't I -- I mean, I'm assuming at some point I'm going to get a good-faith objection to confirmation if I don't already have it. I mean, I would think that the entire journey of how we got from Point A to September the 13th is going to be part of the discussion. At least, that's what I'm expecting to hear.

I mean, if there's going to be a challenge to -- that this plan doesn't work because it is the byproduct of flawed negotiations, I mean, I don't know what the answer to all of that is but I'm expecting that if that's an issue, I'm going to hear testimony about what was done and what wasn't done. Am I off base on that?

**MR. STARNER:** No, you're absolutely on target --

**THE COURT:** Okay.

**MR. STARNER:** -- your Honor. It's really just a matter of timing. I guess -- it's our view is, you know, these are issues that are ripe now. I mean, certainly we could put it off to confirmation when it all will be absolutely addressed but, you know, you could -- you know, this is a conflict that's in place right now. This is a flaw in the process right now and so I view that there are some ways we could try to fix it

now and try to put in place some fixes to provide us -- you know, provide standing to -- or at least put in place protections and the type of unconflicted representation that we're entitled to under the Code.

THE COURT:  What is it that you think that you're entitled to that you're not getting?

MR. STARNER:  Well, first off, a fiduciary that has no conflicts.

THE COURT:  And is there anything -- I mean, I don't think that -- if they're truly is a -- if there truly is an issue with a fiduciary to the estate, a motion for standing is not the way to address that.

MR. STARNER:  To that point, I hear what your Honor is saying and, look, this is not something that comes up -- this is not unusual.  It comes up a lot in cases where you have inter-debtor issues --

THE COURT:  Uh-huh.

MR. STARNER:  -- and oftentimes it's addressed through negotiations and reaching consensus but obviously the Debtors here didn't go that route.  That's their prerogative as the Court made clear to them.

THE COURT:  Sure.

MR. STARNER:  And standing isn't necessarily the most comprehensive fix and certainly you could seek to disqualify counsel.  You could ask for the employment of a Trustee but it

36

was argued that this was a modest attempt to try to put a fix in place.  They didn't go that -- all the way down the road on that.

THE COURT:  Can I ask for the appointment of independent board members?  I mean, there are all sorts of things that could be done.  And I get what you're saying.  I look at just -- and I'm not asking you to see it from my vantage point but I don't know whether the plan is the byproduct of arm's length negotiations.  I got -- you know I've got one set of lawyers who are saying it absolutely all works.  I've got another set of lawyers saying, nope, it's not, it's flawed.

And I hear all of that and I -- you can give me examples but until I actually get an evidentiary record under oath, you know, I don't know what the answer to that is and now we've just started describing testimony that you're going to have to put on in order to support or challenge confirmation and I've been in cases as a lawyer where we have plans that are at different points and it's just a big, unqualified mess has been my experience.  It's really difficult to manage.

It's hard for me to understand where everybody's motivation is and if you haven't figured out, you know, I'm very -- I look in the eyes of people and, you know, I have my own ideas about where -- what people's true motivations are and that all factors into what I do and what I say and, you know,

37

the orders I write and the language I use.  I mean, all of that factors into that.

It's just been my experience that if I say, okay, you can go out and start working on a plan, then everybody's motivation changes and people start negotiating from different positions and I get even less of an accurate picture of where people truly stand than I normally get.

And so it's -- I don't see the corresponding benefit given where we are timewise.  Now, if I'm missing something, you know, I'm wrong every day about things and I fully acknowledge that.  So if I'm missing something that would push the scale back the other way, I absolutely want to know it but I don't see -- I just don't see a corresponding benefit to the mess that I know that gets created once I open that up. Serious about it if -- you know, if they fail, what I'm going to consider to be important is going to change immediately but that's -- I mean, that's just my thought process as I sit here today.

**MR. STARNER:**  And I appreciate that, your Honor. Hopefully we're transparent kind of in our motives.  Our motives have always been focused on, you know, maximizing value of EGC and having --

**THE COURT:**  I've been a lawyer for 20 years and a judge for five.  There is no one in this courtroom that is transparent, me included.

38

**MR. STARNER:** Fair. But just maybe to wrap it up and sum, I think I've heard what the Court's position is on this. We certainly will be developing the record and be putting forward evidence on these issues --

**THE COURT:** Okay.

**MR. STARNER:** -- and, you know, our concern was having this thought process and the costs involved in having to go to what we think is a flawed and a doomed confirmation hearing and --

**THE COURT:** Well, let me say this. I've thought about that a lot too and if it is as self-evident as you say it is, then that's going to factor into my ultimate determination as to what the proper amount of compensation that ought to be received should be. I mean, that's -- it would -- I could not possibly be doing my job by signing a fee application for fees on a final basis for a course of action that is unambiguously destined to not comply with the Code. I mean, I just -- I couldn't possibly meet standards I'm required to follow.

Now, if it's subject to genuine dispute, then that's what -- you know, that's -- unfortunately costs are part of the process that makes our system better than anybody else's and I get that but I haven't forgotten about that. I mean, that's been raised all along and in my mind, the cost factor -- if it really is as one-sided as you say it is, they'll be a true-up day and that's my way of dealing with that.

39

MR. STARNER: I understand, your Honor.

THE COURT: All right.

MR. STARNER: Keep in mind we're not paid by the estate, of course.

THE COURT: Well, I'm assuming that you're going to -- well, I -- but you might be. If what you're -- if you're really doing God's work, as you want me to believe, I mean, there's -- there are provisions under the Code that allow me to recognize that. I mean, I don't know if we've met that standard or not. I don't know if we've gotten there but there are ways -- depending upon, you know, how far you're willing to go, there are ways to even all of this out in terms of the cost perspective. Dealing with the dollars is easy for me. It's dealing with all the other things that causes me to lose sleep at night.

MR. STARNER: Thank you, your Honor.

THE COURT: All right, thank you.

Yes, ma'am?

MS. ALFONSO: Good afternoon, your Honor.

THE COURT: Good afternoon.

MS. ALFONSO: For the record, Ana Alfonso from Willkie Farr & Gallagher, counsel for Wells Fargo which is the first lien agent.

THE COURT: Yes, ma'am.

MS. ALFONSO: We've, your Honor, been largely outside

40

of the fray here.  We caught our deal, if you will, several months ago.  So we're just footing the bill for all of these skirmishes and I don't mean to belittle them.  The bank understands that there are a lot of incredibly nuanced issues to contend with in order to get through to confirmation but I rise because the Debtors have asked the first lien agent to consent to extend cash collateral through September 30th which certainly makes sense given the time table that's in front of us now but the forecasted professional fee budget, not just for the Debtors but for all the fees that the Debtor is --

THE COURT:  Okay.

MS. ALFONSO:  -- supposed to pay from the beginning of the case through October 10th is $75 million, your Honor, and the go-forward projected burn rate, which I'm told could be higher, is 8 to $10 million thereafter.  So --

THE COURT:  So that's through the end of September?

MS. ALFONSO:  Through the end of September -- actually technically through October 10th --

THE COURT:  October 10th, okay.

MS. ALFONSO:  -- $75 million.  Now, I don't know if they'll hit that or not.  It'd be nice if people could find some common sense and economical solutions to all of these issues to try to get to an agreed confirmation hearing but hopes springs eternal.

Your Honor, I'm saying this because we really read

41

for the first time over the weekend these aspirations about a hurricane disaster DIP which obviously no one's spoken to Wells about having their liens primed by a DIP, let alone extending this case through October and beyond to try to roll the dice through hurricane season, not to mention deal with all of these fees.

There's a lot to contend with and I rise in part to just send a message to everyone in this courtroom, not just your Honor, that we really do need to do exactly what your Honor has admonished which is to try to get everything on the table and get it over with in September or there are going to be a lot more problems ahead of us.

THE COURT:  That's helpful.  Thank you.

MS. ALFONSO:  Thank you, your Honor.

THE COURT:  Thank you.

Mr. Androphy, I saw you get up and then sit down and I'm --

MR. ANDROPHY:  I was standing up with my co-counsel, your Honor.

THE COURT:  I'm sorry.

MR. ANDROPHY:  I was thinking of saying something but I really wasn't sure.

THE COURT:  All right.  I'm sorry, sir.  Please --

MR. MYERS:  Your Honor, for the record, Todd Myers, Kilpatrick Townsend, on behalf of Wilmington Trust as the

42

Indenture Trustee for the EGC unsecured notes.  Your Honor, I know obviously we're not arguing confirmation today but I think everybody is just giving your Honor a couple things to think about as we head towards that hearing and I think echoing some of the conflicts that were pointed out by counsel for the Ad Hoc EGC Noteholders, your Honor, there were some papers filed last night -- a lot of papers filed last night including a pleading by the Debtor which was their omnibus objection to the derivative standing motions.

THE COURT:  Uh-huh.

MR. MYERS:  Your Honor, in Paragraph 28 of that motion, the Debtors state that they worked -- that they have worked and continue to work on a transparent basis towards achieving their restructuring goals of eliminating substantially all of their funded indebtedness.

Your Honor, I think every CEO in America would like to eliminate all of their funded indebtedness but my client represents the interests of holders of over $700 million in notes that don't think their indebtedness should be eliminated and I don't want your Honor to gloss over what sounds like a noble goal.

That is not what you're entitled to under the Bankruptcy Code.  You're certainly entitled to rehabilitation and a relief from your debt but depending on values and 1129(a)(7) and 1129(b)(1), you're not entitled to elimination

43

of all of your funded indebtedness and I don't think that if we had a -- I'm not suggesting that we're -- we certainly have not moved for the appointment of a Chapter 11 Trustee but because a Debtor acts as a Trustee with a fiduciary duty to the estate and its creditors, I want you to think about whether a Trustee here trying to reorganize this company would have as its goal eliminating substantially all of the funded indebtedness.

Now, the second liens have presented the Debtors with -- as any second lien creditor in this situation would -- with the perfect path to do that.  They've said, if you get rid of all of your unsecured debt, we'll get rid of our secured debt and we'll be the equity and of course they would.  Why would a secured creditor not be?  If you control the company, you control the board coming out and you have no debt above you, then you not only can get repaid the value that you have in this as secured creditor but you get all of the upside.  Okay?

But that is not the -- you will hear at confirmation that's just not the dynamic that is presented here.  We don't have assets that are 100-percent encumbered and under water such that the unsecured creditors are out of the money.  Even by the Debtors own admission in their disclosure statement and in the plan, the unsecured creditors are in the money.

Now, we disagree exponentially with what -- with how much we are in the money but even under the Debtors' admission, we are in the money and yet the consideration of providing for

44

that is out-of-the-money warrants which don't get in the money until the second liens have been paid in full.  That is giving the second liens their cake and eating it too.  So that's simply what we want your Honor to consider as we move to confirmation.

THE COURT:  Fair enough.

MR. MYERS:  Thank you.

THE COURT:  Let me give you an area of comfort if I can.

MR. MYERS:  I'll take it.

THE COURT:  Because of my push toward confirmation often gets misread as that I think the plan works or I think this is a good idea, totally mutually exclusive and I -- the one thing that I have learned over the years is that what I will see on the day of confirmation is probably different than what exists today.  My focus is only on the process.  When we get through the process and we get to confirmation, then I'll get to the substance.

And I just don't want you to think that my comments -- and I know I do it with a lot of colloquialism and it's just -- it's my personality.  You know, when I say that I'm going to give the Debtors their shot, what I mean is that they've asked for a confirmation date.  I'm going to give them a confirmation date.  In terms of whether or not they've made good decisions or bad decisions, you know, that's what we will determine on

45

September the 13th, not beforehand.

And that's all I'm doing is I'm trying to get to the substance by pushing the process forward but I'm by no means giving an endorsement of a gleaning of how I feel about a particular plan or a particular provision.  All of that is a very separate issue with me and so I don't want you to think that I in any way am trying to push something through.  I am trying to push.  I'm trying to push to that day because I think -- I mean, $75 million -- I hadn't heard that number.

That's got to make anybody worry a little bit.  You know, when you think about this morning I spent, you know, an hour on somebody's 30,000-dollar car and a hundred-and-fifty-thousand-dollar home, you know, $75 million is a lot of money.  Now, the zeros don't bother me one way or the other.  Lawyers have to get paid.  You know, I understand that but it ought to be a sign to us all that we ought to get this process to a conclusion.  We ought to find out if the Debtors are right or if they're wrong and if they're right or at least I think they're right, then the course of action is dictated for everybody who disagrees with that conclusion.

If I find that the Debtors are wrong, then everybody's got to immediately react and go down a different path and hopefully does not cost another $75 million.

**MR. MYERS:**  Right.

**THE COURT:**  That's all and I didn't mean to drone on.

46

I just tried to give you some insight.  I'm not endorsing anything.  I'm -- all I'm doing is trying to get to a date.

MR. MYERS:  Understood, your Honor.  I appreciate the comfort.  Thank you.

THE COURT:  All right, thank you.

MR. LEBLANC:  Your Honor --

THE COURT:  I think we've got one more and I'll give you second round.

MR. LEBLANC:  I apologize, your Honor.  Andrew LeBlanc of Milbank, Tweed, Hadley & McCloy on behalf of the Ad Hoc Group of Second Lien Lenders.

THE COURT:  Yes, sir.

MR. LEBLANC:  I'll try to be very brief but there was a lot of comments and then there seems to be an almost unnatural amount of commentary about Plan B and about the alternative plan and I do want to give the Court just a little context because I think your Honor -- I think was understandably confused about when exclusivity was actually up because objections were filed over the weekend or late last week.

Those objections weren't actually due until September 6th which would have been both after the status conference -- be that as it may -- but also after the votes would have been calculated and I think that goes back to what Mr. Myers suggested about they're looking very seriously about the -- at

47

the exclusivity issues.

Now, I also think we need -- I need to comment for a little bit about what Mr. Anker has said and we're -- our head is a little bit spinning about their views as to valuation. We're now delayed for a few days and actually finally seeing what their valuation is.  We'll understand that on August 29th now, not this coming Friday but the reason we're confused is -- and I can't imagine this has been lost on the Court but they're -- they filed a standing motion seeking standing to pursue claims that they contend are colorable that are predicated on insolvency of EPL in 2014 and 2015 and they're telling the Court at the same time that we think they're grossly -- the Debtors are grossly undervaluing this enterprise but at the same time when we get to proposing an alternative plan, what we intend to do is to use the Debtors' valuation for the purposes of that plan or at least use the Debtors' valuation to pay one group of creditors but not to pay ourselves.

And so, your Honor, I think what -- at the end of the day, I think your Honor has suggested this.  We need to get to the confirmation hearing with respect to the only plan that is appropriately before the Court and that's what we would urge the Court to do, is to focus on getting us to confirmation of that plan.

Now, obviously, whatever they want to do in the background to negotiate, to prepare themselves in the

48

eventuality -- in the event that your Honor doesn't confirm the plan, no issues with that but publicly announcing, debating what the terms of their alternative plan are at this point in time, we don't think that's appropriate.  We don't think that's what should be happening here and we think it was done entirely strategically.

Presumably the primary motivation was to be able to say these things to your Honor today.  That's why they filed their objection several weeks early and it wasn't directed at disrupting the voting that's occurring now through September 6th when their objection is actually due but you haven't seen many times that litigators have filed objections several weeks before they're due in advance of a September 30th hearing.  And I wanted to make those points, your Honor.

And let me just briefly address the standing issue because your Honor had made some comments about what may happen at the conclusion of confirmation and there's -- and the EGC bondholders, the White and Case represented group, makes the continuous -- has this continuous mantra that they're the only independent party that could possibly have standing to do this and we made this point in our response to their standing motion.  That isn't the case.

To the extent that the Court doesn't confirm the plan and if it doesn't confirm it for -- it agrees with the Debtors' valuation but doesn't confirm it for some other reason, we have

49

a massive, massive deficiency claim -- we, the second lien lenders on the EGC side.  We have every incentive to protect and preserve the value of that secured intercompany claim against the EPL entities.  We have a greater interest than they do because their claims are simply smaller than ours on a deficiency basis.

Moreover, I think if I understand their exclusivity papers that were filed early properly, they're also working with the EPL noteholders and trying to come up with an alternative plan.  It certainly doesn't sound to us like that will ultimately be an unconflicted party but rather someone who will strategically use a settlement of that intercompany claim in an effort to try to confirm their plan.

And so when we get to that point -- the reason I wanted to raise is your Honor had made comments about at the conclusion of confirmation, I'll deal with that issue, the standing issue --

**THE COURT:**  Uh-huh.

**MR. LEBLANC:**  -- as well because I'll hear evidence about it.  I didn't want the Court to lose the fact that if you do deny confirmation of this plan, which we don't think you will but if you do, we're also a party that should have standing to deal with that claim and we have a greater interest than the EGC stand-alone noteholders do and we would in that circumstance be truly unconflicted at that point.

50

**THE COURT:** Well, in part, when I made those comments, I was actually talking to you and I meant what I said, is you need to have -- whatever your Plan B is, you need to be ready to go. I wasn't just talking to the person at the podium. I get it and can I go back to something that you said earlier? I want to make sure that I'm not overlooking something. Am I doing, in your mind, anything inconsistent with getting to confirmation?

**MR. LEBLANC:** No -- you, your Honor, no --

**THE COURT:** Okay.

**MR. LEBLANC:** -- not at all.

**THE COURT:** All right. And I'll tell you, to the extent that it was --

**MR. LEBLANC:** I will answer it just with respect to the issue that was asked. No, you were not.

**THE COURT:** Understood. That's -- I can -- I have more control over me than anyone else. So that's where I have to leave that.

And I'll tell you, to the extent -- I mean, I -- you know, I get strategic filings and I get standing up and to the extent that it was directed to me, it had zero effect. I mean, it just did. You know, folks who have known me just know once I've decided on a course of action, I'm hard to change and, you know, I'm going to do my best. I'm going to get to that date and it's going to take some really, hopefully, acts that I

51

don't have to hear about and deal with to stop that process but then I'm going to substantively evaluate where folks are and -- you know, again, it's -- my only goal is to get it right. That's all.

MR. LEBLANC:  No, and my point, your Honor, with the strategic filing and -- we've put things in pleadings to try to influence a judge before.  I don't know that I've ever filed a pleading three weeks before it's due for that purpose but I'd have to really think about that one.  But we do believe exclusivity actually means something and there's an actual solicitation happening at this moment in time and the idea of putting forward alternative plan structures in the middle of that process --

THE COURT:  Yeah.  If I were to find out that there is a letter going out to folks who have a vote about saying, hey, vote a particular way -- I know this would never be done. So I'm comfortable giving the example but if there were a communication going out saying, hey, don't vote this way on this plan because we've got something better, you know, everybody in the courtroom will see another side to me that a few in here have seen but you just don't want to see that day. I mean, that -- you know, that would not be a good day for anybody.  But I'm pretty comfortable that that just would not occur.

MR. LEBLANC:  We have no reason to believe that

52

letter exists.  What we do know exists is the filing that they made last week.

THE COURT:  Yeah, I see that.  That's -- you know, again, to the extent that it was directed at me, it had zero effect.  To the extent that somebody else is going to read it and be persuaded, you know, I can't comment on that.  That's -- you could say that about any pleading that's been filed.

MR. LEBLANC:  Well, you could say that about any pleading but one where -- with the -- and I'll leave it at this, your Honor.  I think the specificity -- I think this is what Mr. Myer was referring to earlier.  I wanted to point out the elements of the timing that your Honor may not have appreciated, that it may have looked like that was being filed because that was the deadline to file it and this was being heard but, in fact, it wasn't and it -- the deadline for filing that actually coincides with the voting deadline.

THE COURT:  Got it.  All right, no, I appreciate your pointing that out.

MR. LEBLANC:  And, your Honor, we'll have a couple of issues -- we have a couple of discovery issues that are discrete that we'll address.  I think we still have disputes that we'll address when the opportunity comes a little bit later.

THE COURT:  All right.

MR. LEBLANC:  Thank you, your Honor.

53

**THE COURT:**  Thank you.

Mr. Anker?

**MR. ANKER:**  Your Honor, I'll -- I will do my darndest to spend less than one minute at the podium right now.  I rise only for two things.  One, I plead guilty.  I file strategic pleadings.  I try to represent my clients.  I've known Mr. LeBlanc.  He's a spectacularly good litigator.  He does the same.  As you put it, no one's transparent.

**THE COURT:**  Right.

**MR. ANKER:**  I'm here to do the best for my client. He's here to do the best for his client which brings me to my second point.  One thing I appreciate about your Honor is I think, as you put it, you look at people's motivations and you don't check your common sense at the door.  I would leave you with this thought on the big issue as you head toward a confirmation.

Why is $75 million being spent just for the estate professionals?  That doesn't include the EGC notes.  It doesn't include myself.  Why are there three Milbank Tweed partners in this room if this company is really worth as little as the Debtor says it is?  Actions speak louder for words -- than words.  Why have the company's executives negotiated so hard to maximize equity, not cash, in a reorganized company?  What does that tell you from a common-sense standpoint?

Final point, what you will hear at confirmation and

54

when you look at the issues is that for this plan to be confirmable as against the EPL notes, it has to both be true -- both be true that the intercompany note is a valid, secured obligation so the first 325 million goes to EGC and that the value of EPL be as low as they're suggesting because if the value is higher, then even if that note is valid, we get all the dollars after the intercompany.  And so one of the answers to Mr. LeBlanc is he needs to prevail on both positions.  Thank you, your Honor.

THE COURT:  All right, thank you.

All right.  Mr. Myer?

MR. MEYER:  Thank you, your Honor.  I'll be quick.  I think just one note as it relates to the exclusivity item.  I would note, as Mr. LeBlanc did not, I think it is slightly heightened when you have a letter that we've agreed to include as part of our solicitation package from the Creditors' Committee encouraging unsecured creditors to vote to reject the plan.  I don't think that that can go unnoticed combined with the detailed outlines that were included in their objection on Friday, I think.

So I did want to mention that but I would just come back to the fact that, again, a lot of the discussion you heard is about alternatives.

THE COURT:  So do you think that they've -- you think that they've violated exclusivity?

55

MR. MEYER: I think that we're taking a hard look at it, your Honor.

THE COURT: Okay. Well, that's -- you know what you need to do.

MR. MEYER: Uh-huh.

THE COURT: I -- if you file the appropriate motion, I'll set it for hearing and I'll get to the bottom of it and try to make the best decision that I can. I -- it doesn't scare me or bother me or it isn't something that I don't want to do. If you file it, I'm more than happy to deal with it but I'm not going to, you know, make comments and -- because someone says something. I mean, if you think there's a problem, I expect you to put it in a written motion, sign it under 9011 and then I'll deal with it and figure out, you know, what's right and what's wrong.

MR. MEYER: Understood, your Honor. Thank you.

THE COURT: Yeah, all right.

MR. MEYER: A couple of other quick points just in the discussion of alternatives. I will come back again to it. There was discussions about lines, about how there's going to be this financing commitment. We as the Debtor, we've talked with our boards about --

THE COURT: Yeah. You just don't have to -- you don't have to respond. I -- you've got your date. You know, you're either going to win, lose or you're going to compromise

56

you're way out of it.  I mean, it's -- there are three defined paths and I'm going to give you your shot.  You know, you're going to give advice to your clients.  You're going to put forth your best case that you can and you're going to try to win.  That's what you're here for.

I -- you know, I am not a baby splitter.  I'm just not.  I believe that people ought to win and people ought to lose.  I just -- it's just what -- it's what makes the system work.  So that's -- I'm coming prepared for somebody to win and somebody to lose.  If you-all take that out of my hands, that's a different thing but that's what I'm coming to do.

**MR. MEYER:**  Understood, your Honor.

**THE COURT:**  Uh-huh.

**MR. MEYER:**  With that, I don't think I have any additional comments.  I would turn the podium over to my colleague Jordan Leu to discuss some of the discovery disputes that are -- I believe are still active between the parties.

**THE COURT:**  All right, thank you.

**MR. LEU:**  Thank you, your Honor.  Jordan Leu for the Debtors with Ms. Waller.  I think we've worked out most of this.

**THE COURT:**  Okay.

**MR. LEU:**  We just have a few discreet issues.

**(To Ms. Waller):**  Do you want to start out with the disputed issues or --

57

MS. WALLER:  Sure.  As he said, your Honor, we can walk through the small number of disputed issues and I think in lieu of an Order we would just note on the record the areas that we have agreement to, so --

THE COURT:  Okay.

MS. WALLER:  -- you don't have to go through that in the Order.

THE COURT:  All right.

MS. WALLER:  The first issue that we have disputed is the matter of materials related to the valuation that the Debtors' expert, PJT, and their valuation.  I don't think I have to tell anybody in this room how important valuation is to this case.  It is everything.  And yesterday Mr. Laurinaitis, the expert from PJT Partners, was deposed and through that deposition, as well as the expert report that the Debtors have served on the parties, there have been five matters that have come to light that are very important in terms of understanding Mr. Laurinaitis's valuation.

To take a step back, there are a couple of key factors that really drive the valuation and can significantly impact the valuation of this company.  One of them is risk adjustment factors that are applied to the Debtors' reserves.  Part of that is what is the source of where those risk factors come from, what type of range did Mr. Laurinaitis use.  We understand that he looked to one particular report from 2014

58

for where he obtained those risk adjustment factors and we would like to dig into that and understand the basis for that versus what PJT and Mr. Laurinaitis has done in other valuations.  The difference in terms of the range that he is looking to as well is very important, as well as the results.  So if you used two-year-old data, do you look at 2016?

There's a lot of different sources for risk adjustment factors and a lot of questions that we have about the ones that Mr. Laurinaitis has applied and we think it's fair for us to be able to test those assumptions based on prior engagements that Mr. Laurinaitis has been involved in, both in personally valuing offshore assets himself.  We understand he's only been involved in two matters where he's valued offshore assets.  That's what we learned yesterday.  And we'd like to understand the methodology and obtain documents reflecting that methodology so that we can test the assumptions that he has used in this case.

THE COURT:  All right.  So you want documents that Mr. Laurinaitis used in the course of other representations with other clients.  Is that what you're asking for?

MS. WALLER:  Correct.  There are three matters where --

THE COURT:  Did you give those folks notice of your request?

MS. WALLER:  We have not.  We have asked the Debtors

59

for it and --

THE COURT:  Okay, that request is denied.  Next?

MS. WALLER:  We also have asked for the working papers of PJT and Opportune, and let me just give you some background in terms of what that means.  We're not asking for drafts of their report.  What we are asking for is the materials that underlie their calculations in terms of information that we understand they received from the Debtors to the information that they put forward in their valuation. And it's extremely complicated in terms of anything -- having our own experts work through how do you get from Point A to Point B and sitting down and trying to do that all through a deposition is extremely tedious.

THE COURT:  Sure.  What is that?  What are we looking at?  What is it specifically that you want?  Have we identified a set of documents that are being withheld?  Are we not looking?  What -- I mean I hear what you're saying, I just don't know what you're asking for.

MS. WALLER:  Sure.  We're looking for the bridge between the company's information and how they have gotten to what they put forth in their valuation, so the spreadsheets that are imbedded in their report that will help us to understand how did they get to those numbers.

THE COURT:  Do you know what she's asking for?

MR. LEU:  Not entirely, your Honor, but my position

60

on this is if you look at the report, it says he had this PV10 value, here's the risk, here's the conclusion, here are the deductions, all the methodology is explained in the report. During the deposition, that's when you should ask an expert how do you get this number into this number.  On the list of documents reviewed, that's where you list these are the company provided documents.  And in every other case I've worked on that's part of the job of the deposition, part of the job of the opposing expert, part of the job of the law firm to figure out how all that fits together.  And what I've not seen is experts being required to turn over what I would call draft reports and internal work papers to do all that work for the opposing side.

**THE COURT:**  And so what did you do with respect to this request to figure out what existed?

**MR. LEU:**  I didn't understand this request until today.  You know, working papers.

**THE COURT:**  All right.  What I'm going to do, I'm going to let -- because I -- and I'm not -- I'm trying to be as open and as candid as I can possibly be.  I don't have the foggiest notion what you're asking for.  It sounds like Debtors' counsel doesn't know either.  I'm going to let you all talk about this and if there is a dispute I will get the two of you back over here on an emergency basis.  But what I really want, what will help me, is I want a calculation of what went

61

into this number.  I want anything having to do with this assumption.  How did you get there?  I mean that will help me. To the extent you can give me more specificity, the better I am able to make a decision and also give you an Order that's enforceable.

I mean if I sign an Order today that says you get everything that's the bridge --

MS. WALLER:  We're not going to do that, your Honor.

THE COURT:  I mean I could never enforce that Order because I don't know what it means.

But have that conversation.  If you still have a dispute, then let Mr. Alonzo know and I will get you both back over here and we'll figure it out.  Okay?

MR. LEU:  Yes, your Honor.

THE COURT:  All right?

MS. WALLER:  We'll do that.

The second issue -- sorry, the third issue that we have is with respect to depositions.  So as your Honor knows, this is an extremely tight schedule in terms of discovery. We've been working together --

THE COURT:  Sure.

MS. WALLER:  -- in terms of --

THE COURT:  Is this the seven hour issue or the multiple appearance issue?

MS. WALLER:  It is.  There are three witnesses who we

62

would like to have additional time with.  Mr. Laurinaitis, who was deposed yesterday --

THE COURT:  You got it.  He's crucial.  I want you to be --

MS. WALLER:  Thank you, your Honor.

THE COURT:  -- reasonable, but you're going to get some more time.

MS. WALLER:  Mr. Chiller's deposition is tomorrow.  He is, as your Honor knows, the CEO of the companies.  There's a need for multiple 30(b)(6) topics for the Debtors, including negotiations with the Second Lien for the RSA and the Plan.

THE COURT:  And so what are you proposing?

MS. WALLER:  What I propose to do is to have Mr. Chiller available on a second day, if needed.  Obviously, the parties are going to work as hard as they can, and they have been working hard together to try and streamline things, but --

THE COURT:  All right, I think that --

MS. WALLER:  -- given that today was our opportunity --

THE COURT:  I think that given who he is and all of his issues, I think that a second day is fair.  If it goes -- but not beyond a second day.

MS. WALLER:  Thank you.

THE COURT:  Okay?

63

MS. WALLER:  The third witness is Mr. Baggett, who is the second of the Debtors' experts.  He is from Opportune.  He is I believe providing a liquidation analysis.  He's on Thursday, your Honor.  Again, we will do our best to try and get it done in one day.  Given that today was our shot to talk to your Honor, we wanted to have the opportunity to ask for a second day, if it is needed, based on our best efforts to streamline things, that we have another opportunity.

THE COURT:  No, you have it.

MS. WALLER:  Thank you.

THE COURT:  Okay.

MS. WALLER:  I believe that that is the outstanding disputes today.  I think the one pending that we had before your Honor at the previous discovery hearing is Mr. Chiller's personal financial information.  I believe that has already been submitted to you in camera.

THE COURT:  You guys have already gotten that back, right?

MR. LEU:  I believe we have the information back.

THE COURT:  I thought that -- I will check on this. I thought there was a list of what documents would be produced and what wouldn't be.  I know I created a list.  So you guys have never seen that --

MR. LEU:  Don't believe we've seen that.

THE COURT:  -- is what you're telling me.

64

MS. WALLER:  I don't believe we have.  We actually don't have a list of what's been submitted.  So if we could --

THE COURT:  I will deal with that when I step down. I went -- I've been through all of those and I created a list of what I thought was appropriately private and what I thought ought to be produced.  And if that somehow got lost, my fault and I'll fix that.

MS. WALLER:  There are a lot of moving pieces, your Honor.  No problem.

And so then I can just tick through and Jordan can -- and Mr. Leu can, of course, jump in where anything I describe (indiscernible) of the agreement that we've come to.

THE COURT:  Sure.

MS. WALLER:  So we've already discussed the expert reports for PJT and Opportune.  Mr. Leu has represented that the investor presentations and press releases have been identified and that has been relied upon by Mr. Laurinaitis.

Mr. Leu and I also came to an agreement in terms of the business plan.  They've noted the documents that have been produced and were actually going to produce.

Mr. Leu also checked with the Opportune folks and the current understanding is that they don't have any notes and memos that are cited on Page 8 of the Opportune report, but they are going to work, if there does appear to be some that get identified later, they'll work with us in terms of

65

producing those.

MR. LEU:  And just to make clear, I'm saying specifically look for notes of these particular interviews that are listed on Item 5, Docket 1117.

THE COURT:  Got it.

MS. WALLER:  The working papers we addressed with your Honor, we will continue to address that.

In terms of the Debtor documents with starts on Page 6 of the Debtors' Response in Docket 1117, the Debtors are looking to located the reconciliation of the Aries database and they'll get back to us on that.

The Debtors believe that they've already produced the quarterly impairment testing by both the accounting group and the auditors and they will work with us to help us identify that in what's been produced.

The documents regarding an evaluation of potential acquisitions sounds like is subject to our nondisclosure agreement.  They are going to check with the counterparties to see if they are able to produce that.

The internal evaluations have been identified in the Debtors' Response (indiscernible) we're going to -- I think we'll take the time to confirm that that's the information we're looking for and we'll confer with the Debtors, as needed.

The estimation of the unencumbered tort claims are being in the process of looking for that information, whether

66

in the specific document that Mr. Foxmire [sic] identified or a similar document, that essentially supports the value of the unencumbered tort claims in the most recently filed Disclosure Statement.

The documents related to the Debtors' insurance, we have come to an agreement that the Debtors will help us to set up some discussions with the company, including the insurance professionals, to help understand the information that's being targeted there.

THE COURT:  All right.

MS. WALLER:  The communications between the Debtors and the OEM I believe have been --

MR. LEU:  Yes.

MS. WALLER:  -- resolved as well.

MR. LEU:  That's resolved.  My understanding is we're going to look by people at the company to see if there are any communications in writing relating to the statements made in the Disclosure Statement about BOEM's position in the case.

THE COURT:  All right.

MS. WALLER:  The monthly financial statements and the standalone financial statements on the next page have been resolved in the Debtors' Response.  And the parties -- the Committee and the Debtors have agreed to continue to confer on the board minutes and the Debtors are going to go back and take a second look at the redactions and confirm the privilege for

67

each of the redactions based on the concerns that the Committee has raised.

THE COURT:  All right.

MS. WALLER:  That is it, your Honor --

THE COURT:  All right.

MS. WALLER:  -- I believe.

MR. LEU:  That's it, your Honor.

THE COURT:  Is that the agreement?

MS. WALLER:  That is the agreement.  I believe there are some Second Lien issues that I think other counsel will cover.

THE COURT:  Got it.  Thank you.

MS. WALLER:  Thank you.

MR. STARNER:  Your Honor, may I approach the podium?

THE COURT:  If you intend on speaking.

MR. STARNER:  Very briefly, your Honor.  Greg Starner of White & Case on behalf the EGC Ad Hoc Group.  I've been asked to speak for the objecting parties about a discreet issue.

THE COURT:  Okay.

MR. STARNER:  I think we've teed this up for the Court.  What we're seeking is valuation-related information from within the Second Lien Ad Hoc Group.

You know, Judge, this is an issue that's come up rarely, but it has been addressed a few times.  Some Courts

68

have expressed some skepticism about requiring creditors just to produce valuation materials.  But I think what we have here is a somewhat unique circumstance.  You know, this is an issue where the Second Liens have been kind of the driving force behind the RSA and the terms of the RSA that are imbedded into the Plan.  Valuation obviously is a critical issue.  And this is not an issue where we're seeking their opinion.  The evidence we're seeking doesn't necessarily go to establish valuation.  It really I think ties directly into what we've heard from the Debtors' expert.  He's articulated his approach and methodologies he's applied is the way to approach valuation.  That's a critical issue that's going to be in dispute at a confirmation hearing and we believe it would be highly probative to see how highly sophisticated investors that are the members of the Second Lien Group, how they look at this valuation.  Do they use the same type of assumptions?  Do they use the same type of approach?  And I think that's probative evidence as to whether or not how the Debtors have approached this is consistent and also it also ties into whether or not the Debtors in fact have employed the exact same methodologies as, you know, the kind of key plan proponents here.

So that's kind of where our focus is, your Honor.  And I'll just finally end with the issues of confidentiality, there's been some objection as this is proprietary information, you know, frankly, if it is proprietary I find that

69

interesting, because the Debtors' expert has made it very clear this is standard industry approach to valuation.  And to the extent that, you know, the economic (indiscernible) investors, the Second Lien Group, are approaching it differently, you know, that by itself would be I think relative and probative here.

So we're actually very happy to work with the counsel for the Second Lien as to burden and narrowly tailor and work with them as to giving just the discreet information that we're looking for here on these valuation assumptions and how they approached valuation, your Honor.

**THE COURT:**  All right.  Thank you.

**MR. LEBLANC:**  Your Honor, again Andrew LeBlanc of Milbank Tweed on behalf of the Second Lienholders.  A couple of points, your Honor.  And Mr. Starner had suggested this is an issue that comes up he said infrequently, I actually think that three of us in this courtroom have argued this and the Judges in those cases all came out the same way and precluded this information.

And just -- but to step back one step, just to give you some context to this, your Honor.  We were served document requests on the 25th of July.  We had a -- we scheduled a meet and confer session on the 26th.  We took this position.  We -- at the request of the requesting parties, we sent them the authority for this position, which is the same documents, same

70

citations that are included in our papers.  We had more meet and confer sessions over the course of the next several days.

And the predicate for this in the cases that both I've litigated and the other of my colleagues here who have litigated it, including Mr. Starner and Mr. Anker, the predicate for this is if a party is not putting on their own valuation testimony, even through the form of their retained expert --

THE COURT:  It doesn't matter what you think.

MR. LEBLANC:  I'm sorry, your Honor?

THE COURT:  It's -- the ultimate conclusion is if you're not putting on evidence it doesn't matter what you think.

MR. LEBLANC:  It does.  And there's a variety of reasons for that.  It's not relevant.  And you just think about a transaction.  Necessarily if somebody's purchasing a bond in the open market, they think it's going to increase in value. You also have a person selling that bond in the open market, they think it's going to decrease in value.  And I think this is probably the -- the closest example is the *Genco* decision, your Honor, where Judge Lane in that case, we were the ones arguing this, looked at this and said I'm not going to have a series of mini trials and then require evidence from every layperson out there, because presumably it's going to be all over the map because you have sellers and you have buyers and

71

people have different views as to valuation.

And so for those reasons, your Honor, we think it's irrelevant, it's inappropriate, it's admissibility would be constricted by Rule 701, but we also think it's irrelevant because it can't possibly be probative on the value of the company, particularly where we have -- and this was a concession. We had a discussion with everybody and there was a back and forth on a lot of things and we were asked are you putting Houlihan on to testify as to value and we said we don't intend to at this time, if that changes we will tell you. We don't intend to.

And so we thought this was resolved the first time we heard about it. We produced documents. We were open and notorious that we were excluding this information because we redacted with a label that said internal valuation in our productions. And what -- and we produced our documents from the 9th through the 12th of August and the first we heard of this was Sunday that this was still an open issue. We thought this had been resolved. To the extent that it hasn't, that's fine. We're not saying that they've waived the argument. But we are suggesting, your Honor, that you should follow the decisions that we've cited in our pleadings and conclude that this information doesn't have to be produced.

THE COURT: All right.

MR. STARNER: I'll just say, your Honor, in terms of

72

the timing issue, this is something we've always been focused on. We just got the last of their documents on the 18th, so we certainly have been trying to tee it up in a consolidated fashion along with the other discovery disputes for this status conference.

I will say regarding the other cases where this has been raised, Mr. Anker and I both raised this in front of Judge Sontchi in Delaware, two different motions. I lost mine on more of a procedural timing issue as premature. And I would distinguish Judge Sontchi's ruling in the other matter because there it was a question of solvency in the context of a (indiscernible) dispute. So I think very distinguished with what we have here.

And really what we have here is not necessarily an issue about whether the Second Liens are going to put forward a valuation of their own. The question is do we have an opportunity to test how the Debtors' approach, how they approached valuation. Is it consistent with how other relevant kind of market makers are approaching valuation? And I would suggest to the Court that probative value can be found or probative evidence would be in the files of the Second Liens, the ones who are effectively working closely with the Debtors and having kind of oversight, how they approached valuation. If it's wildly different in the way the Second Liens approached valuation, I think that would be critical and very relevant to

73

how this Court would consider the Debtors' valuation.

**THE COURT:**  Thank you.

Mr. Rothberg, do you want to weigh in?

**MR. ROTHBERG:**  Yes, your Honor.  Ed Rothberg for the Equity Committee.  And I have with me Ms. Brown and also our chairperson.

And I would say that it seems -- when I saw this fight come up, it seems to me to be one of the most extraordinary things I've ever seen.  How could it possibly be that the evidence of a lender, this is a lender, a secured lender, of what they think the value is is not admissible when they're coming into the Court and asserting that they're an undersecured creditor.  How could it possibly be that it's not relevant?  I can think of one exception:  consulting expert. But what -- I have not seen one iota of authority for a secured lender in a case who's asserting affirmatively that they are undersecured --

**THE COURT:**  But they're not asserting that in the context of confirmation.

**MR. ROTHBERG:**  Absolutely they are, your Honor.  They asserted it --

**THE COURT:**  They have zero burden.

**MR. ROTHBERG:**  They asserted it in the motion to oppose the appointment of the Equity Committee and --

**THE COURT:**  Which has nothing to do with

74

confirmation.

MR. ROTHBERG:  Well, your Honor, Mr. LeBlanc came up to me in this hearing today and said they have a huge undersecured deficiency claim.

THE COURT:  Which has to be dealt with if the Plan fails.  I get it, I --

MR. ROTHBERG:  Well, your Honor, point me, somebody, to some ruling.  In the hundreds of debtor cases that I have handled over 36 years, in virtually every single one if there's a dispute about value I subpoena the appraisal testimony, I subpoena the bank records to get their understanding of what the value is, I've never had a problem getting that.  And so it seems extremely extraordinary to me today that in a case where the key issue is value we are not to be able to learn what the beneficiaries of this Plan are asking the Court to give them to what they think the value is.  It's an extraordinary concept.

THE COURT:  But they're not asking.

MR. ROTHBERG:  They absolutely are asking, your Honor.  They are asking the Court --

THE COURT:  All right --

MR. ROTHBERG:  -- to swap their --

THE COURT:  Then --

MR. ROTHBERG:  -- their debt for equity.

THE COURT:  Then let me rephrase that.  In this courtroom today they're not asking.  The Debtor is asking.  And

EXCEPTIONAL REPORTING SERVICES, INC

75

I will respectfully disagree and I don't think it's appropriate for you to tell me what it is that's going on in my courtroom.

MR. ROTHBERG:  Well, your Honor, maybe you haven't been in the trenches in this case, but I can tell you they are advocating --

THE COURT:  Thank you, Mr. Rothberg.

Mr. Anker?

MR. ANKER:  Your Honor, I rise only to draw one distinction, just to make sure we're on the same page.  And Mr. LeBlanc's recitation is accurate.  I litigated this issue in another case on the side of asking for the valuation testimony and had it denied.  And that's one reason I didn't rise at the beginning and I haven't pressed this issue.  So I'm not going to argue with Mr. LeBlanc.

What I understand we're talking about today is whether documents that may or may not exist within the Second Lien Ad Hoc Group about what they think the Reorganized Debtor will be worth if this Plan gets confirmed, whether those need to be produced.  And I appreciate both the case law that is existing today and the discussions we had with Milbank, which have been productive and very professional.

I don't think what we're talking about, and I just want to make sure I'm right about this, is historical documents, for example, with respect to the negotiation end of the Second Lien facility back in 2014.  If in that historical

76

context, whereas we've talked about the intercompany notes and the history here matter, if in that context there are documents where, you know, any lender is going to be talking about what the collaterals were, if -- I don't think we're having a dispute about that historical stuff and I rise only to make sure I'm right about that.  If I'm right about that, I'm content and I sit down.  I don't think anyone's arguing that historical set of materials, to the extent it exists, are not producible.

MR. LEBLANC:  Your Honor, I don't think there's a disagreement about that.  I don't know if there are any documents that are responsive to that.  There's obviously been -- not all of my clients are original lenders here.  But that's not the issue that we're dealing with on this and it's not -- frankly, it's not the issue that was dealt with in *Genco* and *EFH* and the case before Judge Shannon and *Molycorp*, which I just recently argued in front of Judge Sontchi.  It's the issue that Mr. Anker thought it was.

THE COURT:  Got it.

MR. ANKER:  (Indiscernible)

THE COURT:  Thank you.

MR. STARNER:  And just one last point, your Honor.  I will just note, you know, we're not focused or looking for -- I know that a lot of these funds have a lot of internal modeling they do focused on IR and return on investments and modeling.

77

That's not what we're focused on here.  We're looking at, I think as Mr. Anker articulated, what the value, what the anticipated value of this company will be coming out of bankruptcy and the focus really is their methodologies and the assumptions that apply and whether it's consistent or inconsistent with how the Debtors expert approached this and his statement that that's standard, the way they do it.

THE COURT:  Fair enough.  I agree with the Second Lienholders.  This can't be -- this just can't be possibly relevant to the Debtors' thought process and the Debtors' valuation, their methodologies.  It is simply too far removed, too invasive.  I'm going to sustain the objection.  All right?

MR. LEBLANC:  Thank you, your Honor.  We have one -- I'm now trading opponents.  The final issue, your Honor, relates to depositions.  We have -- in the course of those meet and confers it was clearly identified to us that there are two holders that they wanted to take, so we had those -- we haven't had schedules for those, because those, they're going to be backdated and back loaded, but we focused on that.  And what we've told them throughout is if there's a reason you need additional depositions, just tell us what that reason is and we'll consider it.  We've now got to a point, and we outlined this in our paper, that they've said we want all five of your Committee members, we'll limit it to a half day.  And our response to that was why do you need all of them?  We haven't,

EXCEPTIONAL REPORTING SERVICES, INC

78

frankly, gotten a response to that.

We understand there's been some discussion about limiting that, but then there's other components to that so I won't go into it, but the issue here, your Honor, is just one of burden, relevance, duplication of efforts.  There's five Committee members.  We don't know why all five of them need to be deposed.  We've asked the question and haven't gotten an answer to it.

**THE COURT:**  So you've offered two.

**MR. LEBLANC:**  We've offered two and we would consent -- they've asked -- they've identified a third that we I think would be prepared to consent to that as well.  The issue, and we've pointed -- and your Honor knows this better than I do, but a half day deposition takes no less preparation than a full day deposition.  And so if next week we're going to be doing a deposition with each of our clients, that means we're doing a full day of preparation, because they're not -- these aren't 30(b)(6) witnesses, so there's not a topic that we can point to.  We've asked them if they could -- if they want to just authenticate documents through witnesses, that we could have a discussion about that if they tell us what documents.  And if they want to have a deposition just to do that, we don't have to spend a day prepping.  But we haven't been able to come to a conclusion.

So we would ask that the Court just limit them to

79

three depositions.  We've always offered two and if they want to identify a third, we'll do that even without them articulating a basis for doing so.

THE COURT:  All right.

MR. MANTHEY:  Your Honor, let me first say we're dealing with five members of the Ad Hoc Committee, each owed over a hundred million dollars.  We served document requests upon them and we did several meet and confers.  As a result of those meet and confers -- first we were told we were going to -- look, we're going to have to produce 40,000, 50,000 pages, each one of our members, it's impossible, we can't do this.  So what we did in those meet and confers is we tailored it down and worked and worked hard to tailor it down.  We agreed that, okay, these search terms, let's go forward with them.  We saw on average from 500, or at a range 500 pages to 2500 pages for each of these noteholders.  We didn't see the thousands and thousands of documents in the extreme burden that the Second Lienholders, who are ending up with 99 percent of the equity in this company, went through to do this document production.

After we got the document production, we went through those documents for each of the five members.  In each of those productions there are interesting documents that we think are appropriate to ask those individuals about.

THE COURT:  Okay.

80

**MR. MANTHEY:** They offered, correct, two of the members a few weeks ago, dates in Los Angeles and San Francisco. We said we would like dates for each of the others, given this calendar we're working with, we'd like to figure out how to overlay. No, we're not giving you dates on the other three deponents. I said, well, we haven't reviewed the documents in full, but when we review the documents it would be helpful just to have dates so we can agree.

We finally made the request. All the objecting parties got together and said, look, we're willing to cut Houlihan loose. We're not going to depose Houlihan. You have represented you're not putting him on for valuation. But we would like to depose each of the five individual members. We will limit it to a half a day. We'll do the depositions in California via videoconference. We did everything we could to try to make this workable for, again, the Second Lienholders who are ending up with 99 percent of the company.

**THE COURT:** What's the topic?

**MR. MANTHEY:** The topics are the documents. Your Honor, I'm under a Protective Order and I'll tell you, you were on one of the issues that are central to this case, good faith. I think the documents show -- and let me, before I get there. Where we ended up was we agreed that we'd do three of the members, and I can name them, but we agreed to do three of those members, and the other two, as long as they agreed that

81

the documents were authentic and admissible, subject to their reservation of the relevancy of the documents, we would forego the other two depositions.  They would not agree to that.

So, your Honor, what we would offer is, we're under a Protective Order, we see these documents as to the two holders they have refused to produce, I'd offer to produce those documents to your Honor for review in camera and if your Honor believes we're entitled to a deposition, we'll have a deposition.  If they're not, you don't think they rise to the level for us to do that deposition, then we'll respect your ruling and move forward with the other three deponents.

THE COURT:  So let me ask this.  So you've gotten a folder of documents.

MR. MANTHEY:  Correct.

THE COURT:  And is the intent of the depos to just go through and authenticate them or is it substantive questioning about certain documents?

MR. MANTHEY:  There is substantive questioning. Your Honor, you'll see from the documents --

THE COURT:  Now, with respect to the other two, you're willing to let them go if they will agree to authenticity and admissibility.

MR. MANTHEY:  Correct.

THE COURT:  So at least those two couldn't have been substantive.

82

**MR. MANTHEY:** Well, there's emails in there and documents in there that we do want to bring to your Honor, but we respect the fact that, you know, we have time constraints here. Our preference is to depose all five, but given, in the spirit of trying to work through this issue, we agreed that we would do the three. But again, your Honor, we'd love to submit the emails and documents to you to review in camera and you can make a decision if we're on base or off base.

You'll see that the documents among the Second Lien Lenders will show that the Second Lienholders were heavily involved directly with the company involving the negotiation of the RSA and the MIP, that the Second Lienholders have other plans for these assets. And again, I'm hesitant to go much further because I'm under a Protective Order.

**THE COURT:** No, I don't want you to. So your scope of the inquiry runs to the negotiation of the deal that's embodied in the Plan?

**MR. MANTHEY:** As well as the plans for these assets.

**THE COURT:** And why is that going to be relevant to confirmation?

**MR. MANTHEY:** It's relevant to confirmation in terms of the value. One of the arguments is that these assets have not been subject to market and the evidence will show through these lienholders that there are parties interested in potentially buying the assets.

83

THE COURT:  Okay.

MR. LEBLANC:  May I be heard, your Honor?

THE COURT:  Please.

MR. LEBLANC:  So the proposal you just heard, your Honor, I have not heard that before.  Last night there was communication between Mr. Manthey and my partner, who's here in the courtroom, Mr. Renenger, who is in town for a deposition yesterday, which is why he's here today in the courtroom, your Honor.  There were conversations between the two of them where the concept of we'll limit it to three and then you agree to -- we have no issue with authenticity, not an issue -- to admissibility of any other documents that are in your production.  We've made the point to them that not all documents are admissible simply because they've been produced by us.  For example, if there was a third party communication.

THE COURT:  I also don't know what good it's going to do if you agree to admissibility and no one else agrees to that as well, but --

MR. LEBLANC:  And so --

THE COURT:  -- I got it.

MR. LEBLANC:  -- we didn't -- our view, your Honor, was that simply wasn't a workable solution.  They're not necessarily business records.  They may be, but they may not be.  And so we said we can't agree to what you suggested.

What we've offered to them is, and I would make the

84

same proposal, rather than showing them to your Honor in camera, show them to us and we will tell you if we agree -- if we have any issue with their being admissible.  And then, obviously, other parties would have a view on that as well. But we thought that was a better solution to this.  We also said if you want to do -- if we can't say that they're admissible but you want to do a deposition just to admit a document, that can be a very short deposition.  Or if you want to do some of these depositions solely for that purpose that are not substantive, then I don't have to prepare these witnesses as though they're going to be deposed for three and a half hours on any topic imaginable.

We've tried to come to a workable solution, your Honor.  I think -- they have not yet articulated to us why the other two that aren't being -- that are subject to this proposal, what relevance their documents or their testimony would possibly have.  We've asked that question, we haven't gotten an answer to it.  So we object on that basis, your Honor.

**MR. MANTHEY:**  Your Honor, I guess the response is I don't really necessarily feel sorry for the Second Lien Lenders having to sit through a half day deposition, given the stakes here.  There is elimination of all funded debt that is trying to be done and the beneficiary of that is the Second Lien Lenders.  We limited the scope of the documents significantly

85

from, again, the 40,000 that we were supposed to be produced to, again, 500 to 2500, which include numerous duplicates. Quite frankly, a subject area for those depositions is whether we've been produced -- whether all the documents responsive have been produced.

So we don't think it's extreme hardship, given the stakes, and we would ask that we conduct the five depositions or conduct the three depositions and present the documents to your Honor in camera and you can make the decision whether it's appropriate for us to depose those two individuals.

THE COURT:  All right.

MR. LEBLANC:  Your Honor, can I respond just to the document production issue?

THE COURT:  Sure.

MR. LEBLANC:  There's not a 30(b)(6) request for a document custodian or someone involved in the production of documents.  They're going to be asking -- we would present -- they've asked for one individual among the group, but otherwise they've allowed us to choose which of the business people at these institutions would testify.  So if their purpose is to ask them what steps did you take to do production, they're not going to get it, unless they want to serve a 30(b)(6), which I don't think they could do at this time.

But more importantly, Mr. Manthey is talking about the difference between 40,000 per client and a much smaller

86

number.  And in candor, your Honor, we did it, and this was agreed by everybody, we ran it through a sample, one of the firm's information, and we extrapolated from that.  That's the difference between their initial set of search terms and the last set of agreed search terms.  They proposed to us a set of search terms.  We gave them the information to show what it would return and we talked about burden.  We then negotiated a new set of search terms that yielded a different number of documents.  It is completely unremarkable -- well, this was an agreed set of search terms, your Honor.

And so I don't need Mr. Manthey to feel sorry for me. That's not what I'm looking for.  All I'm looking for, your Honor, is your Honor's decision on whether or not it is appropriate for them to require, without any articulation of relevance, depositions of five different institutions, even if for only half a day, where the burden on us to prepare them is completely unmoved by limiting it to three and a half hours.

**THE COURT:**  Fair enough.  Let me tell you what I'm going to do and part of it -- I haven't gotten a good sense of what the purpose of these depositions is either.  I'm also unwilling to conclude that I ought to not have them based upon a reluctance or an inability to tell me why.  So here's what I'm going to do.

Mr. Manthey, you have ten hours.  You allocate it however you want.

87

MR. MANTHEY:  Okay.

THE COURT:  You can take two hours apiece, you can take one five hours, but you have ten hours total.  And I'll leave it to you all to work out the appearances and whatever it is that you decide that you want to do with those folks.  All right?

MR. MANTHEY:  Thank you, your Honor.

THE COURT:  Okay.  What else?

MR. LEBLANC:  I think those are my only issues, your Honor.

THE COURT:  All right, thank you.

MR. LEBLANC:  Unless somebody tells me otherwise.

THE COURT:  Anyone else?

All right.

MR. MEYER:  I think we have, your Honor, two additional items on the agenda today.  I anticipate they should move more quickly than the ones we've had so far.

The first, your Honor, is a motion seeking approval of a stipulation to provide adequate protection for Prosperity Bank.  Your Honor, Mr. Rothberg filed an objection to this pleading.  We've been in discussions with the Equity Committee.  They would like to adjourn our motion further.  Prosperity, as of the time before this hearing, was objecting to that.  We do not intend to go forward with this motion today, your Honor, and I'll cede the podium to Prosperity's counsel to the extent

88

that they're still objecting to that position.

THE COURT: All right. Thank you.

MR. SWONKE: Good afternoon, your Honor. Adam Swonke for Prosperity Bank. S-w-o-n-k-e.

The stip -- the agreed stipulation that was filed was the result of a lift stay motion -- negotiations resulting from a lift stay motion that was filed back in June.

THE COURT: Okay.

MR. SWONKE: As the other agreed party to the Order that was submitted, we'd like to go forward with the hearing today.

THE COURT: All right. And did you file your witness and exhibit list?

MR. SWONKE: I'm sorry?

THE COURT: Did you file your witness and exhibit list?

MR. SWONKE: I did not, your Honor.

THE COURT: It's going to be awfully difficult for you to proceed ahead without any witnesses or exhibits, isn't it?

MR. SWONKE: I'm not sure that I need any -- it was agreed until -- well, it's still agreed.

THE COURT: You've got to prove it up. Just because something's agreed doesn't mean that I just sign it. I have an objection, so you've got a burden, correct? And how do we meet

89

our burden?

**MR. SWONKE:** Well, the objection isn't to the position Prosperity has taken. The objection is to, I believe, a position that the Debtors are taking.

**THE COURT:** Okay. So you'd like to proceed?

**MR. SWONKE:** We're just looking for adequate protection payments and your signature on the Order that was submitted at Docket Number 917.

**THE COURT:** Okay. Is that your case?

**MR. SWONKE:** I suppose so.

**THE COURT:** The Order is denied.

**MR. SWONKE:** Yes, sir.

**THE COURT:** A really bad decision. I mean you just took something that you could kick down the road and now you have a definitive ruling. The request has been denied. There will be no adequate protection.

That was a really bad decision. You've got to learn to read the room. I mean there isn't -- you could see that one coming a mile away.

All right, what's next?

**MR. SWONKE:** May I be excused?

**THE COURT:** Yes, sir.

**MR. MEYER:** Your Honor, one more item on the agenda and I'll turn the podium to my colleague, Jessica Pete, to cover the contract rejection motion.

90

THE COURT:   Thank you.

MS. PETE:   Good afternoon, your Honor.

THE COURT:   Good afternoon.

MS. PETE:   Jessica Pete for the Debtors.

THE COURT:   Will that not bend down any further?

MS. PETE:   I wasn't going to try it again.

THE COURT:   All right.

MS. PETE:   I thought I'd just speak up.

Thank you, Mr. Anker.

All right (indiscernible)

(Laughter)

THE COURT:   He didn't get it, either.

MS. PETE:   We filed a motion to reject a couple of operational contracts on July 26th.  The objection deadline was August 16th.  We received no formal objections filed on the docket.  We did receive an informal response from Archrock's counsel.  For that reason, we agreed to some modified language that just clarifies which of their contracts are not being rejected pursuant to this Order.

THE COURT:   All right.

MS. PETE:   We have no issue with that.  They've agreed to the Order that we submitted and filed yesterday at Docket Number 1091.  And --

THE COURT:   So that's got the additional language in it?

91

MS. PETE:  Yes, your Honor, it does.  And I believe we uploaded to the Court a redline as well that just shows -- it's Paragraph 4, the part -- ah, we did not upload a redline, but we do have hard copies if you are interested.

THE COURT:  You're saying it's all in Paragraph 4?

MS. PETE:  Correct.  Where it says "For the avoidance of doubt, we do not reject…," yes.

THE COURT:  All right.  And Archrock has reviewed and approved --

MS. PETE:  They have.

THE COURT:  -- the exceptions?  All right.

Anyone else wish to be heard?

**(No audible response)**

All right.  Based on those representations, I will grant the motion.  I have signed the Order that was uploaded at Docket Number 1091.  It's been signed, it's on its way to docketing.

MS. PETE:  Thanks very much, your Honor.

THE COURT:  Thank you.

Anything else?

MR. MEYER:  I don't believe so, your Honor.  Thank you for your patience today --

THE COURT:  All right.

MR. MEYER:  -- and I do not believe we have anything else for today.

92

THE COURT:  Anything else I can do to help the process.  All right.  Safe travels home, everybody.  We'll be adjourned.

     (Counsel thank the Court)

          THE MARSHAL:  All rise.

     (This proceeding was adjourned at 1:41 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                          August 25, 2016_

TONI HUDSON, TRANSCRIBER